**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

*In the Matter of the Arbitration Between:*

| | | |
|---|---|---|
| **GOLDMAN SACHS BANK USA,** | § | |
| | § | |
| | § | |
| *Petitioner*, | § | |
| | § | |
| **v.** | § | |
| | § | **Case No. 3:24-CV-2021** |
| **ROBERT W. CARTER** | § | |
| **and TODD W. CARTER,** | § | |
| | § | |
| | § | |
| *Respondents*. | § | |
| | § | |

**APPENDIX IN SUPPORT OF PETITIONER GOLDMAN SACHS BANK USA'S
APPLICATION FOR AN ORDER CONFIRMING AN ARBITRATION AWARD**

Petitioner Goldman Sachs Bank USA submits this appendix in support of its Application

for an Order Confirming an Arbitration Award against Respondents Robert W. Carter and Todd

W. Carter.  The appendix contains the following exhibits:

| EXHIBIT | DESCRIPTION | PAGES |
|---|---|---|
| **A** | Declaration of Jordan W. Leu | 4–6 |
| A-1 | Loan Agreement among Goldman Sachs Bank USA, as Lender, Robert W. Carter, as Borrower, Panda Power Generation Infrastructure Fund, LLC, as Guarantor and Panda Power Fund II GP, L.P., as Guarantor (Arbitration Joint Exhibit J-1) | 7–104 |
| A-2 | Loan Agreement among Goldman Sachs Bank USA, as Lender, Todd W. Carter, as Borrower, Panda Power Generation Infrastructure Fund, LLC, as Guarantor and Panda Power Fund II GP, L.P., as Guarantor (Arbitration Joint Exhibit J-2) | 105–200 |
| A-3 | Guaranty and Joinder Agreement by Robert W. Carter for the Benefit of Goldman Sachs Bank USA (Arbitration Joint Exhibit J-12) | 201–209 |

| A-4 | April 26, 2022 letter from Seana Rolon (AAA) to Arbitration Participants | 210–211 |
| A-5 | Procedural Order No. 3, *Goldman Sachs Bank USA v. Robert W. Carter; Todd Carter*, AAA Case Number: 01-21-0017-0809 (June 2, 2022) | 212–236 |
| A-6 | Final Award, *Goldman Sachs Bank USA v. Robert W. Carter; Todd Carter*, AAA Case Number: 01-21-0017-0809 (August 29, 2023) | 237–285 |

Dated:  August 8, 2024

Respectfully submitted,

*/s/ Jordan W. Leu*
**VINSON & ELKINS LLP**

Matthew W. Moran (State Bar No. 24002642)
Jordan W. Leu  (State Bar No. 24070139)
2001 Ross Avenue, Suite 3900
Dallas, Texas  75201-2975
Telephone: (214) 220-7700
Facsimile: (214) 999-7716
mmoran@velaw.com
jleu@velaw.com

*Attorneys for Petitioner Goldman Sachs Bank USA*

## CERTIFICATE OF SERVICE

I certify that on August 8, 2024, I sent a true and correct copy of the foregoing Appendix in Support of Application for an Order Confirming an Arbitration Award by email and messenger to the Respondents' counsel as follows:

Thomas C. Moore
**LAW OFFICES OF THOMAS C MOORE PC**
63 White Plains Road
Bronxville, NY 10708
Telephone: (914) 255-0108
Email: thomascmoorelaw@gmail.com

*Arbitration Counsel for Respondents*

Stephen Campbell
**ATTORNEY**
8717 Middle Downs Dr.
Dallas, TX 75243
Telephone: (214) 766-2879
Email: stevedc124@gmail.com

*Counsel for Respondents*

*/s/ Jordan W. Leu*
Jordan W. Leu

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

*In the Matter of the Arbitration Between:*

| | | |
|---|---|---|
| **GOLDMAN SACHS BANK USA,** | § | |
| | § | |
| | § | |
| *Petitioner*, | § | |
| | § | |
| **v.** | § | |
| | § | **Case No. _____** |
| **ROBERT W. CARTER** | § | |
| **and TODD W. CARTER,** | § | |
| | § | |
| | § | |
| *Respondents*. | § | |
| | § | |

### DECLARATION OF JORDAN W. LEU

1.      My name is Jordan W. Leu.  I am over the age of eighteen and fully competent to make this declaration.  I have never been convicted of a felony or a crime involving moral turpitude.  I have personal knowledge of the facts stated in this declaration.

2.      I am a licensed attorney in the State of Texas and am one of the attorneys with Vinson & Elkins LLP representing Goldman Sachs Bank USA both in the above-captioned case and in the underlying arbitration proceeding (the "**Arbitration**").  In this role, I am familiar with the documents produced and served in the Arbitration.  I also received and am familiar with the correspondence from, and orders issued by, the American Arbitration Association and the Arbitration Tribunal in the Arbitration.  I attended the January 5 through 6, 2023 hearing in the Arbitration, and am familiar with the transcript and exhibits from such hearing.

3.      Attached as **Exhibit A-1** to this declaration is a true and correct copy of the document that was admitted as evidence in the Arbitration as Joint Exhibit J-1:  a Loan Agreement among Goldman Sachs Bank USA, as Lender, Robert W. Carter, as Borrower, Panda Power

1

**Exhibit A**    **4**

Generation Infrastructure Fund, LLC, as Guarantor, and Panda Power Fund II GP, L.P., as Guarantor, dated November 13, 2014.

4.       Attached as **Exhibit A-2** to this declaration is a true and correct copy of the document that was admitted as evidence in the Arbitration as Joint Exhibit J-2:  a Loan Agreement among Goldman Sachs Bank USA, as Lender, Todd W. Carter, as Borrower, Panda Power Generation Infrastructure Fund, LLC, as Guarantor, and Panda Power Fund II GP, L.P., as Guarantor, dated November 13, 2014.

5.       Attached as **Exhibit A-3** to this declaration is a true and correct copy of the document that was admitted as evidence as in the Arbitration as Joint Exhibit J-12:  a Guaranty and Joinder Agreement by Robert W. Carter for the benefit of Goldman Sachs Bank USA, dated July 7, 2017.

6.       Attached as **Exhibit A-4** to this declaration is a true and correct copy of a letter from Seana Rolon, the American Arbitration Association Case Manager, to Christopher Duffy and Thomas C. Moore, with copy to other counsel of record in the Arbitration, dated April 26, 2022.

7.       Attached as **Exhibit A-5** to this declaration is a true and correct copy of Procedural Order No. 3, issued by the Tribunal in the Arbitration on or about June 2, 2022.

8.       Attached as **Exhibit A-6** to this declaration is a true and correct copy of the Final Award, dated August 29, 2023, which the American Arbitration Association transmitted to the Arbitration parties by email on August 30, 2023.

9.    Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED in Dallas County, State of Texas, on the 7th day of August, 2024.

JORDAN W. LEU

**EXECUTION COPY**



# LOAN AGREEMENT

among

GOLDMAN SACHS BANK USA,
as Lender,

ROBERT W. CARTER,
as Borrower,

PANDA POWER GENERATION INFRASTRUCTURE FUND, LLC,
as Guarantor

and

PANDA POWER FUND II GP, L.P.,
as Guarantor

November 13, 2014

711870426 14466044

Exhibit A-1

**7**

## LOAN AGREEMENT

This Loan Agreement (this "**Agreement**"), is among GOLDMAN SACHS BANK USA (together with its successors and permitted assigns, the "**Lender**"), Robert W. Carter (the "**Borrower**"), PANDA POWER GENERATION INFRASTRUCTURE FUND, LLC, a Delaware limited liability company (the "**Advisor**"), and PANDA POWER FUND II GP, L.P., a Delaware limited partnership (the "**General Partner**" and together with the Advisor, the "**Guarantors**"), and is dated as of November 13, 2014 (the "**Effective Date**").

ARTICLE I

DEFINITIONS

As used in this Agreement:

"**Advisor**" has the meaning given to that term in the Preamble of this Agreement.

"**Advisory Agreement**" means (a) the Amended and Restated Advisory Agreement dated as of November 21, 2013 between Panda Fund II A and the Advisor, (b) the Amended and Restated Advisory Agreement dated as of November 21, 2013 between Panda Fund II B and the Advisor, (c) the Advisory Agreement dated as of April 30, 2010 between Panda Power Generation Infrastructure Fund A, L.P. and the Advisor, (d) the Advisory Agreement dated as of April 30, 2010 between Panda Power Generation Infrastructure Fund B, L.P. and the Advisor, (e) the Advisory Agreement dated as of May 12, 2011 between Panda Power Generation Infrastructure Fund B (AIV), L.P. and the Advisor, and (f) any other advisory, management or similar agreement entered into between any other private investment or similar fund or entity and by the Advisor, in each case as amended, restated, supplemented or otherwise modified from time to time in accordance with this Agreement.

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person.

"**Affiliate Transaction**" has the meaning given to that term in Section 2.10 of this Agreement.

"**Agreement**" has the meaning given to that term in the Preamble of this Agreement, as amended, restated, supplemented or otherwise modified from time to time.

"**Applicable Margin**" means a rate equal to 2.50% per annum.

"**Appraised Value**" means, as of any date, the value of the GP's Limited Partnership Interest in each Fund as determined based on the most recent valuation report(s) prepared by Marshall & Stevens and delivered to the Lender pursuant to this Agreement.

2

CONFIDENTIAL
GSBANK0002118

"**Bank Official**" means an executive officer, director, or principal shareholder of the Lender or any Company of which the Lender is a subsidiary or any other subsidiary of such Company.

"**Base Rate**" means the rate of interest quoted in the print edition of The Wall Street Journal, Money Rates Section as the U.S. Prime Rate, as in effect from time to time.  The Base Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer.  The Lender may make commercial loans or other loans at rates of interest at, above or below the Base Rate.

"**Base Rate Loan**" means a Loan which bears interest at a rate determined by reference to the Base Rate.

"**Borrower**" has the meaning given to that term in the Preamble of this Agreement.

"**Business Day**" means, with respect to any borrowing or payment, a day other than Saturday or Sunday on which banks are open for business in New York, New York.

"**Collateral**" has the meaning given to such term in the applicable Security Documents.

"**Company**" means any corporation, partnership, trust (business or otherwise), association, joint venture, pool syndicate, sole proprietorship, unincorporated organization, or any other form of business entity not specifically listed, provided that "Company" does not include: (a) an insured depository institution (as defined in 12 U.S.C. 1813); or (b) a corporation the majority of the shares of which are owned by the United States or by any State.

"**Constituent Documents**" means the certificate of incorporation and by-laws of a corporation; the certificate of limited partnership and agreement of limited partnership of a limited partnership; the partnership agreement of a general partnership; the certificate of formation and operating or comparable agreement of a limited liability company; and the comparable instruments for any other entity, including, with respect to a trust, any agreement or instrument creating such trust, including: (a) with respect to Panda Fund II A, the Second Amended and Restated Limited Partnership Agreement of Panda Fund II A dated as of November 21, 2013 among the General Partner and the various limited partners party thereto, as amended by Amendment No. 1 thereto, dated as of September 29, 2014, (b) with respect to Panda Fund II B, the Second Amended and Restated Limited Partnership Agreement of Panda Fund II B dated as of November 21, 2013 among the General Partner and the various limited partners party thereto, as amended by Amendment No. 1 thereto, dated as of September 29, 2014, (c) with respect to the General Partner, the Amended and Restated Limited Partnership Agreement dated as of February 21, 2014 and  effective as of June 28, 2013 among Panda Power Fund II GP, LLC and the limited partners party thereto, (d) with respect to the Advisor, the Amended and Restated Limited Liability Company Agreement of the Advisor dated as of April 30, 2010, among the members party thereto, (e) with respect to Panda Power Generation Infrastructure Fund A, L.P., the Amended and Restated Limited Partnership Agreement dated as of April 30, 2010, as amended from time to time, and (f) with respect to Panda Power Generation

3

**9**

CONFIDENTIAL                                                                                  GSBANK0002119

Infrastructure Fund B (AIV), L.P., the Amended and Restated Limited Partnership Agreement dated as of April 30, 2010, as amended from time to time.

"**Credit Period**" means the period from and including the Effective Date to but excluding the Demand Date.

"**Default Interest**" has the meaning given to that term in Section 2.3 of this Agreement.

"**Demand Date**" means the earlier to occur of (i) the date the Obligations become due and payable pursuant to Section 6.1 hereof and (ii) the date on which the Lender demands payment hereunder and/or declares the Obligations to be immediately due and payable in full in cash, in each case which the Lender shall have the ability to do in its sole and absolute discretion; *provided* that subject to the provisions of Section 6.1, the Borrower shall have 90 days from the date the Lender demands payment hereunder to repay the Obligations so long as no Trigger Event exists or arises during such 90 day period (if any Trigger Event occurs, the Obligations shall become immediately due and payable at the election of the Lender in its sole discretion and such 90 day period shall not apply).

"**Deposit Account**" has the meaning given to that term in the applicable Deposit Account Control Agreement.

"**Deposit Account Control Agreement**" means the Blocked Account Control Agreement between the Advisor, the Depository and the Lender, as amended, restated, supplemented or otherwise modified from time to time.

"**Depository**" means JPMorgan Chase Bank, N.A.

"**Disposition**" has the meaning ascribed thereto in each Fund's Constituent Documents.

"**Disposition Proceeds**" has the meaning ascribed thereto in each Fund's Constituent Documents.

"**Dissolution Sale**" has the meaning ascribed thereto in each Fund's Constituent Documents.

"**Effective Date**" has the meaning given to that term in the Preamble of this Agreement.

"**Excess Cash Flow**" means, for each fiscal year of the Advisor (commencing with the fiscal year ended December 31, 2015) an amount equal to (a) all income of the Advisor, including amounts received by the Advisor under or with respect to any Advisory Agreement or the Constituent Documents of any Fund, including without limitation, any Management Fees, during such fiscal year, *minus* (b) tax distributions paid or payable by the Advisor in an amount not to exceed 40% of the Advisor's net income for any fiscal year *minus* (c) amounts applied towards interest expense payable with respect to this Agreement or any Other Loan Agreement during such fiscal year *minus* (d) the operating expenses incurred and paid by the Advisor in the ordinary course of business during any such fiscal year (but excluding fees and expenses related

4

**10**

CONFIDENTIAL

GSBANK0002120

to compensation (including salary and incentive compensation) paid or payable to any borrower under any Other Loan Agreement or the Borrower other than salary and bonuses that are paid in the ordinary course of business consistent with past methodologies used for calculating such compensation) *minus* (e) fees and expenses incurred under Section 3.2 of this Agreement (and the Other Loan Agreements) and any other fees and expenses in relation to this Agreement (and the Other Loan Agreements) incurred during such fiscal year.

"**Excluded Taxes**" means with respect to a Lender (i) taxes imposed on or measure by its overall net income (however denominated and including U.S. federal backup withholding taxes), franchise taxes and branch profits taxes, in each case, (1) imposed by the United States or the jurisdiction in which (a) the Lender is organized or (b) the lending office of the Lender is located, (2) arising from the Lender's present or former connection with the jurisdiction imposing such tax, other than a connection resulting solely from executing, delivering, becoming a party to, performing its obligations under, receiving payments under, receiving or perfecting a security interest under, selling or assigning an interest in, engaging in any other transaction pursuant to or enforcing any Loan Document and (ii) any penalties or interest imposed on any of the foregoing amounts in clause (i).

"**Facility Amount**" means $13,250,000.

"**Funds**" means each of (a) Panda Fund II A, (b) Panda Fund II B, (c) Panda Power Generation Infrastructure Fund A, L.P., (d) Panda Power Generation Infrastructure Fund B, L.P., (e) Panda Power Generation Infrastructure Fund B (AIV), L.P. and (f) any other private investment fund or collective investment vehicle, or similar fund or entity, including any parallel fund thereof, that is sponsored or managed directly or indirectly by the Advisor or its Affiliates or with respect to which the General Partner acts as the general partner.

"**General Partner**" has the meaning given to that term in the Preamble of this Agreement.

"**Goldman Affiliated Group**" means the Lender and GS&Co., together with their present and future Affiliates.

"**Governmental Authority**" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Gross-Up Tax**" means any tax other than Excluded Taxes.

"**GP's Limited Partnership Interest**" means the economic interests held by the Borrower in the General Partner.

711870426 14466044

CONFIDENTIAL                                                                                          GSBANK0002121

"**GS&Co.**" means Goldman, Sachs & Co., a broker-dealer registered with the United States Securities and Exchange Commission, acting in its capacity as Securities Intermediary and custodian with respect to the Securities Account.

"**Guarantors**" has the meaning given to that term in the Preamble of this Agreement.

"**Guaranty**" has the meaning given to that term in Section 8.1 of this Agreement.

"**Indemnified Liabilities**" has the meaning given to that term in Section 7.10 of this Agreement.

"**Indemnified Person**" has the meaning given to that term in Section 7.10 of this Agreement.

"**Interest Payment Date**" means, with respect to any Loan (whether a Base Rate Loan or a LIBOR Loan), the tenth day of each month commencing on the tenth day of the month immediately following the month in which the Effective Date occurs.

"**Investment**" means, as to any Person, any acquisition or investment by such Person in any other Person, in the form of (a) the purchase or other acquisition of equity interests or debt or other securities of another Person, (b) a loan or advance to any other Person (other than for travel advances and other similar cash advances made to employees in the ordinary course of business) or (c) the purchase or other acquisition of all or substantially all of the property and assets or business of another Person or assets constituting a division of such other Person.

"**Lender**" has the meaning given to that term in the Preamble of this Agreement.

"**Lending Office**" means the Lender's office at 200 West Street, New York, NY 10282-2198, or such other office as Lender may designate in writing from time to time to Borrower.

"**LIBOR**" means, with respect to any LIBOR Reset Period, the rate of interest at which deposits in U.S. dollars are offered to major banks in the London interbank market for a thirty (30) day period on the day that is two (2) LIBOR Business Days prior to the commencement of such LIBOR Reset Period, based on information presented by any interest rate reporting service of recognized standing selected by the Lender, or if Lender determines that no interest rate reporting service has presented such information, the rate of interest at which deposits in Dollars are offered to major banks in the London interbank market for a thirty (30) day period on the day that is two (2) LIBOR Business Days prior to the commencement of such LIBOR Reset Period by any bank reasonably selected by Lender. Under the terms of this Agreement, the applicable "LIBOR" rate is used by the Lender as a reference rate.  The use of thirty (30) day LIBOR as a reference rate does not mean the Borrower will actually pay interest on any Loans pursuant to a thirty (30) day contract or any other interest rate contract.  Instead, the effective interest rate under this Agreement will adjust at the beginning of each LIBOR Reset Period as described further in Section 2.3.

6

CONFIDENTIAL

"**LIBOR Business Day**" means a Business Day on which commercial banks are open for dealings in U.S. dollar deposits in the London interbank market.

"**LIBOR Loan**" means any Loan which bears interest at a rate determined by reference to LIBOR.

"**LIBOR Reset Period**" means (a) as to the initial LIBOR Loan and any other LIBOR Loan made during the same month as the initial LIBOR Loan, the period commencing on the date the first LIBOR Loan is made under this Agreement and ending on the last calendar day of the month during which such initial LIBOR Loan is made, and (b) as to any LIBOR Loan made or continued after such month, the period commencing on the first calendar day of the month during which such subsequent LIBOR Loan is made or, with respect to a LIBOR Loan that is continued, the period commencing on the first calendar day of the month immediately following the end of the prior LIBOR Reset Period, and ending on the earlier of (i) the last calendar day of the month during which such LIBOR Loan is made or most recently continued and (ii) the Demand Date unless the demand for payment was made in accordance with Section 6.1 and the 90 day period referenced therein has not lapsed or terminated, if applicable (in which case, the earliest to occur of the lapse or termination of such 90 day period).

"**Loan Documents**" means this Agreement, the Note, each of the agreements listed on Schedule I hereto (if any), any other Security Documents and each certificate, agreement or document made or entered into by the Borrower with or in favor of the Lender in connection with or pursuant to any of the foregoing.

"**Loan Party**" means the Borrower and any Guarantor under this Agreement or any other Loan Document.

"**Loans**" has the meaning given to that term in Section 2.1 of this Agreement.

"**Management Fees**" means all management fees under the Advisory Agreements.

"**Maintenance Value**" means, as of each determination date, the ratio of the aggregate outstanding principal amount of the Obligations as of such date to the Appraised Value of the GP's Limited Partnership Interest owned by the Borrower.

"**Material Adverse Effect**" means a material adverse effect (a) on the business or affairs, financial condition, obligation, operations, performance or properties of the Guarantors, taken as a whole, or the Borrower, (b) on the Guarantors' ability, taken as a whole, or the Borrower's ability to enter into and perform its obligations under this Agreement or any of the transactions contemplated by this Agreement, (c) on the validity or enforceability of any of the Loan Documents against any Loan Party, or (d) on the Lender's rights and remedies under any of the Loan Documents or on the Lender's first priority perfected security interest in the Collateral.

"**Maximum Facility Amount**" means, as of any date of determination, an amount equal to the lesser of (a) the Facility Amount and (b) the Facility Amount minus the amount of any prepayments made or required to be made pursuant to Section 2.5 or Section 2.6 as of such date.

7

711870426 14466044

**13**

"**Net Disposition Proceeds**" means, with respect to any Disposition or Dissolution Sale, the result of (a) the amount of Disposition Proceeds or other amounts received by any Fund on account of any Disposition or Dissolution Sale, as applicable, *minus* (b) tax distributions paid or payable by the Borrower (at a rate not to exceed 25% of the related gain) with respect to such Disposition of Dissolution Sale.

"**Note**" has the meaning given to that term in Section 2.1 of this Agreement.

"**Notice of Borrowing**" has the meaning given to that term in Section 2.2 of this Agreement.

"**Obligations**" means all unpaid principal of, and accrued and unpaid interest due on, the Note and all other obligations, interest, fees, charges and expenses of the Borrower to the Lender arising under or in connection with the Loan Documents.

"**OFAC**" has the meaning given to that term in Section 4.7 of this Agreement.

"**Oral Request**" has the meaning given to that term in Section 2.2 of this Agreement.

"**Other Loan Agreements**" means, collectively, each of the Loan Agreement among Todd W. Carter, the Guarantors, and the Lender, dated as of the date hereof, the Loan Agreement among Robert K. Simmons, the Guarantors and the Lender, dated as of the date hereof, the Loan Agreement among William C. Nordlund, the Guarantors, and the Lender, dated as of the date hereof, and the Loan Agreement among Ralph T. Killian, The Ralph T. Killian Special Community Property Subtrust of the Killian Living Trust, Ralph T. Killian as trustee of The Ralph T. Killian Special Community Property Subtrust of the Killian Living Trust, the Guarantors and the Lender, dated as of the date hereof.

"**Panda Fund II A**" means Panda Power Fund II A, L.P., a Delaware limited partnership.

"**Panda Fund II B**" means Panda Power Fund II B, L.P., a Delaware limited partnership.

"**Participant**" has the meaning given to that term in Section 7.11 of this Agreement.

"**Payment Default**" means a nonpayment of any amount of principal or accrued and unpaid interest or any other amount owed hereunder or under any other Loan Document on the date any such amount is due, including when due upon demand by the Lender.

"**Permitted Liens**" means:

(a)      Any Liens existing on the Effective Date and disclosed in personal financial statements of the Borrower or arising under this Agreement or the other Loan Documents;

(b)      Liens for taxes, either (x) being contested in good faith by appropriate proceedings, and for a Guarantor, with respect to which reserves have been

8

established in accordance with generally accepted accounting procedures or (y) not yet due and payable; and

(c)    Liens incurred in connection with the extension, renewal or refinancing of the indebtedness secured by Liens of the type described in clause (a) above, *provided* that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the indebtedness being extended, renewed or refinanced does not increase.

"**Person**" means any corporation, natural person, firm, joint venture, partnership, trust, unincorporated organization, enterprise, government or any department or agency of any government.

"**Regulation U**" means Federal Reserve Board Regulation U, 12 CFR Part 221, as amended from time to time, and any successor regulation or statute.

"**Returned Payment**" has the meaning given to that term in Section 7.14 of this Agreement.

"**Securities**" means stocks, bonds, securities entitlements, financial assets or other securities or investment property (as such terms are defined in the UCC).

"**Securities Account**" has the meaning given to such term in the Borrower's Security Document.

"**Securities Intermediary**" has the meaning given to such term in the applicable Security Document.

"**Security Documents**" means, collectively, each of the agreements listed on Schedule I hereto and any other agreements, instruments, documents, financing statements, notices of assignment of accounts, schedules of accounts assigned, mortgages and other written matter necessary or reasonably requested by the Lender to perfect, and maintain perfected, the Lender's security interest in the Collateral.

"**Solvent**" means, when used with respect to any Person, that at the time of determination: (a) the fair value of the assets of such Person, at a fair valuation, will exceed its debts and liabilities, subordinated, contingent or otherwise, (b) the present fair saleable value of the property of such Person will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured, and (c) such Person will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured.  For the purposes of determining whether a Person is Solvent, the amount of any contingent liability shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that reasonably can be expected to become an actual or matured liability.

9

711870426 14466044

CONFIDENTIAL                                                                                          GSBANK0002125

"**Subscription Facility**" means the Revolving Credit Agreement dated as of November 10, 2014 among Panda Fund II A, Panda Fund II B, the General Partner, the affiliates thereof from time to time party thereto, and Goldman Sachs Bank USA, as lender, as amended, restated, amended and restated or otherwise modified from time to time.

"**Trigger Event**" has the meaning given to that term in Section 6.1 of this Agreement.

"**Trust**" means the Ralph T. Killian Special Community Property Subtrust of the Killian Living Trust.

"**UCC**" means the Uniform Commercial Code as in effect in the State of New York; provided, in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, the Lender's security interest in the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions of this Agreement and the other Loan Documents relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions; provided further, that to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles or Divisions of the UCC, the definition of such term contained in Article or Division 9 shall govern.

"**USA Patriot Act**" has the meaning given to that term in Section 4.7 of this Agreement.

All undefined terms contained in this Agreement shall, unless the context indicates otherwise, have the meanings provided for by the UCC to the extent the same are used or defined therein.  The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole, including the Exhibits and Schedules hereto, as the same may from time to time be amended, modified or supplemented, and not to any particular section, subsection or clause contained in this Agreement.

Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter.

Unless the context requires otherwise, any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein).

ARTICLE II

THE LOANS

2.1    Loans.  (a)  Following a request pursuant to Section 2.2 below, the Lender may, in its sole discretion, agree from time to time, during the Credit Period, to extend credit (each such

10

711870426 14466044

CONFIDENTIAL                                                                                      GSBANK0002126

extension of credit, a "**Loan**" and collectively, the "**Loans**") to the Borrower in an aggregate principal amount not to exceed the Maximum Facility Amount at any time. Borrower acknowledges and agrees that no provision of this Agreement, any other Loan Document or any other agreement securing or relating to this Loan Agreement or the Loans hereunder shall be deemed to impose on Lender any obligation to extend credit to the Borrower or to affect Lender's unrestricted right to demand payment in full of the Loans at any time. Once repaid, a Loan may not be reborrowed.

(b)     The obligation of the Borrower to repay the outstanding principal amount of the Loans, and any and all interest which accrues thereon, shall be evidenced by a promissory note executed and delivered by the Borrower in the form of Exhibit A hereto (the "**Note**").

(c)     Without limiting Section 2.1(a), the Borrower may not request or obtain any Loan hereunder if, after giving effect to such Loan, the Maintenance Value would exceed 25%.

2.2     <u>Requests for Borrowing</u>.   To request a Loan, the Lender shall have received, no later than noon (New York City time) at least two (2) Business Days prior to the proposed borrowing date (or such shorter time as the Lender may agree in its sole discretion), a written notice of borrowing in the form of Exhibit B attached hereto signed by the Borrower (a "**Notice of Borrowing**"), which Notice of Borrowing shall state the amount of such proposed borrowing (which shall be in an aggregate minimum principal amount of the greater of (i) $100,000 or (ii) the Maximum Facility Amount) and the date of such proposed borrowing. After the initial borrowing, the Lender may, in its sole discretion, act upon an oral request from the Borrower (an "**Oral Request**") for any subsequent borrowing permitted hereunder. After the delivery of any Oral Request, at the request of the Lender, the Borrower shall deliver to the Lender for its records a written Notice of Borrowing corresponding to such Oral Request. In submitting an Oral Request, the Borrower accepts all risks of Oral Requests and waives any claim that it may have against the Lender arising from any such Oral Request except those claim(s) arising from the Lender's gross negligence or willful misconduct.  Each submission by the Borrower of a Notice of Borrowing or an Oral Request and each acceptance by the Borrower of the proceeds of each Loan requested therein shall be deemed to constitute a representation and warranty by the Borrower that (i) both before and after giving effect to such Loans the representations and warranties of the Borrower set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects (except to the extent stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct as of such earlier date) and (ii) the conditions precedent set forth in this Section 2.2 will be satisfied at the time of the making of such Loan.

2.3     <u>Interest</u>.

(a)     Except as otherwise expressly set forth herein, all Loans hereunder shall be LIBOR Loans.  Interest on LIBOR Loans shall accrue at a per annum rate equal to the sum of (i) LIBOR for the then-current LIBOR Reset Period plus (ii) the Applicable Margin.

711870426 14466044

CONFIDENTIAL     GSBANK0002127

(b)    To the extent any LIBOR Loan is converted to a Base Rate Loan or any Base Rate Loan is made to the Borrower, in each case, whether pursuant to Sections 2.3(e) or 2.7 or by mutual agreement between the Lender and the Borrower, interest on such Base Rate Loans shall accrue at a per annum rate equal to (i) the Base Rate plus (ii) the Applicable Margin.

(c)    Notwithstanding the foregoing, during any period in which a Payment Default shall exist, the principal balance of all Obligations shall bear interest at a rate that is four percent (4%) per annum in excess of the interest rate otherwise applicable to such Obligations from time to time until all delinquent payments due hereunder (including any late payments, costs, expenses and any amounts accelerated) are paid to the Lender in full.  Any interest payable pursuant to the foregoing sentence ("**Default Interest**") which is not paid when due may be added to the outstanding principal sum of the Loans and itself bear interest accordingly to the extent permitted by applicable law.

(d)    Accrued interest on the Loans shall be payable in arrears on (i) each applicable Interest Payment Date and (ii) on the Demand Date unless the demand for payment was made in accordance with Section 6.1 and the 90 day period referenced therein has not lapsed or terminated, if applicable (in which case, the date of the earliest to occur of the lapse or termination of such 90 day period), *provided* that any time a Payment Default exists, all accrued interest on the Loans, including, without limitation, Default Interest, shall be payable on demand by the Lender.  The Borrower agrees that interest amounts payable hereunder which are not paid when due may be added to the outstanding principal sum of the Loans and itself bear interest accordingly to the extent permitted by applicable law.  Each determination made by the Lender pursuant to the provisions hereof shall be conclusive and binding on the Borrower in the absence of manifest error.  Provided no Payment Default exists at the end of a LIBOR Reset Period, each LIBOR Loan shall automatically continue as a LIBOR Loan for an additional LIBOR Reset Period.  Interest shall be calculated for actual days elapsed on the basis of a 360-day year.  Notwithstanding anything contained herein to the contrary, Lender shall never be entitled to receive, collect or apply as interest on the Loans any amount in excess of the maximum rate of interest permitted to be charged by applicable law.

(e)    If the Lender determines that for any reason adequate and reasonable means do not exist for determining LIBOR for any LIBOR Reset Period, the Lender will promptly so notify the Borrower.  Thereafter, LIBOR Loans hereunder shall be suspended until the Lender revokes such notice in writing and all LIBOR Loans, on the Interest Payment Date, shall automatically convert into Base Rate Loans.  Upon the revocation of such notice by the Lender, unless there then exists a Payment Default, all such Base Rate Loans shall automatically convert into LIBOR Loans on the Interest Payment Date following the revocation of such notice.

2.4    <u>Method of Payment</u>.  All payments hereunder for principal, interest and other amounts shall be made in lawful money of the United States of America and in immediately available funds to the Lending Office, or such other account as Lender may designate in writing from time to time to Borrower no later than noon (New York City time) on the date when due.  If any principal payment hereunder becomes due and payable on a day other than a Business Day,

12

711870426 14466044

CONFIDENTIAL                                                                          GSBANK0002128

such payment date shall be extended to the next succeeding Business Day, and interest thereon shall be payable at the then applicable rate during such extension.

2.5    Repayment of Loans; Mandatory Prepayments.  (a)   *Generally.* On the Demand Date the Borrower shall pay the outstanding principal balance of the Loans, together with all accrued and unpaid interest thereon and all other Obligations.

(b)    *On Demand.*  Notwithstanding any provision in this Agreement or any other Loan Document to the contrary, solely with respect to a deemed demand for payment hereunder arising as a result of the occurrence of any event described in Section 5.1(i)(y), the Borrower shall have 90 days from such deemed demand event to repay the Obligations subject to satisfaction of the conditions set forth in the second sentence of Section 6.1 and the Lender's right to declare a Payment Default during such time as set forth in such Section 6.1.

(c)    *Advisor Fee Excess Cash Flow Mandatory Prepayment.*  No later than January 30 of each calendar year (commencing in January of 2016) the Borrower shall, or shall cause the Advisor (and the Advisor agrees), to make a mandatory prepayment of the Loans to the Lender in an amount equal to the Borrower's pro rata share (based on his percentage membership interest of the Advisor) of the greater of (i) $3,000,000 and (ii) the amount of Excess Cash Flow for the immediately preceding fiscal year ended, which amount, in each case of the foregoing clauses (i) and (ii), if paid collectively by the Advisor with respect to the Obligations and the obligations under the Other Loan Agreements (or deducted directly by the Lender from the Advisor's Deposit Account, as the case may be) shall be proportionally credited by the Lender towards the Obligations under this Agreement and the Obligations (as such term is defined in the Other Loan Agreements).

(d)    *Disposition Proceeds Mandatory Prepayment.*   Promptly, and in any event within 3 Business Days of receipt by the Borrower or 10 Business Days of receipt by the General Partner of any Disposition Proceeds or other amounts on account of any Disposition or Dissolution Sale, the Borrower shall, or shall cause the General Partner (and the General Partner agrees), to make a mandatory prepayment of the Loans to the Lender in an amount equal to the Borrower's pro rata share (based on his relative GP's Limited Partnership Interest) of (x) if the Maintenance Value is equal to or less than 25% on the date of such Disposition (without giving effect to the application of any funds deposited pursuant to Section 5.16(a) during the immediately preceding 30 day period), 70% of the Net Disposition Proceeds attributable to his GP's Limited Partnership Interests (with the remaining 30% of the Net Disposition Proceeds eligible to be distributed to the Borrower if the Demand Date has not occurred, no Payment Default exists and no event described in Section 5.1 exists) and (y) if the Maintenance Value is greater than 25% on the date of such Disposition or the Demand Date has occurred, a Payment Default exists or any event described in Section 5.1 exists, 100% of the Net Disposition Proceeds attributable to the GP's Limited Partnership Interests.

2.6    Optional Prepayments.  The Borrower may, at its option, upon notice as provided below, prepay at any time, or from time to time, in whole or in part and without any penalty or

711870426 14466044

CONFIDENTIAL                                                                    GSBANK0002129

premium, other than as provided under Section 2.8, the Loans in an amount not less than $100,000 (or, if less, the entire then outstanding principal amount of the Loans).

The Borrower will give the Lender written notice of each optional prepayment under this Section 2.6 not less than two (2) Business Days prior to the proposed date of such prepayment (or such lesser time as the Lender may agree in its sole discretion).  Each such notice shall specify such requested prepayment date and the aggregate principal amount of the Loan to be prepaid on such date.   Once such notice is given, the payment amount specified in such notice shall be due and payable on the date specified, together with any other amounts then due, if any.

2.7    <u>Illegality</u>.  If the Lender determines that the introduction of any requirement of law, or any change in any requirement of law, or in the interpretation or administration of any requirement of law, has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for the Lender to make LIBOR Loans, then the Lender shall convert such loans to Base Rate Loans or if such option is not at such time then available, the Borrower shall, upon its receipt of notice of such fact and demand from the Lender, prepay in full such LIBOR Loans then outstanding, together with interest accrued thereon, either on the last day of the LIBOR Reset Period thereof, if the Lender may lawfully continue to maintain such LIBOR Loans to such day, or immediately (together with any amount payable pursuant to Section 2.8), if the Lender may not lawfully continue to maintain such LIBOR Loans.  Each Base Rate Loan advanced pursuant to the foregoing clause shall remain a Base Rate Loan until the Borrower receives notice to the contrary from the Lender.

2.8    <u>Funding Costs</u>.  Without limiting any other provisions contained herein, the Borrower shall reimburse the Lender and hold it harmless from any loss, increased costs or expense which the Lender may sustain or incur as a consequence of:

(a)    the failure by the Borrower to make on a timely basis any payment of principal of the Loans;

(b)    the prepayment or other payment (including after acceleration thereof) of all or part of any LIBOR Loan to the extent the Lender actually incurs any breakage costs associated with such prepayment or payment; or

(c)    the introduction of or any change in the interpretation of any law or regulation (other than in each case any introduction or change in interpretation relating to withholding taxes, which is governed by Section 2.9) or the compliance by the Lender with any guideline, regulation or request from any Governmental Authority (whether or not having the force of law), including, without limitation, the introduction of, change of, change by any Governmental Authority in the interpretation or administration of, or compliance by the Lender or corporation or other entity controlling the Lender with, any capital adequacy regulation, in each case, after the Effective Date.  Notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign

14

711870426 14466044

**20**

CONFIDENTIAL                                                                  GSBANK0002130

regulatory authorities shall in each case be deemed for purposes of this subsection 2.8 to be a change in law after the Effective Date, regardless of the date enacted, adopted or issued.

2.9    Taxes; Waiver of Borrower's Right of Setoff and Counterclaim.

(a)    All payments by the Borrower under this Agreement shall be made free and clear of any restrictions or conditions, without set off or counterclaim (any such setoff and/or counterclaim rights of Borrower being hereby expressly waived by Borrower, to the maximum extent permissible under the applicable law), and free and clear of, and without any deduction or withholding whether for or on account of any Gross-Up Tax.  If any such deduction or withholding is required by law to be made by the Borrower or any other Person (whether or not a party to, or on behalf of a party to this Agreement) from any sum paid or payable by, or received or receivable from, the Borrower, the Borrower shall pay in the same manner and at the same time such additional amounts as will result in the Lender's receiving and retaining (free from any liability other than Excluded Taxes) such net amount as would have been received by it had no such deduction or withholding been required to be made.

(b)    The Borrower shall indemnify each Lender, within 10 days after demand therefor, for the full amount of any Gross-Up Taxes (including Gross-Up Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by the Lender or required to be withheld or deducted from a payment to the Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Gross-Up Taxes were correctly or legally imposed or asserted by the relevant governmental authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by the Lender shall be conclusive absent manifest error.

(c)    As soon as practicable after any payment of any taxes by the Borrower to a governmental authority pursuant to this Section 2.9, the Borrower shall deliver to the Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Lender.

(d)    If the Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Gross-Up Tax, it shall pay to the Borrower an amount equal to such refund (but only to the extent of the amount of Gross-Up Taxes paid giving rise to such refund), net of all out-of-pocket expenses (including taxes) of the Lender and without interest (other than any interest paid by the relevant governmental authority with respect to such refund). The Borrower, upon the request of the Lender, shall repay to the Lender the amount paid over pursuant to this paragraph (d) (plus any penalties, interest or other charges imposed by the relevant governmental authority) in the event that the Lender is required to repay such refund to such governmental authority.  Notwithstanding anything to the contrary in this paragraph (c), in no event will the Lender be required to pay any amount to the Borrower pursuant to this paragraph (h) the payment of which would place the Lender in a less favorable net after-Tax position than the Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification

15

CONFIDENTIAL

GSBANK0002131

payments or additional amounts with respect to such Tax had never been paid.  This paragraph (d) shall not be construed to require the Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other person.

2.10    Purpose.  (a)  The Borrower shall use the proceeds of the Loans to (i) make capital contributions with respect to the Funds indirectly through the General Partner and (ii) repay indebtedness related to the funding of capital contributions for Panda Power Generation Infrastructure Fund A, L.P. and Panda Power Generation Infrastructure Fund B (AIV), L.P under the Loan and Security Agreement dated as of March 26, 2013 (as amended from time to time), by and among the Advisor and PPG Fund I, LLC, as borrowers and Comerica Bank, as lender.  The Borrower will not, directly or indirectly, use any part of such proceeds for the purpose of purchasing or carrying any margin stock within the meaning of Regulation U or to extend credit to any Person for the purpose of purchasing or carrying any such margin stock in contravention of Regulation U.  THE BORROWER MUST OBTAIN THE PRIOR APPROVAL OF THE LENDER IF THE INTENDED PURPOSE OF THE FACILITY IS DIFFERENT FROM THE PURPOSE DISCLOSED BY THE BORROWER IN THIS SECTION 2.10 OR IN ANY FEDERAL RESERVE FORM U-1 SUBMITTED BY THE BORROWER TO THE LENDER.

(b)     The Borrower will not use any part of the proceeds of the Loans for the benefit of, or transfer any part of the proceeds of the Loans to, any affiliate of the Lender (an "**Affiliate Transaction**") without the prior consent of the Lender which consent may be given or withheld in the Lender's sole discretion.  Borrower acknowledges and agrees that Lender may, in its sole discretion, refuse to fund a borrowing if the Lender determines that such borrowing would result in an Affiliate Transaction.

2.11    Application of Payments.  All payments received from or on behalf of any Loan Party with respect of the Obligations shall be applied thereto in the order and manner Lender determines in its sole discretion.

2.12    Loan Accounts.  In accordance with ordinary procedures and, solely for this purpose as an agent of the Borrower, the Lender shall record on its books and records the amount of each Loan made, the interest rate applicable, all payments of principal and interest thereon and the principal balance thereof from time to time outstanding.  Such record shall, absent demonstrable error, be conclusive evidence of the amount of the Loans made by the Lender to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder (and under the Note) to pay any amount owing with respect to the Loans or provide the basis for any claim against the Lender.

ARTICLE III

CONDITIONS PRECEDENT TO EFFECTIVENESS

3.1    Conditions Precedent to Effectiveness of this Agreement.  The effectiveness of this Agreement shall be subject to satisfaction of the following conditions precedent:

711870426 14466044

CONFIDENTIAL                                                                                     GSBANK0002132

(a)    The Borrower shall have furnished to the Lender, or caused to be furnished to the Lender (unless otherwise waived by the Lender in writing), the following, each in form and substance satisfactory to the Lender and its counsel, each dated as of the Effective Date (or such other date as shall be acceptable to the Lender) and duly executed (to the extent applicable) by each Loan Party that is a  party thereto:

(i)    this Agreement;

(ii)    the Note;

(iii)    each of the Security Documents including the Spousal Consent;

(iv)    a written Notice of Borrowing signed by the Borrower;

(v)    if the Loans are to be secured directly or indirectly by margin stock, the appropriate "Federal Reserve Form, Statement of Purpose for an Extension of Credit Secured by Margin Stock," completed in a manner satisfactory to the Lender;

(vi)    certified copies of UCC and other lien search reports dated a date near to the Effective Date, listing all effective financing statements and other lien filings that name any Loan Party (under their current names and any previous names) as debtors, together with (A) copies of such financing statements and other lien filings and (B) such UCC termination statements or amendments and other lien terminations as the Lender may request;

(vii)    certified copies of the Constituent Documents, incumbency and other certificates of the Guarantors and each Fund, in each case as the Lender may reasonably request relating to the organization, existence and good standing of such Persons, the authorization to enter into this Agreement, the Note and each Security Document, as applicable and the identity, authority and capacity of each responsible officer thereof authorized to act on behalf of such Persons;

(viii)    a consent to the pledge by the Borrower of the Collateral related to the Borrower's economic interests in the General Partner, signed by Panda Power Fund II GP, LLC;

(ix)    a copy of a state-issued form of identification for the Borrower in the state of the Borrower's primary residence;

(x)    good standing certificates with respect to the Guarantors;

(xi)    a payoff letter from Comerica Bank; and

(xii)    such other documents as the Lender or its counsel may reasonably request.

17

**23**

CONFIDENTIAL

GSBANK0002133

(b)      The Lender shall have received a customary opinion of counsel addressed to the Lender covering such matters relating to the transactions contemplated hereby as reasonably requested by the Lender and substantially in a form acceptable to the Lender.

(c)      The Lender shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

(d)      The Lender shall have received copies of each Loan Party's financial statements and other financial information reasonably requested by the Lender.

3.2      Fees and Expenses.  On the Effective Date, the Borrower and/or the Guarantors shall have paid all fees and expenses incurred by or payable to the Lender (including, without limitation, an upfront fee of 50 basis points (0.50%) of the Facility Amount and reasonable fees and expenses of counsel for the Lender), arising in connection with the negotiation, preparation and execution of this Agreement and the other Loan Documents and all other instruments and documents to be delivered hereunder or thereunder or arising in connection with the transactions contemplated hereunder or thereunder, and the Borrower hereby authorizes the Lender to deduct all such amounts from the aggregate proceeds of the Loans.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES

The Borrower and each Guarantor represents and warrants to the Lender on the date hereof and on the date each Loan is advanced that:

4.1      Name, Etc.  The Borrower's and each Guarantor's legal name as of the date hereof is correctly set forth on the signature page hereto and the other information regarding the Borrower and the Guarantors set forth in this Agreement, including without limitation, the below Borrower's and Guarantors' signatures hereto are true, correct and complete on the date hereof.

4.2      Enforceable Obligations.  (a) The Borrower is competent to enter into this Agreement and the other Loan Documents to which it is a party and to perform its obligations hereunder and thereunder, (b) the Advisor is a limited liability company duly organized and validly existing in good standing under the laws of its jurisdiction of formation, is duly qualified and in good standing in all such foreign jurisdictions where its business or property so requires and has the power and authority to enter into this Agreement and the other Loan Documents to which it is a party, and (c) the General Partner is a limited partnership duly organized and validly existing in good standing under the laws of its jurisdiction of formation, is duly qualified and in good standing in all such foreign jurisdictions where its business or property so requires and has the power and authority to enter into this Agreement and the other Loan Documents to which it is a party, except in the case of clauses (b) and (c) with respect to qualification and good standing in any foreign jurisdictions where such Guarantor's business or ownership of property so requires to the extent such failure would not result in a Material Adverse Effect.

18

**24**

GSBANK0002134

The execution, delivery and performance by the Borrower and the Guarantors of the Loan Documents to the extent each is a party thereto and the consummation of the transactions contemplated by this Agreement and the other Loan Documents have been duly authorized by all necessary action, including necessary actions by directors, members, shareholders or trustees, as the case may be and: (i) will not violate any law or regulation, or any order or decree of any court or governmental instrumentality (including Regulations U and X of the Board of Governors of the Federal Reserve System) applicable to such parties; (ii) will not, with respect to each Guarantor, violate any Constituent Documents of such Guarantor, (iii) will not conflict with or result in the breach or termination of, constitute a default under, or accelerate any performance required by, any indenture, mortgage, deed of trust, lease, agreement or other instrument to which any Loan Party is a party or by which such Loan Party or any of its property is bound which would be reasonably expected to result in a Material Adverse Effect; (iv) will not result in the creation or imposition of any lien upon any of the property of any Loan Party other than those in favor of the Lender, all pursuant to the Loan Documents; and (v) do not require the consent or approval of any governmental body, agency, authority or any other Person, except such consents as have been obtained or which would not be reasonably expected to result in a Material Adverse Effect.  Each of the Loan Documents to which any Loan Party is a party when delivered hereunder shall constitute a legal, valid and binding obligation of such Loan Party, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws of general application relating to or affecting the rights and remedies of creditors and subject to the general principles of equity, regardless of whether considered in a proceeding in equity or at law.

4.3    Taxes; Compliance with Laws.  Except as would otherwise result in a Material Adverse Effect:  (a) each Loan Party has filed or caused to be filed all federal, state and local tax returns that are required to be filed by such Person, which returns were true, accurate and complete in all respects, and has paid or caused to be paid all taxes shown to be due and payable on such returns or on any assessments received by such Person and (b) no Loan Party is in violation in any respect of any applicable law, rule, regulation, order, judgment, writ or decree of any Governmental Authority applicable to such Person or their respective property.

4.4    Solvency.  After giving effect to each Loan, the Borrower and each of the Guarantors shall be Solvent.

4.5    Complete Disclosure.  The information, reports, financial statements, exhibits and schedules furnished in writing (other than financial projections and information of a general economic nature or industry-specific nature, or as to which no representation or warranty is made) by or on behalf of any Loan Party to the Lender in connection with the negotiation, preparation or delivery of this Agreement and the other Loan Documents or included herein or therein or delivered pursuant hereto or thereto, and the transactions contemplated hereby and thereby did not contain any untrue statement of material fact or omit to state any material fact necessary to make the statements herein or therein, in light of the circumstances under which they were made, not materially misleading as of the date such information was furnished to the Lender (after giving effect to any supplements and updates thereto) and as of the Effective Date.

19

711870426 14466044

CONFIDENTIAL                                                                                     GSBANK0002135

4.6     _Absence of Undisclosed Liabilities._  Neither the Borrower nor the Guarantors has any material liabilities or obligations, either accrued, absolute, contingent or otherwise, other than (a) the Obligations and (b) the liabilities and obligations set forth in the financial statements and financial representations previously delivered or made to the Lender.

4.7     _Foreign Assets Control Regulations, Etc._   Neither the Borrower nor the Guarantors is (a) in violation of the Trading with the Enemy Act of the United States of America (50 U.S.C. App. §§ 1 et seq.), as amended; (b) on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("**OFAC**"), Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation; (c) in violation of the USA Patriot Act, Title III of Pub. L. 107-56, signed into law October 26, 2001 ("**USA Patriot Act**"); (d) a Person designated under Section 1(b), (c) or (d) or Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders; or (e) to the best of its knowledge, engaging in any dealings or transactions, or is otherwise associated, with any of the foregoing blocked Persons.

4.8     _No Default._  No Loan Party is, and after giving effect to this Agreement shall not be, in default in the payment or performance of any material contractual obligation.

4.9     _No Litigation._  There are no actions, suits, litigations, arbitrations, administrative or other legal proceedings, or investigations, pending or threatened in writing, against the Borrower, the Guarantors or any of the Collateral in which such Person has rights that will or could reasonably be expected to have a Material Adverse Effect.  There have not been any judgment(s) against the Borrower or the Guarantors in the past seven (7) years.  Neither the Borrower nor either Guarantor has filed bankruptcy or been subject to an insolvency proceeding in the past seven (7) years.

4.10    _Investment Company Act._  Neither Guarantor is an "investment company," or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.  Neither Guarantor is subject to regulation under any federal or state statute or regulation which limits its ability to borrow money.

4.11    _Transact Business._   Each Guarantor has all the necessary right, power and authority to own such Guarantor's property and assets and to transact the business in which such Guarantor is engaged.

4.12    _Employee Retirement Income Security Act of 1974._  No Guarantor is (a) an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), subject to Title I of ERISA or a "plan" subject to the prohibited transaction provisions of Section 4975 of the Internal Revenue Code of 1986, as amended (an "ERISA Plan"), (b) a Person acting on behalf of any ERISA Plan, or (c) a Person the assets of whom constitutes assets of any ERISA Plan.

4.13    _Bank Official._

711870426 14466044

CONFIDENTIAL                                                          GSBANK0002136

(a)     No Loan Party is (i) a Company controlled by a Bank Official or by the spouse or child of a Bank Official, (ii) a political or campaign committee that benefits or is controlled by a Bank Official or by the spouse or child of a Bank Official or (iii) the spouse or child of a Bank Official.

(b)     If any Loan Party is organized as a trust or an estate vehicle, neither the trustee nor the beneficiary of such trust or estate vehicle is a Bank Official or the spouse or the child of a Bank Official.

4.14    <u>Fiscal Year</u>.  The fiscal year of each Guarantor is the calendar year.

4.15    <u>Liens; Title</u>.  There are no liens, security interests or other encumbrances with respect to the Collateral, except for Permitted Liens and liens from time to time granted in favor of the Lender pursuant to the Loan Documents. Each Loan Party has good and defensible title to its property, including the relevant Collateral.

4.16    <u>No Defenses</u>.  No Loan Party is aware of any default or circumstance which with the passage of time and/or giving of notice would constitute a default under any Advisory Agreement or which would constitute a defense to the obligations of any Fund or investor in such Fund to pay Management Fees in accordance with any Advisory Agreement, or has any knowledge of any claims of offset or any other claims of any Fund or investor in any such Fund which would or could diminish or adversely affect the obligations of such Fund or investor, as applicable, to pay Management Fees in accordance with the applicable Advisory Agreement and the Constituent Documents of such Fund.

4.17    <u>Final Closing Date</u>.  The Principals (as defined in the Constituent Documents of each of Panda Fund II A and Panda Fund II B in existence on the Effective Date) are Robert W. Carter, Todd Carter, Ralph Killian, William Nordlund and Robert Simmons; such Persons own at least 51% of the limited partnership interests of the General Partner as of the Final Closing Date (as defined in the Constituent Documents of each of Panda Fund II A and Panda Fund II B in existence on the Effective Date).

4.18    <u>Special Contribution Entities</u>.  No Special Contribution Entity (as defined in the Constituent Documents of each of Panda Fund II A and Panda Fund II B) exists.

ARTICLE V

COVENANTS

For so long as any Loan remains outstanding under this Agreement, unless the Lender shall otherwise consent in writing, the Borrower and the Guarantors shall:

5.1    <u>Notice of Certain Events</u>.  Give the Lender prompt written notice of any of the following events:

21

CONFIDENTIAL                                                                          GSBANK0002137

(a)     The breach by any Loan Party of any other covenant contained in any Loan Document.

(b)     The Borrower or any Guarantor become aware that any representation or warranty made in any Loan Document by any Loan Party was materially false or misleading as of the date such representation or warranty was made.

(c)     The occurrence of any default under any of the other Loan Documents or any other agreement between any Loan Party, on the one hand, and any member of the Goldman Affiliated Group, on the other hand (other than the Subscription Facility) or any other agreement that could have a Material Adverse Effect on any Loan Party.

(d)     Any Loan Party shall (i) have an order for relief entered with respect to it under the Federal bankruptcy laws as now or hereafter in effect, (ii) make an assignment for the benefit of creditors, (iii) become insolvent or admit in writing its inability or refusal to pay debts as they become due, (iv) apply for, seek, consent to, acquiesce in, or have appointed for it or any substantial portion of its property a receiver, custodian, trustee, examiner, liquidator or similar official, or (v) institute, or have commenced against it, any proceeding seeking an order for relief under the Federal bankruptcy laws as now or hereafter in effect or seeking to adjudicate it bankrupt or insolvent, or seeking dissolution, winding up, liquidation, reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors or fail to file an answer or other pleading denying the material allegations of any such proceeding filed against it and, in the case of any such proceeding that is instituted without the consent of such Loan Party, such proceeding shall continue undismissed or unstayed for a period of 60 days.

(e)     The Security Documents shall for any reason fail to create a valid lien and security interest in the Collateral, or this Agreement or any of the other Loan Documents shall fail to remain in full force or effect, or any action shall be taken by a Loan Party to discontinue or to assert the invalidity or unenforceability thereof.

(f)     An attachment or garnishment writ or the like is levied against all or any portion of the Securities Account, any Deposit Account or any other Collateral.

(g)     Any indebtedness for borrowed money in excess of $250,000 of any Loan Party to any entity, lender or other Person (including any member of the Goldman Affiliated Group) to whom any Loan Party is indebted:  (i) is not paid when due nor within any applicable grace period in any agreement relating to such indebtedness, or (ii) becomes due and payable before its normal maturity by reason of a default or event of default, however described.

(h)     Final judgment for the payment of money in excess of $250,000 is rendered against any Loan Party which is not covered by insurance and within thirty (30) days from the entry of such judgment has not been discharged, paid or stayed pending appeal or has not been discharged within thirty (30) days from the entry of a final order of affirmance on appeal.

22

**28**

CONFIDENTIAL                                                                 GSBANK0002138

(i)      (x) If any event or circumstance shall occur which would reasonably be expected to result in the dissolution or liquidation of either Guarantor or (y) if the Borrower dies or becomes or is declared (by an appropriate legal authority) incompetent or of unsound mind.

(j)      The occurrence or existence of any "Event of Default" under and as defined in the Subscription Facility.

(k)      (x) The occurrence of any event that constitutes (A) "Cause" or a "Disabling Event" under and as defined in the Constituent Documents of the General Partner or (B) "Cause" under and as defined in the Constituent Documents of the Advisor or (y) the Borrower's employment or other status with the General Partner or the Advisor is terminated for any reason.

(l)      The General Partner ceases to be the sole general partner of each of Panda Fund II A or Panda Fund II B, or any action is instituted by any investors in any such Fund to remove the General Partner as the general partner of such Fund.

(m)      The Borrower for any reason ceases to be, or is removed as, (x) a partner of the General Partner or (y) a member of the Advisor.

(n)      The occurrence of any event that would reasonably be expected to result in the reduction of Management Fees payable to the Advisor, including without limitation, the termination of the Commitment Period as defined in any Fund's Constituent Documents, the incurrence of Excess Organizational Expenses or payment of Other Fees (as such terms are defined in any Fund Constituent Document); *provided* that a reduction in Management Fees as a result of payment of placement agent fees or non-affiliate financial advisor commissions or as a result of adjustments to service-provider compensation levels under servicing agreements as set forth in the Advisory Agreements as in effect on the Effective Date, shall not constitute a reduction of Management Fees for purposes of determining whether any Trigger Event has occured.

(o)      The General Partner or the Advisor cease to be controlled either directly or indirectly collectively by the Borrower and the borrowers under the Other Loan Agreements.

(p)      The termination of any Advisory Agreement or the failure of any Management Fee to be paid or received when due.

5.2      Execution of Supplemental Instruments.  Execute and deliver to the Lender from time to time, upon demand, such supplemental agreements, statements, assignments, transfers, instructions, instruments or documents as the Lender may request, in order that the full intent of this Agreement and the other Loan Documents may be carried into effect.

5.3      Obligations and Taxes.  Pay and discharge promptly when due all material taxes, assessments and governmental charges or levies imposed upon it or upon its income or assets

711870426 14466044

CONFIDENTIAL                                                                                   GSBANK0002139

before the same shall become delinquent or in default, as well as all lawful claims for labor, materials and supplies or otherwise, which, if unpaid, might give rise to liens or charges upon such assets or any part thereof; provided, however, that no Loan Party shall be required to pay and discharge or to cause to be paid and discharged any such tax, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings.

5.4    Litigation.  Give the Lender prompt written notice of the filing or commencement of any action, suit or proceeding against the Borrower or the Guarantors, whether at law or in equity or by or before any court or any Governmental Authority, in each case, that could reasonably be expected to have a material adverse effect on the Borrower or the Guarantors where the amount demanded is in excess of $250,000.

5.5    USA Patriot Act, OFAC Compliance.  Provide such information and take such actions as are reasonably requested by the Lender in order to assist the Lender with compliance with the USA Patriot Act; and the Loan Parties shall at all times take all reasonable steps to fully comply with OFAC and the USA Patriot Act.

5.6    Solvency.  The Borrower and the Guarantors shall at all times be Solvent.

5.7    Negative Pledge.  The Loan Parties shall not (a) create, incur, assume or permit to exist any lien (statutory or other), charge or other encumbrance on the Collateral except for Permitted Liens; (b) pledge, charge or otherwise encumber the equity interests of the Guarantors other than in favor of the Lender pursuant to the Loan Documents; (c) enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon the ability of any Loan Party to create, incur or permit to exist any lien, charge, mortgage or other encumbrance on any of the Collateral; or (d) enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon the ability of the Guarantors or any Fund to pay dividends or other distributions with respect to such Person's equity interests (other than pursuant to the Subscription Facility as in effect on the Effective Date) or to make or repay loans or advances to the Borrower.

5.8    Indebtedness.  With respect to the Borrower, not create, incur, assume, guarantee or be or remain liable for, contingently or otherwise, or suffer to exist any indebtedness, except (i) the Obligations, (ii) other indebtedness not exceeding $1,000,000 in aggregate principal amount at any one time outstanding, (iii) debt incurred pursuant to residential mortgages secured only by the real estate subject thereto and (iv) the existing indebtedness described in the financial statements and financial representations delivered or made to the Lender prior to the Effective Date (and any renewals or extensions thereof, with any increase thereof subject to the limitation in the foregoing clause (ii)), unless the prior written consent of the Lender is obtained.

5.9    Accounts.  Except as expressly permitted by the applicable Security Document or Section 5.15 below, without the prior written consent of the Lender, not close or cause to be closed, the Securities Account or any Deposit Account, as applicable, or withdraw, or cause to be withdrawn, any securities or other funds from the Securities Account or any Deposit Account, as applicable.  All amounts paid or distributed with respect to the Collateral shall be paid or

24

711870426 14466044

30

                                                  GSBANK0002140

distributed to the applicable Deposit Account or Securities Account, as applicable.  The General Partner shall distribute all dividends, distributions and other property owing and payable to the Borrower directly to the Securities Account.

5.10    Name, Etc.  Promptly, but no later than 30 days prior to such change, provide notice to the Lender of any change to (a) any Loan Party's legal name, (b) any Loan Party's address, (c) the Borrower's principal residence, or either Guarantor's principal place of business, chief executive office, jurisdiction of organization or situs for administration or (d) the fiscal year of any Guarantor or Fund.

5.11    Use of Proceeds.  Use all proceeds of the Loans only as permitted under Section 2.10 hereof.

5.12    Compliance with Laws.  Comply in all material respects, with all applicable laws, statutes, codes, ordinances, regulations, rules, orders, awards, judgments, decrees, injunctions, approvals and permits.  Each Guarantor shall preserve and maintain its existence and all necessary rights, licenses and authority to own its property and assets and to transact the business in which such Guarantor is engaged.

5.13    Financial Information; Valuations.  (a)  Promptly upon the request of the Lender, but in any event no later than thirty (30) days after receipt of such request, deliver to the Lender copies of each Loan Party's most recently filed federal tax returns, bank and brokerage statements and other information reasonably requested by Lender.

(b)    As soon as available and no later than 60 days following the end of each calendar year, deliver to the Lender copies of the Borrower's personal financial statements.

(c)    As soon as available and no later than 60 days of each fiscal quarter end, deliver to the Lender copies of each Fund's and each Guarantor's quarterly unaudited financial statements (which, in the case of the General Partner, shall be in the form of a statement of capital account for Panda Fund II A and Panda Fund II B) for the first three quarters of any fiscal year, certified to be true and correct for such year by a responsible officer of the applicable Guarantor or applicable Fund.

(d)    As soon as available and no later than 120 days following each fiscal year end, deliver to the Lender copies of each Fund's audited financial statements, and, (i) within 60 days of the end of each fiscal year, the unaudited financial statements for the Advisor, certified to be true and correct for such year by a responsible officer of the Advisor and (ii) within 120 days following each fiscal year end, a statement of the General Partner's capital account in Panda Fund II A and Panda Fund II B, certified to be true and correct for such year by a responsible officer of the General Partner.

(e)    As soon as available and beginning with the valuation as of December 31, 2014, no later than (i) 60 days following the end of each of the first three quarters of the year and 90 days following the end of each fiscal year end, (ii) 60 days following any Disposition or Dissolution Sale, and (iii) within 60 days of any request by Lender (such request to be limited to

25

CONFIDENTIAL

GSBANK0002141

one time per year unless a Payment Default exists), deliver to the Lender at the expense of the Loan Parties a valuation report with respect to the portfolio investments in each Fund prepared by Marshall & Stevens together with a reconciliation of such valuation report to the value of the GP's Limited Partnership Interest prepared by the General Partner based on the most recently available statement of capital account of the General Partner delivered to the Lender pursuant to 5.13(c) or (d).

(f)     As soon as available and no later than January 25 of each year (commencing in January 2015), deliver to the Lender a compliance certificate in form and substance reasonably satisfactory to the Lender  setting forth a calculation of Excess Cash Flow for the immediately preceding fiscal year (which is to be paid to the Lender no later than January 30 of such year), it being understood that for the compliance certificate delivered in 2015, no mandatory prepayment of Excess Cash Flow shall be required.

(g)     As soon as available and no later than 60 days following the end of each calendar quarter, deliver to the Lender forecasts projecting the Advisor's operating expenses and cash flow through the end of the relevant fiscal year, *provided*, that the first forecast provided in each fiscal year shall include a projection of the Advisor's operating expenses and cash flow covering the entire calendar year.

(h)     Substantially concurrently with any mandatory prepayment to be made pursuant to Section 2.5(d), a compliance certificate setting forth a calculation of the Maintenance Value and the amount of the mandatory prepayment to be paid in connection with the relevant Disposition or Dissolution Sale, in form and substance reasonably satisfactory to Lender.

5.14     <u>Investments</u>.  Neither Guarantor shall directly or indirectly make, retain, or have outstanding any Investments; *provided,* that the foregoing shall not apply to nor operate to prevent:

(a)     Investments in direct obligations of the United States of America or of any agency or instrumentality thereof whose obligations constitute full faith and credit obligations of the United States of America, *provided* that any such obligations shall mature within one year of the date of acquisition thereof;

(b)     Investments in commercial paper rated at least P-1 by Moody's and at least A-1 by S&P maturing within one year of the date of issuance thereof;

(c)     investments in certificates of deposit issued by Lender or by any United States commercial bank having capital and surplus of not less than $100,000,000 which have a maturity of one year or less;

(d)     Investments in money market funds that invest at least 95%, and which are restricted by their respective charters to invest at least 95%, in investments of the type described in the immediately preceding **subsections (a)**, **(b)**, and **(c)** above; and

26

711870426 14466044

**32**

(e)     Investments in private equity funds sponsored by the Advisor or one of its Affiliates, including the portfolio companies of such Persons.

In determining the amount of Investments permitted under this Section, Investments (other than loans and advances) shall always be taken at the original cost thereof (regardless of any subsequent appreciation or depreciation therein), and loans and advances shall be taken at the principal amount thereof then remaining unpaid.

5.15    Distributions.  At any time any Obligations remain outstanding, any obligations under any Other Loan Agreement remain outstanding or this Agreement has not been terminated by the parties hereto, the Borrower shall not cause or permit, and neither the Advisor nor the General Partner shall, (a) declare or pay or make any dividends or distributions in respect of any class or series of its membership interests or other equity interests or otherwise other than, with respect to the General Partner, distributions made to the Borrower directed to its Securities Account and to the other partners of the General Partner in accordance with the Other Loan Agreements to the extent applicable to such partners, (b) directly or indirectly purchase, redeem, or otherwise acquire or retire any of its membership interests or other equity interests or any warrants, options or similar instruments to acquire the same or (c) give any instruction to transfer any amount from such Person's deposit account, Deposit Account or Securities Account (other than, with respect to the General Partner or the Borrower, any transfer of amounts (other than amounts constituting Disposition Proceeds or other amounts subject to mandatory prepayment under Section 2.5(d) which amounts shall remain in the applicable Securities Account or deposit account until distributed in accordance with Section 2.5(d)) from such Person's deposit account or Securities Account to make a capital contribution to the Funds for purposes of an investment), as applicable; *provided* that, (I) so long as (w) no Payment Default exists, (x) the Lender has not made a demand for payment hereunder, (y) the Demand Date has not occurred for any reason and (z) the Maintenance Value does not exceed 25%, (i) the Advisor shall be permitted to make periodic distributions and transfer funds from its Deposit Account solely to pay amounts (or to permit the Borrower and/or other members of the Advisor to pay amounts) described in clauses (b) through (e) of the definition of Excess Cash Flow, (ii) regardless of whether an event described in clause (w), (x), (y) or (z) above exists, the General Partner shall be permitted to make (and agrees to make) periodic distributions and transfer funds in its deposit account to the Borrower and/or the other partners of the General Partner as expressly provided by Section 2.5(d) hereof and (iii) the Borrower shall be permitted to make periodic transfers of funds in its Securities Account to pay the amounts applicable to it described in the foregoing clauses (i) and (ii) to the extent the Advisor or the General Partner, as applicable, is permitted to transfer such amount; and (II) the Loan Parties shall be permitted to transfer any amount or property from such Person's deposit account, Deposit Account or Securities Account, as applicable, to repay the Obligations hereunder or the obligations under the Other Loan Agreements.  Notwithstanding the above, if any of the events described in this Section 5.15(I)(x), (y) or (z) exists, the Advisor and the General Partner, as applicable, shall be permitted to make payments or distributions with respect to (i) the salaries of employees of any Guarantor, including compensation in the form of distributions or Carried Interest (as defined in the Constituent Documents of each Fund) other than compensation to the Borrower or any borrower under any Other Loan Agreement and (ii) operating expenses of any Guarantor incurred and paid in the ordinary course of business (other

27

**33**

CONFIDENTIAL                                                                 GSBANK0002143

than compensation to the Borrower or any Borrower under any Other Loan Agreement).  Other than as expressly set forth in the foregoing provisions of this Section 5.15, no Loan Party shall deliver any instruction or entitlement order, or transfer any amount or property from the Deposit Account or the Securities Account, without the prior consent of the Lender.

5.16    Maintenance Value.  At all times during the term hereof, the Maintenance Value shall not exceed 25%.  In the event the Maintenance Value is greater than 30%, the Borrower shall either (a) post cash collateral in immediately available funds to the Securities Account (which shall be treated solely for purposes of this Section 5.16 as if a like amount of Loans had been prepaid) or (b) prepay the Loans, in each either case, in an amount sufficient to reduce the Maintenance Value to 25% or less.

5.17    Amendment to Management Fees and Agreements.  No Loan Party shall, and shall not permit any other Person to, (a) amend, terminate or waive any right to payment of the Management Fees under any Advisory Agreement or the Constituent Documents of any Fund, (b) amend any provision of the Constituent Documents of the General Partner, the Advisor or any Fund that in any way affects any Loan Party's right to receive distributions, dividends, Disposition Proceeds, fees, carried interest or other amounts paid or payable to such Person or any other economic rights of such Person, in each case under the foregoing clause (a) or (b) without the prior consent of the Lender (which consent shall not be unreasonably withheld or delayed), other than adjustments to service-provider compensation levels under servicing agreements as set forth in the Advisory Agreements as in effect on the Effective Date, or (c) amend any provision of the Constituent Documents of the General Partner, the Advisor or any Fund without providing prior written notice to the Lender.  In the event any Constituent Document is amended, waived or modified in any respect, the Loan Parties, within five Business Days of the effectiveness of such amendment, waiver or modification, shall provide the Lender with copies of such executed or otherwise effective document relating thereto.

5.18    Further Assurances.  Take such actions as are reasonably necessary or as the Lender may reasonably request from time to time (a) in order that the full intent of this Agreement may be carried into effect and (b) to ensure that the Obligations are appropriately secured as contemplated pursuant to the terms hereof, including the execution and delivery of security agreements, pledge agreements, mortgages, deeds of trust, financing statements and other documents, and the filing or recording of any of the foregoing.

5.19    Transactions with Affiliates.  The Borrower shall not, and shall not permit the Guarantors to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except in the ordinary course of business (other than services agreements and leases disclosed to the Lender in writing prior to the Effective Date) at prices and on terms and conditions not less favorable to such Loan Party than could be obtained on an arm's-length basis from unrelated third parties.

711870426 14466044

**34**

CONFIDENTIAL                                                                                      GSBANK0002144

5.20    Business of the Guarantors.  The Guarantors shall not engage in any business other than businesses of the type conducted by the Guarantors on the Effective Date and businesses reasonably related, complementary or synergistic thereto.

5.21    Transfer of Interest.  The Borrower shall not transfer, sell or redeem its limited partnership interest in the General Partner or its membership interest in the Advisor.

5.22    Sharing and Membership Percentages.  (a)   Neither the Borrower nor the General Partner shall take any action to alter the Carried Interest Sharing Percentage or the Capital Commitment Sharing Percentage (as such terms are defined in the General Partner's Constituent Documents) from the percentages set forth on Schedule II-A.

(b)    The Advisor shall not take any action to alter the Membership Percentages (as such term is defined in the Advisor's Constituent Documents) from the percentages set forth on Schedule II-B.

5.23    Alternative Investment Structures; Special Contribution Entities.  The General Partner shall not form (a) any AIV GP (as defined in the General Partner's Constituent Documents) or (b) any Special Contribution Entity, without in each case, the prior consent of the Lender.

5.24    Books and Records; Access.  Each Guarantor will give any representative of the Lender access, with reasonable notice and not to exceed one time during any fiscal year unless a Trigger Event has occurred, to permit representatives to examine, copy, or make excerpts from, any and all books, records, and documents in the possession of such Guarantor and relating to its affairs, and to inspect any of the properties of such Guarantor.

5.25    Post-Closing Obligations.    Notwithstanding anything to the contrary set forth in this Agreement, the Advisor shall deliver to the Lender as soon as practicable and in any event not later than 3:00 p.m. on November 25, 2014 (or such later date as agreed to by the Lender in its reasonable discretion), the Deposit Account Control Agreement, which shall be in form and substance satisfactory to the Lender, together with an opinion of counsel to the Advisor in form and substance reasonably satisfactory to the Lender.

ARTICLE VI

DEEMED DEMAND, WAIVERS,
AMENDMENTS AND REMEDIES

6.1    Deemed Demand in Certain Events.  If any event described in Section 5.1(d) or (i) (if applicable) occurs, the Lender shall be deemed to have declared the Obligations immediately due and payable and the Demand Date shall be deemed to have occurred without any election, notice or action on the part of the Lender.  Notwithstanding the foregoing, upon the occurrence of the Demand Date pursuant to this Section 6.1 due to the death of the Borrower or the declaration that the Borrower is incompetent or of unsound mind, the Borrower shall have 90 days from such Demand Date to repay the Obligations before the Lender may declare a Payment

29

711870426 14466044

CONFIDENTIAL                                                                      GSBANK0002145

Default, and the Lender shall refrain from exercising its rights and remedies in respect of the Collateral during such 90 day period so long as no Trigger Event has occurred; <u>provided</u>, the Lender may declare a Payment Default, terminate such 90 day period and/or exercise any of its rights and remedies in respect of the Collateral if, at any time: (i) an event described in Section 5.1 (*other than* (A) Section 5.1(i)(x); (B) Section 5.1(a) solely with respect to (x) covenants contained in Section 5.13 until thirty days have passed from the date originally due to the extent such failure is cured by such thirtieth day and (y) any other affirmative covenant set forth in the Credit Agreement (excluding those covenants set forth in Sections 5.6, 5.11 and 5.16, and the obligation to provide notice under Section 5.1 or 5.4) the failure of which to comply is susceptible to cure and such non-compliance is cured within 30 days from the earlier of (I) the date of notice thereof from the Lender to any Loan Party and (II) the date any Loan Party or Principal (as defined in the Constituent Documents of any Fund) had knowledge of such failure; (C) Section 5.1(c) solely with respect to a non-payment or non-monetary default under an agreement between a Loan Party and any member of the Goldman Affiliated Group; and (D) Section 5.1(p) solely with respect to payment of Management Fees to the extent such Management Fees are paid within five Business Days of the date originally due) occurs, (ii) the Maintenance Value exceeds 30%, (iii) the Lender otherwise deems its security interest in any material portion of the Collateral insufficient, invalid or otherwise unenforceable, (iv) the Borrower fails to make a payment of interest on any Interest Payment Date or (v) does not comply with Section 5.25 (each of the foregoing events in clauses (i) through (v), a "**Trigger Event**").

6.2    <u>Other Remedies</u>.  Upon the occurrence of a Payment Default, the Lender (a) shall have, in addition to all other rights of the Lender, the rights and remedies of a secured party under the UCC, (b) may proceed to protect and enforce the Lender's rights by suit in equity, action of law and/or other appropriate proceeding either for specific performance of any covenant or condition contained in this Agreement, any other Loan Document or in any instrument or document delivered to the Lender pursuant hereto or thereto, and (c) in the exercise of any rights, remedies or powers granted in this Agreement, any other Loan Document and/or any such instrument or document, may proceed to enforce payment of the Obligations as provided herein or in any Loan Document, and may offset and apply toward the payment of such amount any indebtedness of the Lender to any Loan Party.

Upon the occurrence of a Payment Default, the Lender in its discretion may also set-off any or all of the Obligations against any securities, cash or other property of the any Loan Party in the possession of the Lender or any other member of the Goldman Affiliated Group and against any obligations owed to any Loan Party by the Lender or any other member of the Goldman Affiliated Group to the extent that it does not impact the Lender's ability to recover amounts owed to the Lender.  THE LOAN PARTIES UNDERSTAND THAT PURSUANT TO THE TERMS OF THIS AGREEMENT THE LOAN PARTIES ARE ALLOWING THE LENDER TO SET-OFF ANY OR ALL OBLIGATIONS OF THE LOAN PARTIES TO THE LENDER OR ANY OTHER MEMBER OF THE GOLDMAN AFFILIATED GROUP AND BY ALLOWING FOR SUCH AFFILIATE SET-OFF, THE LOAN PARTIES ARE WAIVING ALL OF THEIR RIGHTS TO LIMIT SET-OFF TO THOSE OBLIGATIONS WHICH ARE MUTUAL AS BETWEEN THE LENDER AND SUCH LOAN PARTY.

711870426 14466044

CONFIDENTIAL                                                                                 GSBANK0002146

6.3    <u>Amendments</u>.  The Lender and the Loan Parties may enter into written agreements supplemental hereto or the Loan Documents for the purpose of adding or modifying any provisions to the Loan Documents or changing in any manner the rights of the Lender or the Loan Parties hereunder or waiving any Payment Default hereunder.  To be effective, any such amendment or waiver must be in writing and signed by the Lender and the Loan Parties.

6.4    <u>Preservation of Rights; No Adverse Impact</u>.  No delay or omission of the Lender to exercise any right under this Agreement or any of the Loan Documents shall impair such right or be construed to be a waiver of any Payment Default or an acquiescence therein.  Any single or partial exercise of any such right shall not preclude other or further exercise thereof or the exercise of any other right.  All remedies contained in the Loan Documents, or afforded by law, shall be cumulative and all shall be available to the Lender until the Obligations have been indefeasibly paid in full in cash.

6.5    <u>DEMAND PAYMENT</u>.  BORROWER ACKNOWLEDGES AND AGREES THAT THE OBLIGATIONS ARE PAYABLE ON DEMAND, THAT NO PROVISION OF ANY LOAN DOCUMENT OR OF ANY OTHER AGREEMENT BETWEEN BORROWER AND LENDER IS INTENDED TO OR SHALL IN ANY WAY LIMIT, PREJUDICE OR OTHERWISE AFFECT THE DEMAND NATURE OF THIS AGREEMENT, AND THAT THE LENDER SHALL HAVE THE ABSOLUTE AND UNCONDITIONAL RIGHT TO DEMAND PAYMENT OF THE OBLIGATIONS IN ITS DISCRETION, REGARDLESS OF THE EXISTENCE OF ANY PROVISION HEREOF OR OF ANY COMPLIANCE OR NON-COMPLIANCE BY THE BORROWER WITH ANY SUCH PROVISION.

ARTICLE VII

<u>GENERAL PROVISIONS</u>

7.1    <u>Survival of Representations</u>.  All representations and warranties of the Borrower contained in this Agreement shall survive delivery of the Loan Documents and the making of the Loans.

7.2    <u>Headings</u>.  Section headings in the Loan Documents are for convenience of reference only and shall not govern the interpretation of any of the provisions of the Loan Documents.

7.3    <u>Entire Agreement</u>.  The Loan Documents embody the entire agreement and understanding between the Borrower and the Lender and supersede all prior agreements and understandings between the Borrower and the Lender relating to the subject matter thereof.

7.4    <u>No Third Party Beneficiary</u>.  This Agreement shall not be construed so as to confer any right or benefit upon any Person other than the parties to this Agreement and their respective successors and assigns.

7.5    <u>Expenses</u>.  Upon the occurrence of a Payment Default, the Borrower/Guarantors shall pay to the Lender on demand all expenses reasonably incurred in connection with the

31

**CONFIDENTIAL**

GSBANK0002147

collection and enforcement of all Obligations under the Loan Documents and in connection with any proceeding commenced by or against the Borrower under Title 11 of the U.S. Code including, without limitation, all reasonable attorneys' fees and expenses. The Borrower's/Guarantors' obligations under this Section shall survive the termination of the Loan Documents and payment of the Obligations.

7.6   <u>Severability of Provisions</u>.  Any provision in any Loan Document that is held to be inoperative, unenforceable, or invalid in any jurisdiction shall, as to that jurisdiction, be inoperative, unenforceable, or invalid without affecting the remaining provisions of the Loan Documents in that jurisdiction or the operation, enforceability, or validity of that provision in any other jurisdiction, and to this end the provisions of all Loan Documents are declared to be severable.

7.7   <u>Non-liability of the Lender</u>.  The relationship between the Borrower and the Lender shall be solely that of borrower and lender.  The Lender shall have no fiduciary responsibilities to the Loan Parties under this Agreement, any other Loan Document or in connection with the transactions contemplated hereby or thereby.

7.8   <u>CHOICE OF LAW</u>.   THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN THOSE CONTAINING A CONTRARY EXPRESS CHOICE OF LAW PROVISION) SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF NEW YORK.

7.9   <u>BINDING ARBITRATION</u>.

(a)   THE PARTIES HERETO HEREBY WAIVE ALL RIGHTS TO A COURT TRIAL OR TRIAL BY JURY WITH RESPECT TO ANY DISPUTE, CONTROVERSY OR CLAIM UNDER THIS AGREEMENT AND THE LOAN PARTIES AGREE TO SETTLE BY ARBITRATION ANY CONTROVERSY BETWEEN THE LOAN PARTIES AND THE LENDER OR ITS AFFILIATES ARISING OUT OF OR RELATING TO THIS AGREEMENT.  THE ARBITRATION WILL BE CONDUCTED IN ACCORDANCE WITH THE RULES THEN IN EFFECT OF THE AMERICAN ARBITRATION ASSOCIATION.  ANY DISPUTE OR CLAIM INVOLVING A DOLLAR AMOUNT OF $50,000 OR LESS WILL BE BEFORE ONE ARBITRATOR, AND ALL OTHER DISPUTES AND CLAIMS WILL BE BEFORE A PANEL OF AT LEAST THREE ARBITRATORS.  THE AWARD OF THE ARBITRATOR OR A MAJORITY OF THE ARBITRATORS, AS THE CASE MAY BE, WILL BE FINAL, AND JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY COURT HAVING JURISDICTION.

(b)   NO PARTY HERETO WILL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO ENFORCE ANY PRE-DISPUTE ARBITRATION AGREEMENT AGAINST THE OTHER PARTY WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION OR WHO IS A MEMBER OF A PUTATIVE CLASS WHO HAS NOT OPTED OUT OF THE CLASS WITH RESPECT TO ANY CLAIMS ENCOMPASSED BY THE PUTATIVE CLASS ACTION UNTIL:   (I) THE CLASS

32

711870426 14466044

**38**

CERTIFICATION IS DENIED; (II) THE CLASS IS DECERTIFIED; OR (III) THE OTHER PARTY IS EXCLUDED FROM THE CLASS BY THE COURT.  SUCH FORBEARANCE TO ENFORCE AN AGREEMENT TO ARBITRATE SHALL NOT CONSTITUTE A WAIVER OF ANY RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT STATED HEREIN.

(c)     THE LOAN PARTIES AGREE TO HOLD HARMLESS THE SECURITIES INTERMEDIARY AND ITS AFFILIATES AND ITS DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS FROM ANY AND ALL CLAIMS, LIABILITIES, AND/OR DAMAGES, IN ANY WAY RELATED TO, OR ARISING OUT OF, OR IN CONNECTION WITH, THE LOAN PARTIES' GRANTING OF THE SECURITY INTEREST OR THE LENDER'S EXERCISE OF RIGHTS UNDER THIS AGREEMENT OR THE SECURITY DOCUMENTS, INCLUDING ANY ACTION OR INACTION BY THE SECURITIES INTERMEDIARY IN FOLLOWING THE LENDER'S INSTRUCTIONS REGARDING THE SECURITIES ACCOUNT IN ACCORDANCE WITH THIS AGREEMENT OR ANY OTHER SECURITY DOCUMENT.

(d)     THE LOAN PARTIES AND THE LENDER HEREBY FURTHER AGREE AS FOLLOWS:

(i)     THE LOAN PARTIES AND THE LENDER ARE EACH GIVING UP THE RIGHT TO SUE EACH OTHER IN COURT, INCLUDING THE RIGHT TO A TRIAL BY JURY, EXCEPT AS PROVIDED BY THE RULES OF  THE ARBITRATION FORUM IN WHICH A CLAIM IS FILED.

(ii)     ARBITRATION AWARDS ARE GENERALLY FINAL AND BINDING; A PARTY'S ABILITY TO HAVE A COURT REVERSE OR MODIFY AN ARBITRATION AWARD IS VERY LIMITED.

(iii)     THE ABILITY OF THE PARTIES HERETO TO OBTAIN DOCUMENTS, WITNESS STATEMENTS AND OTHER DISCOVERY IS GENERALLY MORE LIMITED IN ARBITRATION THAN IN COURT PROCEEDINGS.

(iv)     THE ARBITRATOR(S) DO NOT HAVE TO EXPLAIN THE REASON(S) FOR THEIR AWARD UNLESS, IN AN ELIGIBLE CASE, A JOINT REQUEST FOR AN EXPLAINED DECISION HAS BEEN SUBMITTED BY ALL PARTIES TO THE PANEL AT LEAST 20 DAYS PRIOR TO THE FIRST SCHEDULED HEARING DATE.

(v)     ANY PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES AND/OR BANKING INDUSTRY.

(vi)     THE RULES OF SOME ARBITRATION FORUMS MAY IMPOSE TIME LIMITS FOR BRINGING A CLAIM IN ARBITRATION.  IN SOME CASES, A CLAIM THAT IS INELIGIBLE FOR ARBITRATION MAY BE BROUGHT IN COURT.

711870426 14466044

CONFIDENTIAL                                                                                    GSBANK0002149

(vii)   THE RULES OF THE ARBITRATION FORUM IN WHICH A CLAIM IS FILED, AND ANY AMENDMENTS THERETO, SHALL BE INCORPORATED INTO THIS AGREEMENT.

7.10    Indemnity.

(a)     The Borrower and/or Guarantors hereby agrees to indemnify, defend and hold harmless the Lender and its officers, directors, employees, agents, representatives, successors and assigns (each, an "**Indemnified Person**") in connection with any losses, claims, damages, liabilities, obligations, penalties, actions, suits, costs, charges and expenses, including reasonable attorneys' fees, (i) of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement and any other Loan Document, or the transactions contemplated hereby or thereby, and with respect to any investigation, litigation or proceeding (including any bankruptcy, insolvency or appellate proceeding) related to this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby or the use of the proceeds of the Loans, whether or not any Indemnified Party is a party thereto and (ii) which may be incurred by or asserted against such Indemnified Person in connection with or arising out of any pending or threatened investigation, litigation, or proceeding (including any bankruptcy or insolvency proceeding) or any action taken by any Person, with respect to any environmental claim or suit arising out of or related to any property of the Borrower and/or Guarantors (all of the foregoing, the "**Indemnified Liabilities**").  Notwithstanding the foregoing, the Borrower and/or Guarantors shall have no obligation to any Indemnified Person for any Indemnified Liabilities to the extent arising from the gross negligence or willful misconduct of such Indemnified Person as determined in a final, non-appealable decision of a court of competent jurisdiction or of an arbitration panel. The Borrower hereby acknowledges and agrees that any member of the Goldman Affiliated Group that grants a security interest in any of its assets as collateral security for the Loans shall have all rights of subrogation against the Borrower.  This Section 7.10(a) shall not apply with respect to taxes other than any taxes that represent losses, claims, damages, liabilities, obligations, penalties, costs, charges and expenses arising from any non-tax claim.

(b)     To the fullest extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnified Person, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan, or the use of the proceeds thereof.  No Indemnified Person referred to in paragraph (a) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(c)     The Borrower's obligations under this Section shall survive the termination of the Loan Documents and payment of the Obligations.

34

711870426 14466044

**40**

7.11    Assignment, Etc.

(a)    The Lender may sell, assign, transfer or negotiate its rights and obligations under this Agreement and the other Loan Documents, in whole or in part at any time (i) to any other member of the Goldman Affiliated Group without notice to or consent of Borrower or any other Person or (ii) to any other bank or entity with net assets in excess of $100,000,000 so long as the Borrower consents to such sale, assignment, transfer or negotiation in writing; provided that any such consent shall not be required if a Payment Default is then continuing.  Borrower agrees to execute any additional or replacement Notes requested by Lender to further document any such sale, assignment, transfer or negotiation.  Any assignee or transferee of the Lender's rights and/or obligations shall be entitled to the full benefit of this Agreement to the same extent as if it were an original party in respect of the rights or obligations assigned or transferred to it.

(b)    The Lender may sell participating interests in any Loan owing to Lender, any Note held by the Lender or any other interest of the Lender under this Agreement and the other Loan Documents to one or more banks or other entities with net assets in excess of $100,000,000 ("**Participants**"), provided that so long as no Payment Default exists, any such participation shall be subject to written consent of the Borrower.  In the event of any such sale by the Lender of participating interests to a Participant, the Lender's obligations under this Agreement and the other Loan Documents shall remain unchanged, the Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, the Lender shall remain the owner of its Loans and the holder of any Note issued to it in evidence thereof for all purposes under the Loan Documents, all amounts payable by the Borrower under this Agreement shall be determined as if the Lender had not sold such participating interests, and the Borrower shall continue to deal solely and directly with the Lender in connection with the Lender's rights and obligations under the Loan Documents.

(c)    No Loan Party may assign its rights or obligations under this Agreement. This Agreement shall be binding upon and inure to the benefit of the respective heirs, successors (and the Borrower's estate and legal representatives in the event of the death or incapacity of the Borrower whether or not an executor, administrator trustee or other representative has been appointed to the Borrower's estate) and permitted assigns of all the parties to this Agreement. The Lender may at any time change the office through which it is acting for the purpose of this Agreement and may at any time act for this purpose through more than one office.  The Lender may disclose to an assignee or transferee permitted by this Agreement such information about the Loan Parties and the Loan Documents as it may deem appropriate.

(d)    Nothing herein shall prohibit Lender from pledging or assigning Loans to any Federal Reserve Bank in accordance with applicable law.

7.12    Giving Notice.    Unless otherwise provided herein, all notices and other communications provided to any party hereto under this Agreement or any other Loan Document shall be in writing or by facsimile and addressed or delivered to such party at its address as follows (unless otherwise designated in writing to the other parties):  (a) if to the Borrower, at the address set forth below the Borrower's name on the signature page hereto and (b) if to the

711870426 14466044

CONFIDENTIAL                                                                    GSBANK0002151

Lender, at the address set forth below the Lender's name on the signature page hereto.  Unless otherwise provided herein, any notice, if mailed and properly addressed with postage prepaid, shall be deemed given three (3) Business Days after being sent; any notice, if transmitted by facsimile, shall be deemed given when transmitted; any notice transmitted by electronic communication (including e-mail and Internet or intranet websites) shall be pursuant to procedures approved by the Lender; any notice with a confirmation of receipt, if hand delivered, shall be deemed given on the date of such delivery; any notice, if mailed by overnight courier, shall       be       deemed       given       on       the       date       of       such       delivery.

      7.13   <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one agreement, and any of the parties hereto may execute this Agreement by signing any such counterpart.  Facsimiled or other electronic format (i.e. "pdf" or "tif") signatures to this Agreement shall be valid.   This Agreement shall be effective when it has been executed by the Borrower and the Lender.

      7.14   <u>Reinstatement of Obligations</u>.  If and to the extent the Lender or the Securities Intermediary receives any payment with respect to the Obligations or this Agreement and all or any part of such payment is subsequently invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid by the Lender or the Securities Intermediary or paid over to a trustee, receiver, or any other entity, whether under any bankruptcy law or otherwise (any such payment is referred to as a "**<u>Returned Payment</u>**"), then this Agreement shall continue to be effective or shall be reinstated, as the case may be, to the extent of such payment or repayment by the Lender or the Securities Intermediary, and the indebtedness or part thereof intended to be satisfied by such Returned Payments shall be revived and continued in full force and effect as if the Returned Payment had not been made.

      7.15   <u>Certain Risks and Potential Conflicts of Interest</u>.

        (a)   (This Section 7.15(a) is applicable to the extent the Collateral includes "Funds" and "Fund Interests" (as such terms are defined in the Security Document) and such "Fund Interests" are issued by a member of the Goldman Affiliated Group.)  There are certain risks and potential conflicts of interest relating to the various capacities in which the Lender and its affiliates are acting in connection with the Funds (as defined in the applicable Security Document), the Collateral and acting as Lender, a summary description of which is set forth on Exhibit 7.16.  Borrower acknowledges that it has received, read and understood the disclosure set forth on Exhibit 7.15.

        (b)   The Borrower acknowledges that, to the extent the Collateral includes municipal securities, shares of municipal bond funds or shares of mutual funds invested in municipal securities, a ratable portion of otherwise tax deductible interest expense incurred on the Loans may not be tax deductible.

      7.16   <u>USA Patriot Act</u>.  The Lender hereby notifies the Borrower that, pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and

36

711870426 14466044

**42**

other information that will allow the Lender to identify the Borrower in accordance with the USA Patriot Act.

7.17   Other Disclosures.

(a)   Each Loan Party by its execution of the Loan Documents to which it is a party acknowledges that it has received, read and understood the privacy notice set forth on Annex I.

(b)   Each Loan Party by its execution of the Loan Documents to which it is a party acknowledges that it has received, read and understood the notice of potential conflicts of interest set forth on Annex II.

7.18   Subordination.  No Loan Party shall make any payments or advances of any kind, directly or indirectly, on any debts and liabilities to any other Loan Party, any borrower under any Other Loan Agreement, or to any Affiliate of a Loan Party, as applicable, whether now existing or hereafter arising and whether direct, indirect, several, joint and several, or otherwise, and howsoever evidenced or created (collectively, the "***Other Claims***") at any time (a) a Payment Default exists, (b) the Lender has made a demand for payment hereunder or (c) the Demand Date has occurred for any reason, *provided* that payments of Other Claims shall be permitted (i) with the prior written consent of the Lender, (ii) with respect to the salaries of employees of any Loan Party, including compensation in the form of distributions or Carried Interest (as defined in the Constituent Documents of each Fund) other than compensation to the Borrower or any borrower under any Other Loan Agreement and (iii) with respect to operating expenses of the Loan Parties incurred and paid in the ordinary course of business (other than compensation to the Borrower or any borrower under any Other Loan Agreement).  All Other Claims, together with all liens, security interests, and all other encumbrances or charges on assets securing the payment of all or any portion of the Other Claims shall at all times be subordinated to and inferior in right and in payment to the Obligations and all liens, security interest, and all other encumbrances or charges on assets securing all or any portion of the Obligations.

ARTICLE VIII

GUARANTY

8.1   Guaranty of Payment.  Each Guarantor hereby jointly and severally, absolutely, irrevocably and unconditionally guarantees to Lender the prompt payment of the Obligations in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise). The guaranty in this Article VIII (this "**Guaranty**") is a guaranty of payment and not of collection and is a continuing guaranty and shall apply to all of the Obligations whenever arising.  Notwithstanding any provision to the contrary contained herein or in any of the other Loan Documents, to the extent the obligations of each Guarantor shall be adjudicated to be invalid or unenforceable for any reason (including, without limitation, because of any applicable state or federal law relating to fraudulent conveyances or transfers) then the obligations of each Guarantor hereunder shall be limited to the maximum amount that is permissible under applicable law (whether federal or state or otherwise).

37

711870426 14466044

**43**

8.2    <u>Obligations Unconditional</u>.  The obligations of each Guarantor hereunder are absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of any of the Loan Documents or any other agreement or instrument referred to therein, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor (other than payment in full).  Each Guarantor agrees that this Guaranty may be enforced by Lender without the necessity at any time of resorting to or exhausting any other security or collateral and without the necessity at any time of having recourse to the Note or any of the other Loan Documents or any collateral, if any, hereafter securing the Obligations or otherwise and the Guarantors hereby waive the right to require Lender to make demand on or proceed against any Loan Party or any other Person (including a co-guarantor) or to require Lender to pursue any other remedy or enforce any other right.  Each Guarantor further agrees that no Person or governmental authority shall have any right to request any return or reimbursement of funds from Lender in connection with monies received under the Loan Documents.  Each Guarantor further agrees that nothing contained herein shall prevent Lender from suing on the Note or any of the other Loan Documents or foreclosing its security interest in or lien on any Collateral securing the Obligations or from exercising any other rights available to it under this Agreement, the Notes, any other of the Loan Documents, or any other instrument of security and the exercise of any of the aforesaid rights and the completion of any foreclosure proceedings shall not constitute a discharge of any Guarantor's obligations hereunder.  Neither Guarantor's obligations under this Guaranty nor any remedy for the enforcement thereof shall be impaired, modified, changed or released in any manner whatsoever by an impairment, modification, change, release, increase or limitation of the liability of any Loan Party or by reason of the bankruptcy or insolvency of any Loan Party.  Each Guarantor waives any and all notice of the creation, renewal, extension or accrual of any of the Obligations and notice of or proof of reliance by Lender on this Guaranty or acceptance of this Guaranty.  The Obligations, and any part of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon this Guaranty.  All dealings between any Loan Party, on the one hand, and the Lender, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon this Guaranty.  Each Guarantor hereby subordinates to the Obligations all debts, liabilities and other obligations, whether direct, indirect, primary, secondary, several, joint and several or otherwise, and irrespective of whether such debts, liabilities and obligations be evidenced by note, contract, open account, book entry or otherwise, owing to each Guarantor by any other Loan Party.

8.3    <u>Modifications</u>.  Each Guarantor agrees that: (a) all or any part of the Collateral now or hereafter held or received for the Obligations may be exchanged, compromised or surrendered from time to time; (b) the Lender shall have no obligation to protect, perfect, secure or insure any such security interests, liens or encumbrances now or hereafter held, if any, for the Obligations; (c) the time or place of payment of the Obligations may be changed or extended, in whole or in part, to a time certain or otherwise, and may be renewed or accelerated, in whole or in part; (d) any Loan Party and any other party liable for payment under the Loan Documents may be granted indulgences generally; (e) any of the provisions of the Note or any of the other Loan Documents, including, without limitation, this Agreement may be modified, amended or waived; (f) any party (including any co-guarantor) liable for the payment thereof may be granted

38

CONFIDENTIAL                                              GSBANK0002154

indulgences or be released; and (g) any deposit balance for the credit of any Loan Party or any other party liable for the payment of the Obligations or liable upon any security therefor may be released, in whole or in part, at, before or after the stated, extended or accelerated maturity of the Obligations, all without notice to or further assent by any Guarantor, which shall remain bound thereon, notwithstanding any such exchange, compromise, surrender, extension, renewal, acceleration, modification, indulgence or release.

8.4     Waiver of Rights.   Each Guarantor expressly waives to the fullest extent permitted by applicable law: (a) notice of acceptance of this Guaranty by the Lender and of all extensions of credit to any Loan Party by Lender; (b) notice of presentment and demand for payment or performance of any of the Obligations; (c) protest and notice of dishonor or of default (except as specifically required in this Agreement) with respect to the Obligations or with respect to any security therefor; (d) notice of Lender obtaining, amending, substituting for, releasing, waiving or modifying any security interest, lien or encumbrance hereafter securing the Obligations, or the Lender subordinating, compromising, discharging or releasing such security interests, liens or encumbrances, if any; and (e) all other notices to which any Guarantor might otherwise be entitled, except those expressly required hereunder. Each Guarantor does not waive his, her or its rights to service of process in accordance with the Loan Documents or applicable law.

8.5     Reinstatement.   Notwithstanding anything contained in this Agreement or the other Loan Documents, the obligations of each Guarantor under this Article VIII shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Person in respect of the Obligations is rescinded or must be otherwise restored by any holder of any of the Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, and each Guarantor agrees that it will indemnify Lender on demand for all reasonable costs and expenses (including, without limitation, reasonable fees of counsel) incurred by such Person in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.

8.6     Remedies.   Each Guarantor agrees that the Obligations may be declared to be forthwith due and payable upon demand or as provided in Sections 2.5 or 6.1 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 6.1 notwithstanding any stay, injunction or other prohibition preventing such declaration (or preventing such Obligations from becoming automatically due and payable) as against any other Person and that, in the event of such declaration (or such Obligations being deemed to have become automatically due and payable), such Obligations shall forthwith become due and payable by each Guarantor upon the same timeframes as due by such party).  Each Guarantor acknowledges and agrees that its obligations hereunder (a) are fully recourse to the Guarantors and its properties and assets (and for the avoidance of doubt, does not include portfolio companies of any Fund) and (b) are secured in accordance with the terms of the Security Documents, and that Lender may exercise its remedies thereunder in accordance with the terms of such Security Documents and this Agreement.

39

711870426 14466044

CONFIDENTIAL                                                    GSBANK0002155

8.7    Subrogation.  Each Guarantor agrees that, until the payment of the Obligations in full in cash, it will not exercise, and hereby waives, any right of reimbursement, subrogation, contribution, offset, indemnitee or other claims against any Loan Party or any other guarantor of the Obligations, arising by contract or operation of law in connection with the Obligations and any payment made or required to be made by each Guarantor under this Agreement or the other Loan Documents.  After the payment in full in cash of the Obligations (other than any part of the Obligations that represents contingent contractual indemnities), each Guarantor shall be entitled to exercise against any other Loan Party all such rights of reimbursement, subrogation, contribution, indemnification and offset, and all such other claims, to the fullest extent permitted by law.

8.8    Guaranty of Payment.  Each Guarantor hereby severally, absolutely, irrevocably and unconditionally guarantees to Lender the prompt payment of the Obligations in full when due (whether on the Demand Date, as a mandatory prepayment, by acceleration or otherwise).

8.9    Acknowledgement.  Each Guarantor hereby acknowledges (a) that it will receive direct or indirect benefits in connection with the Obligations and (b) the receipt and sufficiency of good and valuable consideration in connection with this Guaranty.

[Remainder of page intentionally left blank; signature page follows]

40

711870426 14466044

**46**

THE BORROWER ACKNOWLEDGES THAT THE LOANS MADE PURSUANT TO THIS AGREEMENT ARE PAYABLE IN FULL UPON DEMAND BY THE LENDER.

BORROWER:

_Robert W. Carter_

Robert W. Carter

Notice Address:    4004 Colgate Avenue
                         Dallas, Texas 75225

Email: _BCarter@Pandafunds.com_

Loan Agreement – Robert W. Carter

47

GSBANK0002157

**GUARANTORS:**

PANDA POWER GENERATION
INFRASTRUCTURE FUND, LLC, a Delaware
limited liability company

By: _____

Name: Todd W. Carter
Title: Senior Partner and President

Address:     4100 Spring Valley, Suite 1001
Dallas, TX 75244

Email: _TCarter@Pandafunds.com_


PANDA POWER FUND II GP, L.P., a Delaware
limited partnership

By:     Panda Power Fund II GP, LLC, a
Delaware limited liability company, its general
partner

By: _____

Name: Todd W. Carter
Title: Senior Partner and President

Address:     4100 Spring Valley, Suite 1001
              Dallas, TX 75244

Email: _TCarter@Pandafunds. com_


**Loan Agreement – Robert W. Carter**

**48**

                                                          GSBANK0002158

IN WITNESS WHEREOF, the Borrower and the Lender have executed this Agreement as of the date set forth below the Lender's signature.

**LENDER:**

GOLDMAN SACHS BANK USA

By: _____

Name: _Brad R. Baker_

Title: _Vice President_

| | |
|---|---|
| Address: | 200 West Street<br>New York, NY 10282-2198 |
| Facsimile: | 212-428-1474 |

With a copy to:

| | |
|---|---|
| Address: | Attn: Bradley R. Baker<br>100 Crescent Court, Suite 1000<br>Dallas, TX 75201 |
| Facsimile: | 646-835-3251 |

711870426 14466044

**Loan Agreement – Robert W. Carter**

**49**

CONFIDENTIAL GSBANK0002159

**SCHEDULE I**

Security and Pledge Agreement dated as of the Effective Date between the Advisor and the Lender, as amended, restated, supplemented or otherwise modified from time to time, securing the Obligations, substantially in the form of Exhibit C hereto.

Security and Pledge Agreement dated as of the Effective Date between the Borrower and the Lender, as amended, restated, supplemented or otherwise modified from time to time, securing the Obligations, substantially in the form of Exhibit D hereto.

Deposit Account Control Agreement

711870426 14466044

**50**

## SCHEDULE II-A

### General Partner (Sharing Percentages)

| Regular Limited Partner | Carried Interest Sharing Percentage | Capital Commitment Sharing Percentage |
|---|---|---|
| Robert W. Carter | 50% | 60.24% |
| Todd Carter | 15% | 18.07% |
| Robert K. Simmons | 6% | 7.23% |
| William Nordlund | 6% | 7.23% |
| Ralph Killian | 0% | 0% |
| Family Investment Partners: | | |
| Ralph T. Killian Special Community Property Subtrust of the Killian Living Trust | 6% | 7.23% |
| Total: | 83% | 100% |

## SCHEDULE II-B

### Advisor (Membership Percentages)

| Managing Members | Membership Interest |
|---|---|
| Robert W. Carter | 60.24% |
| Todd Carter | 18.07% |
| Robert K. Simmons | 7.23% |
| William Nordlund | 7.23% |
| Ralph Killian | 7.23% |
| Total: | 100% |

711870426 14466044

**51**

 GSBANK0002161

**EXHIBIT A**
**(see attached)**

711870426 14466044

**52**

**CONFIDENTIAL**                                                                                       **GSBANK0002162**

**NOTE**

Principal Amount:  $[_____]                                    [_____], 2014


      FOR VALUE RECEIVED, the undersigned Borrower (the "**Borrower**") promises to pay on demand to Goldman Sachs Bank USA (the "**Lender**"), at the Lending Office or such other place as the Lender or any holder hereof may from time to time designate, the principal sum of [_____ AND __/100 DOLLARS ($_____)], or such lesser principal amount as may be outstanding from time to time, in United States Dollars and in immediately available funds as provided in that certain Loan Agreement of even date herewith between the Borrower and the Lender (as amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), together with interest on the unpaid principal amount hereof from time to time outstanding, at the rates and on the dates set forth in the Loan Agreement.  Interest shall be calculated on the basis of a three hundred sixty (360) day year and actual days elapsed.

      This Note is issued pursuant to, and is entitled to the benefits of, the Loan Agreement. Reference hereby is made thereto for a statement of the terms and conditions under which this Note may be prepaid or under which demand for payment may be made.  This Note is entitled to the benefits of the Security Documents and is secured pursuant to the terms of the Loan Agreement and certain other Loan Documents and reference is made thereto for a statement of the terms and provisions thereof.  Capitalized terms used herein and not otherwise defined herein are used with the respective meanings attributed to them in the Loan Agreement.

      The Lender may, in its sole and absolute discretion, demand payment and declare any and all of the Borrower's obligations, liabilities and indebtedness owing by Borrower under this Note, the Loan Agreement and any other Loan Document (collectively, the "**Obligations**") to be due and payable, whereupon the then unpaid balance thereof, together with all interest accrued thereon or expenses incurred in connection therewith shall forthwith become due and payable, together with all interest accruing thereafter at the rate set forth in the Loan Agreement until the Obligations, plus all costs and expenses of collection hereof, including, without limitation, reasonable attorneys' fees and expenses, are indefeasibly paid in full in cash.

      The Borrower shall pay all of the Lender's costs and expenses (including, without limitation, all reasonable attorneys' fees and expenses) incurred in connection with the enforcement of or preservation of rights under this Note on the terms provided in the Loan Agreement.

      No delay or omission on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right of the Lender, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any future occasion.  The Borrower and every indorser or guarantor of this Note regardless of the time, order or place of signing waives presentment, demand, protest and notices of every kind and assents to any extension or postponement of the time of payment or any other

711870426 14466044

**53**

indulgence, to any substitution, exchange or release of Collateral, and to the addition or release of any other Person primarily or secondarily liable.

None of the terms or provisions of this Note may be excluded, modified, or amended except by a written instrument duly executed by Lender and the Borrower expressly referring hereto and setting forth the provision so excluded, modified or amended.  This Note shall be binding upon the successors and assigns of the Borrower and inure to the benefit of the Lender and its successors, endorsees and assigns.  If any term or provision of this Note shall be held to be invalid or unenforceable, in whole or in part in any jurisdiction, then such invalidity or unenforceability shall only effect such term or provision, and shall not effect such term or provision in any other jurisdiction or any other term or provision of this Note.

All rights and obligations hereunder shall be governed by the laws of the State of New York (without giving effect to principles of conflicts or choice of laws) and this Note shall be deemed to be made under seal.

IN WITNESS WHEREOF, the Borrower has executed this Note as of the date first above written.

THE BORROWER ACKNOWLEDGES THAT THE OBLIGATIONS EVIDENCED BY THIS NOTE ARE PAYABLE IN FULL UPON DEMAND BY THE LENDER.

[Remainder of page intentionally left blank; signature page follows]

711870426 14466044

**54**

 GSBANK0002164

**BORROWER:**

_____

Robert W. Carter

711870426 14466044

CONFIDENTIAL                                                    GSBANK0002165

**EXHIBIT B**

**Notice of Borrowing**

Goldman Sachs Bank USA
222 S. Main Street
Salt Lake City, Utah 84101
Facsimile: 212-428-1474
Attention: Private Lending Services

Re:     Robert W. Carter (the "**Borrower**")

       Reference is made to that certain Loan Agreement dated as of November 13, 2014 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**") among the Borrower, the guarantors named therein and Goldman Sachs Bank USA ("**Lender**").  Capitalized terms used herein and not otherwise defined herein are used herein as defined in the Loan Agreement.

       This is a Notice of Borrowing being delivered in accordance with the Loan Agreement. The Borrower requests that Lender make an advance under the Loan Agreement in the amount of $_____ [minimum of $100,000] to be advanced on _____, 20__ [must be a Business Day at least two (2) Business Days from the date of this notice if a LIBOR Loan is requested] and that the proceeds be paid to the following account:

Bank Name:     _____

ABA Number:     _____

Account Name:     _____

Account #:     _____

For Credit To:     _____

**CONFIDENTIAL**                                                                                    GSBANK0002166

Purpose of the Funding:

_____

_____ [1]

1. To the best of my knowledge, these funds will not be used to benefit the Lender or any of its affiliates.
   ☐ I Agree        ☐ I Disagree

2. If the purpose of draw is real estate related, please provide the name of the seller and/or the address of the property:

   _____

The undersigned hereby certifies that all representations and warranties set forth in the Loan Agreement and such other Loan Documents are true and correct in all material respects on and as of the date hereof (except to the extent such representation and warranty is expressly stated to relate to a specific earlier date in which case such representation and warranty shall be true and correct in all material respects as of such earlier date).  If any portion of the advance requested is being used to purchase or carry margin stock, a revised Federal Reserve Form U-1 is attached hereto.

Date:_____

---

[1] If the standard language in Section 2.10(b) is deleted then the following language must be inserted in this Notice of Borrowing beneath the "Purpose of the Funding Section":

Please check off "Yes" or "No" to indicate your agreement with the sentence below:

The Borrower will not use any part of the proceeds of the Loans for the benefit of, or transfer any part of the proceeds of the Loans to, any affiliate of the Lender.

                    ___ Yes

                    ___ No

CONFIDENTIAL                    GSBANK0002167

*sign below if a second authorized signatory is required*

By: _____

Name: _____

**58**

CONFIDENTIAL

GSBANK0002168

# EXHIBIT C

## Form of

## Advisor Security Agreement

### (see attached)

CONFIDENTIAL  GSBANK0002169

### SECURITY AND PLEDGE AGREEMENT
### PANDA POWER GENERATION INFRASTRUCTURE FUND, LLC

**THIS SECURITY AND PLEDGE AGREEMENT** (this "**Agreement**") is made by and between PANDA POWER GENERATION INFRASTRUCTURE FUND, LLC, a Delaware limited liability company (the "**Pledgor**"), and GOLDMAN SACHS BANK USA ("**Secured Party**"), and dated as of November 13, 2014.

### RECITALS:

A.      WHEREAS, the Pledgor has entered into (i) the Loan Agreement among Robert W. Carter, the Pledgor, Panda Power Fund II GP, L.P. (the "**General Partner**"), and the Lender, dated as of the date hereof, (ii) the Loan Agreement among Todd W. Carter, the Pledgor, the General Partner, and the Lender, dated as of the date hereof, (iii) the Loan Agreement among Robert K. Simmons, the Pledgor, the General Partner, and the Lender, dated as of the date hereof, (iv) the Loan Agreement among William C. Nordlund, the Pledgor, the General Partner, and the Lender, dated as of the date hereof, and (v) the Loan Agreement among Robert T. Killian, the Ralph T. Killian Special Community Property Subtrust of the Killian Living Trust, and Ralph T. Killian as Trustee of the Ralph T. Killian Special Community Property Subtrust of the Killian Living Trust (together with Robert W. Carter, Todd W. Carter, Robert K. Simmons, William C. Nordlund and Robert T. Killian, the "**Borrowers**"), the Pledgor, the General Partner, and the Lender, dated as of the date hereof (collectively, each such Loan Agreement as amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreements**"), pursuant to which the Secured Party has agreed to make certain advances to or for the account of the Borrowers;

B.      WHEREAS, the Pledgor is the legal and beneficial owner of the Collateral to be pledged hereunder;

C.      WHEREAS, it is a condition to the obligation of the Secured Party to make the loans under the Loan Agreements that the Pledgor execute and deliver this Agreement;

D.      WHEREAS, this Agreement is given by the Pledgor in favor of the Secured Party to secure the payment and performance of all of the Secured Obligations (as hereinafter defined); and

E.      WHEREAS, the Pledgor will derive benefit from the extension of credit pursuant to the Loan Agreements.

**NOW, THEREFORE**, in consideration of the foregoing premises, of the mutual covenants contained in this Agreement, and of other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties to this Agreement, intending to be legally bound, hereby agree as follows:

1.      **Definitions.**

(a)      Capitalized terms used herein which are defined in the Uniform Commercial Code as in effect from time to time in the State of New York or any other applicable

711870426 14466044

**60**

jurisdiction (the "**UCC**") shall have the meanings given them in Article 8 or Article 9 of the UCC, as applicable, thereof and other capitalized terms used but not defined herein shall have the meanings ascribed to such terms in each Loan Agreement, in each case unless the context clearly requires otherwise.

(b)     The following terms shall have the following meanings:

"**Advisory Agreement**" has the meaning given to such term in the Loan Agreements.

"**Agreement**" has the meaning given to that term in the Preamble of this Agreement.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto, as hereafter amended.

"**Collateral**" has the meaning given to that term in Section 2 of this Agreement.

"**Constituent Documents**" has the meaning given to that term in each of the Loan Agreements.

"**Deposit Account**" means the deposit account established with the Depository, with Account Number ▉▉▉▉▉▉▉, in the name of Panda Power Generation Infrastructure Fund, LLC, together with any and all subaccounts thereof, segregated accounts thereunder and cash or other accounts linked or related thereto, and any and all of their respective successor, replacement or substitute accounts.

"**Deposit Account Control Agreement**" means the Blocked Account Control Agreement among the Pledgor, the Depository and the Lender, as amended, restated, supplemented or otherwise modified from time to time.

"**Depository**" means JPMorgan Chase Bank, N.A.

"**Dollars**" and the sign "**$**" each means the lawful currency of the United States of America.

"**Funds**" has the meaning given to that term in the Loan Agreements.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, any such encumbrance arising out of or pursuant to any conditional sale or other title retention agreement, any financing or similar statement or notice filed under any recording or notice statute, and any capital lease having substantially the same effect as any of the foregoing).

"**Loan Agreements**" has the meaning given to that term in the Recitals of this Agreement.

"**Management Fees**" means all management fees under the Advisory Agreements.

711870426 14466044                     55

**61**

"**Permitted Liens**" means Depository's Liens to the extent permitted by the Deposit Account Control Agreement and Permitted Liens (as such term is defined in the Loan Agreements); *provided* that the term "Permitted Liens" shall not include any Lien securing the Secured Obligations.

"**Pledgor**" has the meaning given to that term in the Preamble of this Agreement.

"**Secured Obligations**" has the meaning given to that term in Section 2 of this Agreement.

"**Secured Party**" has the meaning given to that term in the Preamble of this Agreement.

"**Security Interest**" has the meaning given to that term in Section 2 of this Agreement.

Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter. Unless the context requires otherwise, any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein).

2.     **Grant of Security Interest.**

As security for the full payment and performance of the Secured Obligations, the Pledgor hereby assigns, pledges, grants and conveys to the Secured Party a continuing first priority lien and security interest (the "**Security Interest**") on and in the following (collectively, the "**Collateral**"), whether now existing or hereafter arising and wherever located:

(a)     all of Pledgor's rights, titles, interests and privileges in and to the Management Fees and other amounts payable under the Advisory Agreements and to receive the same;

(b)     all of Pledgor's rights, titles, interests, remedies and privileges under each Advisory Agreement relating to Management Fees and other amounts payable thereunder, or the enforcement of the payment thereof;

(c)     the Deposit Account and any extensions or renewals thereof, if the account is one which may be extended or renewed, and any successor or substitute accounts, and any sub-account related thereto, together with all of Pledgor's right, title, and interest (whether now existing or hereafter created or arising) in and to such account, all funds, financial assets or other property now or at any time hereafter on deposit therein, credited thereto, or payable thereon and all instruments, documents, certificates, and other writings evidencing such account;

(d)     all books and records (in whatever form or media, including computerized records, software and disks) relating to any of the foregoing;

(e)     all General Intangibles relating to or arising out of any of the foregoing;

CONFIDENTIAL                                                          GSBANK0002172

(f)      all Proceeds of any of the foregoing.

For purposes of this Agreement, the term "**Secured Obligations**" shall mean collectively all of the Obligations (as such term is defined in each Loan Agreement).

3.      **Maintenance of Collateral.**

(a)      The Pledgor shall require that each Fund wire-transfer to the Deposit Account, all monies or sums paid or to be paid by any Fund to the Pledgor as Management Fees as and when Management Fees are due pursuant to the Advisory Agreements.   In addition, the Pledgor shall, upon receipt, deposit in the Deposit Account any payments, funds and monies that the Pledgor receives directly from any Fund as Management Fees.

(b)      Without the prior written consent in the sole discretion of the Secured Party, the Pledgor shall not affect, and shall not permit to occur, any assignment, sale, transfer, pledge, redemption or any change in the Collateral or withdraw funds from the Deposit Account; provided, that the prior written consent of the Secured Party shall not be required to withdraw funds from the Deposit Account solely to the extent permitted by and in accordance with Section 5.15 of each Loan Agreement.

(c)      In the event the Pledgor fails to comply with the requirements of Section 3(a) and 3(b) above, or a Payment Default exists, then the Secured Party may, at its option from time to time and without demand for additional Collateral or notice of sale or purchase or any other notice to the Pledgor, (i) instruct the Depository to cancel any open orders and close any or all outstanding contracts, liquidate any or all Collateral, withdraw any or all Collateral and (ii) take any other actions to which it is entitled, whether pursuant to Section 6 or otherwise.

4.      **Representations and Warranties.**  The Pledgor hereby represents and warrants to Secured Party that:

(a)      (i) Set forth on the signature page hereto is the Pledgor's correct legal name, as such name appears in Pledgor's Constituent Documents, (ii) the Pledgor is a limited liability company, and (iii) the Pledgor is located in Delaware for purposes of Section 9-301 and 9-307 of the UCC.  The Pledgor has not changed the Pledgor's name, place of business or its jurisdiction of organization in the past five (5) years.

(b)      The Pledgor is and at all times will continue to be the sole direct, legal and beneficial owner of the Collateral pledged by it hereunder.  All Collateral is and shall be free and clear of any and all Liens, security interests, encumbrances and claims (other than the Lien and Security Interest created by this Agreement or any other Loan Document and any Permitted Liens).

(c)      The Pledgor has not authorized the filing of, and the Pledgor is not aware of, any financing statements against the Pledgor that includes a description of collateral covering any part of the Collateral, other than any financing statements relating to the Security Interest granted to the Secured Party hereunder.

CONFIDENTIAL                                                                      GSBANK0002173

(d)     This Agreement creates a valid, perfected and continuing first priority Lien on and security interest in the Collateral in favor of Secured Party upon (i) in the case of Collateral in which a security interest may be perfected by filing a financing statement under the UCC, the completion of the filings and other actions specified on Schedule A and (ii) in the case of Collateral in which a security interest may be perfected by control under the UCC, the execution of the Deposit Account Control Agreement.

(e)     The Pledgor has not consented to any Person complying with instructions with respect to the Deposit Account of any Person other than the Secured Party;

(f)     Except as otherwise provided by this Agreement, no consent, authorization, approval, license or other action by, and no notice to or filing with, any Governmental Authority or other Person, other than those that have been received or completed is required for (x) the execution, delivery or performance of this Agreement by the Pledgor (including, without limitation, the grant of the Lien hereunder), (y) the exercise by the Secured Party of the rights provided for in this Agreement or (z) the exercise by the Secured Party of the remedies in respect of the Collateral pursuant to this Agreement.  In the event that the Secured Party desires to exercise any remedies, voting or consensual rights or attorney-in-fact powers set forth in this Agreement and determines it necessary to obtain any approvals or consents of any Governmental Authority or any other Person therefor, then, upon the reasonable request of the Secured Party, the Pledgor agrees to assist and aid the Secured Party to obtain as soon as practicable any necessary approvals for the exercise of any such remedies, rights and powers.

(g)     In connection with the transfer and/or pledge of the Collateral to the Secured Party, all required notices to third parties have been given and any required consents or approvals from third parties have been obtained and are in full force and effect as of the date hereof.

(h)     The execution, delivery and performance of this Agreement does not violate or conflict with (i) the terms or provisions of any document or agreement to which the Pledgor is a party or pursuant to which the Pledgor's assets or properties are bound and all consents necessary in order for the Pledgor to execute and deliver this Agreement have been obtained, (ii) any order, ruling, consent, decree or other directive issued or made by any court, regulatory body or governmental authority having jurisdiction over the Pledgor or its properties, or (iii) any laws applicable to or binding on the Pledgor or its assets and properties.

(i)     The Pledgor has all necessary right, power and authority to own the Pledgor's property and assets, to transact the business in which the Pledgor is engaged and to grant to the Secured Party a security interest in the Collateral, and has taken all necessary action to authorize the Pledgor's execution, delivery and performance of this Agreement, including all necessary actions by directors, members, shareholders or trustees, as the case may be, and all filing and recordations.

(j)     The Pledgor has, independently and without reliance upon the Secured Party and based on such documents and information as the Pledgor has deemed appropriate, made the Pledgor's own credit analysis and decision to enter into this Agreement.

**64**

5.     **Covenants.**  During the term of this Agreement, the Pledgor hereby covenants as follows:

(a)     To the extent not already obtained, the Pledgor will promptly request and obtain executed consents required by the Secured Party in connection with the pledge of any interests in the Collateral.

(b)     The Pledgor will promptly execute and deliver, and hereby authorizes the Secured Party to execute on behalf of the Pledgor, such further instruments and take such further actions as Secured Party may deem necessary or desirable to maintain or perfect the Security Interest, including without limitation, stock powers indorsed in blank, control agreements and UCC financing statements.

6.     **Remedies.**

(a)     Upon the occurrence of a Payment Default or as otherwise permitted by Section 3(c) hereof, the Secured Party may exercise from time to time, any and all rights and remedies of a secured party under the UCC (whether or not in effect in the jurisdiction where such rights are exercised) or any applicable laws in effect in any jurisdiction where any rights and remedies may be asserted and any and all rights and remedies available to it as a result of this Agreement or any other Loan Document including, without limitation, its right to (i) demand payment and performance of all due and payable Secured Obligations from the funds in or credited to the Deposit Account; (ii) deliver a shifting control notice or other notice establishing exclusive control in favor of the Secured Party over the Deposit Account; (iii) surrender or present for notation of withdrawal the passbook, certificate, or other documents issued to the Pledgor in connection with the Deposit Account; (iv) withdraw, collect, transfer and receive any and all funds on deposit in or payable to the Deposit Account; and (v)  withdraw or transfer funds from the Deposit Account and apply all or any portion of the funds in or credited to the Deposit Account to the Secured Obligations; provided, however, that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Pledgor under the Bankruptcy Code, the Secured Obligations shall automatically become due and payable without further act of the Secured Party.  The Pledgor shall be responsible for any decrease in the value of the Collateral occurring prior to or during liquidation.  Upon the occurrence of a Payment Default or as otherwise permitted by Section 3(c) hereof, the Secured Party in its discretion may also set-off any or all of the Secured Obligations against any securities, cash, or other property of the Pledgor in the possession of the Secured Party or any other member of the Goldman Affiliated Group and against any obligations owed to the Pledgor by the Secured Party or any other member of the Goldman Affiliated Group to the extent that it does not impact the Secured Party's ability to recover amounts owed to the Secured Party.  **THE PLEDGOR UNDERSTANDS THAT PURSUANT TO THE TERMS OF THIS AGREEMENT THE PLEDGOR IS ALLOWING THE SECURED PARTY TO SET-OFF ANY OR ALL SECURED OBLIGATIONS OF THE PLEDGOR TO THE SECURED PARTY OR ANY OTHER MEMBER OF THE GOLDMAN AFFILIATED GROUP AND BY ALLOWING FOR SUCH AFFILIATE SET-OFF, THE PLEDGOR IS WAIVING ALL OF ITS RIGHTS TO LIMIT SET-OFF TO THOSE SECURED OBLIGATIONS WHICH ARE MUTUAL AS BETWEEN THE SECURED PARTY AND THE PLEDGOR.**

CONFIDENTIAL                                                                              GSBANK0002175

(b)     Upon the occurrence of a Payment Default, the Secured Party may upon ten (10) days' prior written notice to the Pledgor of the time and place, with respect to the Collateral or any part thereof that shall then be or shall thereafter come into the possession, custody or control of the Secured Party or any of its agents, sell, lease, assign or otherwise dispose of all or any part of the Collateral, at such place or places as the Secured Party deems best, and for cash or for credit or for future delivery, at public or private sale, without demand of performance or notice of intention to effect any such disposition or of the time or place thereof (except such notice as is required above or by applicable statute and cannot be waived, and the Secured Party or anyone else may be the purchaser, lessee, assignee or recipient of any or all of the Collateral so disposed of at any public sale (or, to the extent permitted by law, at any private sale) and thereafter hold the same absolutely free from any claim or right of whatsoever kind, including any right or equity of redemption (statutory or otherwise) of the Pledgor, any such demand, notice (other than the notice specified above) and right or equity being hereby expressly waived and released.  The Secured Party may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the sale may be so adjourned.  With respect to that portion of the Collateral that is perishable, threatens to decline speedily in value or is of a type customarily sold on a recognized market, the parties acknowledge and agree that the Secured Party need not furnish the Pledgor with notice of its intention to sell such Collateral.

(c)     The Pledgor acknowledges that any specific disclaimer of any warranty of title or the like by the Secured Party, will not be considered to adversely affect the commercial reasonableness of any sale of Collateral.

(d)     The Secured Party shall incur no liability as a result of the sale of the Collateral, or any part thereof, at any private sale pursuant to this Section 6 conducted in a commercially reasonable manner.  The Pledgor hereby waives any claims against the Secured Party arising by reason of the fact that the price at which the Collateral may have been sold at such a private sale was less than the price that might have been obtained at a public sale or was less than the aggregate amount of the indebtedness under the Loan Agreement, even if the Secured Party accepts the first offer received and does not offer the Collateral to more than one offeree.

7.     **General Provisions.**

(a)     **No Release.**  Nothing set forth in this Agreement shall relieve the Pledgor from the performance of any term, covenant, condition or agreement required on the Pledgor's part to be performed or observed under or in respect of any of the Collateral or from any liability to any Person under or in respect of any of the Collateral or shall impose any obligation on the Secured Party to perform or observe any such term, covenant, condition or agreement on the Pledgor's part to be so performed or observed or shall impose any liability on the Secured Party for any act or omission on the part of the Pledgor relating thereto or for any breach of any representation or warranty on the part of the Pledgor contained in this Agreement or under or in respect of the Collateral or made in connection herewith or therewith.

CONFIDENTIAL                                                                 GSBANK0002176

(b)     **Reasonable Care.**  The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if such Collateral is accorded treatment substantially equivalent to that which the Secured Party, in its individual capacity, accords its own property consisting of similar instruments or interests, it being understood that the Secured Party shall have no responsibility for taking any necessary steps to preserve rights against any Person with respect to any Collateral, except as a result of the gross negligence or willful misconduct of the Secured Party.

(c)     **Expenses.**   The Pledgor will pay promptly all amounts payable by it pursuant to the Loan Agreement.  All such amounts shall be part of the Secured Obligations.

(d)     **No Waiver; Cumulative Remedies.**

(i)     No failure or delay on the part of the Secured Party in exercising any right, power or privilege hereunder and no course of dealing between the Pledgor and the Secured Party shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.  The rights, powers and remedies herein expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Secured Party would otherwise have.  No notice to or demand on the Pledgor in any case shall entitle the Pledgor to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Secured Party to any other or further action in any circumstances without notice or demand.

(ii)     In the event that the Secured Party shall have instituted any proceeding to enforce any right, power or remedy under this Agreement by foreclosure, sale, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Secured Party, then and in every such case, the Pledgor and the Secured Party shall be restored to their respective former positions and rights hereunder with respect to the Collateral, and all rights, remedies and powers of the Secured Party shall continue as if no such proceeding had been instituted.

(e)     **Application of Collateral.**  Secured Party shall apply Collateral received by it in the order prescribed in the Loan Agreement.

(f)     **Secured Party.**  The actions of the Secured Party hereunder are subject to the provisions of the Loan Agreement.  The Secured Party shall have the right hereunder to make demands, to give notices, to exercise or refrain from exercising any rights, and to take or refrain from taking action (including, without limitation, the release or substitution of Collateral), in accordance with this Agreement and the Loan Agreement.  The Secured Party may employ agents and attorneys-in-fact in connection herewith and shall not be liable for the negligence or misconduct of any such agents or attorneys-in-fact selected by it in good faith.

(g)     **Secured Party May Perform; Secured Party Appointed Attorney-in-fact.**  If the Pledgor shall fail to do any act or thing that it has covenanted to do hereunder after notice or if any representation or warranty on the part of the Pledgor contained herein shall be breached, the Secured Party may (but shall not be obligated to) do the same or cause it to be done

CONFIDENTIAL                                                                              GSBANK0002177

or remedy any such breach, and may expend funds for such purpose. The Pledgor hereby appoints the Secured Party its attorney-in-fact, with full authority in the place and stead of the Pledgor and in the name of the Pledgor, or otherwise, from time to time in the Secured Party's discretion, to take any action and to execute any instrument consistent with the terms of this Agreement and the other Loan Documents which the Secured Party may reasonably determine to be necessary or advisable to accomplish the purposes of this Agreement. The foregoing grant of authority is a power of attorney coupled with an interest and such appointment shall be irrevocable for the term of this Agreement. The Pledgor hereby ratifies all that such attorney shall lawfully do or cause to be done by virtue hereof.

(h)     **Continuing Security Interest; Assignment.** This Agreement shall create a continuing security interest in the Collateral and shall (i) be binding upon the Pledgor and its successors and permitted assigns and (ii) inure, together with the rights and remedies of the Secured Party hereunder, to the benefit of the Secured Party and its permitted successors, transferees and assigns; no other Persons (including, without limitation, any other creditor of the Pledgor) shall have any interest herein or any right or benefit with respect hereto. Without limiting the generality of the foregoing clause (ii), the Secured Party may assign or otherwise transfer any indebtedness held by it secured by this Agreement to any other Person, and such other Person so long as such assignment or transfer is consistent with the provisions of the Loan Agreement, shall thereupon become vested with all the benefits in respect thereof granted to the Secured Party, herein or otherwise, subject however, to the provisions of the Loan Agreement.

(i)     **Termination.** When all the Secured Obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been made) and the Secured Party has agreed to terminate the Loan Agreement, this Agreement and the Lien noted hereunder shall automatically terminate without any further action. Upon termination of this Agreement, the Secured Party shall, upon the request and at the sole cost and expense of the Pledgor, assign, transfer and deliver to the Pledgor, against receipt and without recourse to or warranty by the Secured Party, such of the Collateral to be released (in the case of a release) as may be in possession of the Secured Party and as shall not have been sold or otherwise applied pursuant to the terms hereof, and, with respect to any other Collateral, proper documents and instruments (including UCC-3 termination statements) acknowledging the termination of this Agreement and the Lien noted hereunder or the release of such Collateral, as the case may be.

(j)     **Notices.** Unless otherwise provided herein, all notices and other communications provided to any party hereto under this Agreement shall be in writing or by facsimile and addressed or delivered to such party at its address as set forth below. Unless otherwise provided herein, any notice, if mailed and properly addressed with postage prepaid, shall be deemed given three (3) Business Days after being sent; any notice, if transmitted by facsimile, shall be deemed given when transmitted with confirmation of receipt; any notice transmitted by electronic communication (including e-mail and Internet or intranet websites) shall be deemed given pursuant to the procedures approved by the Lender; any notice, if hand delivered, shall be deemed given on the date of such delivery; any notice, if mailed by overnight courier, shall be deemed given on the date of such delivery.

| If to the Pledgor: | To the applicable address set forth on the signature pages hereto. |
| If to Secured Party: | Goldman Sachs Bank USA<br>222 S. Main Street<br>Salt Lake City, Utah 84101<br>Facsimile: 212-428-1474<br>Attention: Private Lending Services |

(k)     **Severability.**   Any provision in this Agreement that is held to be inoperative, unenforceable, or invalid in any jurisdiction shall, as to that jurisdiction, be inoperative, unenforceable, or invalid without affecting the remaining provisions of the Agreement in that jurisdiction or the operation, enforceability, or validity of that provision in any other jurisdiction.

(l)     **Payment of Costs.**   The Pledgor shall pay, on demand, any and all costs of collection and reasonable attorneys' fees and costs paid or incurred by Secured Party in enforcing this Agreement after a Payment Default, whether or not any suit or other legal proceedings shall be instituted.

(m)     **APPLICABLE LAW.   THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF.**

(n)     **Miscellaneous.**   No amendment, modification, supplement, termination or waiver of or to any provision of this Agreement, nor consent to any departure by the Pledgor therefrom, shall be effective unless the same shall be made in accordance with the terms of the Loan Agreement and unless in writing and signed by each of the Secured Party and the Pledgor. The captions in this Agreement are for convenience of reference only and shall not define or limit the provisions hereof.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.  Execution and delivery of this Agreement by facsimile or other electronic format (i.e. "pdf" or "tif") shall be sufficient for all purposes and shall be binding on any party who so executes.  This Agreement constitutes the exclusive agreement of the parties with respect to the matters addressed herein.

[Remainder of page intentionally left blank; signature page follows]

CONFIDENTIAL                                                    GSBANK0002179

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date set forth below

**SECURED PARTY:**

GOLDMAN SACHS BANK USA

By: _____

Name: _____

Title: _____

Notice Address:      200 West Street
                     New York, NY 10282-2198
Facsimile:           212-428-1474

With a copy to:

Address:             Attn: Bradley R. Baker
                     100 Crescent Court
                     Suite 1000
                     Dallas, TX 75201
Facsimile:           646-835-3251

*[Signature Page to Security and Pledge Agreement (Panda Power Generation Infrastructure Fund, LLC)]*

711870426 14466044

**70**

**CONFIDENTIAL**                                                                 GSBANK0002180

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

PANDA POWER GENERATION
INFRASTRUCTURE FUND, LLC

By: _____

Name: Todd W. Carter
Title:  Senior Partner and President

Jurisdiction of organization or formation:  Delaware

Notice Address:          4100 Spring Valley
                         Suite 1001
                         Dallas, TX 75244

Email:                   _____

*[Signature Page to Security and Pledge Agreement (Panda Power Generation Infrastructure Fund, LLC)]*

711870426 14466044

**71**

**Schedule A**

**Filings**

1.      UCC-1 financing statement naming Panda Power Generation Infrastructure Fund, LLC, as debtor, and Goldman Sachs Bank USA, as secured party, filed with the Secretary of State of the State of Delaware.

711870426 14466044

**72**

CONFIDENTIAL                                                                        GSBANK0002182

**EXHIBIT D**

**Form of**

**Borrower Security Agreement**

**(see attached)**

**CONFIDENTIAL** **GSBANK0002183**



## SECURITY AND PLEDGE AGREEMENT

## ROBERT W. CARTER

**THIS SECURITY AND PLEDGE AGREEMENT** (this "**Agreement**") is made by and among the ROBERT W. CARTER (the "**Pledgor**"), GOLDMAN SACHS BANK USA ("**Secured Party**"), and GOLDMAN, SACHS & CO. ("**Securities Intermediary**"), and dated as of November 13, 2014.

### RECITALS:

A.    WHEREAS, the Pledgor has entered into the Loan Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), dated as of the date hereof, among the Pledgor, as borrower, Panda Power Generation Infrastructure Fund, LLC, as a guarantor, Panda Power Fund II GP, L.P., as a guarantor, and Secured Party, as lender, pursuant to which the Secured Party has agreed to make certain advances to or for the account of the Pledgor;

B.    WHEREAS, the Pledgor is the beneficial owner of the Collateral to be pledged by it hereunder;

C.    WHEREAS, it is a condition to the obligation of the Secured Party to make the loan under the Loan Agreement that the Pledgor execute and deliver this Agreement;

D.    WHEREAS, this Agreement is given by the Pledgor in favor of the Secured Party to secure the payment and performance of all of the Secured Obligations (as hereinafter defined); and

E.    WHEREAS, the Pledgor will derive benefit from the extension of credit pursuant to the Loan Agreement.

**NOW, THEREFORE**, in consideration of the foregoing premises, of the mutual covenants contained in this Agreement, and of other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties to this Agreement, intending to be legally bound, hereby agree as follows:

1.   **Definitions**.

(a)    Capitalized terms used herein which are defined in the Uniform Commercial Code as in effect from time to time in the State of New York or any other applicable jurisdiction (the "**UCC**") shall have the meanings given them in Article 8 or Article 9 of the UCC, as applicable, thereof and other capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Loan Agreement, in each case unless the context clearly requires otherwise.

711870426 14466044

**74**

(b)      The following terms shall have the following meanings:

"**Account Agreement**" means, as the context may require, that certain Account Agreement (as amended, restated, supplemented or otherwise modified from time to time in accordance with its terms) by and between the Pledgor and the Securities Intermediary relating to the Pledgor's Securities Account.

"**Agreement**" has the meaning given to that term in the Preamble of this Agreement.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto, as hereafter amended.

"**Collateral**" has the meaning given to that term in Section 2 of this Agreement.

"**Constituent Documents**" has the meaning given to that term in Section 2(c) of this Agreement.

"**Dollars**" and the sign "**$**" each means the lawful currency of the United States of America.

"**Exchange Act**" means the United States Securities Exchange Act of 1934, as amended from time to time.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, any such encumbrance arising out of or pursuant to any conditional sale or other title retention agreement, any financing or similar statement or notice filed under any recording or notice statute, and any capital lease having substantially the same effect as any of the foregoing).

"**Loan Agreement**" has the meaning given to that term in the Recitals of this Agreement.

"**Maintenance Value**" has the meaning given to that term in the Loan Agreement.

"**Notice of Exclusive Control**" has the meaning given to that term in Section 4(c)(ii) of this Agreement.

"**Permitted Liens**" means Securities Intermediary's Liens and Permitted Liens (as such term is defined in the Loan Agreements); *provided* that the term "Permitted Liens" shall not include any Lien securing the Secured Obligations.

"**Pledged Entity**" has the meaning given to that term in Section 2(a) of this Agreement.

"**Pledged Interest**" has the meaning given that term in Section 2(a) of this Agreement.

"**Pledgor**" has the meaning given to that term in the Preamble of this Agreement.

"**Rule 144**" means Rule 144 promulgated under the Securities Act, as amended from time to time, and any successor regulation or statute.

711870426 14466044

**75**

"**Secured Obligations**" has the meaning given to that term in Section 2 of this Agreement.

"**Secured Party**" has the meaning given to that term in the Preamble of this Agreement.

"**Securities**" has the meaning given to that term in Section 2 of this Agreement.

"**securities account**" means a "securities account" as such term is defined in Section 8-501 of the UCC.

"**Securities Account**" means the securities account established with the Securities Intermediary pursuant to Section 4(a) of this Agreement, with Account Number ████████, in the name of Robert W. Carter, together with any and all subaccounts thereof, segregated accounts thereunder and cash or other accounts linked or related thereto, and any and all of their respective successor, replacement or substitute accounts.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time.

"**Securities Intermediary**" has the meaning given to that term in the Preamble of this Agreement.

"**Securities Intermediary's Liens**" means Liens in favor of the Securities Intermediary incurred in the ordinary course of business of settling trades and to otherwise secure payment for property purchased or securities or property sold for the Securities Account and for commissions and fees owing to the Securities Intermediary in respect of the Securities Account.

"**Security Interest**" has the meaning given to that term in Section 2 of this Agreement.

Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter.  Unless the context requires otherwise, any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein).

2. **Grant of Security Interest**.

As security for the full payment and performance of the Secured Obligations, the Pledgor hereby assigns, pledges, grants and conveys to the Secured Party a continuing first priority lien and security interest (the "**Security Interest**") on and in the following (collectively, the "**Collateral**") whether now existing or hereafter arising and wherever located:

(a)     all of the Pledgor's right, title and interest of an economic nature, whether fixed or contingent, as a limited partner or equity holder of Panda Power Fund II GP, L.P., a Delaware limited partnership (the "**Pledged Entity**"), including without limitation, any and all rights to (i) share in profits and losses, (ii) receive distributions, allocations of income, gain, loss, deduction or credits or any similar item, (iii) receive distributions of Carried Interest Proceeds,

711870426 14466044

**76**

Temporary Investment Proceeds and Capital Proceeds (as such terms are defined in the Constituent Documents) and (iv) receive any other amount paid or payable, or property or asset distributed or to be distributed, on account of the Pledgor's Interest (as defined in the Constituent Documents) (collectively, the "**Pledged Interest**");

(b)      all Instruments, certificates or other writings evidencing such Pledged Interest;

(c)      all of Pledgor's right, title and interest in, to and under the Pledged Entity's limited partnership agreement or other organizational documents of the Pledged Entity (collectively, the "**Constituent Documents**"), including all economic rights in the Pledgor's capacity as a limited partner of the Pledged Entity;

(d)      all rights and privileges of an economic nature, including all income, profits and all distributions on or with respect to any of the Pledgor's Pledged Interest;

(e)      all General Intangibles relating to or arising out of any of the foregoing;

(f)      the Securities Account and all funds, stocks, bonds, security entitlements, financial assets or other securities or investment property (as such terms are defined in the UCC) now or hereafter in the possession, custody or control of the Secured Party, including, without limitation, any of the foregoing from time to time deposited in or credited to the Securities Account (the "**Securities**");

(g)      all credit balances, accounts, general intangibles, instruments, documents, money, certificates of deposit (as such terms are defined in the UCC) and all other property of whatever kind or description now or hereafter held in or credited to the Securities Account;

(h)      any additional securities described in confirmations and other reports delivered by the Securities Intermediary to the Pledgor or the Secured Party in connection with the Securities Account, which additional securities are deemed to be Securities in the Securities Account for purposes of this Agreement (for purposes of this Agreement, "additional securities" shall include all investment property and options, including put and call option contracts);

(i)      all dividends, distributions and interest (and all income or payments in lieu of or in substitution for any of the foregoing) of any of the property described in clauses (f), (g) (h);

(j)      all books and records (in whatever form or media, including computerized records, software and disks) relating to any of the foregoing; and

(k)      all Proceeds of any of the foregoing.

For purposes of this Agreement, the term "Secured Obligations" shall mean, collectively, (i) all Obligations and (ii) all other obligations, interest, fees, charges and expenses of the Pledgor to any member of the Goldman Affiliated Group pursuant to any agreement between the Pledgor and any member of the Goldman Affiliated Group.

711870426 14466044

**77**

3.      **Dividends, Distributions, etc**.

(a)      Notwithstanding the foregoing or any other provision of this Agreement to the contrary, so long as no Payment Default shall have occurred and be continuing, Pledgor may receive and retain in the Securities Account any and all dividends, distributions, interest paid, cash, funds, instruments, and proceeds (and all income or payments in lieu of or in substitution for any of the foregoing) in respect of the Collateral; *provided* that all such dividends, distributions and other property shall be deposited directly to, and maintained, exclusively in the Securities Account subject to any subsequent withdrawals from the Securities Account expressly permitted by and in accordance with Section 5.15 of the Loan Agreement.

(b)      Upon the occurrence and during the continuance of a Payment Default, all rights of the Pledgor to receive any dividends, distributions, cash, instruments or other property in respect of the Collateral shall cease immediately, without any notice to Pledgor or action by or on behalf of Secured Party or any other Person, and all such rights thereupon shall become vested in Secured Party automatically without any action by Secured Party or any other Person, and Secured Party shall have the sole and exclusive right and authority to receive and retain such dividends, distributions, cash, funds, instruments or other property.  Pledgor shall execute and deliver such proxies, powers of attorney, dividend orders, interest orders and other instruments and documents as Secured Party may request to enable Secured Party to exercise such rights and receive such dividends, distributions, cash, funds, instruments or other property.  In addition, Secured Party is hereby appointed the attorney-in-fact of Pledgor, with full power of substitution, which appointment as attorney-in-fact is irrevocable and coupled with an interest, to take all such actions after the occurrence and continuation of a Payment Default, whether in the name of Secured Party or Pledgor, as Secured Party may consider necessary or desirable for the purpose of exercising such rights and receiving such dividends, distributions, cash, funds, instruments or other property.  Any and all money and other property paid over to or received by Secured Party pursuant to the provisions of this Section 3(b) (and following the occurrence of a Payment Default) shall be retained by Secured Party as part of the Collateral and shall be applied in accordance with the provisions hereof and the Loan Agreement.  All dividends, distributions, cash, instruments or other property of any kind in respect of Collateral which are received by Pledgor contrary to the provisions of this Section 3 shall be received in trust for the benefit of Secured Party, shall be segregated from the other funds of Pledgor, and shall be forthwith paid over to Secured Party as Collateral in the exact form received, to be held by Secured Party as Collateral.

4.      **Securities Account; Control**.

(a)      **Establishment of the Securities Account**.  The Pledgor directs the Securities Intermediary, and the Securities Intermediary agrees, subject to the terms of the Account Agreement, to establish a Securities Account, which shall be known by a title acceptable to the Secured Party to reflect the Secured Party's Security Interest in, and control over, such Securities Account pledged to the Secured Party pursuant to this Agreement as Collateral for the Secured Obligations.  The Pledgor, the Secured Party, and the Securities Intermediary each acknowledge and agree that (i) in establishing and maintaining the Securities Account, the Securities Intermediary is acting as a securities intermediary, and (ii) all property now or in the future in or credited to the Securities Account will be treated as financial assets

711870426 14466044

**78**

under Article 8 of the UCC.  For purposes of perfecting the Secured Party's Security Interest in any Collateral not constituting security entitlements, the Secured Party hereby appoints the Securities Intermediary as its agent and the Securities Intermediary hereby accepts such appointment and acknowledges that any such Collateral in its possession is being held for the benefit of the Secured Party.  The parties hereto further agree that all securities or other property underlying any financial assets credited to the Securities Account shall be registered in the name of the Securities Intermediary, indorsed to the Securities Intermediary or indorsed in blank or credited to another securities account maintained in the name of the Securities Intermediary, and in no event will financial assets be registered in the name of the Pledgor, payable to the order of the Pledgor or specially indorsed to the Pledgor except to the extent that the foregoing shall have been indorsed to the Securities Intermediary or in blank.   The Pledgor and the Securities Intermediary each agree that, so long as this Agreement is in effect and Secured Obligations are outstanding, they shall not enter into any control or similar agreement with any third party with respect to the Securities Account.  Notwithstanding any other agreement, New York shall be the Securities Intermediary's jurisdiction within the meaning of Section 8-110 of the UCC.

(b)      **Control; Certain Rights in the Securities Account.**

(i)      The Secured Party may give either oral or written entitlement orders and other instructions of any kind or character to the Securities Intermediary in regard to the Securities Account.  The Secured Party's instructions may include instructions to liquidate Collateral and other property in the Securities Account, to pay credit balances from the Securities Account to the Secured Party or its designees, or to move the Collateral from the Securities Account to the Secured Party or into an account in the Secured Party's name or the name of its designees.  The Securities Intermediary shall comply with the Secured Party's entitlement orders and other instructions in regard to the Securities Account without further consent by the Pledgor.  In following the Secured Party's instructions, the Securities Intermediary is under no duty to the Pledgor to determine whether a Payment Default or any other event has occurred.  The Securities Intermediary shall neither accept nor comply with any entitlement orders or instructions from the Pledgor in regard to the Securities Account unless such entitlement orders or instructions have been given in accordance with Sections 4(c)(i) or 4(c)(ii) below or have been consented to in writing by the Secured Party.   The Secured Party is entitled to receive directly from the Securities Intermediary and, to the extent permitted by law and the internal policies of the Secured Party and the Securities Intermediary, the Pledgor irrevocably authorizes the Securities Intermediary to provide to the Secured Party, duplicates of any and all notices, confirmations, and statements of account that the Pledgor is entitled to receive with respect to the Securities Account and any and all information in its possession or control relating to the Securities Account.

(ii)      Notwithstanding the provisions of Section 4(b)(i), as between the Secured Party and the Pledgor, the Secured Party agrees that it will not issue an entitlement order or other instruction with respect to the Securities Account or deliver a Notice of Exclusive Control to the Securities Intermediary unless: (A) such entitlement order or instruction has been approved or authorized by the Pledgor having record ownership of the Securities Account, (B) a Payment Default has occurred, or (C) such entitlement order or instruction is permitted by Section 5(b) hereof.  This Section 4(b)(ii) is intended solely for the benefit of the Pledgor and in no way constitutes a limitation on the Secured Party's control over the Securities Account,

711870426 14466044

**79**

including the Secured Party's right, at any time, to issue entitlement orders or otherwise instruct the Securities Intermediary in accordance with the provisions of Section 4(b)(i).

(c)   **Transactions in the Securities Account.**

(i)   Without the prior written consent in the sole discretion of the Secured Party, the Pledgor shall not affect, and shall not permit to occur, any assignment, sale, transfer, pledge, redemption or any change in the composition of, the Collateral (whether through redemption, purchase or otherwise) or withdraw funds from the Securities Account; provided, that (A) the prior written consent of the Secured Party shall not be required to withdraw funds from the Securities Account solely to the extent permitted by and in accordance with Section 5.15 of the Loan Agreement.  For the avoidance of doubt, the Pledgor may, with the prior written consent of the Secured Party in its sole discretion, instruct or direct the Securities Intermediary to sell, trade, transfer, liquidate or otherwise change the composition of the funds and Securities credited to the Securities Account, *provided* if any Payment Default exists, the Demand Date has occurred unless the demand for payment was made in accordance with Section 6.1 of the Loan Agreement and the 90 day period referenced therein has not lapsed or terminated, or the Maintenance Value is greater than 25%, the Secured Party shall have no obligation to consider any such instruction or direction.

(ii)   Upon receipt by the Securities Intermediary of a notice from the Secured Party that the Secured Party shall have exclusive control over the Securities Account, which notice may be written or oral and in any form reasonably acceptable to the Securities Intermediary, but which Secured Party shall endeavor to conform to the form attached hereto as Annex I (any such notice, a "**Notice of Exclusive Control**"), the Securities Intermediary will not comply with any entitlement orders or other instructions concerning the Securities Account originated by the Pledgor or its representatives and will cease distributing interest or dividends on property in the Securities Account to the Pledgor.

(iii)   Without limiting any other right or remedy available to the Secured Party under this Agreement or at law or in equity, including, without limitation, the rights and remedies contemplated in Section 8, the Secured Party may, upon the occurrence of a Payment Default or as permitted by Section 5(b) hereof, (A) buy or sell any or all Securities or other property which may be in the Securities Account; (B) cancel any open orders; and (C) exercise or refrain from exercising, terminate, liquidate or close, modify, extend, obtain or reestablish, any or all outstanding contracts or options and any or all hedges, related or associated positions, securities, or transactions.

(d)   **Other Account Agreement Provisions; Subordination.**

(i)   The Pledgor acknowledges that no credit card, funds transfer services or wire transfer, check-writing or margin capabilities exist or will be permitted with respect to the Securities Account pledged by it hereunder.  This Agreement does not create any obligations or duties on the Securities Intermediary to the Pledgor greater than or in addition to the obligations and duties of the Securities Intermediary under the Account Agreement, except to the extent expressly provided in this Agreement.  The Pledgor agrees to pay customary brokerage fees and commissions and other fees and expenses established by the Securities

711870426 14466044

**80**

Intermediary pursuant to the Account Agreement in connection with any transactions in a Securities Account made in accordance with this Agreement and authorizes the Securities Intermediary to debit the Securities Account for such fees, commissions and expenses.

(ii)     So long as this Agreement is in effect and Secured Obligations are outstanding, the Securities Intermediary subordinates in favor of the Secured Party any security interest, Lien, or right of setoff it may have, now or in the future against the Securities Account and the property in the Securities Account, except for the Securities Intermediary's Liens.

5.     **Maintenance of Collateral**.

(a)     The Pledgor agrees to (i) cause all distributions and payments of cash or other property on account of the Collateral to be deposited directly to the Securities Account and (ii) post cash Collateral in the Securities Account to the extent required from time to time by Section 5.16 of the Loan Agreement.

(b)     In the event the Pledgor fails to comply with the requirements of Section 5(a) above, or a Payment Default has occurred, then the Secured Party may, at its option from time to time and without demand for additional Collateral or notice of sale or purchase or any other notice to the Pledgor, (i) instruct the Securities Intermediary to cancel any open orders and close any or all outstanding contracts, liquidate any or all Collateral, withdraw and/or sell any or all Collateral and (ii) take any other actions to which it is entitled, whether pursuant to Section 8 or otherwise.

(c)     The Pledgor shall, if the Secured Party pays any calls or other monies payable on or with respect to any of the Securities in the Collateral (which the Secured Party shall not be obliged to do), indemnify the Secured Party or any agents acting on behalf of the Secured Party, which may include the Securities Intermediary, against such payment.

6.     **Representations and Warranties.**   The Pledgor hereby represents and warrants to Secured Party that:

(a)     The Pledgor's legal name is correctly set forth on the signature page hereto and the other information regarding the Pledgor set forth in this Agreement, including without limitation, its signature hereto is true, correct and complete on the date hereof.   The Pledgor has not changed the Pledgor's name or its principal residence (which is correctly identified on the signature page hereto) in the past five (5) years.

(b)     The Pledgor is and at all times will continue to be the sole direct, legal and beneficial owner of the Collateral pledged by it hereunder.   All Collateral is and shall be free and clear of any and all Liens, security interests, encumbrances and claims (other than the Lien and Security Interest created by this Agreement or any other Loan Document and any Permitted Liens).

(c)     The Pledgor has not authorized the filing of and the Pledgor is not aware of any financing statements against the Pledgor that includes a description of collateral covering any part of the Collateral, other than any financing statements relating to the Security Interest granted to the Secured Party hereunder.

711870426 14466044

**81**

(d)     This Agreement creates a valid, perfected first priority Lien on and security interest in the Collateral in favor of Secured Party upon (i) in the case of Collateral in which a security interest may be perfected by filing a financing statement under the UCC, the completion of the filings and other actions specified on Schedule A and (ii) in the case of Collateral in which a security interest may be perfected by control under the UCC, the execution of this Agreement.

(e)     The Pledgor has not consented to any Person complying with entitlement orders of any Person other than the Secured Party.

(f)     Except as otherwise provided by this Agreement, no consent, authorization, approval, license or other action by, and no notice to or filing with, any Governmental Authority or other Person, other than those that have been received or completed is required for (x) the execution, delivery or performance of this Agreement by the Pledgor (including, without limitation, the grant of the Lien hereunder), (y) the exercise by the Secured Party of the rights provided for in this Agreement or (z) the exercise by the Secured Party of the remedies in respect of the Collateral pursuant to this Agreement.  In the event that the Secured Party desires to exercise any remedies, voting or consensual rights or attorney-in-fact powers set forth in this Agreement and determines it necessary to obtain any approvals or consents of any Governmental Authority or any other Person therefor, then, upon the reasonable request of the Secured Party, the Pledgor agrees to assist and aid the Secured Party to obtain as soon as practicable any necessary approvals for the exercise of any such remedies, rights and powers.

(g)     In connection with the transfer and/or pledge of the Collateral to the Secured Party, all required notices to third parties have been given and any required consents or approvals from third parties have been obtained.

(h)     None of the Securities included in the Collateral are entitled to the benefits of any registration rights agreement or similar agreement.

(i)     Either none of the Collateral consists of "restricted securities" within the meaning of Rule 144, or, with respect to any Collateral comprised of "restricted securities" as determined in accordance with Rule 144, such restricted securities are eligible for sale by the Pledgor under Rule 144 as of the date of the agreement without restriction.

(j)     The Pledgor is not, within the preceding three months has not been, and during the term of this Agreement will not become, an Insider (as defined below) with respect to the issuer of any of the Securities.  "Insider" means a Person who is an officer, director or beneficial owner of more than 10% of any class of equity securities of an issuer required to file reports pursuant to Section 16(a) of the Exchange Act or otherwise an affiliate of an issuer within the meaning of the Securities Act.

(k)     All Collateral which consists of equity interests has been validly acquired and validly issued, and is fully paid, to the extent such equity interests consist of stock, and non-assessable and no Collateral is evidenced or represented by any certificate, note or chattel paper other than such as has been delivered to and is in the possession of the Securities Intermediary.

711870426 14466044

**82**

(l)     The execution, delivery and performance of this Agreement does not violate or conflict with (i) the Constituent Documents of the Pledged Entity and the terms or provisions of any other document or agreement to which the Pledgor or the Pledged Entity is a party or pursuant to which the Pledgor's or the Pledged Entity's assets or properties are bound and all consents necessary in order for the Pledgor to execute and deliver this Agreement have been obtained, (ii) any order, ruling, consent, decree or other directive issued or made by any court, regulatory body or governmental authority having jurisdiction over the Pledgor or its properties, or (iii) any laws applicable to or binding on the Pledgor or its assets and properties.

(m)     The Pledged Interests are General Intangibles.  None of the Pledged Interests are a "security" (within the meaning of Section 8-102(a)(15) and 8-103 of the UCC). The Pledged Interests are not dealt with or traded on any securities exchange or in any securities market.

7.     **Covenants.**  During the term of this Agreement, the Pledgor hereby covenants as follows:

(a)     To the extent not already obtained, the Pledgor will promptly request and obtain executed consents required by the Secured Party in connection with the pledge of the limited partnership interests included in the Collateral.

(b)     The Pledgor will promptly execute and deliver, and hereby authorizes the Secured Party to execute on behalf of the Pledgor, such further instruments and take such further actions as Secured Party may deem necessary or desirable to maintain or perfect the Security Interest, including without limitation, stock powers indorsed in blank, control agreements and UCC financing statements.

(c)     The Pledgor shall not cause or permit any Pledged Interest to be a security governed by Article 8 of the UCC or represented by a certificate.  Notwithstanding the foregoing, the Pledgor shall provide written notice to Secured Party if certificates are issued after the date hereof evidencing any of the Pledged Interest or other Collateral owned the Pledgor, and agrees to transfer and deliver to the Secured Party, in accordance with the Secured Party's instructions, any and all such certificates (together with powers indorsed in blank).

(d)     The Pledgor will maintain the Collateral pledged by it in the Securities Account in accordance with Section 5 of this Agreement.

8.     **Remedies**.

(a)     Upon the occurrence of a Payment Default or as otherwise permitted by Section 5(b) hereof, the Secured Party may exercise from time to time, any and all rights and remedies of a secured party under the UCC (whether or not in effect in the jurisdiction where such rights are exercised) or any applicable laws in effect in any jurisdiction where any rights and remedies may be asserted and any and all rights and remedies available to it as a result of this Agreement or any other Loan Document including, without limitation, (i) its right to instruct the Securities Intermediary to cancel any open orders and close any and all outstanding contracts; (ii) its right to liquidate any or all of the Collateral; (iii) its right to withdraw and/or sell any or all of the Collateral; (iv) its right to apply any or all of the Collateral as well as the proceeds of any

711870426 14466044

**83**

                                                  GSBANK0002193

such Collateral to the Secured Obligations; and (v) its rights under the Account Agreement; provided, however, that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Pledgor under the Bankruptcy Code, the Secured Obligations shall automatically become due and payable without further act of the Secured Party.  The Pledgor shall be responsible for any decrease in the value of the Collateral occurring prior to or during liquidation.  Upon the occurrence of a Payment Default or as otherwise permitted by Section 5(b) hereof, the Secured Party in its discretion may also set-off any or all of the Secured Obligations against any securities, cash, or other property of the Pledgor in the possession of the Secured Party (directly or through the Securities Intermediary as the Secured Party's agent) or any other member of the Goldman Affiliated Group and against any obligations owed to the Pledgor by the Secured Party or any other member of the Goldman Affiliated Group to the extent that it does not impact the Secured Party's ability to recover amounts owed to the Secured Party.  **THE PLEDGOR UNDERSTANDS THAT PURSUANT TO THE TERMS OF THIS AGREEMENT THE PLEDGOR IS ALLOWING THE SECURED PARTY TO SET-OFF ANY OR ALL SECURED OBLIGATIONS OF THE PLEDGOR TO THE SECURED PARTY OR ANY OTHER MEMBER OF THE GOLDMAN AFFILIATED GROUP AND BY ALLOWING FOR SUCH AFFILIATE SET-OFF, THE PLEDGOR IS WAIVING ALL OF ITS RIGHTS TO LIMIT SET-OFF TO THOSE SECURED OBLIGATIONS WHICH ARE MUTUAL AS BETWEEN THE SECURED PARTY AND THE PLEDGOR.**

(b)     Upon the occurrence of a Payment Default or as otherwise permitted by Section 5(b) hereof, the Secured Party may upon ten (10) days' prior written notice to the Pledgor of the time and place, with respect to the Collateral or any part thereof that shall then be or shall thereafter come into the possession, custody or control of the Secured Party or any of its agents, sell, lease, assign or otherwise dispose of all or any part of the Collateral, at such place or places as the Secured Party deems best, and for cash or for credit or for future delivery, at public or private sale, without demand of performance or notice of intention to effect any such disposition or of the time or place thereof (except such notice as is required above or by applicable statute and cannot be waived, and the Secured Party or anyone else may be the purchaser, lessee, assignee or recipient of any or all of the Collateral so disposed of at any public sale (or, to the extent permitted by law, at any private sale) and thereafter hold the same absolutely free from any claim or right of whatsoever kind, including any right or equity of redemption (statutory or otherwise) of the Pledgor, any such demand, notice (other than the notice specified above) and right or equity being hereby expressly waived and released.  The Secured Party may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the sale may be so adjourned.  With respect to that portion of the Collateral that is perishable, threatens to decline speedily in value or is of a type customarily sold on a recognized market, the parties acknowledge and agree that the Secured Party need not furnish the Pledgor with notice of its intention to sell such Collateral.

(c)     The Pledgor recognizes that, by reason of certain prohibitions contained in the Securities Act and applicable state securities laws, or other laws, the Secured Party, in the exercise of its rights and remedies hereunder may, with respect to any sale of all or any part of the Collateral, limit purchasers to Persons who are not United States Persons and/or who will agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to the distribution or resale thereof and who otherwise satisfy applicable legal and

711870426 14466044

**84**

contractual restrictions on the transfer of such Collateral.  The Pledgor acknowledges that any such restricted or private sales may be at prices and on terms less favorable to the Pledgor than those obtainable through a public sale without such restrictions, but agrees that such sales are commercially reasonable so long as sales to the Secured Party or any of its affiliates are based on arm's length terms consistent with industry practice.  The Pledgor further acknowledges that any specific disclaimer of any warranty of title or the like by the Secured Party, will not be considered to adversely affect the commercial reasonableness of any sale of Collateral, except as a result of the gross negligence or willful misconduct of the Secured Party.

(d)    The Secured Party shall incur no liability as a result of the sale of the Collateral, or any part thereof, at any private sale pursuant to this Section 8 conducted in a commercially reasonable manner.  The Pledgor hereby waives any claims against the Secured Party arising by reason of the fact that the price at which the Collateral may have been sold at such a private sale was less than the price that might have been obtained at a public sale or was less than the aggregate amount of the indebtedness under the Loan Agreement, even if the Secured Party accepts the first offer received and does not offer the Collateral to more than one offeree.

9.     **General Provisions**.

(a)    **No Release**.  Nothing set forth in this Agreement shall relieve the Pledgor from the performance of any term, covenant, condition or agreement required on the Pledgor's part to be performed or observed under or in respect of any of the Collateral or from any liability to any Person under or in respect of any of the Collateral or shall impose any obligation on the Secured Party to perform or observe any such term, covenant, condition or agreement on the Pledgor's part to be so performed or observed or shall impose any liability on the Secured Party for any act or omission on the part of the Pledgor relating thereto or for any breach of any representation or warranty on the part of the Pledgor contained in this Agreement or under or in respect of the Collateral or made in connection herewith or therewith.

(b)    **Voting**.  The Secured Party acknowledges that the Pledgor shall retain its right to vote with respect to the Pledged Entity, provided that the Pledgor shall not vote in any way that is inconsistent with the terms of this Agreement, the Loan Agreement and the other Loan Documents.  Upon the occurrence and during the continuance of a Payment Default or as Secured Party may otherwise deem necessary in its sole discretion in connection with the exercise of its remedies hereunder, the Secured Party may vote or consent to actions in respect of Collateral (other than Collateral constituting an interest in or right with respect to the Pledged Entity) without the need for any notice to, or consent of, any Pledgor.  Upon the occurrence and during the continuance of a Payment Default or as Secured Party may otherwise deem necessary in its sole discretion in connection with the exercise of its remedies hereunder, the Secured Party may vote or consent to actions in respect of Collateral  (other than Collateral constituting an interest in or right with respect to the Pledged Entity) without the need for any notice to, or consent of, any Pledgor.

(c)    **Reasonable Care**.  The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if such Collateral is accorded treatment substantially equivalent to that which the Secured Party, in its

CONFIDENTIAL                                                                                          GSBANK0002195

individual capacity, accords its own property consisting of similar instruments or interests, it being understood that the Secured Party shall have no responsibility for (i) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or (ii) taking any necessary steps to preserve rights against any Person with respect to any Collateral.

(d)     **Expenses**.   The Pledgor will pay promptly all amounts payable by it pursuant to the Loan Agreement.  All such amounts shall be part of the Secured Obligations.

(e)     **No Waiver; Cumulative Remedies**.

(i)     No failure or delay on the part of the Secured Party in exercising any right, power or privilege hereunder and no course of dealing between the Pledgor and the Secured Party shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.  The rights, powers and remedies herein expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Secured Party would otherwise have.  No notice to or demand on the Pledgor in any case shall entitle the Pledgor to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Secured Party to any other or further action in any circumstances without notice or demand.

(ii)     In the event that the Secured Party shall have instituted any proceeding to enforce any right, power or remedy under this Agreement by foreclosure, sale, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Secured Party, then and in every such case, the Pledgor and the Secured Party shall be restored to their respective former positions and rights hereunder with respect to the Collateral, and all rights, remedies and powers of the Secured Party shall continue as if no such proceeding had been instituted.

(f)     **Application of Collateral**.  Secured Party shall apply Collateral received by it in the order prescribed in the Loan Agreement.

(g)     **Secured Party**.  The actions of the Secured Party hereunder are subject to the provisions of the Loan Agreement.  The Secured Party shall have the right hereunder to make demands, to give notices, to exercise or refrain from exercising any rights, and to take or refrain from taking action (including, without limitation, the release or substitution of Collateral), in accordance with this Agreement and the Loan Agreement.  The Secured Party may employ agents and attorneys-in-fact in connection herewith and shall not be liable for the negligence or misconduct of any such agents or attorneys-in-fact selected by it in good faith.

(h)     **Secured Party May Perform; Secured Party Appointed Attorney-in-fact**.  If the Pledgor shall fail to do any act or thing that it has covenanted to do hereunder after notice or if any representation or warranty on the part of the Pledgor contained herein shall be breached, the Secured Party may (but shall not be obligated to) do the same or cause it to be done or remedy any such breach, and may expend funds for such purpose.  The Pledgor hereby

711870426 14466044

**86**

GSBANK0002196

appoints the Secured Party its attorney-in-fact, with full authority in the place and stead of the Pledgor and in the name of the Pledgor, or otherwise, from time to time in the Secured Party's discretion, to take any action and to execute any instrument consistent with the terms of this Agreement and the other Loan Documents which the Secured Party may reasonably determine to be necessary or advisable to accomplish the purposes of this Agreement.  The foregoing grant of authority is a power of attorney coupled with an interest and such appointment shall be irrevocable for the term of this Agreement.  The Pledgor hereby ratifies all that such attorney shall lawfully do or cause to be done by virtue hereof.

(i)  **Continuing Security Interest; Assignment**.  This Agreement shall create a continuing security interest in the Collateral and shall (i) be binding upon the Pledgor and its successors and permitted assigns and (ii) inure, together with the rights and remedies of the Secured Party hereunder, to the benefit of the Secured Party and its permitted successors, transferees and assigns; no other Persons (including, without limitation, any other creditor of the Pledgor) shall have any interest herein or any right or benefit with respect hereto.  Without limiting the generality of the foregoing clause (ii), the Secured Party may assign or otherwise transfer any indebtedness held by it secured by this Agreement to any other Person, and such other Person so long as such assignment or transfer is consistent with the provisions of the Loan Agreement, shall thereupon become vested with all the benefits in respect thereof granted to the Secured Party, herein or otherwise, subject however, to the provisions of the Loan Agreement.

(j)  **Termination**.  When all the Secured Obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been made) and the Secured Party has agreed to terminate the Loan Agreement, this Agreement and the Lien noted hereunder shall automatically terminate without further action.  Upon termination of this Agreement, the Secured Party shall, upon the request and at the sole cost and expense of the Pledgor, assign, transfer and deliver to the Pledgor, against receipt and without recourse to or warranty by the Secured Party, such of the Collateral to be released (in the case of a release) as may be in possession of the Secured Party and as shall not have been sold or otherwise applied pursuant to the terms hereof, and, with respect to any other Collateral, proper documents and instruments (including UCC-3 termination statements) acknowledging the termination of this Agreement and the Lien noted hereunder or the release of such Collateral, as the case may be.

(k)  **Notices**.  Unless otherwise provided herein, all notices and other communications provided to any party hereto under this Agreement shall be in writing or by facsimile and addressed or delivered to such party at its address as set forth below.  Unless otherwise provided herein, any notice, if mailed and properly addressed with postage prepaid, shall be deemed given three (3) Business Days after being sent; any notice, if transmitted by facsimile, shall be deemed given when transmitted with confirmation of receipt; any notice, if hand delivered, shall be deemed given on the date of such delivery; any notice, if mailed by overnight courier, shall be deemed given on the date of such delivery.

| | |
|---|---|
| If to the Pledgor: | To the applicable address set forth on the signature pages hereto. |
| If to Secured Party: | Goldman Sachs Bank USA |

711870426 14466044

**87**

GSBANK0002197

222 S. Main Street
Salt Lake City, Utah 84101
Facsimile: 212-428-1474
Attention: Private Lending Services

(l)     **Severability**.   Any provision in this Agreement that is held to be inoperative, unenforceable, or invalid in any jurisdiction shall, as to that jurisdiction, be inoperative, unenforceable, or invalid without affecting the remaining provisions of the Agreement in that jurisdiction or the operation, enforceability, or validity of that provision in any other jurisdiction.

(m)     **Payment of Costs**.  The Pledgor shall pay, on demand, any and all costs of collection and reasonable attorneys' fees and costs paid or incurred by Secured Party in enforcing this Agreement after a Payment Default, whether or not any suit or other legal proceedings shall be instituted.

(n)     <u>**APPLICABLE LAW.   THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF.**</u>

(o)     **Miscellaneous**.  No amendment, modification, supplement, termination or waiver of or to any provision of this Agreement, nor consent to any departure by the Pledgor therefrom, shall be effective unless the same shall be made in accordance with the terms of the Loan Agreement and unless in writing and signed by each of the Secured Party and the Pledgor. No amendment, modification, supplement, termination or waiver of or to any provision of this Agreement, nor consent to any departure by the Pledgor therefrom which affects the obligations of the Securities Intermediary, shall be made unless consented to in writing and signed by the Securities Intermediary.  The captions in this Agreement are for convenience of reference only and shall not define or limit the provisions hereof.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.  Execution and delivery of this Agreement by facsimile or other electronic format (i.e. "pdf" or "tif") shall be sufficient for all purposes and shall be binding on any party who so executes.  This Agreement constitutes the exclusive agreement of the parties with respect to the matters addressed herein.

**[Remainder of page intentionally left blank; signature page follows]**

711870426 14466044

CONFIDENTIAL                                                                 GSBANK0002198

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

Principal Residence:                         **PLEDGOR:**

4004 Colgate Avenue                          By:_____
Dallas, Texas 75225                          Name:  Robert W. Carter

Email:_____

**SECURED PARTY:**

GOLDMAN SACHS BANK USA

By: _____

Name: _____

Title: _____

Address:     200 West Street
             New York, NY 10282-2198

Facsimile:   212-428-1474

With a copy to:

Address:     Attn: Bradley R. Baker
             100 Crescent Court, Suite 1000
             Dallas, TX 75201

Facsimile:   646-835-3251

**SECURITIES INTERMEDIARY:**

GOLDMAN, SACHS & CO.

By: _____

Name: _____

Title:

**Borrower Security & Pledge Agreement – Robert W. Carter**

CONFIDENTIAL                                        GSBANK0002200

## EXECUTION ACKNOWLEDGEMENT

The undersigned Pledged Entity hereby joins in the execution of this Agreement for the purposes of (i) agreeing to act at the sole direction and upon the instructions of the Secured Party with respect to the Collateral related to the Pledged Interest without any further action or consent of, or regardless of any contrary intent expressed by the Pledgor or any other limited partner of the Pledged Entity and (ii) agreeing to act in accordance with the terms and provisions of this Agreement, as such terms and provisions apply to the Pledged Entity, including Sections 3, 8 and 9(g).

**[Remainder of page intentionally left blank; signature page follows]**

711870426 14466044

**91**

CONFIDENTIAL                                                                      GSBANK0002201

**PLEDGED ENTITY:**

**PANDA POWER FUND II GP, L.P.**, a Delaware
limited partnership

By:  Panda Power Fund II GP, LLC,
      a Delaware limited liability
      company, its general partner


By:_____
Name: Todd W. Carter
Title:  Senior Partner and President

**CONFIDENTIAL**

GSBANK0002202

## SPOUSAL CONSENT TO SECURITY AND PLEDGE AGREEMENT

The undersigned hereby (a) acknowledges and agrees to the terms of this Security and Pledge Agreement, (b) subordinates any and all community property rights and other similar rights under the laws of the State of Texas or other applicable laws to the security interest granted pursuant to this Pledge Agreement in or to the Collateral, and agrees not to exercise against his/her spouse any claims they may have against the Pledgor or their property, unless and until the Secured Obligations of the Pledgor relating thereto are paid in full, and (c) to the extent his/her property interests are affected herein, does hereby pledge, grant and assign his/her interest (if any) in all of the Collateral to the Secured Party.

**[Remainder of page intentionally left blank; signature page follows]**

711870426 14466044

**93**

CONFIDENTIAL                                                                            GSBANK0002203

Name: _____

**CONFIDENTIAL**                                                    **GSBANK0002204**

**Annex I**

NOTICE OF EXCLUSIVE CONTROL

[NAME AND ADDRESS OF THE SECURITIES INTERMEDIARY]

**Re: Notice of Exclusive Control for Securities Account No. ██████████ (the "Securities Account")**

Ladies and Gentlemen:

This Notice of Exclusive Control is being sent pursuant to the Security and Pledge Agreement dated as of November 13, 2014 by and among Robert W. Carter (the "**Pledgor**"), Goldman Sachs Bank USA, (the "**Secured Party**") and Goldman, Sachs & Co. (the "**Securities Intermediary**").

Pursuant to the above-referenced agreement, the Securities Intermediary is hereby instructed as follows:

_____ (a)   The Securities Intermediary shall freeze all assets and activity in the Securities Account pending further instructions from the Secured Party.

_____ (b)   Notwithstanding the foregoing, the Securities Intermediary shall liquidate assets in the Securities Account which are needed to yield $_____ in proceeds, and transfer such proceeds to the Secured Party.  If the assets contained in the Securities Account have a liquidation value exceeding $_____, the Securities Intermediary shall have the sole discretion to determine which assets are liquidated.  If the liquidation of all assets in the Securities Account shall yield less than $_____, the Securities Intermediary shall liquidate all assets and transfer all proceeds to the Secured Party.

_____ (c)   Without limiting the foregoing, the Securities Intermediary shall not comply with any instructions received by the Pledgor after receipt of this notice but shall continue to comply with all instructions of the Secured Party without the consent of any other Person.

Any proceeds transferred to the Secured Party are to be wired by the Securities Intermediary to the following account:

[wiring instructions]

Very truly yours,

GOLDMAN SACHS BANK USA

By: _____
        Name:
        Title:

711870426 14466044

**95**

**Schedule A**

**Filings**

      1.     UCC-1 financing statement naming Robert William Carter, as debtor, and Goldman Sachs Bank USA, as secured party, filed with the Secretary of State of the State of Texas.

711870426 14466044

**96**

 GSBANK0002206

**EXHIBIT 7.15**

**DISCLOSURE STATEMENT FOR
LOANS MADE BY GOLDMAN SACHS BANK USA THAT ARE
SECURED BY INTERESTS IN CERTAIN GOLDMAN SACHS-MANAGED
INVESTMENT FUNDS**

This disclosure statement (this "Disclosure Statement") identifies, in general terms, certain of the risks and other information related to Goldman Sachs Bank USA ("Lender") making a loan to you that is secured by interests in one or more hedge funds, funds of hedge funds or similar investment vehicles (each, a "Fund") managed, directly or indirectly, by entities of the Goldman Sachs Group, including but not limited to, Goldman Sachs Asset Management, L.P. or Goldman Sachs Hedge Fund Strategies, L.L.C. (each, a "Manager"), each of which is an affiliate of Lender (collectively, a "Financed Investment"). This Disclosure Statement does not purport to identify risks associated with a Financed Investment in any particular Fund and you should carefully review the offering document for the each Fund in which you will be making a Financed Investment before making a decision to do so.

Entering into a Financed Investment involves a high degree of risk, including the risk that any losses with respect to your investment in the Fund will be greater than if no leverage was used. No guarantee or representation is made that entering into a Financed Investment will be successful.

Before entering into a Financed Investment, you should ensure that you fully understand the terms of the financing transaction, relevant risks associated with the transaction, the nature and extent of your risk of loss and the nature of the contractual relationship into which you are entering. You should also carefully evaluate whether the transaction is appropriate for you in light of your experience, objectives, financial resources, and other relevant circumstances.

You are urged to consult with your own advisers to determine the suitability of a Financed Investment and the relationship of such an investment to your overall investment program and financial and tax positions.

**CERTAIN RISKS**

In determining whether a Financed Investment in a Fund is a suitable investment, you should consider, among others, the following risks in addition to the risks regarding an investment in the Fund that are described in the offering document for the applicable Fund.

**Risk Associated with Increased Leverage**

Although the increased leverage provided by a Financed Investment in a Fund may result in a total return as a percentage of your equity in the interests in such Fund ("Fund Interests") that is greater than an unleveraged investment in such Fund Interests, it may also result in a total loss as

711870426 14466044

**97**

a percentage of your equity in such Fund Interests that is greater than that of an unleveraged investment. In addition, the interest expense that you bear in connection with the Financed Investment will reduce the returns on your investment. Moreover, should the Fund Interests decline in value, you may be required to either deposit additional funds or securities with Lender or one of its affiliates as collateral for your loan or suffer mandatory liquidation of the Fund Interests in order to compensate for the decline in value. In the event of a sudden precipitous drop in the value of the Fund Interests, you may be required to liquidate the Fund Interests more quickly than otherwise desirable in order to satisfy your obligation to Lender, which may result in adverse tax or other consequences to you.

In addition to the leverage obtained through the making of a Financed Investment, a Fund may employ leverage in furtherance of its investment objective. This added layer of leverage will result in a higher degree of overall leverage and will further increase the potential risk of loss in a Financed Investment, particularly in the event of an economic downturn or underperformance of the Fund's underlying investments.

**Additional Risk Associated with Securing a Loan with Fund Interests**

Fund Interests are subject to significant restrictions on redemption and transfer as described in the offering document provided for each Fund. You will not receive any additional or special rights of redemption with respect to your Fund Interests which coincide with obligations which may arise under the loan agreement (with all other ancillary documents executed together therewith, the "Loan Agreement") with Lender in connection with your Financed Investment, including the obligation to make interest payments to Lender. Restrictions on redemption increase the risk that the value of Fund Interests may decrease between an event of default under the Loan Agreement and the disposition of such Fund Interests in order to satisfy a liability under the Loan Agreement.

The fact that Lender has accepted the Fund Interests as collateral under the Loan Agreement should not be taken as an indication that the Fund Interests may not lose value. You should not make a Financed Investment unless you can sustain a partial or total loss of your investment in the Fund in addition to the obligation to repay the amounts of principal and interest owed to Lender pursuant to the Loan Agreement.

**No Fiduciary Duty**

While the Manager of a Fund has certain fiduciary duties to the investors in a Fund under applicable law in addition to any contractual obligations it may have, Lender will not owe you any fiduciary duties in connection with the loan it will be making to you and it will only be bound by the terms of the Loan Agreement.

**Limits of Risk Disclosure**

The above discussions relating to various risks associated with a Financed Investment are not, and are not intended to be, a complete enumeration or explanation of the risks involved in the purchase of the Financed Investment. You should read the Loan Agreement, Security

711870426 14466044

98

GSBANK0002208

Documents, and other agreements related to the Financed Investment, and the Private Placement Memoranda of the Funds and should consult with your own advisers before deciding whether to make a Financed Investment.  In addition, as market conditions change or develop over time, the purchase of the Financed Investment may be subject to risk factors not currently contemplated or described in such documents.

## POTENTIAL CONFLICTS OF INTEREST

The Goldman Sachs Group, Inc., Lender, the Manager and their affiliates, directors, partners, trustees, managers, members, officers and employees (collectively, for purposes of this "*POTENTIAL CONFLICTS OF INTEREST*" section, "Goldman Sachs"), are engaged in businesses unrelated to the Financed Investment.  Certain potential conflicts of interest may arise, directly or indirectly, from such engagement that you should consider.

The activities of each Fund, and its respective affiliates, directors, trustees, managers, members, partners, officers and employees, may give rise to conflicts of interest that could disadvantage you and the value of the Financed Investment.  A description of certain of such potential conflicts of interest is set forth under "*POTENTIAL CONFLICTS OF INTEREST*" or a similarly titled section in the Fund's offering document.  By making a Financed Investment, you will be deemed to have acknowledged and assented to the existence of potential conflicts of interest relating to a Fund, its Manager, and Lender, and to your purchase of the Financed Investment in the face of these conflicts.

Goldman Sachs and its sales personnel have interests in promoting Financed Investments.  With respect to Goldman Sachs and its sales personnel, the remuneration and profitability of activity relating to the Financed Investments may be greater than the provision of other services and sales of other products that might be provided or offered.  For example, Goldman Sachs and its sales personnel will directly or indirectly receive fees and commissions in connection with your Financed Investment.  Such fees and commissions may be higher than for other products or services, and the remuneration and profitability to Goldman Sachs and such personnel resulting from such transaction may be greater than the remuneration and profitability resulting from other products.  In particular, it is expected that remuneration and profitability to Goldman Sachs and its sales personnel resulting from Financed Investments will be greater than the remuneration and profitability resulting from sales of Fund Interests that are not Financed Investments.

711870426 14466044

**99**

## Annex I

### Privacy Notice

The Goldman Sachs financial services companies endeavor to maintain the highest standards of confidentiality and to respect the privacy of our client relationships. In that regard, we are providing this Privacy Notice to our clients in accordance with Title V of the Gramm-Leach-Bliley Act of 1999 and its implementing regulations. This notice supplements any privacy policies or statements that we may provide in connection with specific products or services.

**This Privacy Notice is being provided for information purposes only. Individual, Joint and IRA accountholders will shortly be receiving a second copy of this notice which can be used to communicate privacy preferences to us.**

### THE INFORMATION WE COLLECT ABOUT YOU

The non-public personal information we collect about you (your "Information") comes primarily from the account applications or other forms you submit to us. We may also collect Information about your transactions and experiences with us, our affiliates, or others relating to the products or services we provide. Also, depending on the products or services you require, we may obtain additional Information from consumer reporting agencies.

### OUR INFORMATION SECURITY POLICIES

Your privacy is very important to us, and we take the responsibility to safeguard you Information very seriously. We limit access to your Information to those of our employees and service providers who are involved in offering or administering the products or services that we offer. We maintain physical, electronic, and procedural controls that are designed to comply with federal standards to safeguard your information.

If our relationship ends, we will continue to treat your Information as described in this Privacy Notice.

### OUR DISCLOSURE POLICIES

We do not disclose your Information to anyone, except as permitted by law. The types of Information disclosures permitted by law include sharing your Information with non-affiliated companies that perform support services for your account or process your transactions with us or our affiliates, disclosing your Information pursuant to your express consent, disclosing your Information to fulfill your instructions, or disclosures of your Information that are required for us to be in compliance with applicable laws and regulations.

Unless you indicate that you would not like us to do so (i.e., unless you "opt out"), federal law also permits us to share your Information with our affiliates for their use in the marketing of their products and services to you.

711870426 14466044

**100**

GSBANK0002210

## USE OF INFORMATION FOR AFFILIATE MARKETING

Sharing your Information with our affiliates enables us to better provide you with the full range of services and products available from Goldman Sachs to its private clients. This is the case because the core private client offering – investment management, brokerage, wealth advisory services, trust services and banking services – is actually delivered through a variety of affiliated legal entities that are all part of the Goldman Sachs family of financial services companies.

Our affiliates use your Information to evaluate whether the products or services they offer match your specific needs and, if so, to subsequently market those products or services to you. The affiliates that we would most often share your Information for marketing purposes are: Goldman Sachs Bank USA, The Goldman Sachs Trust Company, N.A., The Goldman Sachs Trust Company of Delaware, and The Ayco Company, L.P.

## INFORMATION SHARING WITH NON-AFFILIATES

We do not sell or license your Information to anyone. We only disclose your Information to non-affiliated third-parties that perform support services for your account or process your transactions, or as otherwise permitted by the law. We require any non-affiliated third parties to whom we disclose your Information to adhere to confidentiality agreements and to maintain appropriate safeguards to protect your Information.

## HOW TO EXERCISE YOUR OPT-OUT RIGHTS

If you do not want us to share your Information with our affiliates as described above and / or you want to limit its use for marketing, you may either: i) fill out the opt-out form which will be sent to you shortly and return it to us at the address indicated on the form, or ii) opt out via the Client Web at www.goldman.com, at any time.

Once we receive your opt-out election, we will, within a reasonable time, stop sharing the Information, or if applicable, prevent its use for marketing. Your choices will apply until you tell us to change those choices. If you already made choices about the use and sharing of your Information, you do not need to act again.

All opt-outs described above that are exercised by any party to a joint account will apply to all parties on that account.

Please contact your Private Wealth Advisor if you have any questions.

711870426 14466044

**101**

This notice is being provided on behalf of the following affiliates of The Goldman Sachs Group, Inc.:

Goldman, Sachs & Co.
Goldman Sachs Bank USA
The Goldman Sachs Trust Company
N.A. and The Goldman Sachs Trust Company of Delaware

(Not engaged in affiliate marketing)
Goldman Sachs Financial Markets, L.P.
Goldman Sachs Mitsui Marine Derivative Products, L.P.
Goldman Sachs International
J. Aron & Company
Goldman Sachs Asset Management, L.P.
Goldman Sachs Asset Management International
GS Investment Strategies, LLC
Goldman Sachs Hedge Fund Strategies, LLC
The family of funds managed by the affiliates listed above

711870426 14466044

**102**

**CONFIDENTIAL**                                                                                    GSBANK0002212

## Annex II

## Conflicts of Interest

GS&Co. is a major participant in global financial markets and as such has activities and interests that include potential multiple advisory, transactional and financial and other interests in accounts, securities, instruments and companies that may be purchased or sold in your GS&Co. accounts (such accounts, the "Account"). GS&Co. acts as an investor, investment banker, research provider, investment manager, financer, advisor, market maker, trader, prime broker, lender, agent and principal, and has other direct or indirect interests, in the global fixed income, currency, commodity, equity and other markets in which your Account may invest. GS&Co. and its personnel, including Private Wealth Advisors assigned to your Account, may take positions in securities or take actions for their own accounts which conflict with positions in your Account, and GS&Co. may act as counterparty to any transaction executed for your Account, subject to applicable law. Additionally, GS&Co. may on a proprietary basis sell, redeem, purchase, take short positions in or take similar actions with respect to securities, currencies, funds or other investments in which your Account may be invested ("underlying assets") without having to notify you of such investment or activity. GS&Co. may also create, write, sell or issue, or act as placement agent or distributor of derivatives and structured investment products whose value may be linked to the value of underlying assets. To the extent permitted by applicable law, GS&Co. may hedge its derivative positions by buying or selling such underlying assets, and reserves the right to sell or redeem some or all of these underlying assets without notice to you. Such actions may have an adverse effect on the amount of fees, expenses and other costs incurred directly or indirectly in connection with your Account. For instance, GS&Co. may for its own account, have long or short positions in, and actively buy or sell, the products or related securities purchased or sold for your Account, or derivatives of these products or related securities. In addition, GS&Co. may act as adviser to clients in investment banking, financial advisory, asset management and other capacities in advisory, transactional, financial or other assignments of all types including those related to instruments that may be purchased, sold or held in your Account. Further, GS&Co. may issue, or be engaged as underwriter, financial advisor or the issuer of, instruments that your Account may purchase, sell or hold. In its market making activities, occasionally, GS&Co. may enter the market in anticipation of a likely client transaction or order to "set up for" or "pre-hedge" the transaction and it is possible that such trading could impact the market price of securities purchased or sold in your Account. Substantially all transactions for brokerage accounts will be effected by GS&Co. Employees will generally receive referral or brokerage compensation in connection with these transactions and GS&Co. and employees each have an interest in recommending brokerage execution with GS&Co. GS&Co. receives compensation when brokerage accounts invest in products managed by GS&Co. such as mutual funds, hedge funds or other alternative investments. GS&Co. and its employees will generally directly or indirectly receive a portion of fees and commissions paid by you. Such fees and commissions vary according to the type of product or service and may be higher for certain products or services. The present and future activities of GS&Co. may give rise to additional conflicts of interest with you. You agree that GS&Co., in its sole discretion, may refrain from recommending or effecting transactions including due to (a) regulatory requirements, (b) GS&Co.'s internal policies and procedures, and (c) its determinations

711870426 14466044

CONFIDENTIAL                                                                    GSBANK0002213

regarding actual or potential conflicts of interest or the appearance of such conflicts. However, you also agree that GS&Co. may determine to recommend or effect transactions notwithstanding the existence of such conflicts. You acknowledge that you understand the risks.

In this Annex II, "GS&Co." means Goldman, Sachs & Co., its present and future affiliates, and their respective partners, officers, directors, employees and agent.

711870426 14466044

**104**

**GSBANK0002214**

**EXECUTION COPY**



# LOAN AGREEMENT

among

GOLDMAN SACHS BANK USA,
as Lender,

TODD W. CARTER,
as Borrower,

PANDA POWER GENERATION INFRASTRUCTURE FUND, LLC,
as Guarantor

and

PANDA POWER FUND II GP, L.P.,
as Guarantor

November 13, 2014

711870427 14466044

Exhibit A-2

**105**

## LOAN AGREEMENT

This Loan Agreement (this "**Agreement**"), is among GOLDMAN SACHS BANK USA (together with its successors and permitted assigns, the "**Lender**"), TODD W. CARTER (the "**Borrower**"), PANDA POWER GENERATION INFRASTRUCTURE FUND, LLC, a Delaware limited liability company (the "**Advisor**"), and PANDA POWER FUND II GP, L.P., a Delaware limited partnership (the "**General Partner**" and together with the Advisor, the "**Guarantors**"), and is dated as of November 13, 2014 (the "**Effective Date**").

ARTICLE I

DEFINITIONS

As used in this Agreement:

"**Advisor**" has the meaning given to that term in the Preamble of this Agreement.

"**Advisory Agreement**" means (a) the Amended and Restated Advisory Agreement dated as of November 21, 2013 between Panda Fund II A and the Advisor, (b) the Amended and Restated Advisory Agreement dated as of November 21, 2013 between Panda Fund II B and the Advisor, (c) the Advisory Agreement dated as of April 30, 2010 between Panda Power Generation Infrastructure Fund A, L.P. and the Advisor, (d) the Advisory Agreement dated as of April 30, 2010 between Panda Power Generation Infrastructure Fund B, L.P. and the Advisor, (e) the Advisory Agreement dated as of May 12, 2011 between Panda Power Generation Infrastructure Fund B (AIV), L.P. and the Advisor, and (f) any other advisory, management or similar agreement entered into between any other private investment or similar fund or entity and by the Advisor, in each case as amended, restated, supplemented or otherwise modified from time to time in accordance with this Agreement.

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person.

"**Affiliate Transaction**" has the meaning given to that term in Section 2.10 of this Agreement.

"**Agreement**" has the meaning given to that term in the Preamble of this Agreement, as amended, restated, supplemented or otherwise modified from time to time.

"**Applicable Margin**" means a rate equal to 2.50% per annum.

"**Appraised Value**" means, as of any date, the value of the GP's Limited Partnership Interest in each Fund as determined based on the most recent valuation report(s) prepared by Marshall & Stevens and delivered to the Lender pursuant to this Agreement.

"**Bank Official**" means an executive officer, director, or principal shareholder of the Lender or any Company of which the Lender is a subsidiary or any other subsidiary of such Company.

2

CONFIDENTIAL

GSBANK0002219

"**Base Rate**" means the rate of interest quoted in the print edition of The Wall Street Journal, Money Rates Section as the U.S. Prime Rate, as in effect from time to time. The Base Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. The Lender may make commercial loans or other loans at rates of interest at, above or below the Base Rate.

"**Base Rate Loan**" means a Loan which bears interest at a rate determined by reference to the Base Rate.

"**Borrower**" has the meaning given to that term in the Preamble of this Agreement.

"**Business Day**" means, with respect to any borrowing or payment, a day other than Saturday or Sunday on which banks are open for business in New York, New York.

"**Collateral**" has the meaning given to such term in the applicable Security Documents.

"**Company**" means any corporation, partnership, trust (business or otherwise), association, joint venture, pool syndicate, sole proprietorship, unincorporated organization, or any other form of business entity not specifically listed, provided that "Company" does not include: (a) an insured depository institution (as defined in 12 U.S.C. 1813); or (b) a corporation the majority of the shares of which are owned by the United States or by any State.

"**Constituent Documents**" means the certificate of incorporation and by-laws of a corporation; the certificate of limited partnership and agreement of limited partnership of a limited partnership; the partnership agreement of a general partnership; the certificate of formation and operating or comparable agreement of a limited liability company; and the comparable instruments for any other entity, including, with respect to a trust, any agreement or instrument creating such trust, including: (a) with respect to Panda Fund II A, the Second Amended and Restated Limited Partnership Agreement of Panda Fund II A dated as of November 21, 2013 among the General Partner and the various limited partners party thereto, as amended by Amendment No. 1 thereto, dated as of September 29, 2014, (b) with respect to Panda Fund II B, the Second Amended and Restated Limited Partnership Agreement of Panda Fund II B dated as of November 21, 2013 among the General Partner and the various limited partners party thereto, as amended by Amendment No. 1 thereto, dated as of September 29, 2014, (c) with respect to the General Partner, the Amended and Restated Limited Partnership Agreement dated as of February 21, 2014 and effective as of June 28, 2013 among Panda Power Fund II GP, LLC and the limited partners party thereto, (d) with respect to the Advisor, the Amended and Restated Limited Liability Company Agreement of the Advisor dated as of April 30, 2010, among the members party thereto, (e) with respect to Panda Power Generation Infrastructure Fund A, L.P., the Amended and Restated Limited Partnership Agreement dated as of April 30, 2010, as amended from time to time, and (f) with respect to Panda Power Generation Infrastructure Fund B (AIV), L.P., the Amended and Restated Limited Partnership Agreement dated as of April 30, 2010, as amended from time to time.

"**Credit Period**" means the period from and including the Effective Date to but excluding the Demand Date.

"**Default Interest**" has the meaning given to that term in Section 2.3 of this Agreement.

711870427 14466044

CONFIDENTIAL                                                                                     GSBANK0002220

"**Demand Date**" means the earlier to occur of (i) the date the Obligations become due and payable pursuant to Section 6.1 hereof and (ii) the date on which the Lender demands payment hereunder and/or declares the Obligations to be immediately due and payable in full in cash, in each case which the Lender shall have the ability to do in its sole and absolute discretion; *provided* that subject to the provisions of Section 6.1, the Borrower shall have 90 days from the date the Lender demands payment hereunder to repay the Obligations so long as no Trigger Event exists or arises during such 90 day period (if any Trigger Event occurs, the Obligations shall become immediately due and payable at the election of the Lender in its sole discretion and such 90 day period shall not apply).

"**Deposit Account**" has the meaning given to that term in the applicable Deposit Account Control Agreement.

"**Deposit Account Control Agreement**" means the Blocked Account Control Agreement between the Advisor, the Depository and the Lender, as amended, restated, supplemented or otherwise modified from time to time.

"**Depository**" means JPMorgan Chase Bank, N.A.

"**Disposition**" has the meaning ascribed thereto in each Fund's Constituent Documents.

"**Disposition Proceeds**" has the meaning ascribed thereto in each Fund's Constituent Documents.

"**Dissolution Sale**" has the meaning ascribed thereto in each Fund's Constituent Documents.

"**Effective Date**" has the meaning given to that term in the Preamble of this Agreement.

"**Excess Cash Flow**" means, for each fiscal year of the Advisor (commencing with the fiscal year ended December 31, 2015) an amount equal to (a) all income of the Advisor, including amounts received by the Advisor under or with respect to any Advisory Agreement or the Constituent Documents of any Fund, including without limitation, any Management Fees, during such fiscal year, *minus* (b) tax distributions paid or payable by the Advisor in an amount not to exceed 40% of the Advisor's net income for any fiscal year *minus* (c) amounts applied towards interest expense payable with respect to this Agreement or any Other Loan Agreement during such fiscal year *minus* (d) the operating expenses incurred and paid by the Advisor in the ordinary course of business during any such fiscal year (but excluding fees and expenses related to compensation (including salary and incentive compensation) paid or payable to any borrower under any Other Loan Agreement or the Borrower other than salary and bonuses that are paid in the ordinary course of business consistent with past methodologies used for calculating such compensation) *minus* (e) fees and expenses incurred under Section 3.2 of this Agreement (and the Other Loan Agreements) and any other fees and expenses in relation to this Agreement (and the Other Loan Agreements) incurred during such fiscal year.

"**Excluded Taxes**" means with respect to a Lender (i) taxes imposed on or measure by its overall net income (however denominated and including U.S. federal backup withholding taxes), franchise taxes and branch profits taxes, in each case, (1) imposed by the United States or the

711870427 14466044

CONFIDENTIAL

GSBANK0002221

jurisdiction in which (a) the Lender is organized or (b) the lending office of the Lender is located, (2) arising from the Lender's present or former connection with the jurisdiction imposing such tax, other than a connection resulting solely from executing, delivering, becoming a party to, performing its obligations under, receiving payments under, receiving or perfecting a security interest under, selling or assigning an interest in, engaging in any other transaction pursuant to or enforcing any Loan Document and (ii) any penalties or interest imposed on any of the foregoing amounts in clause (i).

"**Facility Amount**" means $3,990,000.

"**Funds**" means each of (a) Panda Fund II A, (b) Panda Fund II B, (c) Panda Power Generation Infrastructure Fund A, L.P., (d) Panda Power Generation Infrastructure Fund B, L.P., (e) Panda Power Generation Infrastructure Fund B (AIV), L.P. and (f) any other private investment fund or collective investment vehicle, or similar fund or entity, including any parallel fund thereof, that is sponsored or managed directly or indirectly by the Advisor or its Affiliates or with respect to which the General Partner acts as the general partner.

"**General Partner**" has the meaning given to that term in the Preamble of this Agreement.

"**Goldman Affiliated Group**" means the Lender and GS&Co., together with their present and future Affiliates.

"**Governmental Authority**" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Gross-Up Tax**" means any tax other than Excluded Taxes.

"**GP's Limited Partnership Interest**" means the economic interests held by the Borrower in the General Partner.

"**GS&Co.**" means Goldman, Sachs & Co., a broker-dealer registered with the United States Securities and Exchange Commission, acting in its capacity as Securities Intermediary and custodian with respect to the Securities Account.

"**Guarantors**" has the meaning given to that term in the Preamble of this Agreement.

"**Guaranty**" has the meaning given to that term in Section 8.1 of this Agreement.

"**Indemnified Liabilities**" has the meaning given to that term in Section 7.10 of this Agreement.

"**Indemnified Person**" has the meaning given to that term in Section 7.10 of this Agreement.

711870427 14466044

CONFIDENTIAL

GSBANK0002222

"**Interest Payment Date**" means, with respect to any Loan (whether a Base Rate Loan or a LIBOR Loan), the tenth day of each month commencing on the tenth day of the month immediately following the month in which the Effective Date occurs.

"**Investment**" means, as to any Person, any acquisition or investment by such Person in any other Person, in the form of (a) the purchase or other acquisition of equity interests or debt or other securities of another Person, (b) a loan or advance to any other Person (other than for travel advances and other similar cash advances made to employees in the ordinary course of business) or (c) the purchase or other acquisition of all or substantially all of the property and assets or business of another Person or assets constituting a division of such other Person.

"**Lender**" has the meaning given to that term in the Preamble of this Agreement.

"**Lending Office**" means the Lender's office at 200 West Street, New York, NY 10282-2198, or such other office as Lender may designate in writing from time to time to Borrower.

"**LIBOR**" means, with respect to any LIBOR Reset Period, the rate of interest at which deposits in U.S. dollars are offered to major banks in the London interbank market for a thirty (30) day period on the day that is two (2) LIBOR Business Days prior to the commencement of such LIBOR Reset Period, based on information presented by any interest rate reporting service of recognized standing selected by the Lender, or if Lender determines that no interest rate reporting service has presented such information, the rate of interest at which deposits in Dollars are offered to major banks in the London interbank market for a thirty (30) day period on the day that is two (2) LIBOR Business Days prior to the commencement of such LIBOR Reset Period by any bank reasonably selected by Lender. Under the terms of this Agreement, the applicable "LIBOR" rate is used by the Lender as a reference rate.  The use of thirty (30) day LIBOR as a reference rate does not mean the Borrower will actually pay interest on any Loans pursuant to a thirty (30) day contract or any other interest rate contract.  Instead, the effective interest rate under this Agreement will adjust at the beginning of each LIBOR Reset Period as described further in Section 2.3.

"**LIBOR Business Day**" means a Business Day on which commercial banks are open for dealings in U.S. dollar deposits in the London interbank market.

"**LIBOR Loan**" means any Loan which bears interest at a rate determined by reference to LIBOR.

"**LIBOR Reset Period**" means (a) as to the initial LIBOR Loan and any other LIBOR Loan made during the same month as the initial LIBOR Loan, the period commencing on the date the first LIBOR Loan is made under this Agreement and ending on the last calendar day of the month during which such initial LIBOR Loan is made, and (b) as to any LIBOR Loan made or continued after such month, the period commencing on the first calendar day of the month during which such subsequent LIBOR Loan is made or, with respect to a LIBOR Loan that is continued, the period commencing on the first calendar day of the month immediately following the end of the prior LIBOR Reset Period, and ending on the earlier of (i) the last calendar day of the month during which such LIBOR Loan is made or most recently continued and (ii) the Demand Date unless the demand for payment was made in accordance with Section 6.1 and the

711870427 14466044

**110**

90 day period referenced therein has not lapsed or terminated, if applicable (in which case, the earliest to occur of the lapse or termination of such 90 day period).

"**Loan Documents**" means this Agreement, the Note, each of the agreements listed on Schedule I hereto (if any), any other Security Documents and each certificate, agreement or document made or entered into by the Borrower with or in favor of the Lender in connection with or pursuant to any of the foregoing.

"**Loan Party**" means the Borrower and any Guarantor under this Agreement or any other Loan Document.

"**Loans**" has the meaning given to that term in Section 2.1 of this Agreement.

"**Management Fees**" means all management fees under the Advisory Agreements.

"**Maintenance Value**" means, as of each determination date, the ratio of the aggregate outstanding principal amount of the Obligations as of such date to the Appraised Value of the GP's Limited Partnership Interest owned by the Borrower.

"**Material Adverse Effect**" means a material adverse effect (a) on the business or affairs, financial condition, obligation, operations, performance or properties of the Guarantors, taken as a whole, or the Borrower, (b) on the Guarantors' ability, taken as a whole, or the Borrower's ability to enter into and perform its obligations under this Agreement or any of the transactions contemplated by this Agreement, (c) on the validity or enforceability of any of the Loan Documents against any Loan Party, or (d) on the Lender's rights and remedies under any of the Loan Documents or on the Lender's first priority perfected security interest in the Collateral.

"**Maximum Facility Amount**" means, as of any date of determination, an amount equal to the lesser of (a) the Facility Amount and (b) the Facility Amount minus the amount of any prepayments made or required to be made pursuant to Section 2.5 or Section 2.6 as of such date.

"**Net Disposition Proceeds**" means, with respect to any Disposition or Dissolution Sale, the result of (a) the amount of Disposition Proceeds or other amounts received by any Fund on account of any Disposition or Dissolution Sale, as applicable, *minus* (b) tax distributions paid or payable by the Borrower (at a rate not to exceed 25% of the related gain) with respect to such Disposition of Dissolution Sale.

"**Note**" has the meaning given to that term in Section 2.1 of this Agreement.

"**Notice of Borrowing**" has the meaning given to that term in Section 2.2 of this Agreement.

"**Obligations**" means all unpaid principal of, and accrued and unpaid interest due on, the Note and all other obligations, interest, fees, charges and expenses of the Borrower to the Lender arising under or in connection with the Loan Documents.

"**OFAC**" has the meaning given to that term in Section 4.7 of this Agreement.

711870427 14466044

CONFIDENTIAL                                                                                                          GSBANK0002224

"**Oral Request**" has the meaning given to that term in Section 2.2 of this Agreement.

"**Other Loan Agreements**" means, collectively, each of the Loan Agreement among Robert W. Carter, the Guarantors and the Lender, dated as of the date hereof, the Loan Agreement among Robert K. Simmons, the Guarantors and the Lender, dated as of the date hereof, the Loan Agreement among William C. Nordlund, the Guarantors, and the Lender, dated as of the date hereof, and the Loan Agreement among Ralph T. Killian, The Ralph T. Killian Special Community Property Subtrust of the Killian Living Trust, Ralph T. Killian as trustee of The Ralph T. Killian Special Community Property Subtrust of the Killian Living Trust, the Guarantors and the Lender, dated as of the date hereof**.**

"**Panda Fund II A**" means Panda Power Fund II A, L.P., a Delaware limited partnership.

"**Panda Fund II B**" means Panda Power Fund II B, L.P., a Delaware limited partnership.

"**Participant**" has the meaning given to that term in Section 7.11 of this Agreement.

"**Payment Default**" means a nonpayment of any amount of principal or accrued and unpaid interest or any other amount owed hereunder or under any other Loan Document on the date any such amount is due, including when due upon demand by the Lender.

"**Permitted Liens**" means:

(a)     Any Liens existing on the Effective Date and disclosed in personal financial statements of the Borrower or arising under this Agreement or the other Loan Documents;

(b)     Liens for taxes, either (x) being contested in good faith by appropriate proceedings, and for a Guarantor, with respect to which reserves have been established in accordance with generally accepted accounting procedures or (y) not yet due and payable; and

(c)     Liens incurred in connection with the extension, renewal or refinancing of the indebtedness secured by Liens of the type described in clause (a) above, *provided* that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the indebtedness being extended, renewed or refinanced does not increase.

"**Person**" means any corporation, natural person, firm, joint venture, partnership, trust, unincorporated organization, enterprise, government or any department or agency of any government.

"**Regulation U**" means Federal Reserve Board Regulation U, 12 CFR Part 221, as amended from time to time, and any successor regulation or statute.

"**Returned Payment**" has the meaning given to that term in Section 7.14 of this Agreement.

8

711870427 14466044

**112**

GSBANK0002225

"**Securities**" means stocks, bonds, securities entitlements, financial assets or other securities or investment property (as such terms are defined in the UCC).

"**Securities Account**" has the meaning given to such term in the Borrower's Security Document.

"**Securities Intermediary**" has the meaning given to such term in the applicable Security Document.

"**Security Documents**" means, collectively, each of the agreements listed on Schedule I hereto and any other agreements, instruments, documents, financing statements, notices of assignment of accounts, schedules of accounts assigned, mortgages and other written matter necessary or reasonably requested by the Lender to perfect, and maintain perfected, the Lender's security interest in the Collateral.

"**Solvent**" means, when used with respect to any Person, that at the time of determination: (a) the fair value of the assets of such Person, at a fair valuation, will exceed its debts and liabilities, subordinated, contingent or otherwise, (b) the present fair saleable value of the property of such Person will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured, and (c) such Person will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured. For the purposes of determining whether a Person is Solvent, the amount of any contingent liability shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that reasonably can be expected to become an actual or matured liability.

"**Subscription Facility**" means the Revolving Credit Agreement dated as of November 10, 2014 among Panda Fund II A, Panda Fund II B, the General Partner, the affiliates thereof from time to time party thereto, and Goldman Sachs Bank USA, as lender, as amended, restated, amended and restated or otherwise modified from time to time.

"**Trigger Event**" has the meaning given to that term in Section 6.1 of this Agreement.

"**Trust**" means the Ralph T. Killian Special Community Property Subtrust of the Killian Living Trust.

"**UCC**" means the Uniform Commercial Code as in effect in the State of New York; provided, in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, the Lender's security interest in the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions of this Agreement and the other Loan Documents relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions; provided further, that to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles or Divisions of the UCC, the definition of such term contained in Article or Division 9 shall govern.

711870427 14466044

CONFIDENTIAL                                                                    GSBANK0002226

"**USA Patriot Act**" has the meaning given to that term in Section 4.7 of this Agreement.

All undefined terms contained in this Agreement shall, unless the context indicates otherwise, have the meanings provided for by the UCC to the extent the same are used or defined therein.  The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole, including the Exhibits and Schedules hereto, as the same may from time to time be amended, modified or supplemented, and not to any particular section, subsection or clause contained in this Agreement.

Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter.

Unless the context requires otherwise, any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein).

ARTICLE II

THE LOANS

2.1     Loans.  (a)  Following a request pursuant to Section 2.2 below, the Lender may, in its sole discretion, agree from time to time, during the Credit Period, to extend credit (each such extension of credit, a "**Loan**" and collectively, the "**Loans**") to the Borrower in an aggregate principal amount not to exceed the Maximum Facility Amount at any time.   Borrower acknowledges and agrees that no provision of this Agreement, any other Loan Document or any other agreement securing or relating to this Loan Agreement or the Loans hereunder shall be deemed to impose on Lender any obligation to extend credit to the Borrower or to affect Lender's unrestricted right to demand payment in full of the Loans at any time.  Once repaid, a Loan may not be reborrowed.

(b)     The obligation of the Borrower to repay the outstanding principal amount of the Loans, and any and all interest which accrues thereon, shall be evidenced by a promissory note executed and delivered by the Borrower in the form of Exhibit A hereto (the "**Note**").

(c)     Without limiting Section 2.1(a), the Borrower may not request or obtain any Loan hereunder if, after giving effect to such Loan, the Maintenance Value would exceed 25%.

2.2     Requests for Borrowing.   To request a Loan, the Lender shall have received, no later than noon (New York City time) at least two (2) Business Days prior to the proposed borrowing date (or such shorter time as the Lender may agree in its sole discretion), a written notice of borrowing in the form of Exhibit B attached hereto signed by the Borrower (a "**Notice of Borrowing**"), which Notice of Borrowing shall state the amount of such proposed borrowing (which shall be in an aggregate minimum principal amount of the greater of (i) $100,000 or (ii) the Maximum Facility Amount) and the date of such proposed borrowing.  After the initial

10

borrowing, the Lender may, in its sole discretion, act upon an oral request from the Borrower (an "**Oral Request**") for any subsequent borrowing permitted hereunder. After the delivery of any Oral Request, at the request of the Lender, the Borrower shall deliver to the Lender for its records a written Notice of Borrowing corresponding to such Oral Request. In submitting an Oral Request, the Borrower accepts all risks of Oral Requests and waives any claim that it may have against the Lender arising from any such Oral Request except those claim(s) arising from the Lender's gross negligence or willful misconduct. Each submission by the Borrower of a Notice of Borrowing or an Oral Request and each acceptance by the Borrower of the proceeds of each Loan requested therein shall be deemed to constitute a representation and warranty by the Borrower that (i) both before and after giving effect to such Loans the representations and warranties of the Borrower set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects (except to the extent stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct as of such earlier date) and (ii) the conditions precedent set forth in this Section 2.2 will be satisfied at the time of the making of such Loan.

2.3    Interest.

(a)    Except as otherwise expressly set forth herein, all Loans hereunder shall be LIBOR Loans. Interest on LIBOR Loans shall accrue at a per annum rate equal to the sum of (i) LIBOR for the then-current LIBOR Reset Period plus (ii) the Applicable Margin.

(b)    To the extent any LIBOR Loan is converted to a Base Rate Loan or any Base Rate Loan is made to the Borrower, in each case, whether pursuant to Sections 2.3(e) or 2.7 or by mutual agreement between the Lender and the Borrower, interest on such Base Rate Loans shall accrue at a per annum rate equal to (i) the Base Rate plus (ii) the Applicable Margin.

(c)    Notwithstanding the foregoing, during any period in which a Payment Default shall exist, the principal balance of all Obligations shall bear interest at a rate that is four percent (4%) per annum in excess of the interest rate otherwise applicable to such Obligations from time to time until all delinquent payments due hereunder (including any late payments, costs, expenses and any amounts accelerated) are paid to the Lender in full. Any interest payable pursuant to the foregoing sentence ("**Default Interest**") which is not paid when due may be added to the outstanding principal sum of the Loans and itself bear interest accordingly to the extent permitted by applicable law.

(d)    Accrued interest on the Loans shall be payable in arrears on (i) each applicable Interest Payment Date and (ii) on the Demand Date unless the demand for payment was made in accordance with Section 6.1 and the 90 day period referenced therein has not lapsed or terminated, if applicable (in which case, the date of the earliest to occur of the lapse or termination of such 90 day period), *provided* that any time a Payment Default exists, all accrued interest on the Loans, including, without limitation, Default Interest, shall be payable on demand by the Lender. The Borrower agrees that interest amounts payable hereunder which are not paid when due may be added to the outstanding principal sum of the Loans and itself bear interest accordingly to the extent permitted by applicable law. Each determination made by the Lender pursuant to the provisions hereof shall be conclusive and binding on the Borrower in the absence of manifest error. Provided no Payment Default exists at the end of a LIBOR Reset Period, each

711870427 14466044

CONFIDENTIAL                    GSBANK0002228

LIBOR Loan shall automatically continue as a LIBOR Loan for an additional LIBOR Reset Period. Interest shall be calculated for actual days elapsed on the basis of a 360-day year. Notwithstanding anything contained herein to the contrary, Lender shall never be entitled to receive, collect or apply as interest on the Loans any amount in excess of the maximum rate of interest permitted to be charged by applicable law.

(e)     If the Lender determines that for any reason adequate and reasonable means do not exist for determining LIBOR for any LIBOR Reset Period, the Lender will promptly so notify the Borrower. Thereafter, LIBOR Loans hereunder shall be suspended until the Lender revokes such notice in writing and all LIBOR Loans, on the Interest Payment Date, shall automatically convert into Base Rate Loans. Upon the revocation of such notice by the Lender, unless there then exists a Payment Default, all such Base Rate Loans shall automatically convert into LIBOR Loans on the Interest Payment Date following the revocation of such notice.

2.4     <u>Method of Payment</u>.  All payments hereunder for principal, interest and other amounts shall be made in lawful money of the United States of America and in immediately available funds to the Lending Office, or such other account as Lender may designate in writing from time to time to Borrower no later than noon (New York City time) on the date when due. If any principal payment hereunder becomes due and payable on a day other than a Business Day, such payment date shall be extended to the next succeeding Business Day, and interest thereon shall be payable at the then applicable rate during such extension.

2.5     <u>Repayment of Loans; Mandatory Prepayments</u>. (a)   *Generally.* On the Demand Date the Borrower shall pay the outstanding principal balance of the Loans, together with all accrued and unpaid interest thereon and all other Obligations.

(b)     *On Demand.*  Notwithstanding any provision in this Agreement or any other Loan Document to the contrary, solely with respect to a deemed demand for payment hereunder arising as a result of the occurrence of any event described in Section 5.1(i)(y), the Borrower shall have 90 days from such deemed demand event to repay the Obligations subject to satisfaction of the conditions set forth in the second sentence of Section 6.1 and the Lender's right to declare a Payment Default during such time as set forth in such Section 6.1.

(c)     *Advisor Fee Excess Cash Flow Mandatory Prepayment.*  No later than January 30 of each calendar year (commencing in January of 2016) the Borrower shall, or shall cause the Advisor (and the Advisor agrees), to make a mandatory prepayment of the Loans to the Lender in an amount equal to the Borrower's pro rata share (based on his percentage membership interest of the Advisor) of the greater of (i) $3,000,000 and (ii) the amount of Excess Cash Flow for the immediately preceding fiscal year ended, which amount, in each case of the foregoing clauses (i) and (ii), if paid collectively by the Advisor with respect to the Obligations and the obligations under the Other Loan Agreements (or deducted directly by the Lender from the Advisor's Deposit Account, as the case may be) shall be proportionally credited by the Lender towards the Obligations under this Agreement and the Obligations (as such term is defined in the Other Loan Agreements).

(d)     *Disposition Proceeds Mandatory Prepayment.*   Promptly, and in any event within 3 Business Days of receipt by the Borrower or 10 Business Days of receipt by the

711870427 14466044

**CONFIDENTIAL**                                                          GSBANK0002229

General Partner of any Disposition Proceeds or other amounts on account of any Disposition or Dissolution Sale, the Borrower shall, or shall cause the General Partner (and the General Partner agrees), to make a mandatory prepayment of the Loans to the Lender in an amount equal to the Borrower's pro rata share (based on his relative GP's Limited Partnership Interest) of (x) if the Maintenance Value is equal to or less than 25% on the date of such Disposition (without giving effect to the application of any funds deposited pursuant to Section 5.16(a) during the immediately preceding 30 day period), 70% of the Net Disposition Proceeds attributable to his GP's Limited Partnership Interests (with the remaining 30% of the Net Disposition Proceeds eligible to be distributed to the Borrower if the Demand Date has not occurred, no Payment Default exists and no event described in Section 5.1 exists) and (y) if the Maintenance Value is greater than 25% on the date of such Disposition or the Demand Date has occurred, a Payment Default exists or any event described in Section 5.1 exists, 100% of the Net Disposition Proceeds attributable to the GP's Limited Partnership Interests.

2.6    Optional Prepayments.  The Borrower may, at its option, upon notice as provided below, prepay at any time, or from time to time, in whole or in part and without any penalty or premium, other than as provided under Section 2.8, the Loans in an amount not less than $100,000 (or, if less, the entire then outstanding principal amount of the Loans).

The Borrower will give the Lender written notice of each optional prepayment under this Section 2.6 not less than two (2) Business Days prior to the proposed date of such prepayment (or such lesser time as the Lender may agree in its sole discretion).  Each such notice shall specify such requested prepayment date and the aggregate principal amount of the Loan to be prepaid on such date.   Once such notice is given, the payment amount specified in such notice shall be due and payable on the date specified, together with any other amounts then due, if any.

2.7    Illegality.  If the Lender determines that the introduction of any requirement of law, or any change in any requirement of law, or in the interpretation or administration of any requirement of law, has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for the Lender to make LIBOR Loans, then the Lender shall convert such loans to Base Rate Loans or if such option is not at such time then available, the Borrower shall, upon its receipt of notice of such fact and demand from the Lender, prepay in full such LIBOR Loans then outstanding, together with interest accrued thereon, either on the last day of the LIBOR Reset Period thereof, if the Lender may lawfully continue to maintain such LIBOR Loans to such day, or immediately (together with any amount payable pursuant to Section 2.8), if the Lender may not lawfully continue to maintain such LIBOR Loans.  Each Base Rate Loan advanced pursuant to the foregoing clause shall remain a Base Rate Loan until the Borrower receives notice to the contrary from the Lender.

2.8    Funding Costs.  Without limiting any other provisions contained herein, the Borrower shall reimburse the Lender and hold it harmless from any loss, increased costs or expense which the Lender may sustain or incur as a consequence of:

(a)    the failure by the Borrower to make on a timely basis any payment of principal of the Loans;

CONFIDENTIAL                                                    GSBANK0002230

(b)     the prepayment or other payment (including after acceleration thereof) of all or part of any LIBOR Loan to the extent the Lender actually incurs any breakage costs associated with such prepayment or payment; or

(c)     the introduction of or any change in the interpretation of any law or regulation (other than in each case any introduction or change in interpretation relating to withholding taxes, which is governed by Section 2.9) or the compliance by the Lender with any guideline, regulation or request from any Governmental Authority (whether or not having the force of law), including, without limitation, the introduction of, change of, change by any Governmental Authority in the interpretation or administration of, or compliance by the Lender or corporation or other entity controlling the Lender with, any capital adequacy regulation, in each case, after the Effective Date.  Notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities shall in each case be deemed for purposes of this subsection 2.8 to be a change in law after the Effective Date, regardless of the date enacted, adopted or issued.

2.9     Taxes; Waiver of Borrower's Right of Setoff and Counterclaim.

(a)     All payments by the Borrower under this Agreement shall be made free and clear of any restrictions or conditions, without set off or counterclaim (any such setoff and/or counterclaim rights of Borrower being hereby expressly waived by Borrower, to the maximum extent permissible under the applicable law), and free and clear of, and without any deduction or withholding whether for or on account of any Gross-Up Tax.  If any such deduction or withholding is required by law to be made by the Borrower or any other Person (whether or not a party to, or on behalf of a party to this Agreement) from any sum paid or payable by, or received or receivable from, the Borrower, the Borrower shall pay in the same manner and at the same time such additional amounts as will result in the Lender's receiving and retaining (free from any liability other than Excluded Taxes) such net amount as would have been received by it had no such deduction or withholding been required to be made.

(b)     The Borrower shall indemnify each Lender, within 10 days after demand therefor, for the full amount of any Gross-Up Taxes (including Gross-Up Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by the Lender or required to be withheld or deducted from a payment to the Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Gross-Up Taxes were correctly or legally imposed or asserted by the relevant governmental authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by the Lender shall be conclusive absent manifest error.

(c)     As soon as practicable after any payment of any taxes by the Borrower to a governmental authority pursuant to this Section 2.9, the Borrower shall deliver to the Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Lender.

711870427 14466044

CONFIDENTIAL                                                                                           GSBANK0002231

(d)     If the Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Gross-Up Tax, it shall pay to the Borrower an amount equal to such refund (but only to the extent of the amount of Gross-Up Taxes paid giving rise to such refund), net of all out-of-pocket expenses (including taxes) of the Lender and without interest (other than any interest paid by the relevant governmental authority with respect to such refund). The Borrower, upon the request of the Lender, shall repay to the Lender the amount paid over pursuant to this paragraph (d) (plus any penalties, interest or other charges imposed by the relevant governmental authority) in the event that the Lender is required to repay such refund to such governmental authority.  Notwithstanding anything to the contrary in this paragraph (c), in no event will the Lender be required to pay any amount to the Borrower pursuant to this paragraph (h) the payment of which would place the Lender in a less favorable net after-Tax position than the Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph (d) shall not be construed to require the Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other person.

2.10     Purpose.  (a)  The Borrower shall use the proceeds of the Loans to (i) make capital contributions with respect to the Funds indirectly through the General Partner and (ii) repay indebtedness related to the funding of capital contributions for Panda Power Generation Infrastructure Fund A, L.P. and Panda Power Generation Infrastructure Fund B (AIV), L.P under the Loan and Security Agreement dated as of March 26, 2013 (as amended from time to time), by and among the Advisor and PPG Fund I, LLC, as borrowers and Comerica Bank, as lender. The Borrower will not, directly or indirectly, use any part of such proceeds for the purpose of purchasing or carrying any margin stock within the meaning of Regulation U or to extend credit to any Person for the purpose of purchasing or carrying any such margin stock in contravention of Regulation U.  THE BORROWER MUST OBTAIN THE PRIOR APPROVAL OF THE LENDER IF THE INTENDED PURPOSE OF THE FACILITY IS DIFFERENT FROM THE PURPOSE DISCLOSED BY THE BORROWER IN THIS SECTION 2.10 OR IN ANY FEDERAL RESERVE FORM U-1 SUBMITTED BY THE BORROWER TO THE LENDER.

(b)     The Borrower will not use any part of the proceeds of the Loans for the benefit of, or transfer any part of the proceeds of the Loans to, any affiliate of the Lender (an "**Affiliate Transaction**") without the prior consent of the Lender which consent may be given or withheld in the Lender's sole discretion.  Borrower acknowledges and agrees that Lender may, in its sole discretion, refuse to fund a borrowing if the Lender determines that such borrowing would result in an Affiliate Transaction.

2.11     Application of Payments.  All payments received from or on behalf of any Loan Party with respect of the Obligations shall be applied thereto in the order and manner Lender determines in its sole discretion.

2.12     Loan Accounts.   In accordance with ordinary procedures and, solely for this purpose as an agent of the Borrower, the Lender shall record on its books and records the amount of each Loan made, the interest rate applicable, all payments of principal and interest thereon and the principal balance thereof from time to time outstanding.   Such record shall, absent demonstrable error, be conclusive evidence of the amount of the Loans made by the Lender to

15

711870427 14466044

**119**

the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder (and under the Note) to pay any amount owing with respect to the Loans or provide the basis for any claim against the Lender.

ARTICLE III

CONDITIONS PRECEDENT TO EFFECTIVENESS

3.1 <u>Conditions Precedent to Effectiveness of this Agreement</u>.  The effectiveness of this Agreement shall be subject to satisfaction of the following conditions precedent:

(a) The Borrower shall have furnished to the Lender, or caused to be furnished to the Lender (unless otherwise waived by the Lender in writing), the following, each in form and substance satisfactory to the Lender and its counsel, each dated as of the Effective Date (or such other date as shall be acceptable to the Lender) and duly executed (to the extent applicable) by each Loan Party that is a  party thereto:

(i) this Agreement;

(ii) the Note;

(iii) each of the Security Documents including the Spousal Consent;

(iv) a written Notice of Borrowing signed by the Borrower;

(v) if the Loans are to be secured directly or indirectly by margin stock, the appropriate "Federal Reserve Form, Statement of Purpose for an Extension of Credit Secured by Margin Stock," completed in a manner satisfactory to the Lender;

(vi) certified copies of UCC and other lien search reports dated a date near to the Effective Date, listing all effective financing statements and other lien filings that name any Loan Party (under their current names and any previous names) as debtors, together with (A) copies of such financing statements and other lien filings and (B) such UCC termination statements or amendments and other lien terminations as the Lender may request;

(vii) certified copies of the Constituent Documents, incumbency and other certificates of the Guarantors and each Fund, in each case as the Lender may reasonably request relating to the organization, existence and good standing of such Persons, the authorization to enter into this Agreement, the Note and each Security Document, as applicable and the identity, authority and capacity of each responsible officer thereof authorized to act on behalf of such Persons;

(viii) a consent to the pledge by the Borrower of the Collateral related to the Borrower's economic interests in the General Partner, signed by Panda Power Fund II GP, LLC;

711870427 14466044

**120**

CONFIDENTIAL

GSBANK0002233

(ix)   a copy of a state-issued form of identification for the Borrower in the state of the Borrower's primary residence;

(x)   good standing certificates with respect to the Guarantors;

(xi)   a payoff letter from Comerica Bank; and

(xii)   such other documents as the Lender or its counsel may reasonably request.

(b)   The Lender shall have received a customary opinion of counsel addressed to the Lender covering such matters relating to the transactions contemplated hereby as reasonably requested by the Lender and substantially in a form acceptable to the Lender.

(c)   The Lender shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

(d)   The Lender shall have received copies of each Loan Party's financial statements and other financial information reasonably requested by the Lender.

3.2   <u>Fees and Expenses</u>.   On the Effective Date, the Borrower and/or the Guarantors shall have paid all fees and expenses incurred by or payable to the Lender (including, without limitation, an upfront fee of 50 basis points (0.50%) of the Facility Amount and reasonable fees and expenses of counsel for the Lender), arising in connection with the negotiation, preparation and execution of this Agreement and the other Loan Documents and all other instruments and documents to be delivered hereunder or thereunder or arising in connection with the transactions contemplated hereunder or thereunder, and the Borrower hereby authorizes the Lender to deduct all such amounts from the aggregate proceeds of the Loans.

ARTICLE IV

<u>REPRESENTATIONS AND WARRANTIES</u>

The Borrower and each Guarantor represents and warrants to the Lender on the date hereof and on the date each Loan is advanced that:

4.1   <u>Name, Etc.</u>   The Borrower's and each Guarantor's legal name as of the date hereof is correctly set forth on the signature page hereto and the other information regarding the Borrower and the Guarantors set forth in this Agreement, including without limitation, the below Borrower's and Guarantors' signatures hereto are true, correct and complete on the date hereof.

4.2   <u>Enforceable Obligations</u>.   (a) The Borrower is competent to enter into this Agreement and the other Loan Documents to which it is a party and to perform its obligations hereunder and thereunder, (b) the Advisor is a limited liability company duly organized and validly existing in good standing under the laws of its jurisdiction of formation, is duly qualified and in good standing in all such foreign jurisdictions where its business or property so requires and has the power and authority to enter into this Agreement and the other Loan Documents to

17

711870427 14466044

**121**

which it is a party, and (c) the General Partner is a limited partnership duly organized and validly existing in good standing under the laws of its jurisdiction of formation, is duly qualified and in good standing in all such foreign jurisdictions where its business or property so requires and has the power and authority to enter into this Agreement and the other Loan Documents to which it is a party, except in the case of clauses (b) and (c) with respect to qualification and good standing in any foreign jurisdictions where such Guarantor's business or ownership of property so requires to the extent such failure would not result in a Material Adverse Effect.

The execution, delivery and performance by the Borrower and the Guarantors of the Loan Documents to the extent each is a party thereto and the consummation of the transactions contemplated by this Agreement and the other Loan Documents have been duly authorized by all necessary action, including necessary actions by directors, members, shareholders or trustees, as the case may be and: (i) will not violate any law or regulation, or any order or decree of any court or governmental instrumentality (including Regulations U and X of the Board of Governors of the Federal Reserve System) applicable to such parties; (ii) will not, with respect to each Guarantor, violate any Constituent Documents of such Guarantor, (iii) will not conflict with or result in the breach or termination of, constitute a default under, or accelerate any performance required by, any indenture, mortgage, deed of trust, lease, agreement or other instrument to which any Loan Party is a party or by which such Loan Party or any of its property is bound which would be reasonably expected to result in a Material Adverse Effect; (iv) will not result in the creation or imposition of any lien upon any of the property of any Loan Party other than those in favor of the Lender, all pursuant to the Loan Documents; and (v) do not require the consent or approval of any governmental body, agency, authority or any other Person, except such consents as have been obtained or which would not be reasonably expected to result in a Material Adverse Effect. Each of the Loan Documents to which any Loan Party is a party when delivered hereunder shall constitute a legal, valid and binding obligation of such Loan Party, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws of general application relating to or affecting the rights and remedies of creditors and subject to the general principles of equity, regardless of whether considered in a proceeding in equity or at law.

4.3    Taxes; Compliance with Laws.  Except as would otherwise result in a Material Adverse Effect:  (a) each Loan Party has filed or caused to be filed all federal, state and local tax returns that are required to be filed by such Person, which returns were true, accurate and complete in all respects, and has paid or caused to be paid all taxes shown to be due and payable on such returns or on any assessments received by such Person and (b) no Loan Party is in violation in any respect of any applicable law, rule, regulation, order, judgment, writ or decree of any Governmental Authority applicable to such Person or their respective property.

4.4    Solvency.  After giving effect to each Loan, the Borrower and each of the Guarantors shall be Solvent.

4.5    Complete Disclosure.  The information, reports, financial statements, exhibits and schedules furnished in writing (other than financial projections and information of a general economic nature or industry-specific nature, or as to which no representation or warranty is made) by or on behalf of any Loan Party to the Lender in connection with the negotiation, preparation or delivery of this Agreement and the other Loan Documents or included herein or

18

711870427 14466044

**122**

therein or delivered pursuant hereto or thereto, and the transactions contemplated hereby and thereby did not contain any untrue statement of material fact or omit to state any material fact necessary to make the statements herein or therein, in light of the circumstances under which they were made, not materially misleading as of the date such information was furnished to the Lender (after giving effect to any supplements and updates thereto) and as of the Effective Date.

4.6   Absence of Undisclosed Liabilities.   Neither the Borrower nor the Guarantors has any material liabilities or obligations, either accrued, absolute, contingent or otherwise, other than (a) the Obligations and (b) the liabilities and obligations set forth in the financial statements and financial representations previously delivered or made to the Lender.

4.7   Foreign Assets Control Regulations, Etc.   Neither the Borrower nor the Guarantors is (a) in violation of the Trading with the Enemy Act of the United States of America (50 U.S.C. App. §§ 1 et seq.), as amended; (b) on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("**OFAC**"), Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation; (c) in violation of the USA Patriot Act, Title III of Pub. L. 107-56, signed into law October 26, 2001 ("**USA Patriot Act**"); (d) a Person designated under Section 1(b), (c) or (d) or Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders; or (e) to the best of its knowledge, engaging in any dealings or transactions, or is otherwise associated, with any of the foregoing blocked Persons.

4.8   No Default.   No Loan Party is, and after giving effect to this Agreement shall not be, in default in the payment or performance of any material contractual obligation.

4.9   No Litigation.   There are no actions, suits, litigations, arbitrations, administrative or other legal proceedings, or investigations, pending or threatened in writing, against the Borrower, the Guarantors or any of the Collateral in which such Person has rights that will or could reasonably be expected to have a Material Adverse Effect.   There have not been any judgment(s) against the Borrower or the Guarantors in the past seven (7) years.   Neither the Borrower nor either Guarantor has filed bankruptcy or been subject to an insolvency proceeding in the past seven (7) years.

4.10   Investment Company Act.   Neither Guarantor is an "investment company," or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.   Neither Guarantor is subject to regulation under any federal or state statute or regulation which limits its ability to borrow money.

4.11   Transact Business.   Each Guarantor has all the necessary right, power and authority to own such Guarantor's property and assets and to transact the business in which such Guarantor is engaged.

4.12   Employee Retirement Income Security Act of 1974.   No Guarantor is (a) an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), subject to Title I of ERISA or a "plan" subject to the prohibited transaction provisions of Section 4975 of the Internal Revenue Code of 1986, as

711870427 14466044

CONFIDENTIAL   GSBANK0002236

amended (an "ERISA Plan"), (b) a Person acting on behalf of any ERISA Plan, or (c) a Person the assets of whom constitutes assets of any ERISA Plan.

4.13   Bank Official.

(a)   No Loan Party is (i) a Company controlled by a Bank Official or by the spouse or child of a Bank Official, (ii) a political or campaign committee that benefits or is controlled by a Bank Official or by the spouse or child of a Bank Official or (iii) the spouse or child of a Bank Official.

(b)   If any Loan Party is organized as a trust or an estate vehicle, neither the trustee nor the beneficiary of such trust or estate vehicle is a Bank Official or the spouse or the child of a Bank Official.

4.14   Fiscal Year.  The fiscal year of each Guarantor is the calendar year.

4.15   Liens; Title.  There are no liens, security interests or other encumbrances with respect to the Collateral, except for Permitted Liens and liens from time to time granted in favor of the Lender pursuant to the Loan Documents. Each Loan Party has good and defensible title to its property, including the relevant Collateral.

4.16   No Defenses.  No Loan Party is aware of any default or circumstance which with the passage of time and/or giving of notice would constitute a default under any Advisory Agreement or which would constitute a defense to the obligations of any Fund or investor in such Fund to pay Management Fees in accordance with any Advisory Agreement, or has any knowledge of any claims of offset or any other claims of any Fund or investor in any such Fund which would or could diminish or adversely affect the obligations of such Fund or investor, as applicable, to pay Management Fees in accordance with the applicable Advisory Agreement and the Constituent Documents of such Fund.

4.17   Final Closing Date.  The Principals (as defined in the Constituent Documents of each of Panda Fund II A and Panda Fund II B in existence on the Effective Date) are Robert W. Carter, Todd Carter, Ralph Killian, William Nordlund and Robert Simmons; such Persons own at least 51% of the limited partnership interests of the General Partner as of the Final Closing Date (as defined in the Constituent Documents of each of Panda Fund II A and Panda Fund II B in existence on the Effective Date).

4.18   Special Contribution Entities.  No Special Contribution Entity (as defined in the Constituent Documents of each of Panda Fund II A and Panda Fund II B) exists.

ARTICLE V

COVENANTS

For so long as any Loan remains outstanding under this Agreement, unless the Lender shall otherwise consent in writing, the Borrower and the Guarantors shall:

711870427 14466044

CONFIDENTIAL                                                                          GSBANK0002237

5.1     Notice of Certain Events.  Give the Lender prompt written notice of any of the following events:

(a)     The breach by any Loan Party of any other covenant contained in any Loan Document.

(b)     The Borrower or any Guarantor become aware that any representation or warranty made in any Loan Document by any Loan Party was materially false or misleading as of the date such representation or warranty was made.

(c)     The occurrence of any default under any of the other Loan Documents or any other agreement between any Loan Party, on the one hand, and any member of the Goldman Affiliated Group, on the other hand (other than the Subscription Facility) or any other agreement that could have a Material Adverse Effect on any Loan Party.

(d)     Any Loan Party shall (i) have an order for relief entered with respect to it under the Federal bankruptcy laws as now or hereafter in effect, (ii) make an assignment for the benefit of creditors, (iii) become insolvent or admit in writing its inability or refusal to pay debts as they become due, (iv) apply for, seek, consent to, acquiesce in, or have appointed for it or any substantial portion of its property a receiver, custodian, trustee, examiner, liquidator or similar official, or (v) institute, or have commenced against it, any proceeding seeking an order for relief under the Federal bankruptcy laws as now or hereafter in effect or seeking to adjudicate it bankrupt or insolvent, or seeking dissolution, winding up, liquidation, reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors or fail to file an answer or other pleading denying the material allegations of any such proceeding filed against it and, in the case of any such proceeding that is instituted without the consent of such Loan Party, such proceeding shall continue undismissed or unstayed for a period of 60 days.

(e)     The Security Documents shall for any reason fail to create a valid lien and security interest in the Collateral, or this Agreement or any of the other Loan Documents shall fail to remain in full force or effect, or any action shall be taken by a Loan Party to discontinue or to assert the invalidity or unenforceability thereof.

(f)     An attachment or garnishment writ or the like is levied against all or any portion of the Securities Account, any Deposit Account or any other Collateral.

(g)     Any indebtedness for borrowed money in excess of $250,000 of any Loan Party to any entity, lender or other Person (including any member of the Goldman Affiliated Group) to whom any Loan Party is indebted:  (i) is not paid when due nor within any applicable grace period in any agreement relating to such indebtedness, or (ii) becomes due and payable before its normal maturity by reason of a default or event of default, however described.

(h)     Final judgment for the payment of money in excess of $250,000 is rendered against any Loan Party which is not covered by insurance and within thirty (30) days from the entry of such judgment has not been discharged, paid or stayed pending appeal or has not been discharged within thirty (30) days from the entry of a final order of affirmance on appeal.

711870427 14466044

CONFIDENTIAL     GSBANK0002238

(i)      (x) If any event or circumstance shall occur which would reasonably be expected to result in the dissolution or liquidation of either Guarantor or (y) if the Borrower dies or becomes or is declared (by an appropriate legal authority) incompetent or of unsound mind.

(j)      The occurrence or existence of any "Event of Default" under and as defined in the Subscription Facility.

(k)      (x) The occurrence of any event that constitutes (A) "Cause" or a "Disabling Event" under and as defined in the Constituent Documents of the General Partner or (B) "Cause" under and as defined in the Constituent Documents of the Advisor or (y) the Borrower's employment or other status with the General Partner or the Advisor is terminated for any reason.

(l)      The General Partner ceases to be the sole general partner of each of Panda Fund II A or Panda Fund II B, or any action is instituted by any investors in any such Fund to remove the General Partner as the general partner of such Fund.

(m)      The Borrower for any reason ceases to be, or is removed as, (x) a partner of the General Partner or (y) a member of the Advisor.

(n)      The occurrence of any event that would reasonably be expected to result in the reduction of Management Fees payable to the Advisor, including without limitation, the termination of the Commitment Period as defined in any Fund's Constituent Documents, the incurrence of Excess Organizational Expenses or payment of Other Fees (as such terms are defined in any Fund Constituent Document); *provided* that a reduction in Management Fees as a result of payment of placement agent fees or non-affiliate financial advisor commissions or as a result of adjustments to service-provider compensation levels under servicing agreements as set forth in the Advisory Agreements as in effect on the Effective Date, shall not constitute a reduction of Management Fees for purposes of determining whether any Trigger Event has occured.

(o)      The General Partner or the Advisor cease to be controlled either directly or indirectly collectively by the Borrower and the borrowers under the Other Loan Agreements.

(p)      The termination of any Advisory Agreement or the failure of any Management Fee to be paid or received when due.

5.2    Execution of Supplemental Instruments.  Execute and deliver to the Lender from time to time, upon demand, such supplemental agreements, statements, assignments, transfers, instructions, instruments or documents as the Lender may request, in order that the full intent of this Agreement and the other Loan Documents may be carried into effect.

5.3    Obligations and Taxes.  Pay and discharge promptly when due all material taxes, assessments and governmental charges or levies imposed upon it or upon its income or assets before the same shall become delinquent or in default, as well as all lawful claims for labor, materials and supplies or otherwise, which, if unpaid, might give rise to liens or charges upon

711870427 14466044

CONFIDENTIAL                                                                                              GSBANK0002239

such assets or any part thereof; provided, however, that no Loan Party shall be required to pay and discharge or to cause to be paid and discharged any such tax, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings.

5.4     Litigation.  Give the Lender prompt written notice of the filing or commencement of any action, suit or proceeding against the Borrower or the Guarantors, whether at law or in equity or by or before any court or any Governmental Authority, in each case, that could reasonably be expected to have a material adverse effect on the Borrower or the Guarantors where the amount demanded is in excess of $250,000.

5.5     USA Patriot Act, OFAC Compliance.  Provide such information and take such actions as are reasonably requested by the Lender in order to assist the Lender with compliance with the USA Patriot Act; and the Loan Parties shall at all times take all reasonable steps to fully comply with OFAC and the USA Patriot Act.

5.6     Solvency.  The Borrower and the Guarantors shall at all times be Solvent.

5.7     Negative Pledge.  The Loan Parties shall not (a) create, incur, assume or permit to exist any lien (statutory or other), charge or other encumbrance on the Collateral except for Permitted Liens; (b) pledge, charge or otherwise encumber the equity interests of the Guarantors other than in favor of the Lender pursuant to the Loan Documents; (c) enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon the ability of any Loan Party to create, incur or permit to exist any lien, charge, mortgage or other encumbrance on any of the Collateral; or (d) enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon the ability of the Guarantors or any Fund to pay dividends or other distributions with respect to such Person's equity interests (other than pursuant to the Subscription Facility as in effect on the Effective Date) or to make or repay loans or advances to the Borrower.

5.8     Indebtedness.  With respect to the Borrower, not create, incur, assume, guarantee or be or remain liable for, contingently or otherwise, or suffer to exist any indebtedness, except (i) the Obligations, (ii) other indebtedness not exceeding $1,000,000 in aggregate principal amount at any one time outstanding, (iii) debt incurred pursuant to residential mortgages secured only by the real estate subject thereto and (iv) the existing indebtedness described in the financial statements and financial representations delivered or made to the Lender prior to the Effective Date (and any renewals or extensions thereof, with any increase thereof subject to the limitation in the foregoing clause (ii)), unless the prior written consent of the Lender is obtained.

5.9     Accounts.  Except as expressly permitted by the applicable Security Document or Section 5.15 below, without the prior written consent of the Lender, not close or cause to be closed, the Securities Account or any Deposit Account, as applicable, or withdraw, or cause to be withdrawn, any securities or other funds from the Securities Account or any Deposit Account, as applicable.  All amounts paid or distributed with respect to the Collateral shall be paid or distributed to the applicable Deposit Account or Securities Account, as applicable.  The General Partner shall distribute all dividends, distributions and other property owing and payable to the Borrower directly to the Securities Account.

711870427 14466044

CONFIDENTIAL                                                                    GSBANK0002240

5.10   <u>Name, Etc.</u>   Promptly, but no later than 30 days prior to such change, provide notice to the Lender of any change to (a) any Loan Party's legal name, (b) any Loan Party's address, (c) the Borrower's principal residence, or either Guarantor's principal place of business, chief executive office, jurisdiction of organization or situs for administration or (d) the fiscal year of any Guarantor or Fund.

5.11   <u>Use of Proceeds.</u>   Use all proceeds of the Loans only as permitted under Section 2.10 hereof.

5.12   <u>Compliance with Laws</u>.   Comply in all material respects, with all applicable laws, statutes, codes, ordinances, regulations, rules, orders, awards, judgments, decrees, injunctions, approvals and permits.   Each Guarantor shall preserve and maintain its existence and all necessary rights, licenses and authority to own its property and assets and to transact the business in which such Guarantor is engaged.

5.13   <u>Financial Information; Valuations</u>.   (a)  Promptly upon the request of the Lender, but in any event no later than thirty (30) days after receipt of such request, deliver to the Lender copies of each Loan Party's most recently filed federal tax returns, bank and brokerage statements and other information reasonably requested by Lender.

(b)      As soon as available and no later than 60 days following the end of each calendar year, deliver to the Lender copies of the Borrower's personal financial statements.

(c)      As soon as available and no later than 60 days of each fiscal quarter end, deliver to the Lender copies of each Fund's and each Guarantor's quarterly unaudited financial statements (which, in the case of the General Partner, shall be in the form of a statement of capital account for Panda Fund II A and Panda Fund II B) for the first three quarters of any fiscal year, certified to be true and correct for such year by a responsible officer of the applicable Guarantor or applicable Fund.

(d)      As soon as available and no later than 120 days following each fiscal year end, deliver to the Lender copies of each Fund's audited financial statements, and, (i) within 60 days of the end of each fiscal year, the unaudited financial statements for the Advisor, certified to be true and correct for such year by a responsible officer of the Advisor and (ii) within 120 days following each fiscal year end, a statement of the General Partner's capital account in Panda Fund II A and Panda Fund II B, certified to be true and correct for such year by a responsible officer of the General Partner.

(e)      As soon as available and beginning with the valuation as of December 31, 2014, no later than (i) 60 days following the end of each of the first three quarters of the year and 90 days following the end of each fiscal year end, (ii) 60 days following any Disposition or Dissolution Sale, and (iii) within 60 days of any request by Lender (such request to be limited to one time per year unless a Payment Default exists), deliver to the Lender at the expense of the Loan Parties a valuation report with respect to the portfolio investments in each Fund prepared by Marshall & Stevens together with a reconciliation of such valuation report to the value of the GP's Limited Partnership Interest prepared by the General Partner based on the most recently

24

CONFIDENTIAL   GSBANK0002241

available statement of capital account of the General Partner delivered to the Lender pursuant to 5.13(c) or (d).

(f)　　As soon as available and no later than January 25 of each year (commencing in January 2015), deliver to the Lender a compliance certificate in form and substance reasonably satisfactory to the Lender  setting forth a calculation of Excess Cash Flow for the immediately preceding fiscal year (which is to be paid to the Lender no later than January 30 of such year), it being understood that for the compliance certificate delivered in 2015, no mandatory prepayment of Excess Cash Flow shall be required.

(g)　　As soon as available and no later than 60 days following the end of each calendar quarter, deliver to the Lender forecasts projecting the Advisor's operating expenses and cash flow through the end of the relevant fiscal year, *provided*, that the first forecast provided in each fiscal year shall include a projection of the Advisor's operating expenses and cash flow covering the entire calendar year.

(h)　　Substantially concurrently with any mandatory prepayment to be made pursuant to Section 2.5(d), a compliance certificate setting forth a calculation of the Maintenance Value and the amount of the mandatory prepayment to be paid in connection with the relevant Disposition or Dissolution Sale, in form and substance reasonably satisfactory to Lender.

5.14　　<u>Investments</u>.  Neither Guarantor shall directly or indirectly make, retain, or have outstanding any Investments; *provided,* that the foregoing shall not apply to nor operate to prevent:

(a)　　Investments in direct obligations of the United States of America or of any agency or instrumentality thereof whose obligations constitute full faith and credit obligations of the United States of America, *provided* that any such obligations shall mature within one year of the date of acquisition thereof;

(b)　　Investments in commercial paper rated at least P-1 by Moody's and at least A-1 by S&P maturing within one year of the date of issuance thereof;

(c)　　investments in certificates of deposit issued by Lender or by any United States commercial bank having capital and surplus of not less than $100,000,000 which have a maturity of one year or less;

(d)　　Investments in money market funds that invest at least 95%, and which are restricted by their respective charters to invest at least 95%, in investments of the type described in the immediately preceding ***subsections (a)***, ***(b)***, and ***(c)*** above; and

(e)　　Investments in private equity funds sponsored by the Advisor or one of its Affiliates, including the portfolio companies of such Persons.

In determining the amount of Investments permitted under this Section, Investments (other than loans and advances) shall always be taken at the original cost thereof (regardless of

25

**CONFIDENTIAL**

GSBANK0002242

any subsequent appreciation or depreciation therein), and loans and advances shall be taken at the principal amount thereof then remaining unpaid.

5.15    <u>Distributions</u>.  At any time any Obligations remain outstanding, any obligations under any Other Loan Agreement remain outstanding or this Agreement has not been terminated by the parties hereto, the Borrower shall not cause or permit, and neither the Advisor nor the General Partner shall, (a) declare or pay or make any dividends or distributions in respect of any class or series of its membership interests or other equity interests or otherwise other than, with respect to the General Partner, distributions made to the Borrower directed to its Securities Account and to the other partners of the General Partner in accordance with the Other Loan Agreements to the extent applicable to such partners, (b) directly or indirectly purchase, redeem, or otherwise acquire or retire any of its membership interests or other equity interests or any warrants, options or similar instruments to acquire the same or (c) give any instruction to transfer any amount from such Person's deposit account, Deposit Account or Securities Account (other than, with respect to the General Partner or the Borrower, any transfer of amounts (other than amounts constituting Disposition Proceeds or other amounts subject to mandatory prepayment under Section 2.5(d) which amounts shall remain in the applicable Securities Account or deposit account until distributed in accordance with Section 2.5(d)) from such Person's deposit account or Securities Account to make a capital contribution to the Funds for purposes of an investment), as applicable; *provided* that, (I) so long as (w) no Payment Default exists, (x) the Lender has not made a demand for payment hereunder, (y) the Demand Date has not occurred for any reason and (z) the Maintenance Value does not exceed 25%, (i) the Advisor shall be permitted to make periodic distributions and transfer funds from its Deposit Account solely to pay amounts (or to permit the Borrower and/or other members of the Advisor to pay amounts) described in <u>clauses (b)</u> through <u>(e)</u> of the definition of Excess Cash Flow, (ii) regardless of whether an event described in clause (w), (x), (y) or (z) above exists, the General Partner shall be permitted to make (and agrees to make) periodic distributions and transfer funds in its deposit account to the Borrower and/or the other partners of the General Partner as expressly provided by Section 2.5(d) hereof and (iii) the Borrower shall be permitted to make periodic transfers of funds in its Securities Account to pay the amounts applicable to it described in the foregoing <u>clauses (i)</u> and <u>(ii)</u> to the extent the Advisor or the General Partner, as applicable, is permitted to transfer such amount; and (II) the Loan Parties shall be permitted to transfer any amount or property from such Person's deposit account, Deposit Account or Securities Account, as applicable, to repay the Obligations hereunder or the obligations under the Other Loan Agreements.  Notwithstanding the above, if any of the events described in this Section 5.15(I)(x), (y) or (z) exists, the Advisor and the General Partner, as applicable, shall be permitted to make payments or distributions with respect to (i) the salaries of employees of any Guarantor, including compensation in the form of distributions or Carried Interest (as defined in the Constituent Documents of each Fund) other than compensation to the Borrower or any borrower under any Other Loan Agreement and (ii) operating expenses of any Guarantor incurred and paid in the ordinary course of business (other than compensation to the Borrower or any Borrower under any Other Loan Agreement).  Other than as expressly set forth in the foregoing provisions of this Section 5.15, no Loan Party shall deliver any instruction or entitlement order, or transfer any amount or property from the Deposit Account or the Securities Account, without the prior consent of the Lender.

5.16    <u>Maintenance Value</u>.  At all times during the term hereof, the Maintenance Value shall not exceed 25%.  In the event the Maintenance Value is greater than 30%, the Borrower

711870427 14466044

CONFIDENTIAL                                                                                    GSBANK0002243

shall either (a) post cash collateral in immediately available funds to the Securities Account (which shall be treated solely for purposes of this Section 5.16 as if a like amount of Loans had been prepaid) or (b) prepay the Loans, in each either case, in an amount sufficient to reduce the Maintenance Value to 25% or less.

5.17   <u>Amendment to Management Fees and Agreements</u>.   No Loan Party shall, and shall not permit any other Person to, (a) amend, terminate or waive any right to payment of the Management Fees under any Advisory Agreement or the Constituent Documents of any Fund, (b) amend any provision of the Constituent Documents of the General Partner, the Advisor or any Fund that in any way affects any Loan Party's right to receive distributions, dividends, Disposition Proceeds, fees, carried interest or other amounts paid or payable to such Person or any other economic rights of such Person, in each case under the foregoing clause (a) or (b) without the prior consent of the Lender (which consent shall not be unreasonably withheld or delayed), other than adjustments to service-provider compensation levels under servicing agreements as set forth in the Advisory Agreements as in effect on the Effective Date, or (c) amend any provision of the Constituent Documents of the General Partner, the Advisor or any Fund without providing prior written notice to the Lender.   In the event any Constituent Document is amended, waived or modified in any respect, the Loan Parties, within five Business Days of the effectiveness of such amendment, waiver or modification, shall provide the Lender with copies of such executed or otherwise effective document relating thereto.

5.18   <u>Further Assurances</u>.   Take such actions as are reasonably necessary or as the Lender may reasonably request from time to time (a) in order that the full intent of this Agreement may be carried into effect and (b) to ensure that the Obligations are appropriately secured as contemplated pursuant to the terms hereof, including the execution and delivery of security agreements, pledge agreements, mortgages, deeds of trust, financing statements and other documents, and the filing or recording of any of the foregoing.

5.19   <u>Transactions with Affiliates</u>.   The Borrower shall not, and shall not permit the Guarantors to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except in the ordinary course of business (other than services agreements and leases disclosed to the Lender in writing prior to the Effective Date) at prices and on terms and conditions not less favorable to such Loan Party than could be obtained on an arm's-length basis from unrelated third parties.

5.20   <u>Business of the Guarantors</u>.   The Guarantors shall not engage in any business other than businesses of the type conducted by the Guarantors on the Effective Date and businesses reasonably related, complementary or synergistic thereto.

5.21   <u>Transfer of Interest</u>.   The Borrower shall not transfer, sell or redeem its limited partnership interest in the General Partner or its membership interest in the Advisor.

5.22   <u>Sharing and Membership Percentages</u>. (a)   Neither the Borrower nor the General Partner shall take any action to alter the Carried Interest Sharing Percentage or the Capital Commitment Sharing Percentage (as such terms are defined in the General Partner's Constituent Documents) from the percentages set forth on Schedule II-A.

27

CONFIDENTIAL

GSBANK0002244

(b)     The Advisor shall not take any action to alter the Membership Percentages (as such term is defined in the Advisor's Constituent Documents) from the percentages set forth on Schedule II-B.

5.23     <u>Alternative Investment Structures; Special Contribution Entities</u>.   The General Partner shall not form (a) any AIV GP (as defined in the General Partner's Constituent Documents) or (b) any Special Contribution Entity, without in each case, the prior consent of the Lender.

5.24     <u>Books and Records; Access</u>.   Each Guarantor will give any representative of the Lender access, with reasonable notice and not to exceed one time during any fiscal year unless a Trigger Event has occurred, to permit representatives to examine, copy, or make excerpts from, any and all books, records, and documents in the possession of such Guarantor and relating to its affairs, and to inspect any of the properties of such Guarantor.

5.25     <u>Post-Closing Obligations</u>.     Notwithstanding anything to the contrary set forth in this Agreement, the Advisor shall deliver to the Lender as soon as practicable and in any event not later than 3:00 p.m. on November 25, 2014 (or such later date as agreed to by the Lender in its reasonable discretion), the Deposit Account Control Agreement, which shall be in form and substance satisfactory to the Lender, together with an opinion of counsel to the Advisor in form and substance reasonably satisfactory to the Lender.

ARTICLE VI

DEEMED DEMAND, WAIVERS,<br>AMENDMENTS AND REMEDIES

6.1     <u>Deemed Demand in Certain Events</u>.   If any event described in Section 5.1(d) or (i) (if applicable) occurs, the Lender shall be deemed to have declared the Obligations immediately due and payable and the Demand Date shall be deemed to have occurred without any election, notice or action on the part of the Lender.   Notwithstanding the foregoing, upon the occurrence of the Demand Date pursuant to this Section 6.1 due to the death of the Borrower or the declaration that the Borrower is incompetent or of unsound mind, the Borrower shall have 90 days from such Demand Date to repay the Obligations before the Lender may declare a Payment Default, and the Lender shall refrain from exercising its rights and remedies in respect of the Collateral during such 90 day period so long as no Trigger Event has occurred; <u>provided</u>, the Lender may declare a Payment Default, terminate such 90 day period and/or exercise any of its rights and remedies in respect of the Collateral if, at any time: (i) an event described in Section 5.1 (*other than* (A) Section 5.1(i)(x); (B) Section 5.1(a) solely with respect to (x) covenants contained in Section 5.13 until thirty days have passed from the date originally due to the extent such failure is cured by such thirtieth day and (y) any other affirmative covenant set forth in the Credit Agreement (excluding those covenants set forth in Sections 5.6, 5.11 and 5.16, and the obligation to provide notice under Section 5.1 or 5.4) the failure of which to comply is susceptible to cure and such non-compliance is cured within 30 days from the earlier of (I) the date of notice thereof from the Lender to any Loan Party and (II) the date any Loan Party or Principal (as defined in the Constituent Documents of any Fund) had knowledge of such failure; (C) Section 5.1(c) solely with respect to a non-payment or non-monetary default under an

28

CONFIDENTIAL   GSBANK0002245

agreement between a Loan Party and any member of the Goldman Affiliated Group; and (D) Section 5.1(p) solely with respect to payment of Management Fees to the extent such Management Fees are paid within five Business Days of the date originally due) occurs, (ii) the Maintenance Value exceeds 30%, (iii) the Lender otherwise deems its security interest in any material portion of the Collateral insufficient, invalid or otherwise unenforceable, (iv) the Borrower fails to make a payment of interest on any Interest Payment Date or (v) does not comply with Section 5.25 (each of the foregoing events in clauses (i) through (v), a "**Trigger Event**").

6.2     <u>Other Remedies</u>.  Upon the occurrence of a Payment Default, the Lender (a) shall have, in addition to all other rights of the Lender, the rights and remedies of a secured party under the UCC, (b) may proceed to protect and enforce the Lender's rights by suit in equity, action of law and/or other appropriate proceeding either for specific performance of any covenant or condition contained in this Agreement, any other Loan Document or in any instrument or document delivered to the Lender pursuant hereto or thereto, and (c) in the exercise of any rights, remedies or powers granted in this Agreement, any other Loan Document and/or any such instrument or document, may proceed to enforce payment of the Obligations as provided herein or in any Loan Document, and may offset and apply toward the payment of such amount any indebtedness of the Lender to any Loan Party.

Upon the occurrence of a Payment Default, the Lender in its discretion may also set-off any or all of the Obligations against any securities, cash or other property of the any Loan Party in the possession of the Lender or any other member of the Goldman Affiliated Group and against any obligations owed to any Loan Party by the Lender or any other member of the Goldman Affiliated Group to the extent that it does not impact the Lender's ability to recover amounts owed to the Lender.  THE LOAN PARTIES UNDERSTAND THAT PURSUANT TO THE TERMS OF THIS AGREEMENT THE LOAN PARTIES ARE ALLOWING THE LENDER TO SET-OFF ANY OR ALL OBLIGATIONS OF THE LOAN PARTIES TO THE LENDER OR ANY OTHER MEMBER OF THE GOLDMAN AFFILIATED GROUP AND BY ALLOWING FOR SUCH AFFILIATE SET-OFF, THE LOAN PARTIES ARE WAIVING ALL OF THEIR RIGHTS TO LIMIT SET-OFF TO THOSE OBLIGATIONS WHICH ARE MUTUAL AS BETWEEN THE LENDER AND SUCH LOAN PARTY.

6.3     <u>Amendments</u>.   The Lender and the Loan Parties may enter into written agreements supplemental hereto or the Loan Documents for the purpose of adding or modifying any provisions to the Loan Documents or changing in any manner the rights of the Lender or the Loan Parties hereunder or waiving any Payment Default hereunder.  To be effective, any such amendment or waiver must be in writing and signed by the Lender and the Loan Parties.

6.4     <u>Preservation of Rights; No Adverse Impact</u>.  No delay or omission of the Lender to exercise any right under this Agreement or any of the Loan Documents shall impair such right or be construed to be a waiver of any Payment Default or an acquiescence therein.  Any single or partial exercise of any such right shall not preclude other or further exercise thereof or the exercise of any other right.  All remedies contained in the Loan Documents, or afforded by law, shall be cumulative and all shall be available to the Lender until the Obligations have been indefeasibly paid in full in cash.

711870427 14466044

CONFIDENTIAL                                                                 GSBANK0002246

6.5 <u>DEMAND PAYMENT</u>.   BORROWER ACKNOWLEDGES AND AGREES THAT THE OBLIGATIONS ARE PAYABLE ON DEMAND, THAT NO PROVISION OF ANY LOAN DOCUMENT OR OF ANY OTHER AGREEMENT BETWEEN BORROWER AND LENDER IS INTENDED TO OR SHALL IN ANY WAY LIMIT, PREJUDICE OR OTHERWISE AFFECT THE DEMAND NATURE OF THIS AGREEMENT, AND THAT THE LENDER SHALL HAVE THE ABSOLUTE AND UNCONDITIONAL RIGHT TO DEMAND PAYMENT OF THE OBLIGATIONS IN ITS DISCRETION, REGARDLESS OF THE EXISTENCE OF ANY PROVISION HEREOF OR OF ANY COMPLIANCE OR NON-COMPLIANCE BY THE BORROWER WITH ANY SUCH PROVISION.

ARTICLE VII

<u>GENERAL PROVISIONS</u>

7.1 <u>Survival of Representations</u>.  All representations and warranties of the Borrower contained in this Agreement shall survive delivery of the Loan Documents and the making of the Loans.

7.2 <u>Headings</u>.  Section headings in the Loan Documents are for convenience of reference only and shall not govern the interpretation of any of the provisions of the Loan Documents.

7.3 <u>Entire Agreement</u>.  The Loan Documents embody the entire agreement and understanding between the Borrower and the Lender and supersede all prior agreements and understandings between the Borrower and the Lender relating to the subject matter thereof.

7.4 <u>No Third Party Beneficiary</u>.  This Agreement shall not be construed so as to confer any right or benefit upon any Person other than the parties to this Agreement and their respective successors and assigns.

7.5 <u>Expenses</u>.  Upon the occurrence of a Payment Default, the Borrower/Guarantors shall pay to the Lender on demand all expenses reasonably incurred in connection with the collection and enforcement of all Obligations under the Loan Documents and in connection with any proceeding commenced by or against the Borrower under Title 11 of the U.S. Code including, without limitation, all reasonable attorneys' fees and expenses. The Borrower's/Guarantors' obligations under this Section shall survive the termination of the Loan Documents and payment of the Obligations.

7.6 <u>Severability of Provisions</u>.  Any provision in any Loan Document that is held to be inoperative, unenforceable, or invalid in any jurisdiction shall, as to that jurisdiction, be inoperative, unenforceable, or invalid without affecting the remaining provisions of the Loan Documents in that jurisdiction or the operation, enforceability, or validity of that provision in any other jurisdiction, and to this end the provisions of all Loan Documents are declared to be severable.

7.7 <u>Non-liability of the Lender</u>.  The relationship between the Borrower and the Lender shall be solely that of borrower and lender.  The Lender shall have no fiduciary

30

CONFIDENTIAL GSBANK0002247

responsibilities to the Loan Parties under this Agreement, any other Loan Document or in connection with the transactions contemplated hereby or thereby.

7.8    <u>CHOICE OF LAW</u>.    THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN THOSE CONTAINING A CONTRARY EXPRESS CHOICE OF LAW PROVISION) SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF NEW YORK.

7.9    <u>BINDING ARBITRATION</u>.

(a)    THE PARTIES HERETO HEREBY WAIVE ALL RIGHTS TO A COURT TRIAL OR TRIAL BY JURY WITH RESPECT TO ANY DISPUTE, CONTROVERSY OR CLAIM UNDER THIS AGREEMENT AND THE LOAN PARTIES AGREE TO SETTLE BY ARBITRATION ANY CONTROVERSY BETWEEN THE LOAN PARTIES AND THE LENDER OR ITS AFFILIATES ARISING OUT OF OR RELATING TO THIS AGREEMENT.  THE ARBITRATION WILL BE CONDUCTED IN ACCORDANCE WITH THE RULES THEN IN EFFECT OF THE AMERICAN ARBITRATION ASSOCIATION.  ANY DISPUTE OR CLAIM INVOLVING A DOLLAR AMOUNT OF $50,000 OR LESS WILL BE BEFORE ONE ARBITRATOR, AND ALL OTHER DISPUTES AND CLAIMS WILL BE BEFORE A PANEL OF AT LEAST THREE ARBITRATORS. THE AWARD OF THE ARBITRATOR OR A MAJORITY OF THE ARBITRATORS, AS THE CASE MAY BE, WILL BE FINAL, AND JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY COURT HAVING JURISDICTION.

(b)    NO PARTY HERETO WILL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO ENFORCE ANY PRE-DISPUTE ARBITRATION AGREEMENT AGAINST THE OTHER PARTY WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION OR WHO IS A MEMBER OF A PUTATIVE CLASS WHO HAS NOT OPTED OUT OF THE CLASS WITH RESPECT TO ANY CLAIMS ENCOMPASSED BY THE PUTATIVE CLASS ACTION UNTIL:   (I) THE CLASS CERTIFICATION IS DENIED; (II) THE CLASS IS DECERTIFIED; OR (III) THE OTHER PARTY IS EXCLUDED FROM THE CLASS BY THE COURT.  SUCH FORBEARANCE TO ENFORCE AN AGREEMENT TO ARBITRATE SHALL NOT CONSTITUTE A WAIVER OF ANY RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT STATED HEREIN.

(c)    THE LOAN PARTIES AGREE TO HOLD HARMLESS THE SECURITIES INTERMEDIARY AND ITS AFFILIATES AND ITS DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS FROM ANY AND ALL CLAIMS, LIABILITIES, AND/OR DAMAGES, IN ANY WAY RELATED TO, OR ARISING OUT OF, OR IN CONNECTION WITH, THE LOAN PARTIES' GRANTING OF THE SECURITY INTEREST OR THE LENDER'S EXERCISE OF RIGHTS UNDER THIS AGREEMENT OR THE SECURITY DOCUMENTS, INCLUDING ANY ACTION OR INACTION BY THE SECURITIES INTERMEDIARY IN FOLLOWING THE LENDER'S INSTRUCTIONS REGARDING THE SECURITIES ACCOUNT IN ACCORDANCE WITH THIS AGREEMENT OR ANY OTHER SECURITY DOCUMENT.

711870427 14466044

CONFIDENTIAL                                                                                    GSBANK0002248

(d)     THE LOAN PARTIES AND THE LENDER HEREBY FURTHER AGREE AS FOLLOWS:

(i)     THE LOAN PARTIES AND THE LENDER ARE EACH GIVING UP THE RIGHT TO SUE EACH OTHER IN COURT, INCLUDING THE RIGHT TO A TRIAL BY JURY, EXCEPT AS PROVIDED BY THE RULES OF  THE ARBITRATION FORUM IN WHICH A CLAIM IS FILED.

(ii)     ARBITRATION AWARDS ARE GENERALLY FINAL AND BINDING; A PARTY'S ABILITY TO HAVE A COURT REVERSE OR MODIFY AN ARBITRATION AWARD IS VERY LIMITED.

(iii)     THE ABILITY OF THE PARTIES HERETO TO OBTAIN DOCUMENTS, WITNESS STATEMENTS AND OTHER DISCOVERY IS GENERALLY MORE LIMITED IN ARBITRATION THAN IN COURT PROCEEDINGS.

(iv)     THE ARBITRATOR(S) DO NOT HAVE TO EXPLAIN THE REASON(S) FOR THEIR AWARD UNLESS, IN AN ELIGIBLE CASE, A JOINT REQUEST FOR AN EXPLAINED DECISION HAS BEEN SUBMITTED BY ALL PARTIES TO THE PANEL AT LEAST 20 DAYS PRIOR TO THE FIRST SCHEDULED HEARING DATE.

(v)     ANY PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES AND/OR BANKING INDUSTRY.

(vi)     THE RULES OF SOME ARBITRATION FORUMS MAY IMPOSE TIME LIMITS FOR BRINGING A CLAIM IN ARBITRATION.  IN SOME CASES, A CLAIM THAT IS INELIGIBLE FOR ARBITRATION MAY BE BROUGHT IN COURT.

(vii)     THE RULES OF THE ARBITRATION FORUM IN WHICH A CLAIM IS FILED, AND ANY AMENDMENTS THERETO, SHALL BE INCORPORATED INTO THIS AGREEMENT.

7.10    Indemnity.

(a)     The Borrower and/or Guarantors hereby agrees to indemnify, defend and hold harmless the Lender and its officers, directors, employees, agents, representatives, successors and assigns (each, an "**Indemnified Person**") in connection with any losses, claims, damages, liabilities, obligations, penalties, actions, suits, costs, charges and expenses, including reasonable attorneys' fees, (i) of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement and any other Loan Document, or the transactions contemplated hereby or thereby, and with respect to any investigation, litigation or proceeding (including any bankruptcy, insolvency or appellate proceeding) related to this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby or the use of the proceeds of the Loans, whether or not any Indemnified Party is a party thereto and (ii) which may be incurred by or asserted against such Indemnified Person in connection with or arising out of any pending or threatened investigation, litigation, or proceeding (including any bankruptcy or insolvency proceeding) or any action

711870427 14466044

CONFIDENTIAL                                                                    GSBANK0002249

taken by any Person, with respect to any environmental claim or suit arising out of or related to any property of the Borrower and/or Guarantors (all of the foregoing, the "**Indemnified Liabilities**").  Notwithstanding the foregoing, the Borrower and/or Guarantors shall have no obligation to any Indemnified Person for any Indemnified Liabilities to the extent arising from the gross negligence or willful misconduct of such Indemnified Person as determined in a final, non-appealable decision of a court of competent jurisdiction or of an arbitration panel. The Borrower hereby acknowledges and agrees that any member of the Goldman Affiliated Group that grants a security interest in any of its assets as collateral security for the Loans shall have all rights of subrogation against the Borrower.  This Section 7.10(a) shall not apply with respect to taxes other than any taxes that represent losses, claims, damages, liabilities, obligations, penalties, costs, charges and expenses arising from any non-tax claim.

(b)      To the fullest extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnified Person, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan, or the use of the proceeds thereof.  No Indemnified Person referred to in paragraph (a) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(c)      The Borrower's obligations under this Section shall survive the termination of the Loan Documents and payment of the Obligations.

7.11    Assignment, Etc.

(a)      The Lender may sell, assign, transfer or negotiate its rights and obligations under this Agreement and the other Loan Documents, in whole or in part at any time (i) to any other member of the Goldman Affiliated Group without notice to or consent of Borrower or any other Person or (ii) to any other bank or entity with net assets in excess of $100,000,000 so long as the Borrower consents to such sale, assignment, transfer or negotiation in writing; provided that any such consent shall not be required if a Payment Default is then continuing.  Borrower agrees to execute any additional or replacement Notes requested by Lender to further document any such sale, assignment, transfer or negotiation.  Any assignee or transferee of the Lender's rights and/or obligations shall be entitled to the full benefit of this Agreement to the same extent as if it were an original party in respect of the rights or obligations assigned or transferred to it.

(b)      The Lender may sell participating interests in any Loan owing to Lender, any Note held by the Lender or any other interest of the Lender under this Agreement and the other Loan Documents to one or more banks or other entities with net assets in excess of $100,000,000 ("**Participants**"), provided that so long as no Payment Default exists, any such participation shall be subject to written consent of the Borrower.  In the event of any such sale by the Lender of participating interests to a Participant, the Lender's obligations under this Agreement and the other Loan Documents shall remain unchanged, the Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, the Lender

33

CONFIDENTIAL                                                                                                          GSBANK0002250

shall remain the owner of its Loans and the holder of any Note issued to it in evidence thereof for all purposes under the Loan Documents, all amounts payable by the Borrower under this Agreement shall be determined as if the Lender had not sold such participating interests, and the Borrower shall continue to deal solely and directly with the Lender in connection with the Lender's rights and obligations under the Loan Documents.

(c)     No Loan Party may assign its rights or obligations under this Agreement. This Agreement shall be binding upon and inure to the benefit of the respective heirs, successors (and the Borrower's estate and legal representatives in the event of the death or incapacity of the Borrower whether or not an executor, administrator trustee or other representative has been appointed to the Borrower's estate) and permitted assigns of all the parties to this Agreement. The Lender may at any time change the office through which it is acting for the purpose of this Agreement and may at any time act for this purpose through more than one office.  The Lender may disclose to an assignee or transferee permitted by this Agreement such information about the Loan Parties and the Loan Documents as it may deem appropriate.

(d)     Nothing herein shall prohibit Lender from pledging or assigning Loans to any Federal Reserve Bank in accordance with applicable law.

7.12     <u>Giving Notice</u>.   Unless otherwise provided herein, all notices and other communications provided to any party hereto under this Agreement or any other Loan Document shall be in writing or by facsimile and addressed or delivered to such party at its address as follows (unless otherwise designated in writing to the other parties):  (a) if to the Borrower, at the address set forth below the Borrower's name on the signature page hereto and (b) if to the Lender, at the address set forth below the Lender's name on the signature page hereto.  Unless otherwise provided herein, any notice, if mailed and properly addressed with postage prepaid, shall be deemed given three (3) Business Days after being sent; any notice, if transmitted by facsimile, shall be deemed given when transmitted; any notice transmitted by electronic communication (including e-mail and Internet or intranet websites) shall be pursuant to procedures approved by the Lender; any notice with a confirmation of receipt, if hand delivered, shall be deemed given on the date of such delivery; any notice, if mailed by overnight courier, shall      be      deemed      given      on      the      date      of      such      delivery.

7.13     <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one agreement, and any of the parties hereto may execute this Agreement by signing any such counterpart.  Facsimiled or other electronic format (i.e. "pdf" or "tif") signatures to this Agreement shall be valid.  This Agreement shall be effective when it has been executed by the Borrower and the Lender.

7.14     <u>Reinstatement of Obligations</u>.  If and to the extent the Lender or the Securities Intermediary receives any payment with respect to the Obligations or this Agreement and all or any part of such payment is subsequently invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid by the Lender or the Securities Intermediary or paid over to a trustee, receiver, or any other entity, whether under any bankruptcy law or otherwise (any such payment is referred to as a "**Returned Payment**"), then this Agreement shall continue to be effective or shall be reinstated, as the case may be, to the extent of such payment or repayment

711870427 14466044

**138**

                                                                                          GSBANK0002251

by the Lender or the Securities Intermediary, and the indebtedness or part thereof intended to be satisfied by such Returned Payments shall be revived and continued in full force and effect as if the Returned Payment had not been made.

7.15   Certain Risks and Potential Conflicts of Interest.

(a)   (This Section 7.15(a) is applicable to the extent the Collateral includes "Funds" and "Fund Interests" (as such terms are defined in the Security Document) and such "Fund Interests" are issued by a member of the Goldman Affiliated Group.)  There are certain risks and potential conflicts of interest relating to the various capacities in which the Lender and its affiliates are acting in connection with the Funds (as defined in the applicable Security Document), the Collateral and acting as Lender, a summary description of which is set forth on Exhibit 7.16.  Borrower acknowledges that it has received, read and understood the disclosure set forth on Exhibit 7.15.

(b)   The Borrower acknowledges that, to the extent the Collateral includes municipal securities, shares of municipal bond funds or shares of mutual funds invested in municipal securities, a ratable portion of otherwise tax deductible interest expense incurred on the Loans may not be tax deductible.

7.16   USA Patriot Act.  The Lender hereby notifies the Borrower that, pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the Lender to identify the Borrower in accordance with the USA Patriot Act.

7.17   Other Disclosures.

(a)   Each Loan Party by its execution of the Loan Documents to which it is a party acknowledges that it has received, read and understood the privacy notice set forth on Annex I.

(b)   Each Loan Party by its execution of the Loan Documents to which it is a party acknowledges that it has received, read and understood the notice of potential conflicts of interest set forth on Annex II.

7.18   Subordination.  No Loan Party shall make any payments or advances of any kind, directly or indirectly, on any debts and liabilities to any other Loan Party, any borrower under any Other Loan Agreement, or to any Affiliate of a Loan Party, as applicable, whether now existing or hereafter arising and whether direct, indirect, several, joint and several, or otherwise, and howsoever evidenced or created (collectively, the "*Other Claims*") at any time (a) a Payment Default exists, (b) the Lender has made a demand for payment hereunder or (c) the Demand Date has occurred for any reason, *provided* that payments of Other Claims shall be permitted (i) with the prior written consent of the Lender, (ii) with respect to the salaries of employees of any Loan Party, including compensation in the form of distributions or Carried Interest (as defined in the Constituent Documents of each Fund) other than compensation to the Borrower or any borrower under any Other Loan Agreement and (iii) with respect to operating expenses of the Loan Parties incurred and paid in the ordinary course of business (other than

35

**CONFIDENTIAL**

GSBANK0002252

compensation to the Borrower or any borrower under any Other Loan Agreement).  All Other Claims, together with all liens, security interests, and all other encumbrances or charges on assets securing the payment of all or any portion of the Other Claims shall at all times be subordinated to and inferior in right and in payment to the Obligations and all liens, security interest, and all other encumbrances or charges on assets securing all or any portion of the Obligations.

ARTICLE VIII

GUARANTY

8.1    Guaranty of Payment.  Each Guarantor hereby jointly and severally, absolutely, irrevocably and unconditionally guarantees to Lender the prompt payment of the Obligations in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise). The guaranty in this Article VIII (this "**Guaranty**") is a guaranty of payment and not of collection and is a continuing guaranty and shall apply to all of the Obligations whenever arising.  Notwithstanding any provision to the contrary contained herein or in any of the other Loan Documents, to the extent the obligations of each Guarantor shall be adjudicated to be invalid or unenforceable for any reason (including, without limitation, because of any applicable state or federal law relating to fraudulent conveyances or transfers) then the obligations of each Guarantor hereunder shall be limited to the maximum amount that is permissible under applicable law (whether federal or state or otherwise).

8.2    Obligations Unconditional.  The obligations of each Guarantor hereunder are absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of any of the Loan Documents or any other agreement or instrument referred to therein, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor (other than payment in full).  Each Guarantor agrees that this Guaranty may be enforced by Lender without the necessity at any time of resorting to or exhausting any other security or collateral and without the necessity at any time of having recourse to the Note or any of the other Loan Documents or any collateral, if any, hereafter securing the Obligations or otherwise and the Guarantors hereby waive the right to require Lender to make demand on or proceed against any Loan Party or any other Person (including a co-guarantor) or to require Lender to pursue any other remedy or enforce any other right.  Each Guarantor further agrees that no Person or governmental authority shall have any right to request any return or reimbursement of funds from Lender in connection with monies received under the Loan Documents.  Each Guarantor further agrees that nothing contained herein shall prevent Lender from suing on the Note or any of the other Loan Documents or foreclosing its security interest in or lien on any Collateral securing the Obligations or from exercising any other rights available to it under this Agreement, the Notes, any other of the Loan Documents, or any other instrument of security and the exercise of any of the aforesaid rights and the completion of any foreclosure proceedings shall not constitute a discharge of any Guarantor's obligations hereunder.  Neither Guarantor's obligations under this Guaranty nor any remedy for the enforcement thereof shall be impaired, modified, changed or released in any manner whatsoever by an impairment, modification, change, release, increase or limitation of the liability of any Loan Party or by reason of the bankruptcy or insolvency of any Loan Party.  Each Guarantor waives any and all notice of the creation, renewal, extension or accrual of any of the Obligations and notice of or

36

711870427 14466044

CONFIDENTIAL                                                                                 GSBANK0002253

proof of reliance by Lender on this Guaranty or acceptance of this Guaranty. The Obligations, and any part of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon this Guaranty. All dealings between any Loan Party, on the one hand, and the Lender, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon this Guaranty. Each Guarantor hereby subordinates to the Obligations all debts, liabilities and other obligations, whether direct, indirect, primary, secondary, several, joint and several or otherwise, and irrespective of whether such debts, liabilities and obligations be evidenced by note, contract, open account, book entry or otherwise, owing to each Guarantor by any other Loan Party.

8.3     <u>Modifications</u>.  Each Guarantor agrees that: (a) all or any part of the Collateral now or hereafter held or received for the Obligations may be exchanged, compromised or surrendered from time to time; (b) the Lender shall have no obligation to protect, perfect, secure or insure any such security interests, liens or encumbrances now or hereafter held, if any, for the Obligations; (c) the time or place of payment of the Obligations may be changed or extended, in whole or in part, to a time certain or otherwise, and may be renewed or accelerated, in whole or in part; (d) any Loan Party and any other party liable for payment under the Loan Documents may be granted indulgences generally; (e) any of the provisions of the Note or any of the other Loan Documents, including, without limitation, this Agreement may be modified, amended or waived; (f) any party (including any co-guarantor) liable for the payment thereof may be granted indulgences or be released; and (g) any deposit balance for the credit of any Loan Party or any other party liable for the payment of the Obligations or liable upon any security therefor may be released, in whole or in part, at, before or after the stated, extended or accelerated maturity of the Obligations, all without notice to or further assent by any Guarantor, which shall remain bound thereon, notwithstanding any such exchange, compromise, surrender, extension, renewal, acceleration, modification, indulgence or release.

8.4     <u>Waiver of Rights</u>.  Each Guarantor expressly waives to the fullest extent permitted by applicable law: (a) notice of acceptance of this Guaranty by the Lender and of all extensions of credit to any Loan Party by Lender; (b) notice of presentment and demand for payment or performance of any of the Obligations; (c) protest and notice of dishonor or of default (except as specifically required in this Agreement) with respect to the Obligations or with respect to any security therefor; (d) notice of Lender obtaining, amending, substituting for, releasing, waiving or modifying any security interest, lien or encumbrance hereafter securing the Obligations, or the Lender subordinating, compromising, discharging or releasing such security interests, liens or encumbrances, if any; and (e) all other notices to which any Guarantor might otherwise be entitled, except those expressly required hereunder. Each Guarantor does not waive his, her or its rights to service of process in accordance with the Loan Documents or applicable law.

8.5     <u>Reinstatement</u>.  Notwithstanding anything contained in this Agreement or the other Loan Documents, the obligations of each Guarantor under this Article VIII shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Person in respect of the Obligations is rescinded or must be otherwise restored by any holder of any of the Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, and each Guarantor agrees that it will indemnify Lender on demand for all reasonable costs and expenses (including, without limitation, reasonable fees of counsel)

711870427 14466044

CONFIDENTIAL

GSBANK0002254

incurred by such Person in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.

8.6     Remedies.  Each Guarantor agrees that the Obligations may be declared to be forthwith due and payable upon demand or as provided in Sections 2.5 or 6.1 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 6.1 notwithstanding any stay, injunction or other prohibition preventing such declaration (or preventing such Obligations from becoming automatically due and payable) as against any other Person and that, in the event of such declaration (or such Obligations being deemed to have become automatically due and payable), such Obligations shall forthwith become due and payable by each Guarantor upon the same timeframes as due by such party).  Each Guarantor acknowledges and agrees that its obligations hereunder (a) are fully recourse to the Guarantors and its properties and assets (and for the avoidance of doubt, does not include portfolio companies of any Fund) and (b) are secured in accordance with the terms of the Security Documents, and that Lender may exercise its remedies thereunder in accordance with the terms of such Security Documents and this Agreement.

8.7     Subrogation.  Each Guarantor agrees that, until the payment of the Obligations in full in cash, it will not exercise, and hereby waives, any right of reimbursement, subrogation, contribution, offset, indemnitee or other claims against any Loan Party or any other guarantor of the Obligations, arising by contract or operation of law in connection with the Obligations and any payment made or required to be made by each Guarantor under this Agreement or the other Loan Documents.  After the payment in full in cash of the Obligations (other than any part of the Obligations that represents contingent contractual indemnities), each Guarantor shall be entitled to exercise against any other Loan Party all such rights of reimbursement, subrogation, contribution, indemnification and offset, and all such other claims, to the fullest extent permitted by law.

8.8     Guaranty of Payment.  Each Guarantor hereby severally, absolutely, irrevocably and unconditionally guarantees to Lender the prompt payment of the Obligations in full when due (whether on the Demand Date, as a mandatory prepayment, by acceleration or otherwise).

8.9     Acknowledgement.  Each Guarantor hereby acknowledges (a) that it will receive direct or indirect benefits in connection with the Obligations and (b) the receipt and sufficiency of good and valuable consideration in connection with this Guaranty.

[Remainder of page intentionally left blank; signature page follows]

711870427 14466044

CONFIDENTIAL                                                     GSBANK0002255

THE BORROWER ACKNOWLEDGES THAT THE LOANS MADE PURSUANT TO THIS AGREEMENT ARE PAYABLE IN FULL UPON DEMAND BY THE LENDER.

BORROWER:

_____

Todd W. Carter

Notice Address:    6615 Prestonshire Ln
Dallas, Texas  75225

Email: _TCarter@Pandafunds.com_

Loan Agreement – Todd W. Carter

**143**

CONFIDENTIAL

**GUARANTORS:**

PANDA POWER GENERATION
INFRASTRUCTURE FUND, LLC, a Delaware
limited liability company

By: _____

Name: Todd W. Carter
Title:  Senior Partner and President

Address:       4100 Spring Valley, Suite 1001
Dallas, TX 75244

Email: _TCarter @Pandafunds.com_


PANDA POWER FUND II GP, L.P., a Delaware
limited partnership

By:       Panda Power Fund II GP, LLC, a
Delaware limited liability company, its general
partner

By: _____

Name: Todd W. Carter
Title:  Senior Partner and President

Address:       4100 Spring Valley, Suite 1001
               Dallas, TX 75244

Email: _TCarter @Pandafunds.com_


**Loan Agreement – Todd W. Carter**

**144**

IN WITNESS WHEREOF, the Borrower and the Lender have executed this Agreement as of the date set forth below the Lender's signature.

**LENDER:**

GOLDMAN SACHS BANK USA

By: _____

Name: *Brad R. Baker*

Title: *Vice President*

Address:      200 West Street
              New York, NY 10282-2198

Facsimile:    212-428-1474

With a copy to:

Address:      Attn: Bradley R. Baker
              100 Crescent Court, Suite
1000
              Dallas, TX 75201

Facsimile:    646-835-3251

**Loan Agreement – Todd W. Carter**

711870427 14466044

**145**

**SCHEDULE I**

Security and Pledge Agreement dated as of the Effective Date between the Advisor and the Lender, as amended, restated, supplemented or otherwise modified from time to time, securing the Obligations, substantially in the form of Exhibit C hereto.

Security and Pledge Agreement dated as of the Effective Date between the Borrower and the Lender, as amended, restated, supplemented or otherwise modified from time to time, securing the Obligations, substantially in the form of Exhibit D hereto.

Deposit Account Control Agreement

711870427 14466044

**146**

  GSBANK0002259

## SCHEDULE II-A

### General Partner (Sharing Percentages)

| Regular Limited Partner | Carried Interest Sharing Percentage | Capital Commitment Sharing Percentage |
|---|---|---|
| Robert W. Carter | 50% | 60.24% |
| Todd Carter | 15% | 18.07% |
| Robert K. Simmons | 6% | 7.23% |
| William Nordlund | 6% | 7.23% |
| Ralph Killian | 0% | 0% |
| Family Investment Partners: | | |
| Ralph T. Killian Special Community Property Subtrust of the Killian Living Trust | 6% | 7.23% |
| Total: | 83% | 100% |

## SCHEDULE II-B

### Advisor (Membership Percentages)

| Managing Members | Membership Interest |
|---|---|
| Robert W. Carter | 60.24% |
| Todd Carter | 18.07% |
| Robert K. Simmons | 7.23% |
| William Nordlund | 7.23% |
| Ralph Killian | 7.23% |
| Total: | 100% |

711870427 14466044

**147**

**EXHIBIT A**
**(see attached)**

711870427 14466044

**CONFIDENTIAL** **GSBANK0002261**

# NOTE

Principal Amount:  $[_____]                    [_____], 2014

FOR VALUE RECEIVED, the undersigned Borrower (the "**Borrower**") promises to pay on demand to Goldman Sachs Bank USA (the "**Lender**"), at the Lending Office or such other place as the Lender or any holder hereof may from time to time designate, the principal sum of [_____ AND \_\_/100 DOLLARS ($_____)], or such lesser principal amount as may be outstanding from time to time, in United States Dollars and in immediately available funds as provided in that certain Loan Agreement of even date herewith between the Borrower and the Lender (as amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), together with interest on the unpaid principal amount hereof from time to time outstanding, at the rates and on the dates set forth in the Loan Agreement.  Interest shall be calculated on the basis of a three hundred sixty (360) day year and actual days elapsed.

This Note is issued pursuant to, and is entitled to the benefits of, the Loan Agreement. Reference hereby is made thereto for a statement of the terms and conditions under which this Note may be prepaid or under which demand for payment may be made.  This Note is entitled to the benefits of the Security Documents and is secured pursuant to the terms of the Loan Agreement and certain other Loan Documents and reference is made thereto for a statement of the terms and provisions thereof.  Capitalized terms used herein and not otherwise defined herein are used with the respective meanings attributed to them in the Loan Agreement.

The Lender may, in its sole and absolute discretion, demand payment and declare any and all of the Borrower's obligations, liabilities and indebtedness owing by Borrower under this Note, the Loan Agreement and any other Loan Document (collectively, the "**Obligations**") to be due and payable, whereupon the then unpaid balance thereof, together with all interest accrued thereon or expenses incurred in connection therewith shall forthwith become due and payable, together with all interest accruing thereafter at the rate set forth in the Loan Agreement until the Obligations, plus all costs and expenses of collection hereof, including, without limitation, reasonable attorneys' fees and expenses, are indefeasibly paid in full in cash.

The Borrower shall pay all of the Lender's costs and expenses (including, without limitation, all reasonable attorneys' fees and expenses) incurred in connection with the enforcement of or preservation of rights under this Note on the terms provided in the Loan Agreement.

No delay or omission on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right of the Lender, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any future occasion.  The Borrower and every indorser or guarantor of this Note regardless of the time, order or place of signing waives presentment, demand, protest and notices of every kind and assents to any extension or postponement of the time of payment or any other

711870427 14466044

**149**

indulgence, to any substitution, exchange or release of Collateral, and to the addition or release of any other Person primarily or secondarily liable.

None of the terms or provisions of this Note may be excluded, modified, or amended except by a written instrument duly executed by Lender and the Borrower expressly referring hereto and setting forth the provision so excluded, modified or amended.  This Note shall be binding upon the successors and assigns of the Borrower and inure to the benefit of the Lender and its successors, endorsees and assigns.  If any term or provision of this Note shall be held to be invalid or unenforceable, in whole or in part in any jurisdiction, then such invalidity or unenforceability shall only effect such term or provision, and shall not effect such term or provision in any other jurisdiction or any other term or provision of this Note.

All rights and obligations hereunder shall be governed by the laws of the State of New York (without giving effect to principles of conflicts or choice of laws) and this Note shall be deemed to be made under seal.

IN WITNESS WHEREOF, the Borrower has executed this Note as of the date first above written.

THE BORROWER ACKNOWLEDGES THAT THE OBLIGATIONS EVIDENCED BY THIS NOTE ARE PAYABLE IN FULL UPON DEMAND BY THE LENDER.

[Remainder of page intentionally left blank; signature page follows]

711870427 14466044

**150**

CONFIDENTIAL

GSBANK0002263

**BORROWER:**

 

_____

Todd W. Carter

711870427 14466044

**CONFIDENTIAL**

GSBANK0002264

**EXHIBIT B**

**Notice of Borrowing**

Goldman Sachs Bank USA
222 S. Main Street
Salt Lake City, Utah 84101
Facsimile: 212-428-1474
Attention: Private Lending Services

Re:     Todd W. Carter (the "**Borrower**")

       Reference is made to that certain Loan Agreement dated as of November 13, 2014 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**") among the Borrower, the guarantors named therein and Goldman Sachs Bank USA ("**Lender**").  Capitalized terms used herein and not otherwise defined herein are used herein as defined in the Loan Agreement.

       This is a Notice of Borrowing being delivered in accordance with the Loan Agreement. The Borrower requests that Lender make an advance under the Loan Agreement in the amount of $_____ [minimum of $100,000] to be advanced on _____, 20__ [must be a Business Day at least two (2) Business Days from the date of this notice if a LIBOR Loan is requested] and that the proceeds be paid to the following account:

Bank Name:      _____

ABA Number:    _____

Account Name:  _____

Account #:       _____

For Credit To:   _____

711870427 14466044

**152**

Purpose of the Funding:

_____

_____ [1]

1. To the best of my knowledge, these funds will not be used to benefit the Lender or any of its affiliates.
   ☐ I Agree        ☐ I Disagree

2. If the purpose of draw is real estate related, please provide the name of the seller and/or the address of the property:

   _____

The undersigned hereby certifies that all representations and warranties set forth in the Loan Agreement and such other Loan Documents are true and correct in all material respects on and as of the date hereof (except to the extent such representation and warranty is expressly stated to relate to a specific earlier date in which case such representation and warranty shall be true and correct in all material respects as of such earlier date). If any portion of the advance requested is being used to purchase or carry margin stock, a revised Federal Reserve Form U-1 is attached hereto.

Date:_____

---

[1] If the standard language in Section 2.10(b) is deleted then the following language must be inserted in this Notice of Borrowing beneath the "Purpose of the Funding Section":

Please check off "Yes" or "No" to indicate your agreement with the sentence below:

The Borrower will not use any part of the proceeds of the Loans for the benefit of, or transfer any part of the proceeds of the Loans to, any affiliate of the Lender.

___ Yes

___ No

CONFIDENTIAL                                                    GSBANK0002266

*sign below if a second authorized signatory is required*

By: _____

Name: _____

711870427 14466044      50

**154**

**EXHIBIT C**

**Form of**

**Advisor Security Agreement**

**(see attached)**

**CONFIDENTIAL**

## SECURITY AND PLEDGE AGREEMENT
## PANDA POWER GENERATION INFRASTRUCTURE FUND, LLC

**THIS SECURITY AND PLEDGE AGREEMENT** (this "**Agreement**") is made by and between PANDA POWER GENERATION INFRASTRUCTURE FUND, LLC, a Delaware limited liability company (the "**Pledgor**"), and GOLDMAN SACHS BANK USA ("**Secured Party**"), and dated as of November 13, 2014.

### RECITALS:

A.      WHEREAS, the Pledgor has entered into (i) the Loan Agreement among Robert W. Carter, the Pledgor, Panda Power Fund II GP, L.P. (the "**General Partner**"), and the Lender, dated as of the date hereof, (ii) the Loan Agreement among Todd W. Carter, the Pledgor, the General Partner, and the Lender, dated as of the date hereof, (iii) the Loan Agreement among Robert K. Simmons, the Pledgor, the General Partner, and the Lender, dated as of the date hereof, (iv) the Loan Agreement among William C. Nordlund, the Pledgor, the General Partner, and the Lender, dated as of the date hereof, and (v) the Loan Agreement among Robert T. Killian, the Ralph T. Killian Special Community Property Subtrust of the Killian Living Trust, and Ralph T. Killian as Trustee of the Ralph T. Killian Special Community Property Subtrust of the Killian Living Trust (together with Robert W. Carter, Todd W. Carter, Robert K. Simmons, William C. Nordlund and Robert T. Killian, the "**Borrowers**"), the Pledgor, the General Partner, and the Lender, dated as of the date hereof (collectively, each such Loan Agreement as amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreements**"), pursuant to which the Secured Party has agreed to make certain advances to or for the account of the Borrowers;

B.      WHEREAS, the Pledgor is the legal and beneficial owner of the Collateral to be pledged hereunder;

C.      WHEREAS, it is a condition to the obligation of the Secured Party to make the loans under the Loan Agreements that the Pledgor execute and deliver this Agreement;

D.      WHEREAS, this Agreement is given by the Pledgor in favor of the Secured Party to secure the payment and performance of all of the Secured Obligations (as hereinafter defined); and

E.      WHEREAS, the Pledgor will derive benefit from the extension of credit pursuant to the Loan Agreements.

**NOW, THEREFORE**, in consideration of the foregoing premises, of the mutual covenants contained in this Agreement, and of other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties to this Agreement, intending to be legally bound, hereby agree as follows:

1.      **Definitions.**

(a)      Capitalized terms used herein which are defined in the Uniform Commercial Code as in effect from time to time in the State of New York or any other applicable

711870427 14466044

**156**

CONFIDENTIAL                                                                                    GSBANK0002269

jurisdiction (the "**UCC**") shall have the meanings given them in Article 8 or Article 9 of the UCC, as applicable, thereof and other capitalized terms used but not defined herein shall have the meanings ascribed to such terms in each Loan Agreement, in each case unless the context clearly requires otherwise.

(b)     The following terms shall have the following meanings:

"**Advisory Agreement**" has the meaning given to such term in the Loan Agreements.

"**Agreement**" has the meaning given to that term in the Preamble of this Agreement.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto, as hereafter amended.

"**Collateral**" has the meaning given to that term in Section 2 of this Agreement.

"**Constituent Documents**" has the meaning given to that term in each of the Loan Agreements.

"**Deposit Account**" means the deposit account established with the Depository, with Account Number ▮▮▮▮▮▮, in the name of Panda Power Generation Infrastructure Fund, LLC, together with any and all subaccounts thereof, segregated accounts thereunder and cash or other accounts linked or related thereto, and any and all of their respective successor, replacement or substitute accounts.

"**Deposit Account Control Agreement**" means the Blocked Account Control Agreement among the Pledgor, the Depository and the Lender, as amended, restated, supplemented or otherwise modified from time to time.

"**Depository**" means JPMorgan Chase Bank, N.A.

"**Dollars**" and the sign "**$**" each means the lawful currency of the United States of America.

"**Funds**" has the meaning given to that term in the Loan Agreements.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, any such encumbrance arising out of or pursuant to any conditional sale or other title retention agreement, any financing or similar statement or notice filed under any recording or notice statute, and any capital lease having substantially the same effect as any of the foregoing).

"**Loan Agreements**" has the meaning given to that term in the Recitals of this Agreement.

"**Management Fees**" means all management fees under the Advisory Agreements.

CONFIDENTIAL                                                          GSBANK0002270

"**Permitted Liens**" means Depository's Liens to the extent permitted by the Deposit Account Control Agreement and Permitted Liens (as such term is defined in the Loan Agreements); *provided* that the term "Permitted Liens" shall not include any Lien securing the Secured Obligations.

"**Pledgor**" has the meaning given to that term in the Preamble of this Agreement.

"**Secured Obligations**" has the meaning given to that term in Section 2 of this Agreement.

"**Secured Party**" has the meaning given to that term in the Preamble of this Agreement.

"**Security Interest**" has the meaning given to that term in Section 2 of this Agreement.

Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter. Unless the context requires otherwise, any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein).

2.   **Grant of Security Interest.**

As security for the full payment and performance of the Secured Obligations, the Pledgor hereby assigns, pledges, grants and conveys to the Secured Party a continuing first priority lien and security interest (the "**Security Interest**") on and in the following (collectively, the "**Collateral**"), whether now existing or hereafter arising and wherever located:

(a)   all of Pledgor's rights, titles, interests and privileges in and to the Management Fees and other amounts payable under the Advisory Agreements and to receive the same;

(b)   all of Pledgor's rights, titles, interests, remedies and privileges under each Advisory Agreement relating to Management Fees and other amounts payable thereunder, or the enforcement of the payment thereof;

(c)   the Deposit Account and any extensions or renewals thereof, if the account is one which may be extended or renewed, and any successor or substitute accounts, and any sub-account related thereto, together with all of Pledgor's right, title, and interest (whether now existing or hereafter created or arising) in and to such account, all funds, financial assets or other property now or at any time hereafter on deposit therein, credited thereto, or payable thereon and all instruments, documents, certificates, and other writings evidencing such account;

CONFIDENTIAL                                                                    GSBANK0002271

(d)      all books and records (in whatever form or media, including computerized records, software and disks) relating to any of the foregoing;

(e)      all General Intangibles relating to or arising out of any of the foregoing;

(f)      all Proceeds of any of the foregoing.

For purposes of this Agreement, the term "**Secured Obligations**" shall mean collectively all of the Obligations (as such term is defined in each Loan Agreement).

3.    **Maintenance of Collateral.**

(a)      The Pledgor shall require that each Fund wire-transfer to the Deposit Account, all monies or sums paid or to be paid by any Fund to the Pledgor as Management Fees as and when Management Fees are due pursuant to the Advisory Agreements.  In addition, the Pledgor shall, upon receipt, deposit in the Deposit Account any payments, funds and monies that the Pledgor receives directly from any Fund as Management Fees.

(b)      Without the prior written consent in the sole discretion of the Secured Party, the Pledgor shall not affect, and shall not permit to occur, any assignment, sale, transfer, pledge, redemption or any change in the Collateral or withdraw funds from the Deposit Account; provided, that the prior written consent of the Secured Party shall not be required to withdraw funds from the Deposit Account solely to the extent permitted by and in accordance with Section 5.15 of each Loan Agreement.

(c)      In the event the Pledgor fails to comply with the requirements of Section 3(a) and 3(b) above, or a Payment Default exists, then the Secured Party may, at its option from time to time and without demand for additional Collateral or notice of sale or purchase or any other notice to the Pledgor, (i) instruct the Depository to cancel any open orders and close any or all outstanding contracts, liquidate any or all Collateral, withdraw any or all Collateral and (ii) take any other actions to which it is entitled, whether pursuant to Section 6 or otherwise.

4.    **Representations and Warranties.**  The Pledgor hereby represents and warrants to Secured Party that:

(a)      (i) Set forth on the signature page hereto is the Pledgor's correct legal name, as such name appears in Pledgor's Constituent Documents, (ii) the Pledgor is a limited liability company, and (iii) the Pledgor is located in Delaware for purposes of Section 9-301 and 9-307 of the UCC.  The Pledgor has not changed the Pledgor's name, place of business or its jurisdiction of organization in the past five (5) years.

(b)      The Pledgor is and at all times will continue to be the sole direct, legal and beneficial owner of the Collateral pledged by it hereunder.  All Collateral is and shall be free and clear of any and all Liens, security interests, encumbrances and claims (other than the Lien and Security Interest created by this Agreement or any other Loan Document and any Permitted Liens).

CONFIDENTIAL       GSBANK0002272

(c)     The Pledgor has not authorized the filing of, and the Pledgor is not aware of, any financing statements against the Pledgor that includes a description of collateral covering any part of the Collateral, other than any financing statements relating to the Security Interest granted to the Secured Party hereunder.

(d)     This Agreement creates a valid, perfected and continuing first priority Lien on and security interest in the Collateral in favor of Secured Party upon (i) in the case of Collateral in which a security interest may be perfected by filing a financing statement under the UCC, the completion of the filings and other actions specified on Schedule A and (ii) in the case of Collateral in which a security interest may be perfected by control under the UCC, the execution of the Deposit Account Control Agreement.

(e)     The Pledgor has not consented to any Person complying with instructions with respect to the Deposit Account of any Person other than the Secured Party;

(f)     Except as otherwise provided by this Agreement, no consent, authorization, approval, license or other action by, and no notice to or filing with, any Governmental Authority or other Person, other than those that have been received or completed is required for (x) the execution, delivery or performance of this Agreement by the Pledgor (including, without limitation, the grant of the Lien hereunder), (y) the exercise by the Secured Party of the rights provided for in this Agreement or (z) the exercise by the Secured Party of the remedies in respect of the Collateral pursuant to this Agreement.  In the event that the Secured Party desires to exercise any remedies, voting or consensual rights or attorney-in-fact powers set forth in this Agreement and determines it necessary to obtain any approvals or consents of any Governmental Authority or any other Person therefor, then, upon the reasonable request of the Secured Party, the Pledgor agrees to assist and aid the Secured Party to obtain as soon as practicable any necessary approvals for the exercise of any such remedies, rights and powers.

(g)     In connection with the transfer and/or pledge of the Collateral to the Secured Party, all required notices to third parties have been given and any required consents or approvals from third parties have been obtained and are in full force and effect as of the date hereof.

(h)     The execution, delivery and performance of this Agreement does not violate or conflict with (i) the terms or provisions of any document or agreement to which the Pledgor is a party or pursuant to which the Pledgor's assets or properties are bound and all consents necessary in order for the Pledgor to execute and deliver this Agreement have been obtained, (ii) any order, ruling, consent, decree or other directive issued or made by any court, regulatory body or governmental authority having jurisdiction over the Pledgor or its properties, or (iii) any laws applicable to or binding on the Pledgor or its assets and properties.

(i)     The Pledgor has all necessary right, power and authority to own the Pledgor's property and assets, to transact the business in which the Pledgor is engaged and to grant to the Secured Party a security interest in the Collateral, and has taken all necessary action to authorize the Pledgor's execution, delivery and performance of this Agreement, including all necessary actions by directors, members, shareholders or trustees, as the case may be, and all filing and recordations.

CONFIDENTIAL                                                                    GSBANK0002273

(j)     The Pledgor has, independently and without reliance upon the Secured Party and based on such documents and information as the Pledgor has deemed appropriate, made the Pledgor's own credit analysis and decision to enter into this Agreement.

5.   **Covenants.**  During the term of this Agreement, the Pledgor hereby covenants as follows:

(a)     To the extent not already obtained, the Pledgor will promptly request and obtain executed consents required by the Secured Party in connection with the pledge of any interests in the Collateral.

(b)     The Pledgor will promptly execute and deliver, and hereby authorizes the Secured Party to execute on behalf of the Pledgor, such further instruments and take such further actions as Secured Party may deem necessary or desirable to maintain or perfect the Security Interest, including without limitation, stock powers indorsed in blank, control agreements and UCC financing statements.

6.   **Remedies.**

(a)     Upon the occurrence of a Payment Default or as otherwise permitted by Section 3(c) hereof, the Secured Party may exercise from time to time, any and all rights and remedies of a secured party under the UCC (whether or not in effect in the jurisdiction where such rights are exercised) or any applicable laws in effect in any jurisdiction where any rights and remedies may be asserted and any and all rights and remedies available to it as a result of this Agreement or any other Loan Document including, without limitation, its right to (i) demand payment and performance of all due and payable Secured Obligations from the funds in or credited to the Deposit Account; (ii) deliver a shifting control notice or other notice establishing exclusive control in favor of the Secured Party over the Deposit Account; (iii) surrender or present for notation of withdrawal the passbook, certificate, or other documents issued to the Pledgor in connection with the Deposit Account; (iv) withdraw, collect, transfer and receive any and all funds on deposit in or payable to the Deposit Account; and (v)  withdraw or transfer funds from the Deposit Account and apply all or any portion of the funds in or credited to the Deposit Account to the Secured Obligations; provided, however, that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Pledgor under the Bankruptcy Code, the Secured Obligations shall automatically become due and payable without further act of the Secured Party.  The Pledgor shall be responsible for any decrease in the value of the Collateral occurring prior to or during liquidation.  Upon the occurrence of a Payment Default or as otherwise permitted by Section 3(c) hereof, the Secured Party in its discretion may also set-off any or all of the Secured Obligations against any securities, cash, or other property of the Pledgor in the possession of the Secured Party or any other member of the Goldman Affiliated Group and against any obligations owed to the Pledgor by the Secured Party or any other member of the Goldman Affiliated Group to the extent that it does not impact the Secured Party's ability to recover amounts owed to the Secured Party.  **THE PLEDGOR UNDERSTANDS THAT PURSUANT TO THE TERMS OF THIS AGREEMENT THE PLEDGOR IS ALLOWING THE SECURED PARTY TO SET-OFF ANY OR ALL SECURED OBLIGATIONS OF THE PLEDGOR TO THE SECURED PARTY OR ANY OTHER MEMBER OF THE GOLDMAN AFFILIATED GROUP AND BY ALLOWING**

CONFIDENTIAL                                                                        GSBANK0002274

**FOR SUCH AFFILIATE SET-OFF, THE PLEDGOR IS WAIVING ALL OF ITS RIGHTS TO LIMIT SET-OFF TO THOSE SECURED OBLIGATIONS WHICH ARE MUTUAL AS BETWEEN THE SECURED PARTY AND THE PLEDGOR.**

(b)     Upon the occurrence of a Payment Default, the Secured Party may upon ten (10) days' prior written notice to the Pledgor of the time and place, with respect to the Collateral or any part thereof that shall then be or shall thereafter come into the possession, custody or control of the Secured Party or any of its agents, sell, lease, assign or otherwise dispose of all or any part of the Collateral, at such place or places as the Secured Party deems best, and for cash or for credit or for future delivery, at public or private sale, without demand of performance or notice of intention to effect any such disposition or of the time or place thereof (except such notice as is required above or by applicable statute and cannot be waived, and the Secured Party or anyone else may be the purchaser, lessee, assignee or recipient of any or all of the Collateral so disposed of at any public sale (or, to the extent permitted by law, at any private sale) and thereafter hold the same absolutely free from any claim or right of whatsoever kind, including any right or equity of redemption (statutory or otherwise) of the Pledgor, any such demand, notice (other than the notice specified above) and right or equity being hereby expressly waived and released.  The Secured Party may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the sale may be so adjourned.  With respect to that portion of the Collateral that is perishable, threatens to decline speedily in value or is of a type customarily sold on a recognized market, the parties acknowledge and agree that the Secured Party need not furnish the Pledgor with notice of its intention to sell such Collateral.

(c)     The Pledgor acknowledges that any specific disclaimer of any warranty of title or the like by the Secured Party, will not be considered to adversely affect the commercial reasonableness of any sale of Collateral.

(d)     The Secured Party shall incur no liability as a result of the sale of the Collateral, or any part thereof, at any private sale pursuant to this Section 6 conducted in a commercially reasonable manner.  The Pledgor hereby waives any claims against the Secured Party arising by reason of the fact that the price at which the Collateral may have been sold at such a private sale was less than the price that might have been obtained at a public sale or was less than the aggregate amount of the indebtedness under the Loan Agreement, even if the Secured Party accepts the first offer received and does not offer the Collateral to more than one offeree.

7.     **General Provisions.**

(a)     **No Release.**  Nothing set forth in this Agreement shall relieve the Pledgor from the performance of any term, covenant, condition or agreement required on the Pledgor's part to be performed or observed under or in respect of any of the Collateral or from any liability to any Person under or in respect of any of the Collateral or shall impose any obligation on the Secured Party to perform or observe any such term, covenant, condition or agreement on the Pledgor's part to be so performed or observed or shall impose any liability on the Secured Party for any act or omission on the part of the Pledgor relating thereto or for any breach of any

**CONFIDENTIAL**

GSBANK0002275

representation or warranty on the part of the Pledgor contained in this Agreement or under or in respect of the Collateral or made in connection herewith or therewith.

(b)     **Reasonable Care.**  The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if such Collateral is accorded treatment substantially equivalent to that which the Secured Party, in its individual capacity, accords its own property consisting of similar instruments or interests, it being understood that the Secured Party shall have no responsibility for taking any necessary steps to preserve rights against any Person with respect to any Collateral, except as a result of the gross negligence or willful misconduct of the Secured Party.

(c)     **Expenses.**  The Pledgor will pay promptly all amounts payable by it pursuant to the Loan Agreement.  All such amounts shall be part of the Secured Obligations.

(d)     **No Waiver; Cumulative Remedies.**

(i)     No failure or delay on the part of the Secured Party in exercising any right, power or privilege hereunder and no course of dealing between the Pledgor and the Secured Party shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.  The rights, powers and remedies herein expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Secured Party would otherwise have.  No notice to or demand on the Pledgor in any case shall entitle the Pledgor to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Secured Party to any other or further action in any circumstances without notice or demand.

(ii)     In the event that the Secured Party shall have instituted any proceeding to enforce any right, power or remedy under this Agreement by foreclosure, sale, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Secured Party, then and in every such case, the Pledgor and the Secured Party shall be restored to their respective former positions and rights hereunder with respect to the Collateral, and all rights, remedies and powers of the Secured Party shall continue as if no such proceeding had been instituted.

(e)     **Application of Collateral.**  Secured Party shall apply Collateral received by it in the order prescribed in the Loan Agreement.

(f)     **Secured Party.**  The actions of the Secured Party hereunder are subject to the provisions of the Loan Agreement.  The Secured Party shall have the right hereunder to make demands, to give notices, to exercise or refrain from exercising any rights, and to take or refrain from taking action (including, without limitation, the release or substitution of Collateral), in accordance with this Agreement and the Loan Agreement.  The Secured Party may employ agents and attorneys-in-fact in connection herewith and shall not be liable for the negligence or misconduct of any such agents or attorneys-in-fact selected by it in good faith.

(g)     **Secured Party May Perform; Secured Party Appointed Attorney-in-fact.**  If the Pledgor shall fail to do any act or thing that it has covenanted to do hereunder after

CONFIDENTIAL                                                                 GSBANK0002276

notice or if any representation or warranty on the part of the Pledgor contained herein shall be breached, the Secured Party may (but shall not be obligated to) do the same or cause it to be done or remedy any such breach, and may expend funds for such purpose.  The Pledgor hereby appoints the Secured Party its attorney-in-fact, with full authority in the place and stead of the Pledgor and in the name of the Pledgor, or otherwise, from time to time in the Secured Party's discretion, to take any action and to execute any instrument consistent with the terms of this Agreement and the other Loan Documents which the Secured Party may reasonably determine to be necessary or advisable to accomplish the purposes of this Agreement.  The foregoing grant of authority is a power of attorney coupled with an interest and such appointment shall be irrevocable for the term of this Agreement.  The Pledgor hereby ratifies all that such attorney shall lawfully do or cause to be done by virtue hereof.

(h)      **Continuing Security Interest; Assignment.**  This Agreement shall create a continuing security interest in the Collateral and shall (i) be binding upon the Pledgor and its successors and permitted assigns and (ii) inure, together with the rights and remedies of the Secured Party hereunder, to the benefit of the Secured Party and its permitted successors, transferees and assigns; no other Persons (including, without limitation, any other creditor of the Pledgor) shall have any interest herein or any right or benefit with respect hereto.  Without limiting the generality of the foregoing clause (ii), the Secured Party may assign or otherwise transfer any indebtedness held by it secured by this Agreement to any other Person, and such other Person so long as such assignment or transfer is consistent with the provisions of the Loan Agreement, shall thereupon become vested with all the benefits in respect thereof granted to the Secured Party, herein or otherwise, subject however, to the provisions of the Loan Agreement.

(i)      **Termination.**  When all the Secured Obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been made) and the Secured Party has agreed to terminate the Loan Agreement, this Agreement and the Lien noted hereunder shall automatically terminate without any further action.  Upon termination of this Agreement, the Secured Party shall, upon the request and at the sole cost and expense of the Pledgor, assign, transfer and deliver to the Pledgor, against receipt and without recourse to or warranty by the Secured Party, such of the Collateral to be released (in the case of a release) as may be in possession of the Secured Party and as shall not have been sold or otherwise applied pursuant to the terms hereof, and, with respect to any other Collateral, proper documents and instruments (including UCC-3 termination statements) acknowledging the termination of this Agreement and the Lien noted hereunder or the release of such Collateral, as the case may be.

(j)      **Notices.**  Unless otherwise provided herein, all notices and other communications provided to any party hereto under this Agreement shall be in writing or by facsimile and addressed or delivered to such party at its address as set forth below.  Unless otherwise provided herein, any notice, if mailed and properly addressed with postage prepaid, shall be deemed given three (3) Business Days after being sent; any notice, if transmitted by facsimile, shall be deemed given when transmitted with confirmation of receipt; any notice transmitted by electronic communication (including e-mail and Internet or intranet websites) shall be deemed given pursuant to the procedures approved by the Lender; any notice, if hand delivered, shall be deemed given on the date of such delivery; any notice, if mailed by overnight courier, shall be deemed given on the date of such delivery.

711870427 14466044                           60

**164**

|  |  |
|---|---|
| If to the Pledgor: | To the applicable address set forth on the signature pages hereto. |
| If to Secured Party: | Goldman Sachs Bank USA<br>222 S. Main Street<br>Salt Lake City, Utah 84101<br>Facsimile: 212-428-1474<br>Attention: Private Lending Services |

(k)    **Severability.**   Any provision in this Agreement that is held to be inoperative, unenforceable, or invalid in any jurisdiction shall, as to that jurisdiction, be inoperative, unenforceable, or invalid without affecting the remaining provisions of the Agreement in that jurisdiction or the operation, enforceability, or validity of that provision in any other jurisdiction.

(l)    **Payment of Costs.**   The Pledgor shall pay, on demand, any and all costs of collection and reasonable attorneys' fees and costs paid or incurred by Secured Party in enforcing this Agreement after a Payment Default, whether or not any suit or other legal proceedings shall be instituted.

(m)    **APPLICABLE LAW.**   **THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF.**

(n)    **Miscellaneous.**   No amendment, modification, supplement, termination or waiver of or to any provision of this Agreement, nor consent to any departure by the Pledgor therefrom, shall be effective unless the same shall be made in accordance with the terms of the Loan Agreement and unless in writing and signed by each of the Secured Party and the Pledgor. The captions in this Agreement are for convenience of reference only and shall not define or limit the provisions hereof.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.  Execution and delivery of this Agreement by facsimile or other electronic format (i.e. "pdf" or "tif") shall be sufficient for all purposes and shall be binding on any party who so executes.  This Agreement constitutes the exclusive agreement of the parties with respect to the matters addressed herein.

[Remainder of page intentionally left blank; signature page follows]

**CONFIDENTIAL**                                                                                      GSBANK0002278

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date set forth below

**SECURED PARTY:**

GOLDMAN SACHS BANK USA

By: _____

Name: _____

Title: _____


Notice Address:      200 West Street
                                 New York, NY 10282-2198
Facsimile:              212-428-1474


With a copy to:

Address:                 Attn: Bradley R. Baker
                                  100 Crescent Court
                                  Suite 1000
                                  Dallas, TX 75201
Facsimile:              646-835-3251


*[Signature Page to Security and Pledge Agreement (Panda Power Generation Infrastructure Fund, LLC)]*

711870427 14466044

**166**

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

PANDA POWER GENERATION
INFRASTRUCTURE FUND, LLC

By: _____

Name: Todd W. Carter
Title:  Senior Partner and President

Jurisdiction of organization or formation:  Delaware

Notice Address:         4100 Spring Valley
                        Suite 1001
                        Dallas, TX 75244

Email:                  _____

*[Signature Page to Security and Pledge Agreement (Panda Power Generation Infrastructure Fund, LLC)]*

711870427 14466044

**167**

                                                                                          GSBANK0002280

**Schedule A**

**Filings**

1.      UCC-1 financing statement naming Panda Power Generation Infrastructure Fund, LLC, as debtor, and Goldman Sachs Bank USA, as secured party, filed with the Secretary of State of the State of Delaware.

711870427 14466044

**168**

**EXHIBIT D**

**Form of**

**Borrower Security Agreement**

**(see attached)**



## SECURITY AND PLEDGE AGREEMENT

### TODD W. CARTER

**THIS SECURITY AND PLEDGE AGREEMENT** (this "**Agreement**") is made by and among the TODD W. CARTER (the "**Pledgor**"), GOLDMAN SACHS BANK USA ("**Secured Party**"), and GOLDMAN, SACHS & CO. ("**Securities Intermediary**"), and dated as of November 13, 2014.

### RECITALS:

A.    WHEREAS, the Pledgor has entered into the Loan Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), dated as of the date hereof, among the Pledgor, as borrower, Panda Power Generation Infrastructure Fund, LLC, as a guarantor, Panda Power Fund II GP, L.P., as a guarantor, and Secured Party, as lender, pursuant to which the Secured Party has agreed to make certain advances to or for the account of the Pledgor;

B.    WHEREAS, the Pledgor is the beneficial owner of the Collateral to be pledged by it hereunder;

C.    WHEREAS, it is a condition to the obligation of the Secured Party to make the loan under the Loan Agreement that the Pledgor execute and deliver this Agreement;

D.    WHEREAS, this Agreement is given by the Pledgor in favor of the Secured Party to secure the payment and performance of all of the Secured Obligations (as hereinafter defined); and

E.    WHEREAS, the Pledgor will derive benefit from the extension of credit pursuant to the Loan Agreement.

**NOW, THEREFORE**, in consideration of the foregoing premises, of the mutual covenants contained in this Agreement, and of other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties to this Agreement, intending to be legally bound, hereby agree as follows:

1.  **Definitions**.

    (a)    Capitalized terms used herein which are defined in the Uniform Commercial Code as in effect from time to time in the State of New York or any other applicable jurisdiction (the "**UCC**") shall have the meanings given them in Article 8 or Article 9 of the UCC, as applicable, thereof and other capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Loan Agreement, in each case unless the context clearly requires otherwise.

711870427 14466044

**170**

GSBANK0002283

(b)     The following terms shall have the following meanings:

"**Account Agreement**" means, as the context may require, that certain Account Agreement (as amended, restated, supplemented or otherwise modified from time to time in accordance with its terms) by and between the Pledgor and the Securities Intermediary relating to the Pledgor's Securities Account.

"**Agreement**" has the meaning given to that term in the Preamble of this Agreement.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto, as hereafter amended.

"**Collateral**" has the meaning given to that term in Section 2 of this Agreement.

"**Constituent Documents**" has the meaning given to that term in Section 2(c) of this Agreement.

"**Dollars**" and the sign "**$**" each means the lawful currency of the United States of America.

"**Exchange Act**" means the United States Securities Exchange Act of 1934, as amended from time to time.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, any such encumbrance arising out of or pursuant to any conditional sale or other title retention agreement, any financing or similar statement or notice filed under any recording or notice statute, and any capital lease having substantially the same effect as any of the foregoing).

"**Loan Agreement**" has the meaning given to that term in the Recitals of this Agreement.

"**Maintenance Value**" has the meaning given to that term in the Loan Agreement.

"**Notice of Exclusive Control**" has the meaning given to that term in Section 4(c)(ii) of this Agreement.

"**Permitted Liens**" means Securities Intermediary's Liens and Permitted Liens (as such term is defined in the Loan Agreements); *provided* that the term "Permitted Liens" shall not include any Lien securing the Secured Obligations.

"**Pledged Entity**" has the meaning given to that term in Section 2(a) of this Agreement.

"**Pledged Interest**" has the meaning given that term in Section 2(a) of this Agreement.

"**Pledgor**" has the meaning given to that term in the Preamble of this Agreement.

"**Rule 144**" means Rule 144 promulgated under the Securities Act, as amended from time to time, and any successor regulation or statute.

711870427 14466044

**171**

 GSBANK0002284

"**Secured Obligations**" has the meaning given to that term in Section 2 of this Agreement.

"**Secured Party**" has the meaning given to that term in the Preamble of this Agreement.

"**Securities**" has the meaning given to that term in Section 2 of this Agreement.

"**securities account**" means a "securities account" as such term is defined in Section 8-501 of the UCC.

"**Securities Account**" means the securities account established with the Securities Intermediary pursuant to Section 4(a) of this Agreement, with Account Number ███████, in the name of Todd Carter, together with any and all subaccounts thereof, segregated accounts thereunder and cash or other accounts linked or related thereto, and any and all of their respective successor, replacement or substitute accounts.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time.

"**Securities Intermediary**" has the meaning given to that term in the Preamble of this Agreement.

"**Securities Intermediary's Liens**" means Liens in favor of the Securities Intermediary incurred in the ordinary course of business of settling trades and to otherwise secure payment for property purchased or securities or property sold for the Securities Account and for commissions and fees owing to the Securities Intermediary in respect of the Securities Account.

"**Security Interest**" has the meaning given to that term in Section 2 of this Agreement.

Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter. Unless the context requires otherwise, any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein).

2.   **Grant of Security Interest**.

As security for the full payment and performance of the Secured Obligations, the Pledgor hereby assigns, pledges, grants and conveys to the Secured Party a continuing first priority lien and security interest (the "**Security Interest**") on and in the following (collectively, the "**Collateral**") whether now existing or hereafter arising and wherever located:

(a)   all of the Pledgor's right, title and interest of an economic nature, whether fixed or contingent, as a limited partner or equity holder of Panda Power Fund II GP, L.P., a Delaware limited partnership (the "**Pledged Entity**"), including without limitation, any and all rights to (i) share in profits and losses, (ii) receive distributions, allocations of income, gain, loss, deduction or credits or any similar item, (iii) receive distributions of Carried Interest Proceeds,

**CONFIDENTIAL**

GSBANK0002285

Temporary Investment Proceeds and Capital Proceeds (as such terms are defined in the Constituent Documents) and (iv) receive any other amount paid or payable, or property or asset distributed or to be distributed, on account of the Pledgor's Interest (as defined in the Constituent Documents) (collectively, the "**Pledged Interest**");

(b)     all Instruments, certificates or other writings evidencing such Pledged Interest;

(c)     all of Pledgor's right, title and interest in, to and under the Pledged Entity's limited partnership agreement or other organizational documents of the Pledged Entity (collectively, the "**Constituent Documents**"), including all economic rights in the Pledgor's capacity as a limited partner of the Pledged Entity;

(d)     all rights and privileges of an economic nature, including all income, profits and all distributions on or with respect to any of the Pledgor's Pledged Interest;

(e)     all General Intangibles relating to or arising out of any of the foregoing;

(f)     the Securities Account and all funds, stocks, bonds, security entitlements, financial assets or other securities or investment property (as such terms are defined in the UCC) now or hereafter in the possession, custody or control of the Secured Party, including, without limitation, any of the foregoing from time to time deposited in or credited to the Securities Account (the "**Securities**");

(g)     all credit balances, accounts, general intangibles, instruments, documents, money, certificates of deposit (as such terms are defined in the UCC) and all other property of whatever kind or description now or hereafter held in or credited to the Securities Account;

(h)     any additional securities described in confirmations and other reports delivered by the Securities Intermediary to the Pledgor or the Secured Party in connection with the Securities Account, which additional securities are deemed to be Securities in the Securities Account for purposes of this Agreement (for purposes of this Agreement, "additional securities" shall include all investment property and options, including put and call option contracts);

(i)     all dividends, distributions and interest (and all income or payments in lieu of or in substitution for any of the foregoing) of any of the property described in clauses (f), (g) (h);

(j)     all books and records (in whatever form or media, including computerized records, software and disks) relating to any of the foregoing; and

(k)     all Proceeds of any of the foregoing.

For purposes of this Agreement, the term "Secured Obligations" shall mean, collectively, (i) all Obligations and (ii) all other obligations, interest, fees, charges and expenses of the Pledgor to any member of the Goldman Affiliated Group pursuant to any agreement between the Pledgor and any member of the Goldman Affiliated Group.

711870427 14466044

**173**

                                                                                      GSBANK0002286

3.   **Dividends, Distributions, etc**.

(a)   Notwithstanding the foregoing or any other provision of this Agreement to the contrary, so long as no Payment Default shall have occurred and be continuing, Pledgor may receive and retain in the Securities Account any and all dividends, distributions, interest paid, cash, funds, instruments, and proceeds (and all income or payments in lieu of or in substitution for any of the foregoing) in respect of the Collateral; *provided* that all such dividends, distributions and other property shall be deposited directly to, and maintained, exclusively in the Securities Account subject to any subsequent withdrawals from the Securities Account expressly permitted by and in accordance with Section 5.15 of the Loan Agreement.

(b)   Upon the occurrence and during the continuance of a Payment Default, all rights of the Pledgor to receive any dividends, distributions, cash, instruments or other property in respect of the Collateral shall cease immediately, without any notice to Pledgor or action by or on behalf of Secured Party or any other Person, and all such rights thereupon shall become vested in Secured Party automatically without any action by Secured Party or any other Person, and Secured Party shall have the sole and exclusive right and authority to receive and retain such dividends, distributions, cash, funds, instruments or other property.  Pledgor shall execute and deliver such proxies, powers of attorney, dividend orders, interest orders and other instruments and documents as Secured Party may request to enable Secured Party to exercise such rights and receive such dividends, distributions, cash, funds, instruments or other property.  In addition, Secured Party is hereby appointed the attorney-in-fact of Pledgor, with full power of substitution, which appointment as attorney-in-fact is irrevocable and coupled with an interest, to take all such actions after the occurrence and continuation of a Payment Default, whether in the name of Secured Party or Pledgor, as Secured Party may consider necessary or desirable for the purpose of exercising such rights and receiving such dividends, distributions, cash, funds, instruments or other property.  Any and all money and other property paid over to or received by Secured Party pursuant to the provisions of this Section 3(b) (and following the occurrence of a Payment Default) shall be retained by Secured Party as part of the Collateral and shall be applied in accordance with the provisions hereof and the Loan Agreement.  All dividends, distributions, cash, instruments or other property of any kind in respect of Collateral which are received by Pledgor contrary to the provisions of this Section 3 shall be received in trust for the benefit of Secured Party, shall be segregated from the other funds of Pledgor, and shall be forthwith paid over to Secured Party as Collateral in the exact form received, to be held by Secured Party as Collateral.

4.   **Securities Account; Control**.

(a)   **Establishment of the Securities Account**.  The Pledgor directs the Securities Intermediary, and the Securities Intermediary agrees, subject to the terms of the Account Agreement, to establish a Securities Account, which shall be known by a title acceptable to the Secured Party to reflect the Secured Party's Security Interest in, and control over, such Securities Account pledged to the Secured Party pursuant to this Agreement as Collateral for the Secured Obligations.  The Pledgor, the Secured Party, and the Securities Intermediary each acknowledge and agree that (i) in establishing and maintaining the Securities Account, the Securities Intermediary is acting as a securities intermediary, and (ii) all property now or in the future in or credited to the Securities Account will be treated as financial assets

711870427 14466044

**174**

 GSBANK0002287

under Article 8 of the UCC.  For purposes of perfecting the Secured Party's Security Interest in any Collateral not constituting security entitlements, the Secured Party hereby appoints the Securities Intermediary as its agent and the Securities Intermediary hereby accepts such appointment and acknowledges that any such Collateral in its possession is being held for the benefit of the Secured Party.  The parties hereto further agree that all securities or other property underlying any financial assets credited to the Securities Account shall be registered in the name of the Securities Intermediary, indorsed to the Securities Intermediary or indorsed in blank or credited to another securities account maintained in the name of the Securities Intermediary, and in no event will financial assets be registered in the name of the Pledgor, payable to the order of the Pledgor or specially indorsed to the Pledgor except to the extent that the foregoing shall have been indorsed to the Securities Intermediary or in blank.  The Pledgor and the Securities Intermediary each agree that, so long as this Agreement is in effect and Secured Obligations are outstanding, they shall not enter into any control or similar agreement with any third party with respect to the Securities Account.  Notwithstanding any other agreement, New York shall be the Securities Intermediary's jurisdiction within the meaning of Section 8-110 of the UCC.

(b)   **Control; Certain Rights in the Securities Account.**

(i)   The Secured Party may give either oral or written entitlement orders and other instructions of any kind or character to the Securities Intermediary in regard to the Securities Account.  The Secured Party's instructions may include instructions to liquidate Collateral and other property in the Securities Account, to pay credit balances from the Securities Account to the Secured Party or its designees, or to move the Collateral from the Securities Account to the Secured Party or into an account in the Secured Party's name or the name of its designees.  The Securities Intermediary shall comply with the Secured Party's entitlement orders and other instructions in regard to the Securities Account without further consent by the Pledgor. In following the Secured Party's instructions, the Securities Intermediary is under no duty to the Pledgor to determine whether a Payment Default or any other event has occurred.  The Securities Intermediary shall neither accept nor comply with any entitlement orders or instructions from the Pledgor in regard to the Securities Account unless such entitlement orders or instructions have been given in accordance with Sections 4(c)(i) or 4(c)(ii) below or have been consented to in writing by the Secured Party.  The Secured Party is entitled to receive directly from the Securities Intermediary and, to the extent permitted by law and the internal policies of the Secured Party and the Securities Intermediary, the Pledgor irrevocably authorizes the Securities Intermediary to provide to the Secured Party, duplicates of any and all notices, confirmations, and statements of account that the Pledgor is entitled to receive with respect to the Securities Account and any and all information in its possession or control relating to the Securities Account.

(ii)   Notwithstanding the provisions of Section 4(b)(i), as between the Secured Party and the Pledgor, the Secured Party agrees that it will not issue an entitlement order or other instruction with respect to the Securities Account or deliver a Notice of Exclusive Control to the Securities Intermediary unless: (A) such entitlement order or instruction has been approved or authorized by the Pledgor having record ownership of the Securities Account, (B) a Payment Default has occurred, or (C) such entitlement order or instruction is permitted by Section 5(b) hereof.  This Section 4(b)(ii) is intended solely for the benefit of the Pledgor and in no way constitutes a limitation on the Secured Party's control over the Securities Account,

711870427 14466044

**175**

including the Secured Party's right, at any time, to issue entitlement orders or otherwise instruct the Securities Intermediary in accordance with the provisions of Section 4(b)(i).

(c)     **Transactions in the Securities Account.**

(i)     Without the prior written consent in the sole discretion of the Secured Party, the Pledgor shall not affect, and shall not permit to occur, any assignment, sale, transfer, pledge, redemption or any change in the composition of, the Collateral (whether through redemption, purchase or otherwise) or withdraw funds from the Securities Account; provided, that (A) the prior written consent of the Secured Party shall not be required to withdraw funds from the Securities Account solely to the extent permitted by and in accordance with Section 5.15 of the Loan Agreement.  For the avoidance of doubt, the Pledgor may, with the prior written consent of the Secured Party in its sole discretion, instruct or direct the Securities Intermediary to sell, trade, transfer, liquidate or otherwise change the composition of the funds and Securities credited to the Securities Account, *provided* if any Payment Default exists, the Demand Date has occurred unless the demand for payment was made in accordance with Section 6.1 of the Loan Agreement and the 90 day period referenced therein has not lapsed or terminated, or the Maintenance Value is greater than 25%, the Secured Party shall have no obligation to consider any such instruction or direction.

(ii)     Upon receipt by the Securities Intermediary of a notice from the Secured Party that the Secured Party shall have exclusive control over the Securities Account, which notice may be written or oral and in any form reasonably acceptable to the Securities Intermediary, but which Secured Party shall endeavor to conform to the form attached hereto as Annex I (any such notice, a "**Notice of Exclusive Control**"), the Securities Intermediary will not comply with any entitlement orders or other instructions concerning the Securities Account originated by the Pledgor or its representatives and will cease distributing interest or dividends on property in the Securities Account to the Pledgor.

(iii)     Without limiting any other right or remedy available to the Secured Party under this Agreement or at law or in equity, including, without limitation, the rights and remedies contemplated in Section 8, the Secured Party may, upon the occurrence of a Payment Default or as permitted by Section 5(b) hereof, (A) buy or sell any or all Securities or other property which may be in the Securities Account; (B) cancel any open orders; and (C) exercise or refrain from exercising, terminate, liquidate or close, modify, extend, obtain or reestablish, any or all outstanding contracts or options and any or all hedges, related or associated positions, securities, or transactions.

(d)     **Other Account Agreement Provisions; Subordination.**

(i)     The Pledgor acknowledges that no credit card, funds transfer services or wire transfer, check-writing or margin capabilities exist or will be permitted with respect to the Securities Account pledged by it hereunder.  This Agreement does not create any obligations or duties on the Securities Intermediary to the Pledgor greater than or in addition to the obligations and duties of the Securities Intermediary under the Account Agreement, except to the extent expressly provided in this Agreement.  The Pledgor agrees to pay customary brokerage fees and commissions and other fees and expenses established by the Securities

711870427 14466044

**176**

                                                      GSBANK0002289

Intermediary pursuant to the Account Agreement in connection with any transactions in a Securities Account made in accordance with this Agreement and authorizes the Securities Intermediary to debit the Securities Account for such fees, commissions and expenses.

(ii)     So long as this Agreement is in effect and Secured Obligations are outstanding, the Securities Intermediary subordinates in favor of the Secured Party any security interest, Lien, or right of setoff it may have, now or in the future against the Securities Account and the property in the Securities Account, except for the Securities Intermediary's Liens.

5.    **Maintenance of Collateral**.

(a)     The Pledgor agrees to (i) cause all distributions and payments of cash or other property on account of the Collateral to be deposited directly to the Securities Account and (ii) post cash Collateral in the Securities Account to the extent required from time to time by Section 5.16 of the Loan Agreement.

(b)     In the event the Pledgor fails to comply with the requirements of Section 5(a) above, or a Payment Default has occurred, then the Secured Party may, at its option from time to time and without demand for additional Collateral or notice of sale or purchase or any other notice to the Pledgor, (i) instruct the Securities Intermediary to cancel any open orders and close any or all outstanding contracts, liquidate any or all Collateral, withdraw and/or sell any or all Collateral and (ii) take any other actions to which it is entitled, whether pursuant to Section 8 or otherwise.

(c)     The Pledgor shall, if the Secured Party pays any calls or other monies payable on or with respect to any of the Securities in the Collateral (which the Secured Party shall not be obliged to do), indemnify the Secured Party or any agents acting on behalf of the Secured Party, which may include the Securities Intermediary, against such payment.

6.    **Representations and Warranties.**  The Pledgor hereby represents and warrants to Secured Party that:

(a)     The Pledgor's legal name is correctly set forth on the signature page hereto and the other information regarding the Pledgor set forth in this Agreement, including without limitation, its signature hereto is true, correct and complete on the date hereof. The Pledgor has not changed the Pledgor's name or principal residence (which is correctly identified on the signature page hereto) in the past five (5) years.

(b)     The Pledgor is and at all times will continue to be the sole direct, legal and beneficial owner of the Collateral pledged by it hereunder.  All Collateral is and shall be free and clear of any and all Liens, security interests, encumbrances and claims (other than the Lien and Security Interest created by this Agreement or any other Loan Document and any Permitted Liens).

(c)     The Pledgor has not authorized the filing of and the Pledgor is not aware of any financing statements against the Pledgor that includes a description of collateral covering any part of the Collateral, other than any financing statements relating to the Security Interest granted to the Secured Party hereunder.

711870427 14466044

**177**

(d)     This Agreement creates a valid, perfected first priority Lien on and security interest in the Collateral in favor of Secured Party upon (i) in the case of Collateral in which a security interest may be perfected by filing a financing statement under the UCC, the completion of the filings and other actions specified on Schedule A and (ii) in the case of Collateral in which a security interest may be perfected by control under the UCC, the execution of this Agreement.

(e)     The Pledgor has not consented to any Person complying with entitlement orders of any Person other than the Secured Party.

(f)     Except as otherwise provided by this Agreement, no consent, authorization, approval, license or other action by, and no notice to or filing with, any Governmental Authority or other Person, other than those that have been received or completed is required for (x) the execution, delivery or performance of this Agreement by the Pledgor (including, without limitation, the grant of the Lien hereunder), (y) the exercise by the Secured Party of the rights provided for in this Agreement or (z) the exercise by the Secured Party of the remedies in respect of the Collateral pursuant to this Agreement.  In the event that the Secured Party desires to exercise any remedies, voting or consensual rights or attorney-in-fact powers set forth in this Agreement and determines it necessary to obtain any approvals or consents of any Governmental Authority or any other Person therefor, then, upon the reasonable request of the Secured Party, the Pledgor agrees to assist and aid the Secured Party to obtain as soon as practicable any necessary approvals for the exercise of any such remedies, rights and powers.

(g)     In connection with the transfer and/or pledge of the Collateral to the Secured Party, all required notices to third parties have been given and any required consents or approvals from third parties have been obtained.

(h)     None of the Securities included in the Collateral are entitled to the benefits of any registration rights agreement or similar agreement.

(i)     Either none of the Collateral consists of "restricted securities" within the meaning of Rule 144, or, with respect to any Collateral comprised of "restricted securities" as determined in accordance with Rule 144, such restricted securities are eligible for sale by the Pledgor under Rule 144 as of the date of the agreement without restriction.

(j)     The Pledgor is not, within the preceding three months has not been, and during the term of this Agreement will not become, an Insider (as defined below) with respect to the issuer of any of the Securities.  "Insider" means a Person who is an officer, director or beneficial owner of more than 10% of any class of equity securities of an issuer required to file reports pursuant to Section 16(a) of the Exchange Act or otherwise an affiliate of an issuer within the meaning of the Securities Act.

(k)     All Collateral which consists of equity interests has been validly acquired and validly issued, and is fully paid, to the extent such equity interests consist of stock, and non-assessable and no Collateral is evidenced or represented by any certificate, note or chattel paper other than such as has been delivered to and is in the possession of the Securities Intermediary.

711870427 14466044

**178**

(l)      The execution, delivery and performance of this Agreement does not violate or conflict with (i) the Constituent Documents of the Pledged Entity and the terms or provisions of any other document or agreement to which the Pledgor or the Pledged Entity is a party or pursuant to which the Pledgor's or the Pledged Entity's assets or properties are bound and all consents necessary in order for the Pledgor to execute and deliver this Agreement have been obtained, (ii) any order, ruling, consent, decree or other directive issued or made by any court, regulatory body or governmental authority having jurisdiction over the Pledgor or its properties, or (iii) any laws applicable to or binding on the Pledgor or its assets and properties.

(m)      The Pledged Interests are General Intangibles.  None of the Pledged Interests are a "security" (within the meaning of Section 8-102(a)(15) and 8-103 of the UCC). The Pledged Interests are not dealt with or traded on any securities exchange or in any securities market.

7.      **Covenants.**  During the term of this Agreement, the Pledgor hereby covenants as follows:

(a)      To the extent not already obtained, the Pledgor will promptly request and obtain executed consents required by the Secured Party in connection with the pledge of the limited partnership interests included in the Collateral.

(b)      The Pledgor will promptly execute and deliver, and hereby authorizes the Secured Party to execute on behalf of the Pledgor, such further instruments and take such further actions as Secured Party may deem necessary or desirable to maintain or perfect the Security Interest, including without limitation, stock powers indorsed in blank, control agreements and UCC financing statements.

(c)      The Pledgor shall not cause or permit any Pledged Interest to be a security governed by Article 8 of the UCC or represented by a certificate.  Notwithstanding the foregoing, the Pledgor shall provide written notice to Secured Party if certificates are issued after the date hereof evidencing any of the Pledged Interest or other Collateral owned the Pledgor, and agrees to transfer and deliver to the Secured Party, in accordance with the Secured Party's instructions, any and all such certificates (together with powers indorsed in blank).

(d)      The Pledgor will maintain the Collateral pledged by it in the Securities Account in accordance with Section 5 of this Agreement.

8.      **Remedies**.

(a)      Upon the occurrence of a Payment Default or as otherwise permitted by Section 5(b) hereof, the Secured Party may exercise from time to time, any and all rights and remedies of a secured party under the UCC (whether or not in effect in the jurisdiction where such rights are exercised) or any applicable laws in effect in any jurisdiction where any rights and remedies may be asserted and any and all rights and remedies available to it as a result of this Agreement or any other Loan Document including, without limitation, (i) its right to instruct the Securities Intermediary to cancel any open orders and close any and all outstanding contracts; (ii) its right to liquidate any or all of the Collateral; (iii) its right to withdraw and/or sell any or all of the Collateral; (iv) its right to apply any or all of the Collateral as well as the proceeds of any

711870427 14466044

**179**

such Collateral to the Secured Obligations; and (v) its rights under the Account Agreement; provided, however, that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Pledgor under the Bankruptcy Code, the Secured Obligations shall automatically become due and payable without further act of the Secured Party.  The Pledgor shall be responsible for any decrease in the value of the Collateral occurring prior to or during liquidation.  Upon the occurrence of a Payment Default or as otherwise permitted by Section 5(b) hereof, the Secured Party in its discretion may also set-off any or all of the Secured Obligations against any securities, cash, or other property of the Pledgor in the possession of the Secured Party (directly or through the Securities Intermediary as the Secured Party's agent) or any other member of the Goldman Affiliated Group and against any obligations owed to the Pledgor by the Secured Party or any other member of the Goldman Affiliated Group to the extent that it does not impact the Secured Party's ability to recover amounts owed to the Secured Party.  **THE PLEDGOR UNDERSTANDS THAT PURSUANT TO THE TERMS OF THIS AGREEMENT THE PLEDGOR IS ALLOWING THE SECURED PARTY TO SET-OFF ANY OR ALL SECURED OBLIGATIONS OF THE PLEDGOR TO THE SECURED PARTY OR ANY OTHER MEMBER OF THE GOLDMAN AFFILIATED GROUP AND BY ALLOWING FOR SUCH AFFILIATE SET-OFF, THE PLEDGOR IS WAIVING ALL OF ITS RIGHTS TO LIMIT SET-OFF TO THOSE SECURED OBLIGATIONS WHICH ARE MUTUAL AS BETWEEN THE SECURED PARTY AND THE PLEDGOR.**

(b)     Upon the occurrence of a Payment Default or as otherwise permitted by Section 5(b) hereof, the Secured Party may upon ten (10) days' prior written notice to the Pledgor of the time and place, with respect to the Collateral or any part thereof that shall then be or shall thereafter come into the possession, custody or control of the Secured Party or any of its agents, sell, lease, assign or otherwise dispose of all or any part of the Collateral, at such place or places as the Secured Party deems best, and for cash or for credit or for future delivery, at public or private sale, without demand of performance or notice of intention to effect any such disposition or of the time or place thereof (except such notice as is required above or by applicable statute and cannot be waived, and the Secured Party or anyone else may be the purchaser, lessee, assignee or recipient of any or all of the Collateral so disposed of at any public sale (or, to the extent permitted by law, at any private sale) and thereafter hold the same absolutely free from any claim or right of whatsoever kind, including any right or equity of redemption (statutory or otherwise) of the Pledgor, any such demand, notice (other than the notice specified above) and right or equity being hereby expressly waived and released.  The Secured Party may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the sale may be so adjourned.  With respect to that portion of the Collateral that is perishable, threatens to decline speedily in value or is of a type customarily sold on a recognized market, the parties acknowledge and agree that the Secured Party need not furnish the Pledgor with notice of its intention to sell such Collateral.

(c)     The Pledgor recognizes that, by reason of certain prohibitions contained in the Securities Act and applicable state securities laws, or other laws, the Secured Party, in the exercise of its rights and remedies hereunder may, with respect to any sale of all or any part of the Collateral, limit purchasers to Persons who are not United States Persons and/or who will agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to the distribution or resale thereof and who otherwise satisfy applicable legal and

CONFIDENTIAL                                                                                    GSBANK0002293

contractual restrictions on the transfer of such Collateral.  The Pledgor acknowledges that any such restricted or private sales may be at prices and on terms less favorable to the Pledgor than those obtainable through a public sale without such restrictions, but agrees that such sales are commercially reasonable so long as sales to the Secured Party or any of its affiliates are based on arm's length terms consistent with industry practice.  The Pledgor further acknowledges that any specific disclaimer of any warranty of title or the like by the Secured Party, will not be considered to adversely affect the commercial reasonableness of any sale of Collateral, except as a result of the gross negligence or willful misconduct of the Secured Party.

(d)     The Secured Party shall incur no liability as a result of the sale of the Collateral, or any part thereof, at any private sale pursuant to this Section 8 conducted in a commercially reasonable manner.  The Pledgor hereby waives any claims against the Secured Party arising by reason of the fact that the price at which the Collateral may have been sold at such a private sale was less than the price that might have been obtained at a public sale or was less than the aggregate amount of the indebtedness under the Loan Agreement, even if the Secured Party accepts the first offer received and does not offer the Collateral to more than one offeree.

9.   **General Provisions**.

(a)     **No Release**.  Nothing set forth in this Agreement shall relieve the Pledgor from the performance of any term, covenant, condition or agreement required on the Pledgor's part to be performed or observed under or in respect of any of the Collateral or from any liability to any Person under or in respect of any of the Collateral or shall impose any obligation on the Secured Party to perform or observe any such term, covenant, condition or agreement on the Pledgor's part to be so performed or observed or shall impose any liability on the Secured Party for any act or omission on the part of the Pledgor relating thereto or for any breach of any representation or warranty on the part of the Pledgor contained in this Agreement or under or in respect of the Collateral or made in connection herewith or therewith.

(b)     **Voting**.  The Secured Party acknowledges that the Pledgor shall retain its right to vote with respect to the Pledged Entity, provided that the Pledgor shall not vote in any way that is inconsistent with the terms of this Agreement, the Loan Agreement and the other Loan Documents.  Upon the occurrence and during the continuance of a Payment Default or as Secured Party may otherwise deem necessary in its sole discretion in connection with the exercise of its remedies hereunder, the Secured Party may vote or consent to actions in respect of Collateral (other than Collateral constituting an interest in or right with respect to the Pledged Entity) without the need for any notice to, or consent of, any Pledgor.  Upon the occurrence and during the continuance of a Payment Default or as Secured Party may otherwise deem necessary in its sole discretion in connection with the exercise of its remedies hereunder, the Secured Party may vote or consent to actions in respect of Collateral  (other than Collateral constituting an interest in or right with respect to the Pledged Entity) without the need for any notice to, or consent of, any Pledgor.

(c)     **Reasonable Care**.  The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if such Collateral is accorded treatment substantially equivalent to that which the Secured Party, in its

711870427 14466044

**181**

individual capacity, accords its own property consisting of similar instruments or interests, it being understood that the Secured Party shall have no responsibility for (i) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or (ii) taking any necessary steps to preserve rights against any Person with respect to any Collateral.

(d)    **Expenses**.   The Pledgor will pay promptly all amounts payable by it pursuant to the Loan Agreement.  All such amounts shall be part of the Secured Obligations.

(e)    **No Waiver; Cumulative Remedies**.

(i)    No failure or delay on the part of the Secured Party in exercising any right, power or privilege hereunder and no course of dealing between the Pledgor and the Secured Party shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.  The rights, powers and remedies herein expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Secured Party would otherwise have.  No notice to or demand on the Pledgor in any case shall entitle the Pledgor to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Secured Party to any other or further action in any circumstances without notice or demand.

(ii)    In the event that the Secured Party shall have instituted any proceeding to enforce any right, power or remedy under this Agreement by foreclosure, sale, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Secured Party, then and in every such case, the Pledgor and the Secured Party shall be restored to their respective former positions and rights hereunder with respect to the Collateral, and all rights, remedies and powers of the Secured Party shall continue as if no such proceeding had been instituted.

(f)    **Application of Collateral**.  Secured Party shall apply Collateral received by it in the order prescribed in the Loan Agreement.

(g)    **Secured Party**.  The actions of the Secured Party hereunder are subject to the provisions of the Loan Agreement.  The Secured Party shall have the right hereunder to make demands, to give notices, to exercise or refrain from exercising any rights, and to take or refrain from taking action (including, without limitation, the release or substitution of Collateral), in accordance with this Agreement and the Loan Agreement.  The Secured Party may employ agents and attorneys-in-fact in connection herewith and shall not be liable for the negligence or misconduct of any such agents or attorneys-in-fact selected by it in good faith.

(h)    **Secured Party May Perform; Secured Party Appointed Attorney-in-fact**.  If the Pledgor shall fail to do any act or thing that it has covenanted to do hereunder after notice or if any representation or warranty on the part of the Pledgor contained herein shall be breached, the Secured Party may (but shall not be obligated to) do the same or cause it to be done or remedy any such breach, and may expend funds for such purpose.  The Pledgor hereby

711870427 14466044

**182**

appoints the Secured Party its attorney-in-fact, with full authority in the place and stead of the Pledgor and in the name of the Pledgor, or otherwise, from time to time in the Secured Party's discretion, to take any action and to execute any instrument consistent with the terms of this Agreement and the other Loan Documents which the Secured Party may reasonably determine to be necessary or advisable to accomplish the purposes of this Agreement.  The foregoing grant of authority is a power of attorney coupled with an interest and such appointment shall be irrevocable for the term of this Agreement.  The Pledgor hereby ratifies all that such attorney shall lawfully do or cause to be done by virtue hereof.

(i)        **Continuing Security Interest; Assignment**.  This Agreement shall create a continuing security interest in the Collateral and shall (i) be binding upon the Pledgor and its successors and permitted assigns and (ii) inure, together with the rights and remedies of the Secured Party hereunder, to the benefit of the Secured Party and its permitted successors, transferees and assigns; no other Persons (including, without limitation, any other creditor of the Pledgor) shall have any interest herein or any right or benefit with respect hereto.  Without limiting the generality of the foregoing clause (ii), the Secured Party may assign or otherwise transfer any indebtedness held by it secured by this Agreement to any other Person, and such other Person so long as such assignment or transfer is consistent with the provisions of the Loan Agreement, shall thereupon become vested with all the benefits in respect thereof granted to the Secured Party, herein or otherwise, subject however, to the provisions of the Loan Agreement.

(j)        **Termination**.  When all the Secured Obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been made) and the Secured Party has agreed to terminate the Loan Agreement, this Agreement and the Lien noted hereunder shall automatically terminate without further action.   Upon termination of this Agreement, the Secured Party shall, upon the request and at the sole cost and expense of the Pledgor, assign, transfer and deliver to the Pledgor, against receipt and without recourse to or warranty by the Secured Party, such of the Collateral to be released (in the case of a release) as may be in possession of the Secured Party and as shall not have been sold or otherwise applied pursuant to the terms hereof, and, with respect to any other Collateral, proper documents and instruments (including UCC-3 termination statements) acknowledging the termination of this Agreement and the Lien noted hereunder or the release of such Collateral, as the case may be.

(k)        **Notices**.   Unless otherwise provided herein, all notices and other communications provided to any party hereto under this Agreement shall be in writing or by facsimile and addressed or delivered to such party at its address as set forth below.  Unless otherwise provided herein, any notice, if mailed and properly addressed with postage prepaid, shall be deemed given three (3) Business Days after being sent; any notice, if transmitted by facsimile, shall be deemed given when transmitted with confirmation of receipt; any notice, if hand delivered, shall be deemed given on the date of such delivery; any notice, if mailed by overnight courier, shall be deemed given on the date of such delivery.

| | |
|---|---|
| If to the Pledgor: | To the applicable address set forth on the signature pages hereto. |
| If to Secured Party: | Goldman Sachs Bank USA |

711870427 14466044

**183**

222 S. Main Street
Salt Lake City, Utah 84101
Facsimile: 212-428-1474
Attention: Private Lending Services

(l)     **Severability**.   Any provision in this Agreement that is held to be inoperative, unenforceable, or invalid in any jurisdiction shall, as to that jurisdiction, be inoperative, unenforceable, or invalid without affecting the remaining provisions of the Agreement in that jurisdiction or the operation, enforceability, or validity of that provision in any other jurisdiction.

(m)     **Payment of Costs**.  The Pledgor shall pay, on demand, any and all costs of collection and reasonable attorneys' fees and costs paid or incurred by Secured Party in enforcing this Agreement after a Payment Default, whether or not any suit or other legal proceedings shall be instituted.

(n)     <u>**APPLICABLE LAW.   THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF.**</u>

(o)     **Miscellaneous**.  No amendment, modification, supplement, termination or waiver of or to any provision of this Agreement, nor consent to any departure by the Pledgor therefrom, shall be effective unless the same shall be made in accordance with the terms of the Loan Agreement and unless in writing and signed by each of the Secured Party and the Pledgor. No amendment, modification, supplement, termination or waiver of or to any provision of this Agreement, nor consent to any departure by the Pledgor therefrom which affects the obligations of the Securities Intermediary, shall be made unless consented to in writing and signed by the Securities Intermediary.  The captions in this Agreement are for convenience of reference only and shall not define or limit the provisions hereof.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.  Execution and delivery of this Agreement by facsimile or other electronic format (i.e. "pdf" or "tif") shall be sufficient for all purposes and shall be binding on any party who so executes.  This Agreement constitutes the exclusive agreement of the parties with respect to the matters addressed herein.

**[Remainder of page intentionally left blank; signature page follows]**

711870427 14466044

**184**

**CONFIDENTIAL**                                                                    GSBANK0002297

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

Principal Residence:                          **PLEDGOR:**

6615 Prestonshire Ln                          By:_____
Dallas, Texas  75225                          Name:  Todd W. Carter

Email:_____

**SECURED PARTY:**

GOLDMAN SACHS BANK USA

By: _____

Name: _____

Title: _____

Address:       200 West Street
               New York, NY 10282-2198

Facsimile:     212-428-1474

With a copy to:

Address:       Attn: Bradley R. Baker
               100 Crescent Court, Suite 1000
               Dallas, TX 75201

Facsimile:     646-835-3251

**SECURITIES INTERMEDIARY:**

GOLDMAN, SACHS & CO.

By: _____

Name: _____

Title: _____

**Borrower Security & Pledge Loan Agreement – Todd W. Carter**

**CONFIDENTIAL**                                      GSBANK0002299

## EXECUTION ACKNOWLEDGEMENT

The undersigned Pledged Entity hereby joins in the execution of this Agreement for the purposes of (i) agreeing to act at the sole direction and upon the instructions of the Secured Party with respect to the Collateral related to the Pledged Interest without any further action or consent of, or regardless of any contrary intent expressed by the Pledgor or any other limited partner of the Pledged Entity and (ii) agreeing to act in accordance with the terms and provisions of this Agreement, as such terms and provisions apply to the Pledged Entity, including Sections 3, 8 and 9(g).

**[Remainder of page intentionally left blank; signature page follows]**

711870427 14466044

**187**

**PLEDGED ENTITY:**

**PANDA POWER FUND II GP, L.P.**, a Delaware
limited partnership

By: Panda Power Fund II GP, LLC, a
   Delaware limited liability
   company, its general partner


By:_____
Name: Todd W. Carter
Title:  Senior Partner and President

**CONFIDENTIAL**                     **GSBANK0002301**

**SPOUSAL CONSENT TO SECURITY AND PLEDGE AGREEMENT**

The undersigned hereby (a) acknowledges and agrees to the terms of this Security and Pledge Agreement, (b) subordinates any and all community property rights and other similar rights under the laws of the State of Texas or other applicable laws to the security interest granted pursuant to this Pledge Agreement in or to the Collateral, and agrees not to exercise against his/her spouse any claims they may have against the Pledgor or their property, unless and until the Secured Obligations of the Pledgor relating thereto are paid in full, and (c) to the extent his/her property interests are affected herein, does hereby pledge, grant and assign his/her interest (if any) in all of the Collateral to the Secured Party.

**[Remainder of page intentionally left blank; signature page follows]**

711870427 14466044

**CONFIDENTIAL**                                                                                         **GSBANK0002302**

Name: _____

**CONFIDENTIAL**                    GSBANK0002303

**Annex I**

NOTICE OF EXCLUSIVE CONTROL

[NAME AND ADDRESS OF THE SECURITIES INTERMEDIARY]

**Re: Notice of Exclusive Control for Securities Account No. ▮▮▮▮▮▮ (the "Securities Account")**

Ladies and Gentlemen:

This Notice of Exclusive Control is being sent pursuant to the Security and Pledge Agreement dated as of November 13, 2014 by and among Todd W. Carter (the "**Pledgor**"), Goldman Sachs Bank USA, (the "**Secured Party**") and Goldman, Sachs & Co. (the "**Securities Intermediary**").

Pursuant to the above-referenced agreement, the Securities Intermediary is hereby instructed as follows:

_____ (a) The Securities Intermediary shall freeze all assets and activity in the Securities Account pending further instructions from the Secured Party.

_____ (b) Notwithstanding the foregoing, the Securities Intermediary shall liquidate assets in the Securities Account which are needed to yield $_____ in proceeds, and transfer such proceeds to the Secured Party.  If the assets contained in the Securities Account have a liquidation value exceeding $_____, the Securities Intermediary shall have the sole discretion to determine which assets are liquidated.  If the liquidation of all assets in the Securities Account shall yield less than $_____, the Securities Intermediary shall liquidate all assets and transfer all proceeds to the Secured Party.

_____ (c) Without limiting the foregoing, the Securities Intermediary shall not comply with any instructions received by the Pledgor after receipt of this notice but shall continue to comply with all instructions of the Secured Party without the consent of any other Person.

Any proceeds transferred to the Secured Party are to be wired by the Securities Intermediary to the following account:

[wiring instructions]

Very truly yours,

GOLDMAN SACHS BANK USA

By: _____
      Name:
      Title:

711870427 14466044

**191**

**Schedule A**

**Filings**

      1.     UCC-1 financing statement naming Todd Wilkerson Carter, as debtor, and Goldman Sachs Bank USA, as secured party, filed with the Secretary of State of the State of Texas.

711870427 14466044

**192**

GSBANK0002305

**EXHIBIT 7.15**

## DISCLOSURE STATEMENT FOR
## LOANS MADE BY GOLDMAN SACHS BANK USA THAT ARE
## SECURED BY INTERESTS IN CERTAIN GOLDMAN SACHS-MANAGED
## INVESTMENT FUNDS

This disclosure statement (this "Disclosure Statement") identifies, in general terms, certain of the risks and other information related to Goldman Sachs Bank USA ("Lender") making a loan to you that is secured by interests in one or more hedge funds, funds of hedge funds or similar investment vehicles (each, a "Fund") managed, directly or indirectly, by entities of the Goldman Sachs Group, including but not limited to, Goldman Sachs Asset Management, L.P. or Goldman Sachs Hedge Fund Strategies, L.L.C. (each, a "Manager"), each of which is an affiliate of Lender (collectively, a "Financed Investment").  This Disclosure Statement does not purport to identify risks associated with a Financed Investment in any particular Fund and you should carefully review the offering document for the each Fund in which you will be making a Financed Investment before making a decision to do so.

Entering into a Financed Investment involves a high degree of risk, including the risk that any losses with respect to your investment in the Fund will be greater than if no leverage was used. No guarantee or representation is made that entering into a Financed Investment will be successful.

Before entering into a Financed Investment, you should ensure that you fully understand the terms of the financing transaction, relevant risks associated with the transaction, the nature and extent of your risk of loss and the nature of the contractual relationship into which you are entering.  You should also carefully evaluate whether the transaction is appropriate for you in light of your experience, objectives, financial resources, and other relevant circumstances.

You are urged to consult with your own advisers to determine the suitability of a Financed Investment and the relationship of such an investment to your overall investment program and financial and tax positions.

**CERTAIN RISKS**

In determining whether a Financed Investment in a Fund is a suitable investment, you should consider, among others, the following risks in addition to the risks regarding an investment in the Fund that are described in the offering document for the applicable Fund.

**Risk Associated with Increased Leverage**

Although the increased leverage provided by a Financed Investment in a Fund may result in a total return as a percentage of your equity in the interests in such Fund ("Fund Interests") that is greater than an unleveraged investment in such Fund Interests, it may also result in a total loss as

711870427 14466044

**193**

a percentage of your equity in such Fund Interests that is greater than that of an unleveraged investment. In addition, the interest expense that you bear in connection with the Financed Investment will reduce the returns on your investment. Moreover, should the Fund Interests decline in value, you may be required to either deposit additional funds or securities with Lender or one of its affiliates as collateral for your loan or suffer mandatory liquidation of the Fund Interests in order to compensate for the decline in value. In the event of a sudden precipitous drop in the value of the Fund Interests, you may be required to liquidate the Fund Interests more quickly than otherwise desirable in order to satisfy your obligation to Lender, which may result in adverse tax or other consequences to you.

In addition to the leverage obtained through the making of a Financed Investment, a Fund may employ leverage in furtherance of its investment objective. This added layer of leverage will result in a higher degree of overall leverage and will further increase the potential risk of loss in a Financed Investment, particularly in the event of an economic downturn or underperformance of the Fund's underlying investments.

**Additional Risk Associated with Securing a Loan with Fund Interests**

Fund Interests are subject to significant restrictions on redemption and transfer as described in the offering document provided for each Fund. You will not receive any additional or special rights of redemption with respect to your Fund Interests which coincide with obligations which may arise under the loan agreement (with all other ancillary documents executed together therewith, the "Loan Agreement") with Lender in connection with your Financed Investment, including the obligation to make interest payments to Lender. Restrictions on redemption increase the risk that the value of Fund Interests may decrease between an event of default under the Loan Agreement and the disposition of such Fund Interests in order to satisfy a liability under the Loan Agreement.

The fact that Lender has accepted the Fund Interests as collateral under the Loan Agreement should not be taken as an indication that the Fund Interests may not lose value. You should not make a Financed Investment unless you can sustain a partial or total loss of your investment in the Fund in addition to the obligation to repay the amounts of principal and interest owed to Lender pursuant to the Loan Agreement.

**No Fiduciary Duty**

While the Manager of a Fund has certain fiduciary duties to the investors in a Fund under applicable law in addition to any contractual obligations it may have, Lender will not owe you any fiduciary duties in connection with the loan it will be making to you and it will only be bound by the terms of the Loan Agreement.

**Limits of Risk Disclosure**

The above discussions relating to various risks associated with a Financed Investment are not, and are not intended to be, a complete enumeration or explanation of the risks involved in the purchase of the Financed Investment. You should read the Loan Agreement, Security

711870427 14466044

**194**

Documents, and other agreements related to the Financed Investment, and the Private Placement Memoranda of the Funds and should consult with your own advisers before deciding whether to make a Financed Investment.  In addition, as market conditions change or develop over time, the purchase of the Financed Investment may be subject to risk factors not currently contemplated or described in such documents.

## POTENTIAL CONFLICTS OF INTEREST

The Goldman Sachs Group, Inc., Lender, the Manager and their affiliates, directors, partners, trustees, managers, members, officers and employees (collectively, for purposes of this "*POTENTIAL CONFLICTS OF INTEREST*" section, "Goldman Sachs"), are engaged in businesses unrelated to the Financed Investment.  Certain potential conflicts of interest may arise, directly or indirectly, from such engagement that you should consider.

The activities of each Fund, and its respective affiliates, directors, trustees, managers, members, partners, officers and employees, may give rise to conflicts of interest that could disadvantage you and the value of the Financed Investment.  A description of certain of such potential conflicts of interest is set forth under "*POTENTIAL CONFLICTS OF INTEREST*" or a similarly titled section in the Fund's offering document.  By making a Financed Investment, you will be deemed to have acknowledged and assented to the existence of potential conflicts of interest relating to a Fund, its Manager, and Lender, and to your purchase of the Financed Investment in the face of these conflicts.

Goldman Sachs and its sales personnel have interests in promoting Financed Investments.  With respect to Goldman Sachs and its sales personnel, the remuneration and profitability of activity relating to the Financed Investments may be greater than the provision of other services and sales of other products that might be provided or offered.  For example, Goldman Sachs and its sales personnel will directly or indirectly receive fees and commissions in connection with your Financed Investment.  Such fees and commissions may be higher than for other products or services, and the remuneration and profitability to Goldman Sachs and such personnel resulting from such transaction may be greater than the remuneration and profitability resulting from other products.  In particular, it is expected that remuneration and profitability to Goldman Sachs and its sales personnel resulting from Financed Investments will be greater than the remuneration and profitability resulting from sales of Fund Interests that are not Financed Investments.

711870427 14466044

**195**

GSBANK0002308

## Annex I

### Privacy Notice

The Goldman Sachs financial services companies endeavor to maintain the highest standards of confidentiality and to respect the privacy of our client relationships. In that regard, we are providing this Privacy Notice to our clients in accordance with Title V of the Gramm-Leach-Bliley Act of 1999 and its implementing regulations. This notice supplements any privacy policies or statements that we may provide in connection with specific products or services.

**This Privacy Notice is being provided for information purposes only. Individual, Joint and IRA accountholders will shortly be receiving a second copy of this notice which can be used to communicate privacy preferences to us.**

**THE INFORMATION WE COLLECT ABOUT YOU**

The non-public personal information we collect about you (your "Information") comes primarily from the account applications or other forms you submit to us. We may also collect Information about your transactions and experiences with us, our affiliates, or others relating to the products or services we provide. Also, depending on the products or services you require, we may obtain additional Information from consumer reporting agencies.

**OUR INFORMATION SECURITY POLICIES**

Your privacy is very important to us, and we take the responsibility to safeguard you Information very seriously. We limit access to your Information to those of our employees and service providers who are involved in offering or administering the products or services that we offer. We maintain physical, electronic, and procedural controls that are designed to comply with federal standards to safeguard your information.

If our relationship ends, we will continue to treat your Information as described in this Privacy Notice.

**OUR DISCLOSURE POLICIES**

We do not disclose your Information to anyone, except as permitted by law. The types of Information disclosures permitted by law include sharing your Information with non-affiliated companies that perform support services for your account or process your transactions with us or our affiliates, disclosing your Information pursuant to your express consent, disclosing your Information to fulfill your instructions, or disclosures of your Information that are required for us to be in compliance with applicable laws and regulations.

Unless you indicate that you would not like us to do so (i.e., unless you "opt out"), federal law also permits us to share your Information with our affiliates for their use in the marketing of their products and services to you.

711870427 14466044

**196**

## USE OF INFORMATION FOR AFFILIATE MARKETING

Sharing your Information with our affiliates enables us to better provide you with the full range of services and products available from Goldman Sachs to its private clients. This is the case because the core private client offering – investment management, brokerage, wealth advisory services, trust services and banking services – is actually delivered through a variety of affiliated legal entities that are all part of the Goldman Sachs family of financial services companies.

Our affiliates use your Information to evaluate whether the products or services they offer match your specific needs and, if so, to subsequently market those products or services to you. The affiliates that we would most often share your Information for marketing purposes are: Goldman Sachs Bank USA, The Goldman Sachs Trust Company, N.A., The Goldman Sachs Trust Company of Delaware, and The Ayco Company, L.P.

## INFORMATION SHARING WITH NON-AFFILIATES

We do not sell or license your Information to anyone. We only disclose your Information to non-affiliated third-parties that perform support services for your account or process your transactions, or as otherwise permitted by the law. We require any non-affiliated third parties to whom we disclose your Information to adhere to confidentiality agreements and to maintain appropriate safeguards to protect your Information.

## HOW TO EXERCISE YOUR OPT-OUT RIGHTS

If you do not want us to share your Information with our affiliates as described above and / or you want to limit its use for marketing, you may either: i) fill out the opt-out form which will be sent to you shortly and return it to us at the address indicated on the form, or ii) opt out via the Client Web at www.goldman.com, at any time.

Once we receive your opt-out election, we will, within a reasonable time, stop sharing the Information, or if applicable, prevent its use for marketing. Your choices will apply until you tell us to change those choices. If you already made choices about the use and sharing of your Information, you do not need to act again.

All opt-outs described above that are exercised by any party to a joint account will apply to all parties on that account.

Please contact your Private Wealth Advisor if you have any questions.

CONFIDENTIAL                                                                                      GSBANK0002310

This notice is being provided on behalf of the following affiliates of The Goldman Sachs Group, Inc.:

Goldman, Sachs & Co.
Goldman Sachs Bank USA
The Goldman Sachs Trust Company
N.A. and The Goldman Sachs Trust Company of Delaware

(Not engaged in affiliate marketing)
Goldman Sachs Financial Markets, L.P.
Goldman Sachs Mitsui Marine Derivative Products, L.P.
Goldman Sachs International
J. Aron & Company
Goldman Sachs Asset Management, L.P.
Goldman Sachs Asset Management International
GS Investment Strategies, LLC
Goldman Sachs Hedge Fund Strategies, LLC
The family of funds managed by the affiliates listed above

711870427 14466044

**198**

**Annex II**

**Conflicts of Interest**

GS&Co. is a major participant in global financial markets and as such has activities and interests that include potential multiple advisory, transactional and financial and other interests in accounts, securities, instruments and companies that may be purchased or sold in your GS&Co. accounts (such accounts, the "Account"). GS&Co. acts as an investor, investment banker, research provider, investment manager, financer, advisor, market maker, trader, prime broker, lender, agent and principal, and has other direct or indirect interests, in the global fixed income, currency, commodity, equity and other markets in which your Account may invest. GS&Co. and its personnel, including Private Wealth Advisors assigned to your Account, may take positions in securities or take actions for their own accounts which conflict with positions in your Account, and GS&Co. may act as counterparty to any transaction executed for your Account, subject to applicable law. Additionally, GS&Co. may on a proprietary basis sell, redeem, purchase, take short positions in or take similar actions with respect to securities, currencies, funds or other investments in which your Account may be invested ("underlying assets") without having to notify you of such investment or activity. GS&Co. may also create, write, sell or issue, or act as placement agent or distributor of derivatives and structured investment products whose value may be linked to the value of underlying assets. To the extent permitted by applicable law, GS&Co. may hedge its derivative positions by buying or selling such underlying assets, and reserves the right to sell or redeem some or all of these underlying assets without notice to you. Such actions may have an adverse effect on the amount of fees, expenses and other costs incurred directly or indirectly in connection with your Account. For instance, GS&Co. may for its own account, have long or short positions in, and actively buy or sell, the products or related securities purchased or sold for your Account, or derivatives of these products or related securities. In addition, GS&Co. may act as adviser to clients in investment banking, financial advisory, asset management and other capacities in advisory, transactional, financial or other assignments of all types including those related to instruments that may be purchased, sold or held in your Account. Further, GS&Co. may issue, or be engaged as underwriter, financial advisor or the issuer of, instruments that your Account may purchase, sell or hold. In its market making activities, occasionally, GS&Co. may enter the market in anticipation of a likely client transaction or order to "set up for" or "pre-hedge" the transaction and it is possible that such trading could impact the market price of securities purchased or sold in your Account. Substantially all transactions for brokerage accounts will be effected by GS&Co. Employees will generally receive referral or brokerage compensation in connection with these transactions and GS&Co. and employees each have an interest in recommending brokerage execution with GS&Co. GS&Co. receives compensation when brokerage accounts invest in products managed by GS&Co. such as mutual funds, hedge funds or other alternative investments. GS&Co. and its employees will generally directly or indirectly receive a portion of fees and commissions paid by you. Such fees and commissions vary according to the type of product or service and may be higher for certain products or services. The present and future activities of GS&Co. may give rise to additional conflicts of interest with you. You agree that GS&Co., in its sole discretion, may refrain from recommending or effecting transactions including due to (a) regulatory requirements, (b) GS&Co.'s internal policies and procedures, and (c) its determinations

711870427 14466044

**199**

                                                                  GSBANK0002312

regarding actual or potential conflicts of interest or the appearance of such conflicts. However, you also agree that GS&Co. may determine to recommend or effect transactions notwithstanding the existence of such conflicts. You acknowledge that you understand the risks.

In this Annex II, "GS&Co." means Goldman, Sachs & Co., its present and future affiliates, and their respective partners, officers, directors, employees and agent.

711870427 14466044

**200**



**GUARANTY AND JOINDER AGREEMENT**

This Guaranty and Joinder Agreement (this "**Guaranty**") is by Robert W. Carter (the "**Guarantor**"), for the benefit of GOLDMAN SACHS BANK USA (the "**Lender**"), and dated as of July 7, 2017.

WHEREAS, Todd W. Carter (the "**Borrower**"), has entered into a Loan Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**") dated as of November 13, 2014 among the Borrower, Panda Power Generation Infrastructure Fund, LLC (the "**Advisor**"), and Panda Power Fund II GP, L.P. (together with the Advisor, the "**Existing Guarantors**"), and the Lender;

WHEREAS, it is a condition precedent to (a) the forbearance letter agreement dated of even date hereof among the Borrower, the Existing Guarantors and the Lender and (b) the forbearance letter agreement dated of even date herewith among Guarantor, the Existing Guarantors and the Lender, that Guarantor absolutely and unconditionally guarantee all of the Obligations (as such term is defined in the Loan Agreement); and

WHEREAS, Guarantor has agreed to absolutely and unconditionally, and jointly and severally with the Existing Guarantors, guarantee the Obligations.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged by the parties hereto, Guarantor hereby agrees as follows:

1.  <u>Definitions</u>.  Capitalized terms used herein but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Loan Agreement.

2.  <u>Guaranty</u>.  Guarantor hereby, jointly and severally with the Existing Guarantors, absolutely, irrevocably and unconditionally guarantees to Lender the prompt payment of the Obligations in full when due (whether on the Demand Date, at stated maturity, as a mandatory prepayment, by acceleration or otherwise). This Guaranty is a guaranty of payment and not of collection and is a continuing guaranty and shall apply to all of the Obligations whenever arising.  Notwithstanding any provision to the contrary contained herein or in any of the other Loan Documents, to the extent the obligations of Guarantor shall be adjudicated to be invalid or unenforceable for any reason (including, without limitation, because of any applicable state or federal law relating to fraudulent conveyances or transfers) then the obligations of Guarantor hereunder shall be limited to the maximum amount that is permissible under applicable law (whether federal or state or otherwise).

3.  <u>Obligations Unconditional</u>.  The obligations of Guarantor hereunder are absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of any of the Loan Documents or any other agreement or instrument referred to therein, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor (other than payment in full).  Guarantor agrees that this Guaranty may be enforced by Lender without the necessity at any time of resorting to or exhausting any other security or collateral and without the necessity at any time of having recourse to the Note or any of the other Loan Documents or any collateral, if any, hereafter securing the Obligations or otherwise and Guarantor hereby waives the right to require Lender to make demand on or proceed against any Loan Party or any other Person (including a co-guarantor) or to require Lender to pursue any other remedy or enforce any other right.  Guarantor further agrees that no Person or governmental authority shall have any right to request any return or reimbursement of funds from Lender in connection with monies received under the Loan Documents.  Guarantor further agrees that nothing contained herein

724614484 14466044

<u>Exhibit A-3</u>  **201**

shall prevent Lender from suing on the Note or any of the other Loan Documents or foreclosing its security interest in or lien on any Collateral securing the Obligations or from exercising any other rights available to it under this Agreement, the Notes, any other of the Loan Documents, or any other instrument of security and the exercise of any of the aforesaid rights and the completion of any foreclosure proceedings shall not constitute a discharge of Guarantor's obligations hereunder.  Neither Guarantor's obligations under this Guaranty nor any remedy for the enforcement thereof shall be impaired, modified, changed or released in any manner whatsoever by an impairment, modification, change, release, increase or limitation of the liability of any Loan Party or by reason of the bankruptcy or insolvency of any Loan Party.  Guarantor waives any and all notice of the creation, renewal, extension or accrual of any of the Obligations and notice of or proof of reliance by Lender on this Guaranty or acceptance of this Guaranty.  The Obligations, and any part of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon this Guaranty.  All dealings between any Loan Party, on the one hand, and the Lender, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon this Guaranty.  Guarantor hereby subordinates to the Obligations all debts, liabilities and other obligations, whether direct, indirect, primary, secondary, several, joint and several or otherwise, and irrespective of whether such debts, liabilities and obligations be evidenced by note, contract, open account, book entry or otherwise, owing to Guarantor by any other Loan Party.

4.   <u>Representations and Warranties</u>.  Guarantor represents and warrants to the Lender that:

(a)   <u>Name, Etc.</u>  Guarantor's legal name is correctly set forth on the signature page hereto and the other information regarding Guarantor set forth below Guarantor's signature hereto is true, correct and complete on the date hereof.  Guarantor has not changed its name or, if applicable, principal residence in the past five (5) years or, if applicable, its jurisdiction of organization (which is correctly identified on the signature page hereto) in the past five (5) years

(b)   <u>Enforceable Obligations</u>.  Guarantor is at least twenty-one (21) years of age and is competent to enter into this Guaranty and the other Loan Documents to which it is a party and to perform its obligations hereunder and thereunder.  The execution, delivery and performance by Guarantor of the Loan Documents to the extent Guarantor is a party thereto, the consummation of the transactions contemplated by this Guaranty and the other Loan Documents:  (i) will not violate any law or regulation, or any order or decree of any court or Governmental Authority; (ii) will not conflict with or result in the breach or termination of, constitute a default under, or accelerate any performance required by, any indenture, mortgage, deed of trust, lease, agreement or other instrument to which Guarantor is a party or by which Guarantor or any of Guarantor's property is bound; (iii) will not result in the creation or imposition of any lien upon any of the property of Guarantor; and (iv) do not require the consent or approval of any Governmental Authority or any other Person, except such consents as have been obtained.  Each of the Loan Documents delivered in connection herewith at shall time shall have been duly executed and delivered by Guarantor, and each shall then constitute a legal, valid and binding obligation of Guarantor, enforceable against him in accordance with its terms.

(c)   <u>Compliance with Laws</u>.  Guarantor is not in violation in any material respect of any applicable law.  Guarantor is not in default concerning any judgment, order, writ, injunction or decree of any Governmental Authority, and there is no investigation, enforcement action or regulatory action pending or threatened against or affecting Guarantor by any Governmental Authority.  There is no remedial or other corrective action that Guarantor is required to take to remain in compliance with any judgment, order, writ, injunction or decree of any Governmental Authority or to maintain any material permits, approvals or licenses granted by any Governmental Authority in full force and effect.  During the past ten (10) years, Guarantor has not been arrested or convicted of any material crime, been bankrupt, or been an officer or director of a bankrupt company.

(d)   <u>Taxes</u>.  Guarantor has filed or caused to be filed all federal, state and local tax returns that are required to be filed by it, which returns were true, accurate and complete in all material respects, and has paid or caused to be paid all taxes shown to be due and payable on such returns or on any assessments received by it.

724614484 14466044                                      2

**202**

(e)     Solvency.  Based on the valuation reports delivered to Lender for the fiscal year ended December 31, 2016, the fair value of the assets of the Guarantor, at a fair valuation, will exceed its debts and liabilities, subordinated, contingent or otherwise.

(f)     Complete Disclosure.  All factual information, including, without limitation, all financial statements, furnished by or on behalf of Guarantor to the Lender for purposes of or in connection with this Guaranty and the other Loan Documents is, and all other such factual information hereafter furnished by or on behalf of Guarantor will be, true and accurate in all material respects on the date as of which such information is furnished and not incomplete by omitting to state any fact necessary to make such information not misleading at such time in light of the circumstances under which such information is provided.

(g)     Absence of Undisclosed Liabilities.  Guarantor has no liabilities or obligations, either accrued, absolute, contingent or otherwise, other than the liabilities and obligations set forth in the financial statements and financial representations previously delivered or made to the Lender.

(h)     Foreign Assets Control Regulations, Etc.  Guarantor is not (i) in violation of the Trading with the Enemy Act of the United States of America (50 U.S.C. App. §§ 1 et seq.), as amended; (ii) on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("**OFAC**"), Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation; (iii) in violation of the USA Patriot Act, Title III of Pub. L. 107-56, signed into law October 26, 2001; (iv) a Person designated under Section 1(b), (c) or (d) or Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders; or (v) to the best of its knowledge, engaging in any dealings or transactions, or is otherwise associated, with any of the foregoing blocked Persons.

(i)     No Default.  Other than the Specified Defaults (as defined in the forbearance agreement dated as of the date hereof executed by the Lender and acknowledged by the Guarantor and the Existing Guarantors), Guarantor is not, and after giving effect to this Guaranty shall not be, in default in the payment or performance of any material contractual obligation.

(j)     No Litigation.  Except as set forth on any Schedule 4(j) that may be attached hereto, there are no actions, suits, litigations, arbitrations, administrative or other legal proceedings, or investigations, pending or threatened, against Guarantor or any of the Collateral in which Guarantor has rights, nor has there been any judgment(s) or other legal proceedings against Guarantor in the past seven (7) years, that will or could (a) have a material adverse effect on the business or affairs, condition (financial or otherwise), obligation, operations, performance, properties or prospects of Guarantor, or (b) affect Guarantor's ability to enter into and perform its obligations under this Guaranty or any of the transactions contemplated by this Guaranty.

(k)     Miscellaneous.  Guarantor has made its own credit analysis with respect to the Borrower and the Obligations and has made such arrangements with the Borrower not inconsistent with the provisions hereof as it has deemed appropriate.  Guarantor will receive substantial direct or indirect benefits in connection with the Obligations and the waivers of suretyship defenses are knowingly made in contemplation of such benefits.  Guarantor has not transferred, concealed or removed any of its property with the intent to hinder, delay or defraud its creditors, nor is it now making this Guaranty with intent to hinder, delay or defraud its creditors.

Guarantor acknowledges that, to the extent the Obligations are, or arise under or in connection with, forward contracts, master netting agreements, repurchase agreements, swap agreements, margin loans or other securities contracts or commodity contracts (as such terms are used or defined in sections 101, 741 and 761 of the U.S. Bankruptcy Code (the "**Code**")) ("**protected financial contracts**"), (i) this Guaranty also constitutes a protected financial contract and (ii) any payment or collection hereunder constitutes a settlement payment (as defined in sections 101 or 741 of the Code) and transfer under and in connection with one or more types of protected financial contract.

**203**

5.    <u>Joinder to Loan Agreement</u>.  Guarantor hereby agrees that (a) it has reviewed the Loan Agreement and the other Loan Documents and understands the terms and provisions thereof; and (b) it shall be a party to each Loan Agreement as a Guarantor or a Loan Party, as applicable, for the sole purposes of agreeing to Article I, Sections 5.1 through and including 5.7, 5.10, 5.12, 5.18, and Article VII of the Loan Agreement.  The Loan Parties immediately prior to giving effect to this Guaranty acknowledge and agree to the foregoing.

6.    <u>Guarantor Loan Agreement</u>.  Notwithstanding Section 5.8 of the Loan Agreement dated as of November 13, 2014 among the Guarantor, the Existing Guarantors, and the Lender, as amended, restated, supplemented or otherwise modified from time to time, the Lender hereby consents to the guarantee of the Obligations pursuant to this Guaranty.

7.    <u>Taxes</u>.  All payments by Guarantor under this Guaranty shall be made free and clear of any restrictions or conditions, without set off or counterclaim (any such setoff and/or counterclaim rights of Guarantor being hereby expressly waived by Guarantor, to the maximum extent permissible under the applicable law), and free and clear of, and without any deduction or withholding whether for or on account of tax or otherwise.  If any such deduction or withholding is required by law to be made by Guarantor or any other Person (whether or not a party to, or on behalf of a party to this Guaranty) from any sum paid or payable by, or received or receivable from, Guarantor, Guarantor shall pay in the same manner and at the same time such additional amounts as will result in the Lender's receiving and retaining (free from any liability other than tax on its overall net income) such net amount as would have been received by it had no such deduction or withholding been required to be made.

8.    <u>Waiver of Rights</u>.  Guarantor expressly waives to the fullest extent permitted by applicable law: (a) notice of acceptance of this Guaranty by the Lender and of all extensions of credit to any Loan Party by Lender; (b) notice of presentment and demand for payment or performance of any of the Obligations; (c) protest and notice of dishonor or of default (except as specifically required in the Loan Agreement) with respect to the Obligations or with respect to any security therefor; (d) notice of Lender obtaining, amending, substituting for, releasing, waiving or modifying any security interest, lien or encumbrance hereafter securing the Obligations, or the Lender subordinating, compromising, discharging or releasing such security interests, liens or encumbrances, if any; and (e) all other notices to which Guarantor might otherwise be entitled, except those expressly required hereunder. Guarantor does not waive his, her or its rights to service of process in accordance with the Loan Documents or applicable law.

9.    <u>Modifications</u>.  Guarantor agrees that: (a) all or any part of the Collateral now or hereafter held or received for the Obligations may be exchanged, compromised or surrendered from time to time; (b) the Lender shall have no obligation to protect, perfect, secure or insure any such security interests, liens or encumbrances now or hereafter held, if any, for the Obligations; (c) the time or place of payment of the Obligations may be changed or extended, in whole or in part, to a time certain or otherwise, and may be renewed or accelerated, in whole or in part; (d) any Loan Party and any other party liable for payment under the Loan Documents may be granted indulgences generally; (e) any of the provisions of the Note or any of the other Loan Documents, including, without limitation, this Agreement may be modified, amended or waived; (f) any party (including any co-guarantor) liable for the payment thereof may be granted indulgences or be released; and (g) any deposit balance for the credit of any Loan Party or any other party liable for the payment of the Obligations or liable upon any security therefor may be released, in whole or in part, at, before or after the stated, extended or accelerated maturity of the Obligations, all without notice to or further assent by Guarantor, which shall remain bound thereon, notwithstanding any such exchange, compromise, surrender, extension, renewal, acceleration, modification, indulgence or release.

10.    <u>Waiver of Subrogation</u>.  Guarantor agrees that, until the payment of the Obligations in full in cash, it will not exercise, and hereby waives, any right of reimbursement, subrogation, contribution, offset, indemnitee or other claims against any Loan Party or any other guarantor of the Obligations, arising by contract or operation of law in connection with the Obligations and  any payment made or required to be made by Guarantor under this Agreement or the other Loan Documents.  After the

**204**

CONFIDENTIAL          GSBANK0001189

payment in full in cash of the Obligations (other than any part of the Obligations that represents contingent contractual indemnities), Guarantor shall be entitled to exercise against any other Loan Party all such rights of reimbursement, subrogation, contribution, indemnification and offset, and all such other claims, to the fullest extent permitted by law.

11.    Guaranty of Payment.  Guarantor hereby absolutely, irrevocably and unconditionally guarantees to Lender the prompt payment of the Obligations in full when due (whether on the Demand Date, as a mandatory prepayment, by acceleration or otherwise).

12.    Successors and Assigns.  This Guaranty shall be binding upon Guarantor, Guarantor's successors and permitted assigns and (if applicable) Guarantor's estate and legal representatives in the event of the death or incapacity of Guarantor, whether or not an executor, administrator, guardian, committee, trustee, or other representative has been appointed to Guarantor's estate, and shall inure to the benefit of the Lender's successors and permitted assigns, and to the individual managing directors and assigns of the Lender or any successor of the Lender.

13.    Termination.  Subject to reinstatement of this Guaranty pursuant to Section 14 hereof, upon the indefeasible payment and performance in full of the Obligations in cash, this Guaranty shall terminate.

14.    Reinstatement.  Notwithstanding anything contained in this Guaranty or the other Loan Documents, the obligations of Guarantor under this Guaranty shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Person in respect of the Obligations is rescinded or must be otherwise restored by any holder of any of the Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, and Guarantor agrees that it will indemnify Lender on demand for all reasonable costs and expenses (including, without limitation, reasonable fees of counsel) incurred by such Person in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.

15.    Remedies.  Guarantor agrees that the Obligations may be declared to be forthwith due and payable upon demand or as provided in Sections 2.5 or 6.1 of the Loan Agreement (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 6.1 of the Loan Agreement notwithstanding any stay, injunction or other prohibition preventing such declaration (or preventing such Obligations from becoming automatically due and payable) as against any other Person and that, in the event of such declaration (or such Obligations being deemed to have become automatically due and payable), such Obligations shall forthwith become due and payable by Guarantor upon the same timeframes as due by such party).  Guarantor acknowledges that as of the date of this Guaranty, the Obligations are currently due and payable in full by the Borrower. Guarantor acknowledges and agrees that its obligations hereunder (a) are fully recourse to Guarantor and his properties and assets and (b) are secured in accordance with the terms of the Security Documents, and that Lender may exercise its remedies thereunder in accordance with the terms of such Security Documents, the Loan Agreement and this Guaranty.

16.    Amendments.  Guarantor agrees that no agreement on the Lender's behalf to waive or modify this Guaranty or any provision hereof shall be valid or binding unless evidenced by a writing signed by the Lender.  No failure on the part of the Lender to exercise, and no delay in exercising, any right, remedy or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by the Lender of any right, remedy or power hereunder preclude any other or future exercise of any other right, remedy or power.  Each and every right, remedy and power hereby granted to the Lender or allowed the Lender by law or other agreement shall be cumulative and not exclusive of any other right, remedy or power, and may be exercised by the Lender from time to time.

17.    Acknowledgement.  Guarantor hereby acknowledges (a) that it will receive direct or indirect benefits in connection with the Obligations and (b) the receipt and sufficiency of good and valuable consideration in connection with this Guaranty.

724614484 14466044

**205**

CONFIDENTIAL                                                                                          GSBANK0001190

18. <u>Incorporation by Reference</u>. The provisions of Article I, Sections 7.2, 7.4 through and including 7.10 and 7.13 of the Loan Agreement are incorporated herein by reference, *mutatis mutandis*.

19. <u>Loan Document</u>. This Guaranty is a Loan Document.

20. <u>Giving Notice</u>. Unless otherwise provided herein, all notices and other communications provided to any party hereto under this Guaranty or any other Loan Document shall be in writing or by facsimile and addressed or delivered to such party at its address as follows (unless otherwise designated in writing to the other parties): (i) if to Guarantor, at the address set forth below Guarantor's names on the signature page hereto and (ii) if to the Lender, at the address set forth below the Lender's name on the signature page hereto. Unless otherwise provided herein, any notice, if mailed and properly addressed with postage prepaid, shall be deemed given three (3) Business Days after being sent; any notice, if transmitted by facsimile, shall be deemed given when transmitted with confirmation of receipt; any notice, if hand delivered, shall be deemed given on the date of such delivery; any notice, if mailed by overnight courier, shall be deemed given on the date of such delivery.

21. <u>Joint and Several Liability</u>. Each of the Existing Guarantors and Guarantor agrees that such Person will be jointly and severally liable for the Obligations with the other Persons. Notice provided by the Lender to any Guarantor will be deemed notice to all Guarantors. <u>USA Patriot Act</u>. The Lender hereby notifies Guarantor that, pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies Guarantor, which information includes the name and address of Guarantor and other information that will allow the Lender to identify Guarantor in accordance with the USA Patriot Act.

22. <u>Privacy Disclosures</u>.

(a) Guarantor acknowledges that it has received, read and understood the privacy notice set forth on Annex I to the Loan Agreement.

(b) Guarantor acknowledges that it has received, read and understood the notice of potential conflicts of interest set forth on Annex II to the Loan Agreement.

[remainder of page intentionally left blank; signature page follows]

**CONFIDENTIAL**                                                                                    GSBANK0001191

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the date specified in the preamble.

**NOTICE TO INDIVIDUAL GUARANTOR**

Please note that you are being asked to guarantee the Borrower's Obligations as described in Section 2 of this Guaranty.  Think carefully before you do so.  If the Borrower does not pay its Obligations, you will have to.  Be sure you can afford to pay if you have to, and that you want to accept this responsibility.  You may have to pay up to the full amount of the Borrower's Obligations if the Borrower does not pay.  You may also have to pay any late fees or collection costs that may apply, which would increase this amount.  The Lender can collect these Obligations from you without first trying to collect from the Borrower.  The Lender can use the same collection methods against you that can be used against the Borrower, such as suing you, garnishing your wages, and offsetting other accounts you hold at the Lender or GS&Co.  If payment of the Obligations is ever in default, we may report that default on your credit report.

Principal Residence:

4004 Colgate Avenue
Dallas, Texas 75225

By: Robert W. Carter

[Signature Page to Guaranty of Todd W. Carter Loan Agreement]

724614484 14466044

**207**

Acknowledged and Agreed
as of the date first above written:

**Borrower:**

By: Todd W. Carter

**Existing Guarantors:**

**PANDA POWER GENERATION INFRASTRUCTURE FUND, LLC**,
a Delaware limited liability company

By:
Name: Todd W. Carter
Title:  Senior Partner and President

**PANDA POWER FUND II GP, L.P.**, a Delaware limited partnership

By:      Panda Power Fund II GP, LLC, its general partner

By:
Name: Todd W. Carter
Title:  Senior Partner and President

**[Signature Page to Guaranty of Todd W. Carter Loan Agreement]**

724614484 14466044

**208**

Acknowledged and Agreed
as of the date first above written:

**LENDER:**

GOLDMAN SACHS BANK USA

By: _____

Name: _____

Title: _____

Date: _____

Address:     200 West Street
New York, NY 10282-2198

Facsimile:    212-428-1474

724614484 14466044

[Signature Page to Guaranty of Todd W. Carter Loan Agreement]

**209**



150 East 42nd Street
17th Floor
New York, NY 10017
Telephone: (212)484-4188
Fax: (212)286-0383

April 26, 2022

Christopher Duffy, Esq.
Vinson & Elkins LLP
1114 Avenue of the Americas 32nd Floor
New York, NY 10036
Via Email to: cduffy@velaw.com

Thomas C. Moore
Law Offices of Thomas C Moore PC
63 White Plains Road
Bronxville, NY 10708
Via Email to: thomascmoorelaw@gmail.com

**Case Number: 01-21-0017-0809**

**Goldman Sachs Bank USA**
**-vs-**
**Robert W. Carter; Todd Carter**

Dear Counsel:

Per the enclosed Notices of Appointments and Notices of Compensation Arrangements, the American Arbitration Association (the AAA) has appointed Mark C. Morril, Esq., Edna R. Sussman, Esq., and Steven Skulnik, Esq. as the Arbitrators. Mark C. Morril, Esq. will serve as this Panel's Chair.

The Arbitrators' disclosures are enclosed for your review.

Please notify the AAA of any objections to these appointments by **May 3, 2022**, copying the other party. The Arbitrators shall not be copied on any comments related to the disclosures. If any objections are raised, the other party may respond. In accordance with the Rules, the AAA would make a determination regarding their continued service.

If the parties or their counsel knows of any conflicts that may be relevant, they are to communicate this information to the AAA upon receipt of this letter. This is an ongoing expectation throughout the life of the case.

For cases administered pursuant to the Large Complex Case Procedures, the AAA's Administrative Review Council (ARC) will make any determination regarding an objection to the continued service of an arbitrator or panel. The ARC is the AAA's executive-level administrative decision-making authority with the directive to resolve certain administrative issues arising in the AAA's large, complex domestic caseload. The ARC is composed of current and former AAA executives who bring their significant arbitration experience to the decision making process. In conjunction with the ARC Guidelines and the ARC Review Standards available at www.adr.org/ARC, the ARC reviews and resolves issues in a time- and cost-effective manner after careful consideration of the parties' contentions, while upholding the integrity of the arbitration process and reinforcing the parties' confidence in the process. Parties shall limit any individual submission to five pages with, at most, 20 pages of exhibits per party. Replies will not be accepted without permission from the AAA.

Exhibit A-4

**210**

Sincerely,

Seana Rolon
Case Administrator

*On behalf of,*
Jeff Zaino
Vice President
Direct Dial: (212)484-3224
Email: Zainoj@adr.org
Fax: (212)286-0383

Enclosure

cc:
Jordan W. Leu, Esq.
Kyle Reynolds
Matthew W. Moran, Esq.

Steven Skulnik, Esq.
Edna R. Sussman, Esq.
Mark C. Morril, Esq.

**American Arbitration Association**
**Case Number: 01-21-0017-0809**

**Goldman Sachs Bank USA**
**-vs-**
**Robert W. Carter; Todd Carter**

---

**Procedural Order No. 3**

---

**Mark C. Morril**
**Chair**

**Steven Skulnik**
**Co-Arbitrator**

**Edna R. Sussman**
**Sussman ADR LLC**
**Co-Arbitrator**

Exhibit A-5

DocuSign Envelope ID: 0083F40C-613C-4C03-9880-5B26BA7F8A64

REPORT OF PRELIMINARY HEARING

AND PROCEDURAL ORDER NO. 3

Pursuant to the Commercial Arbitration Rules (the "Rules") of the American Arbitration Association, a preliminary hearing was held in the above matter by telephone on May 17, 2022 before the Tribunal, Mark C. Morril, Steven Skulnik, and Edna R. Sussman.  Appearing on behalf of the Claimant were Christopher Duffy of Vinson & Elkins LLP.  Appearing on behalf of the Respondent was Thomas Clay Moore of Law Office of Thomas C. Moore.  Claimant and Respondents are referred to herein individually as a "Party" and collectively as the "Parties."

By agreement of the Parties and order of the Tribunal, the following is now in effect:

## I. Jurisdiction, Applicable Law and Rules

1. Each Party accepts the appointment of the members of the Tribunal and waives any objection to the jurisdiction of the Tribunal over the Parties and all of the claims asserted in the Demand for Arbitration and Statement of Claim.  It is noted that by Procedural Order No. 2 the Tribunal determined that Dallas, Texas will be the locale for the arbitration.

2. The applicable arbitration agreements in this Arbitration are i) Section 7.9 of the Loan Agreement among Goldman Sachs Bank USA, Robert W. Carter, Panda Power Generation Infrastructure Fund, LLC and Panda Power Fund II GP, L.P. dated November 13, 2014;  and ii) Section 7.9 of the Loan Agreement among Goldman Sachs Bank USA, Todd Carter, Panda Power Generation Infrastructure Fund, LLC and Panda Power Fund II GP, L.P. dated November 13, 2014 (together the "Loan Agreements"). The aforementioned arbitration agreements apply to each Party and to the dispute raised in the pleadings in this Arbitration.

3. In respect to applicable law, Section 7.8 of the Loan Agreements provide that the Loan Agreements and other loan documents (other than those containing a contrary choice of law provision) shall be governed by and construed in accordance with the laws (and not the law of conflicts) of the State of New York.

DocuSign Envelope ID: 0083F40C-613C-4C03-9880-5B26BA7F8A64

4.  The seat of the Arbitration is Dallas, Texas.

5.  The Federal Arbitration Act will govern the arbitration process, together with New York substantive law, the Commercial Arbitration Rules (effective October 1, 2013) of the American Arbitration Association, including the Procedures for Large, Complex Commercial Disputes, and such agreements as the Parties may reach and rulings and procedural orders that the Tribunal may issue regarding matters of procedure.

## II.  Procedural Timetable and Prehearing Matters

6.  The Procedural Timetable, reflecting the Parties' agreement and additional measures determined by the Tribunal, is attached hereto as Annex 1.

7.  The dates provided in the Procedural Timetable and other deadlines shall be subject to short extensions of time agreed on by the Parties as to dates that do not affect the Tribunal or the hearing, or by further order of the Tribunal.

8.  The Parties shall make a good-faith exchange of all documents they anticipate to rely on at the evidentiary hearing by the date provided in the Procedural Timetable, as provided in Commercial Arbitration Rule R-22 (b) (i)- (ii).  Documents not identified as Reliance Documents by the final deadline provided shall be excluded from evidence in the non-producing Party's case-in-chief, except for rebuttal material or subject to a showing of good cause that such non-producing Party had a good faith basis to exclude the document(s) from its Reliance Document production.

9.  The Parties may exchange requests for the production of documents consistent with the standard provided in Commercial Arbitration Rule R-22 (b) (iii) on the schedule set out in the Procedural Timetable.

10.  Documents produced by a Party in this Arbitration shall be produced as maintained in the ordinary course of business, or by categories, or types of documents, or some other rational method of production and identification so to further rather than impede review and comprehension by the receiving Party.   Spreadsheets shall be produced in native format.  Documents shall be produced with metadata intact if

DocuSign Envelope ID: 0083F40C-613C-4C03-9880-5B26BA7F8A64

they are maintained in that format in the ordinary course of business.

11. Claw back agreements shall be in place for all Parties to allow for the retrieval of inadvertently disclosed attorney-client privileged documents.

12. Counsel for the Parties are directed to inform their clients that the Tribunal has ordered an arbitration hold that applies to documents relating to the subject matter of the Arbitration and that the clients should take steps to prevent the destruction of all such documents, both paper and electronic.  If any Party has an automatic document deletion/destruction program in place, that system should be overridden as to documents relating to the subject matter of the Arbitration until the case is completed.  The Parties are invited to consult with regard to the definition of "documents" to be used in this Arbitration.

13. If the cost of collection of any of the electronically stored data presents an unreasonable cost for the producing Party because the data is not readily accessible and the Parties cannot reach an agreement on the handling of the cost, the Tribunal will decide if cost sharing or cost shifting is appropriate.

14. The Parties' agreement regarding electronic disclosure will be memorialized in an ESI case management order/protective order to be submitted in draft to the Tribunal on the date provided in the Procedural Timetable.

15. The Parties may raise to the Tribunal any issues concerning the disclosure process as to which they cannot come to agreement by motion to be filed within 5 days of the meet and confer process provided below.

16. Disputes relating to document production that are not resolved in the Parties' meet and confer process shall be submitted to the Tribunal in the form of jointly drafted "Stern Schedules" in the form of Annex 2 to this Procedural Order.  The Parties shall prepare separate (but jointly drafted) Stern Schedules summarizing each Party's disputed Document Requests, including the reply position of the requesting Party. The Parties may submit short letter briefs supplementing their respective positions set forth in the Stern Schedule but are not required to do so. If letter briefs are submitted, they shall have numbered paragraphs that conform to the numbering

system used in the Stern Schedule.

17. Pursuant to Commercial Arbitration Rule R-33, no motion shall be filed in this arbitration without obtaining the approval of the Tribunal, after first submitting a letter not to exceed five pages setting forth the factual and legal basis of the motion and the basis on which the Party proposing to file a motion contends that it will be dispositive of all or substantially all of the arbitration or otherwise significantly advance its fair and efficient administration.   The other Party may file a letter objecting to the filing of the proposed motion no later than five business days from the filing of the initial letter or such additional time as the Tribunal may permit. The Tribunal will then advise whether it will permit the motion to be made, and, if so, will set a briefing schedule.

18. Any requests to the Tribunal to issue subpoenas or to make alternative arrangements for the taking of third-Party testimony shall be made by the date provided in the Procedural Timetable and accompanied by a letter setting forth in numbered paragraphs the basis for the Tribunal's authority to issue the requested subpoena or for any alternative arrangement involving the participation of the Arbitrator.  Any Party opposing a request shall submit the basis for its opposition by letter with corresponding numbered paragraphs filed with the Tribunal within 3 business days after service of the request.  The Parties are encouraged to review the New York City Bar Association report entitled  A Model Federal Arbitration Summons to Testify and Produce Documentary Evidence at an Arbitration Hearing.

### III.    Prehearing Submissions

19. The pre-hearing submissions shall consist of the following:

   a. An agreed Stipulation of Uncontested Facts, only to the extent that the Parties consider that collaborating on such a statement would be useful to the Tribunal (e.g., background facts) and cost-effective.  The Parties may consider whether chronologies, summaries, an acronym list, *dramatis personae* list, or other aides, would be useful.

   b. Witness statements (except to the extent a Party makes an election to provide

live direct testimony as provided below in respect to Claimant's Party Representative and the individually-named Respondents or as otherwise allowed by the Tribunal on application of a Party) and each Party's list of witnesses, following the procedures set out below.

c. Expert reports, following the procedures described below; each Party shall provide advance notice of their prospective expert witnesses and description of the subject matter of their expected testimony  to the extent and by the date provided in the Procedural Timetable

d. Exhibits (other than exhibits that may be used for impeachment on cross-examination) and any objections to exhibits, following the procedures described below

e. Pre-hearing memoranda setting forth each Party's position and supporting arguments and authorities on all significant disputed issues accompanied by a compilation of 20 exhibits that each Party considers to be most significant to its case.  The memoranda shall not exceed 25 double-spaced pages, excluding copies of any authorities and exhibits that the Parties may submit at the same time.

## IV. **Evidence and Hearing Logistics.**

20. Subject to paragraphs 19 (b) and 21 of this Procedural Order, witnesses under the control of any Party will provide direct testimony through their written witness statements or, in the case of experts, through their reports. Where, in exceptional circumstances,  a Party is unable to obtain a statement from a witness, the evidence of that witness shall be admitted only with permission of the Tribunal. The Tribunal may, in its discretion, and after hearing the Parties, call a witness who has not been called by the Parties.

21. Except as provided in the next sentence, witness statements and expert reports shall stand in lieu of direct examination and therefore must be sufficiently detailed to encompass the witness's or expert's full direct testimony on the matters that are considered by the Party presenting such witness or expert to be relevant, essential

and material.  Claimants as to their Party Representative and the individual named Respondents may elect to provide live direct testimony (whether the hearing is conducted in person or by videoconference).  The Parties shall provide notice of such election, which may be conditional upon the other Party's election, by the date provided in the Procedural Timetable.

22. The Parties are to avoid, insofar as possible, cumulative, repetitive, argumentative, or irrelevant (whether evidentially or legally) testimony.

23. Each witness statement shall contain:

    a.   The full name and address of the witness, a statement regarding his or her present and past relationship (if any) with any of the Parties, and a description of his or her background, qualifications, training, and experience, if such a description may be relevant to the dispute or to the contents of the statement.  A photograph of the witness is appreciated, but not required.

    b.   A full and detailed description of the facts, and the source of the witness's information as to those facts, sufficient to serve as that witness's evidence in the matter in dispute

    c.   An affirmation of the truth of the contents of the witness statement; and

    d.   The signature of the witness and its date and place of signing

    e.   Documents on which the witness relies that have not already been submitted shall be provided.  The witness may not refer to documents which have not been produced.  Documents already marked as exhibits shall be referred to as such and no duplicate copy should be submitted with the witness statement.

24. Each expert witness report shall contain:

    a.   The full name and address of the expert, a statement regarding his or her present and past relationships (if any) with any of the Parties, their legal advisors, or Arbitrators, and a description of his or her background, qualifications, training, and experience;  a photograph of the expert is

DocuSign Envelope ID: 0083F40C-613C-4C03-9880-5B26BA7F8A64

appreciated, but not required.

    b.   A description of the instructions pursuant to which he or she is providing his or her opinions and conclusions

    c.   A statement of his or her independence from the Parties, their legal advisors and the Tribunal

    d.   A statement of the facts on which he or she is basing his or her expert opinions and conclusions

    e.   His or her expert opinions and conclusions, including a description of the methods, evidence and information used in arriving at the conclusions

    f.   An affirmation of his or her genuine belief in the opinions expressed in the expert report

    g.   The signature of the expert and its date and place of signing

    h.   If the expert report has been signed by more than one person, an attribution of the entirety or specific parts of the report to each author

    i.   Documents on which the expert relies that have not already been submitted shall be provided.  Documents already marked as exhibits shall be referred to as such and no duplicate copy should be submitted with the expert report.

25. Identification of Witnesses and Experts to Cross-Examine and Order of Witnesses

    a.   At the date specified by the Procedural Timetable, each Party shall provide a list of the witnesses and experts it reasonably expects to call at the hearing, including those witnesses it is calling for cross-examination, which shall a) identify whether the witness is to be called as a fact or expert witness; b) provide the proposed order of witnesses; and c) set out a brief summary of the subject area of the witness's testimony.  This

disclosure is not required to include any witness a Party may use in presenting its rebuttal case, if any. Each Party shall provide a reasonable estimate of the approximate time it anticipates for direct or cross-examination of each witness it will be examining.

b. Each witness within the control of a Party or expert whose report has been served shall appear for testimony at the hearing if such person's appearance has been requested by any Party or by the Tribunal.

c. Considering any health and safety concerns or other issues, including time and costs and the preferences of the Parties regarding a hybrid hearing, at an appropriate time, the Tribunal may allow a witness to appear and be examined by videoconference and in such case will issue appropriate directions.

d. If a witness or expert whose appearance has been requested fails without a valid reason to appear for testimony at the hearing, the Tribunal shall disregard any witness statement or expert report by that witness, unless the Tribunal in its discretion determines to accept the statement or report in whole or in part.

e. The fact that a witness or expert was not called by an opposing Party to appear for cross-examination at the hearing will not be deemed an admission by an opposing Party that the facts set forth in the witness' statement or the opinions set forth in the expert's report are correct or proven.

26. Testimony at the Hearing

a. Witness testimony at the hearing for both fact and expert witnesses shall be received under oath or affirmation. Where a Party has elected to present direct testimony in the form of a written statement, the Party presenting the witness whose direct testimony is in the form of a written statement may conduct a brief direct examination, but only to introduce the witness and/or to respond to an issue that could not reasonably have been anticipated at the time

DocuSign Envelope ID: 0083F40C-613C-4C03-9880-5B26BA7F8A64

the witness's written statement(s) was submitted or at the time of that Party's final pleading as set out in the Procedural Timetable. The opportunity to conduct a brief direct examination is strictly limited to the circumstances provided in this paragraph and is not a means of adducing further direct testimony which should otherwise have been contained in a witness statement.

b.   After all expert reports have been submitted, a Party offering an expert may request that, prior to cross-examination, the expert be allowed to provide direct testimony, or a presentation supported by demonstratives to the Tribunal.   The Tribunal will provide directions regarding the length and format of such testimony or presentation.

c.   The opposing Party may cross-examine the fact or expert witnesses on relevant matters that were addressed or presented in the direct testimony or expert report.  Subject to the control of the Tribunal, cross-examination shall not be confined to the scope of the witness's direct testimony but must in all events be limited to matters that are relevant.

d.   The Party presenting the witness may then re-examine the witness with respect to any matters or issues arising out of the cross- examination. Any further examination of the witness (e.g., re-cross, etc.) may be had only with leave of the Tribunal.

e.   The Tribunal may examine the witness at any time, either before, during or after examination by one of the Parties; provided that, to the extent the Tribunal elicits new testimony, the Parties may seek to re-direct or re-examine the witness on that testimony.  The Tribunal may, after consultation with the Parties, request that two or more witnesses or experts give evidence at the same time if it deems it appropriate.

f.   To the extent possible, the Parties shall make arrangements to schedule the attendance of witnesses at the hearing so that the case can proceed with all due expedition and without any unnecessary delay.

g.  The Party presenting evidence may adjust its order of witnesses as reasonably necessary in its judgment by giving notice to the other Party and the Arbitrator the day before (by noon New York time) of the names of the witnesses who will be called to testify the next day and the order in which the witnesses will be called.

27. The Tribunal shall, at all times, have complete control over the proceedings. Without limitation of the foregoing, it may in its discretion:

   a.  decline to hear a witness if it considers that the matters with respect to which the witness will testify are either proven by other evidence or are cumulative or irrelevant;

   b.  limit or refuse the right of a Party to examine a witness when it appears that a question has been addressed by other evidence or is otherwise cumulative or irrelevant; or

   c.  direct that a witness be recalled for further examination at any time.

28. Exhibits

   a.  The Parties shall cooperate in preparing one or more joint exhibit compilations including all schedules, summaries, PowerPoint presentations, diagrams and charts and demonstrative exhibits that are then available, to avoid duplicative documents and an unnecessary number of compilations. Each proposed exhibit shall be pre-marked for identification. To the extent necessary, the Parties shall each prepare a separate compilation consisting of that Party's prospective additional hearing exhibits, but the Parties shall make best efforts to include all relevant exhibits in the joint exhibit compilation. The Parties shall submit indices identifying each of the exhibits and legal authorities  both by number and by date (as applicable), together with a brief identifying description, and shall update those indices with subsequent submissions.

   b.  No new documentary evidence may be presented at the hearing except with

DocuSign Envelope ID: 0083F40C-613C-4C03-9880-5B26BA7F8A64

permission of the Tribunal.  Demonstrative exhibits may, however, be shown, using only documents and information submitted earlier in accordance with this Procedural Order.  Such demonstratives may not be used to present new arguments, calculations, or legal authority.  Should the Tribunal grant permission to a Party to present new documentary evidence in the course of the hearing, the other Parties may request a reasonable opportunity to introduce new evidence to rebut it.  Counsel shall make reasonable and timely efforts to provide a copy of any demonstrative exhibit to opposing counsel and the Tribunal before the exhibit is used at the hearing.

c.  All submitted documents shall be deemed to be authentic and complete even if submitted in copies, unless their authenticity is promptly challenged by another Party. In case of incomplete, illegible, or otherwise unclear copies, the Tribunal may request Parties to provide improved copies or originals.

d.  The Parties are encouraged to stipulate with respect to the admissibility of exhibits.  Five business days after its receipt of the other Party's exhibits, each Party shall provide a list of any objections it has to the other Party's exhibits, based on grounds of privilege (including, without limitation, exhibits believed to be inadmissible because they are in the nature of settlement discussions) or other broad category of objections.    The Parties shall meet and confer with respect to such objections.

e.  On the date specified in the Procedural Timetable, each Party shall submit to the Tribunal a list of any objections to the other Party's exhibits that the Parties have been unable to resolve, other than objections based on relevancy, hearsay, and the like.  The Tribunal will thereafter rule on the objections and may call for a telephonic hearing or written submissions at its discretion.  The Tribunal notes that hearsay objections generally will not be sustained but may considered in relation to the weight to be accorded to the testimony.

29. Hearing Compilation

Prior to the hearing, and again at the close of the evidentiary record, the Parties shall also provide the Tribunal with an electronic Hearing Compilation comprised of

a single compiled digital version of all pleadings, prehearing memoranda, witness statements, and the expert reports in both PDF and Word format, and all exhibits and other documents listed below in OCR PDF (not flattened) format. The Parties shall not be required to reformat documents that are not reasonably available to them in OCR PDF format without undue burden or expense.

The hearing compilation shall be organized into the folders and files listed below. **Each exhibit and legal authority shall be separately numbered and shall be accessible as a separate document.**

- Folder 1: Parties' Pleadings and Submissions (including key substantive correspondence)
- Folder 2: Procedural Orders
- Folder 3: Witness Statements, with citations updated to exhibit numbers and not Bates numbers when not provided in the initial submission of the witness statement
- Folder 4: Expert Reports, with citations updated to exhibit numbers and not Bates numbers when not provided in the initial submission of the expert report
- Folder 5: Joint Factual Exhibits
- Folder 6: Claimant's Factual Exhibits to the extent not agreed to include in the Joint Factual Exhibits
- Folder 7: Respondents' Factual Exhibits to the extent not agreed to include in the Joint Factual Exhibits
- Folder 7: Claimant's Legal Authorities
- Folder 8: Respondents' Legal Authorities
- Folder 9: Reserved for Opening Statement Slides and Demonstrative exhibits, if any

30. Merits Hearing

    a.  The hearing shall be held in Dallas at a location or locations to be agreed by the Parties. At an appropriate time, the Tribunal will consult with the Parties whether the hearing should proceed in whole or in part by live video conference on the hearing dates that have been set. If the hearing is to be held

live, the Parties will agree on the exact venue and notify the Tribunal by the date provided in the Procedural Timetable.

b.  If the Tribunal determines, after consultation with the Parties, that based on health and safety conditions or for other reasons (including the possible efficiencies of a hybrid hearings) the hearing should proceed in whole or in part by live video conference on the hearing dates that have been set, the Tribunal will provide reasonable notice of such a determination, and, if made, will work with the Parties on adjustments to the procedures to ensure that the Parties are treated with equality and that each Party has the right to be heard and is given a reasonable opportunity to present its case.

c.  The hearing shall be transcribed and, if agreed by the parties, a LiveNote (or similar) system used to provide a real time feed of the transcript. The costs of the transcript shall be shared by the Parties in the first instance, subject to any later award of costs.  The Parties shall, after consultation with the Tribunal, agree on the necessary details and make the necessary arrangements for the hearings and for the transcript.  They shall inform the Tribunal of such arrangements at the final pre-hearing telephone conference.

d.   Following the hearing, the Parties shall attempt to agree on any proposed corrections to the transcripts. The Tribunal will consider any disputes between the Parties in case of disagreement.

e.  The Arbitration hearing will, in general, be held between the hours of 10:00 AM and 6:00 PM CST, with a one-hour adjournment for lunch and fifteen-minute breaks in the morning and in the afternoon.  Further breaks will be at the discretion of the Tribunal.

f.  Counsel shall meet and confer and report to the Tribunal at the final Pre-Hearing Conference whether they can agree to a chess-clock allocation of hearing time, with each side getting 50%.

### V.     General Provisions

31. The AAA's Accelerated Exchange Program for transmitting documents shall be in effect in this arbitration. Pursuant to the Accelerated Exchange Program, the Parties may transmit written materials directly to the Tribunal, simultaneously providing copies to the other Party and to the Case Manager using the same mode of transmission.

32. Decisions regarding possible post-hearing argument and cost submissions will be discussed prior to the close of the hearing.

33. Further telephonic or video conference pre-hearing status conferences will be held on the dates specified in the Procedural Timetable, subject to cancellation or adjournment if there is no substantial need for a conference.

34. The Chair may sign procedural orders and determine routine procedural issues, such as adjournments of dates that do not affect the merits hearing, on behalf of the Tribunal upon consultation with the Co-Arbitrators, provided, however, at the request of any Party made at the time a dispute is submitted, or at the initiative of the Chair or either of the Co-Arbitrators, the Co-Arbitrators shall participate in the resolution of such dispute.

35. The Parties are to conduct themselves in a manner consistent with the efficient use of time and resources and observe the Tribunal's directions, so as to enable the Arbitration to proceed to the final award in a proper, fair and efficient way.  The Tribunal may take unreasonable behavior into account when exercising its discretion to allocate costs.  Unreasonable behavior includes unjustified failure to meet deadlines in the Procedural Timetable or comply with other procedural orders, dilatory tactics, excessive document production requests, unnecessary legal argument, excessive cross-examination, patently exaggerated claims or unjustified interim applications.

36. The Tribunal does not wish to be copied unnecessarily on inter-party correspondence. Accordingly, the Tribunal should be sent only those documents which the Parties intend the Tribunal to read and act upon.

**VI.**    Format and Time of Submissions

37. All written submissions, including witness statements, and expert reports,  shall be submitted to every person on the Distribution List by 8 PM Dallas Time on the deadline date, unless otherwise directed by the Tribunal.

38. All submissions shall be made via secure email, uploaded electronically to a secure FTP site, or as otherwise agreed by the Parties and approved or ordered by the Tribunal.  Absent further instruction, the Tribunal does not require and will not accept submissions on physical media such as thumb drives.  When passwords are used, they shall be communicated where feasible by a separate mode of communication, e.g., text message or telephone.  All submissions (including exhibits and legal authorities) provided in electronic form shall be text searchable (i.e., OCR PDF (not flattened) or Word), provided that the Parties shall not be required to reformat documents that are not reasonably available to them in OCR PDF format without undue burden or expense.  Legal memoranda, expert reports  and any witness statements shall be provided in Word format as well as PDF.

39. All substantive submissions, including letters, shall be accompanied by copies of the principal case and other legal authorities relied upon.  The Parties shall pre-mark the authorities with highlighting to identify the portions to which the Party is specifically referencing. The Parties are not required to supply authorities they have supplied previously or every authority in a string cite.

40. Absent further instructions, Arbitrators Morril and Skulnik will not require hard copy of documents in this case, which they will receive only in electronic format as provided in this Procedural Order.  Arbitrator Sussman may require hard copy of certain documents and some differing formats of electronic submissions and will provide further instructions at an appropriate time.

DocuSign Envelope ID: 0083F40C-613C-4C03-9880-5B26BA7F8A64

41. Deliveries to the Tribunal shall be as provided in the Confidential Distribution List annexed to this Procedural Order.  Counsel shall inquire as to the Tribunal members' delivery requirements at the time before dispatching hard copy documents.

42. Before bringing any dispute to the Tribunal, the Parties shall meet and confer in good faith and make a conscientious effort to resolve or narrow the scope of any dispute to the extent reasonably possible.  Any application to the Tribunal shall contain a certification that the requesting Party has in good faith conferred with the opposing Party about the proposed application prior to any Party requesting relief from the Tribunal.  The certification shall state whether the relief sought in the application has been agreed to by the Parties or will be opposed.

43. The Parties and Tribunal will convene for a Final Pre-Hearing Conference on the date provided in the Procedural Timetable to address any outstanding issues concerning the conduct of the hearing on the merits, including:
    a. Updated estimate of the required length of hearing
    b. Decision on use of chess clock and number of hours per side
    c. Length of fact witness direct if witness statements are used
    d. Method of presentation of expert witnesses and the nature of their direct testimony
    e. Arrangements for opening and/or closing arguments
    f. The use of demonstrative exhibits
    g. The attendance of Party representatives
    h. Fee and costs submissions
    i. Whether any arbitral participant will require special accommodation for a disability
    j. Such other issues as the parties wish to raise

44. Cybersecurity and Data Protection.
    a. The Parties shall jointly consider and report to the Tribunal by the date specified in the Procedural Timetable in respect to methodologies to safeguard the security of arbitration-related information and protect sensitive confidential and private data that may be exchanged in the Arbitration and/or

DocuSign Envelope ID: 0083F40C-613C-4C03-9880-5B26BA7F8A64

submitted to the Arbitrator.  Such methodologies should take into account the Parties' need for information in the Arbitration and whether such information must be provided to the Tribunal or exchanged among the Parties in light of the sensitivity of the information and its relevance to the proceeding. The Parties are encouraged to review the  ICCA-NYC Bar-CPR Cybersecurity Protocol for International Arbitration (2020).

b.  The Parties shall redact from information provided to the Tribunal any sensitive personal identifiers such as social security numbers (or other national identification numbers), dates of birth or financial account numbers, but may submit partially masked versions of such data if such masking is generally accepted for public use of such data (e.g., last four digits of credit card or social security numbers).  The Parties shall not submit to the Tribunal unredacted documents containing personal identifying numbers, individual health information or financial information absent prior approval of the Tribunal based on a demonstrated need for the Arbitrator to have such information due to the matters at issue in the Arbitration.

45. A Stipulation of Confidentiality will be entered. By the date provided in the Procedural Timetable, the Parties will draft and submit a Stipulation signed by them to the Tribunal for execution. If there is a dispute over the language of such a stipulation, the Tribunal will resolve it.

46. The Tribunal will issue a reasoned award in this Arbitration.

47. The hearing dates provided in the Procedural Timetable are firm and not subject to adjournment except in extraordinary circumstances not related to preparedness.

48. The terms of this Procedural Order, including the Procedural Timetable, may be varied or modified by the Tribunal, in whole or in part, after consultation with the Parties. The Parties may apply to the Tribunal at any time and upon proper notice, to vary or supplement this Procedural Order.

49. The Parties acknowledge that the procedural rules set forth in this Procedural

Order No. 3 and the Procedural Timetable will, in the absence of unforeseen and unavoidable circumstances, allow each Party a reasonable opportunity to make its case and to address the other Party's case.

50. Each counsel and Party has a continuing obligation to protect the integrity of the Arbitration by promptly providing the Tribunal with the information necessary to allow the Tribunal members to comply with their ongoing duties of disclosure.

Dated: June 2, 2022
Place of Arbitration: Dallas, Texas

*Mark Morril*

Mark C. Morril, Chair


Steven Skalnik, Co-Arbitrator


*Edna Sussman*

Edna R. Sussman, Co-Arbitrator


*Chris Duffy*

Vinson & Elkins LLP, by Christopher Duffy
Attorneys for Claimant

*Thomas Moore*

Thomas Clay Moore
Attorney for Respondents

19 **230**

AAA Case No. 01-21-0017-0809

## Confidential Distribution List

**Regular Mailing Address**
**Mark C. Morril**
██████ ▄▄ ████
████████████
████████████████

**Alternate Address:**
**Mark C. Morril**
██████████████
█████████████

**Edna Sussman**
**SussmanADR LLC**
█████████
████████████
██████████████
**Note: All deliveries to be made no signature required**

**Steven Skulnik**
████████████████
**Note:  No delivery of hard copies or tangible media are to be made to Mr. Skulnik without prior approval**

20 **231**

AAA Case No. 01-21-0017-0809

Goldman Sachs Bank USA
(CLAIMANT)
- versus -
Robert W. Carter, Todd Carter
(RESPONDENTS)

**ANNEX 1: PROCEDURAL TIMETABLE**

| EVENT | Interval from Prior Event | Date |
|---|---|---|
| **Respondents to submit a responsive pleading to the Arbitration Demand and Statement of Claim setting out their position in reasonable detail** | **n/a** | **June 15, 2022** |
| • **Submission of agreed proposed confidentiality order and arrangements to protect cybersecurity and data privacy in the Arbitration**<br><br>• **Submission of agreed ESI case management order**<br><br>• **Separate submissions of each of the foregoing with supporting letters to the extent the Parties cannot reach agreement** | **n/a** | **June 15, 2022** |
| **Production of documents on which each party intends to rely; parties to make a good faith effort to produce all such documents** | **n/a** | **June 15, 2022** |
| **Mutual Exchange of Document Requests**<br><br>**Date by which the Parties will advise the Tribunal of an agreed live hearing venue in Dallas, Texas** | **16 days** | **July 1, 2022** |

DocuSign Envelope ID: 0083F40C-613C-4C03-9880-5B26BA7F8A64

AAA Case No. 01-21-0017-0809

| EVENT | Interval from Prior Event | Date |
|---|---|---|
| **Document Production responsive to undisputed Document Requests** | **35 days** | **August 5, 2022** |
| **Parties exchange Objections to Document Requests** | **n/a** | **August 5, 2022** |
| **Parties respond to Objections to Document Requests** | **7 days** | **August 12, 2022** |
| **Deadline to submit requests to the Arbitrators to issue additional summonses or to make alternative arrangements for the taking of third-party testimony** | **n/a** | **August 12, 2022** |
| **Deadline to request depositions by pre-motion letter** | **n/a** | **August 12, 2022** |
| **Submission to the Arbitrators of Unresolved Objections to Document Requests, including reply statements by the party seeking documents, by separate Stern Schedules** | **7 days** | **August 19, 2022** |
| **Quarterly Status Conferences (subject to cancellation if not required)** | **7 days** | **August 26, 2022** |
| **Deadline to Produce Documents** | **14 days** | **September 9, 2022** |
| **Period during which the Parties will conduct a confidential mediation of the dispute with an independent mediator (if agreed)** | **n/a** | **September 9, 2022** |
| **Date for Respondents' identification of potential expert witnesses (other than as to attorneys' fees), description of the subject matter of their expected testimony, and production of Respondents' expert reports**<br><br>**Date for Parties to notify each other and the Tribunal whether Claimant's Party Representative and the individually named Respondents will provide live direct testimony.** | **n/a** | **September 9, 2022** |

| EVENT | Interval from Prior Event | Date |
|---|---|---|
| **Date for Claimants' identification of potential expert witnesses (other than as to attorneys' fees), description of the subject matter of their expected testimony, and production of Claimants' expert reports [applicable only if Respondents disclose experts per the prior event]** | **49 days** | **October 28, 2022** |
| **Simultaneous submission of Pre-Hearing Materials:**<br><br>• **Pre-Hearing Memoranda**<br>• **Witness Statements [if agreed]**<br>• **[If no witness statements, identification of witnesses, their role, and brief description of the subject matter of their testimony]**<br>• **Exhibits**<br>• **Supplemental and final production of reliance documents** | **13 days** | **November 10, 2022** |
| • **Simultaneous submission of Reply Memoranda, together with supplemental witness statements and supplemental exhibits, including any documents on which a Party relies that have not previously been produced**<br>• **Initial list of witnesses and experts to be called for cross-examination at the hearing, together with order of witnesses and other detail required by Procedural Order No. 2** | **22 days** | **December 2, 2022** |
| • **Updated lists of the witnesses and experts who will be called for cross-examination at the evidentiary hearing, together with updated order of witnesses and other detail required by Procedural Order No. 2** | **7 days** | **December 9, 2022** |
| **Hearing Compilation as specified in Procedural Order No. 2** | **7 days** | **December 16, 2022** |

| EVENT | Interval from Prior Event | Date |
|---|---|---|
| **Final Pre-Hearing Conference** | **18 days** | **January 3, 2023** |
| **Hearing** | **2 days** | **January 5, 2023** |
| **Simultaneous Submission of Post Hearing Briefs** | **TBD** | **TBD if needed** |
| **Simultaneous Submission of Post Hearing Reply Briefs** | **TBD** | **TBD if needed** |
| **Post-Hearing Proceedings (including motions and experts, if needed) for recovery of attorneys' fees, costs, and expenses** | **TBD** | **TBD if needed** |

DocuSign Envelope ID: 0083F40C-613C-4C03-9880-5B26BA7F8A64

AAA Case No. 01-21-0017-0809

**ANNEX 2 – SCHEDULE FOR DOCUMENT PRODUCTION REQUESTS**

| | | |
|---|---|---|
| **Request No** | | |
| **Documents or Category of Documents Requested** | | |
| **Relevance according to Requesting Party** | **Reference to the Record** | |
| | **Comments** | |
| **Objections to Document Request** | | |
| **Replies to Document Request** | | |
| **Tribunal Decision** | | |

ARBITRATION CONDUCTED PURSUANT TO THE COMMERCIAL ARBITRATION RULES OF
THE AMERICAN ARBITRATION ASSOCIATION

American Arbitration Association
Case Number: 01-21-0017-0809

Goldman Sachs Bank USA

-vs-

Robert W. Carter and Todd Carter

---

FINAL AWARD

---

Mark C. Morril, Chair

Edna R. Sussman

Steven Skulnik

**August 29, 2023**

Exhibit A-6

1 **237**

## Table of Contents

I. *Introduction* ........................................................................................................ *3*

II. *The Parties, their Counsel, and the Tribunal* ................................................... *3*

III. *Arbitration Agreement, Applicable Law, and Rules* ......................................... *4*

IV. *Procedural History* ........................................................................................... *5*

V. *Facts of the Case* ........................................................................................... *12*

 A. Background to the loans at issue in this arbitration ................................... 12

 B. The Loans ....................................................................................................... 15

 C. Performance of Panda Fund II ....................................................................... 17

 D. Respondents' performance on the loan obligations ................................... 18

 E. The Parties' Dealings Subsequent to Default Notice .................................. 19

 F. Facts Relevant to Respondents' Equitable Defenses .................................. 21

1. *Discussion* ...................................................................................................... *21*

 A. Issues to be Determined ............................................................................... 21

 B. Introduction to Respondents' Factual and Equitable Defenses .................. 22

 C. Issue 1: Did Respondents breach contract obligations owed to Claimant? .............................. 26

 D. Issue 2:  Were the Parties in a partnership or other fiduciary relationship? ............................ 28

 E. Issue 3: Did the Parties' agreement or the terms of their relationship provide that the Loans were to be paid solely from PPF partnership distributions and the proceeds of power plant sales? 31

 F. Issue 4: Should the Tribunal exercise equitable powers to deny Claimant recovery in this arbitration? ...................................................................................... 34

 G. Issue 4: Are Claimant's claims time-barred? .......................................................... 43

 H. Issue 6: Is Claimant Entitled to an Award of Fees and Costs in the Arbitration? ...................... 46

2. *Final Award* ................................................................................................... *47*

## I.      Introduction

1.     Claimant, a commercial bank, seeks to recover payments it contends Respondents owe under the terms of loans it extended in 2014 to fund Respondents' general partner capital contributions to limited partnerships engaged in the development of co-generation power plants in the ERCOT (Texas) and PJM (Pennsylvania/New Jersey/Maryland) energy markets (the "Loans").  Respondents, sophisticated, experienced, and successful entrepreneurs in the energy industry, do not dispute that that they took out the Loans or the amounts due as calculated pursuant to the Loan Agreements.  Rather, they defend the claims in this arbitration primarily with a series of equitable defenses and urge the Tribunal to relieve them of any further obligations under the Loans.  We find Respondents' equitable defenses, and such factual and legal defenses as they assert, to be predicated on extensive narrative and speculation, but unsupported by any substantial credible evidence in the case.  Assuming the Tribunal has the equitable powers Respondents assert, we decline to exercise such powers to relieve them of their obligations.

## II.     The Parties, their Counsel, and the Tribunal

2.     Claimant Goldman Sachs Bank is a New York State-chartered bank with its principal place of business in New York, New York.[1]

3.     Respondents Robert W. Carter and Todd W. Carter are individuals who are residents and citizens of the State of Texas.

4.     In accordance with the Parties' arbitration agreement, and the Commercial Arbitration Rules of the American Arbitration Association, the appointments of Mark C. Morril (Chair), Steven Skulnik, and Edna R. Sussman as members of the three-member Tribunal were confirmed on April 26, 2022.

---

[1] Claimant Goldman Sachs Bank USA is a subsidiary of The Goldman Sachs Group, Inc.  The Goldman Sachs Investment Banking Division of the Goldman Sachs Group, Inc. (the "Investment Bank") was the entity the Panda Power Funds engaged to sell its power plants.  *See* Respondents' Pre-Hearing Memorandum attachment 6 at 8.  We also note that in response to Claimant's objections to Respondents' use of the blanket term "Goldman" without differentiating the Claimant Goldman Sachs Bank from other Goldman Sachs entities, Respondents argued that "The gestalt of this case is that Respondents were enveloped by the entirety of the Goldman empire…."  Respondents' Rule 39 Statement at 3.

### III.   Arbitration Agreement, Applicable Law, and Rules

5.  The jurisdiction of the Tribunal is derived from i) Section 7.9 of the Loan Agreement among Goldman Sachs Bank USA, Robert W. Carter, Panda Power Generation Infrastructure Fund, LLC and Panda Power Fund II GP, L.P. dated November 13, 2014; and ii) Section 7.9 of the Loan Agreement among Goldman Sachs Bank USA, Todd Carter, Panda Power Generation Infrastructure Fund, LLC and Panda Power Fund II GP, L.P. dated November 13, 2014 (each a "Loan Agreement" and together the "Loan Agreements") [2], which contain the Parties' arbitration agreements, as follows:

> The parties hereto hereby waive all rights to a court trial or trial by jury with respect to any dispute, controversy or claim under this agreement and the loan parties agree to settle by arbitration any controversy between the loan parties and the lender or its affiliates arising out of or relating to this agreement. The arbitration will be conducted in accordance with the rules then in effect of the American Arbitration Association. Any dispute or claim involving a dollar amount of $50,000 or less will be before one arbitrator, and all other disputes and claims will be before a panel of at least three arbitrators. The award of the arbitrator or a majority of the arbitrators, as the case may be, will be final, and judgment upon the award rendered may be entered in any court having jurisdiction.

6.   Pursuant to Section 7.8 thereof, the Loan Agreements (and other loan documents) are governed by and construed in accordance with the laws (and not the conflict of laws) of the State of New York. The Parties agreed, as confirmed in Procedural Order No. 3, that the Federal Arbitration Act would govern the arbitration process, together with New York substantive law, the Commercial Arbitration Rules (effective October 1, 2013) of the American Arbitration Association, including the Procedures for Large, Complex Commercial Disputes, and such agreements as the Parties might reach and rulings and procedural orders that the Tribunal might issue regarding matters of procedure.

7.  The Loan Agreements made no provision as to the seat of the arbitration.  Claimant requested New York, New York as the hearing locale in its Demand for Arbitration. Respondents sought a "change of venue" to Dallas, Texas, initially from the AAA and later from the Tribunal.  *See* Respondents' Scheduling Request, submitted on May 11, 2022.  On

---

[2] The loan documents for both Respondents were identical, save that Respondent Robert Carter also provided a guarantee for the obligations of Respondent Todd Carter.  The discussion in this Award cites to Respondent Robert Carter's loan documents for ease of reference.  The discussion, and the Tribunal's findings, apply also to Respondent Todd Carter.

March 10, 2022, the AAA advised the Parties that its Administrative Review Council had determined that the locale of the case would be New York, New York, subject to a final determination by the arbitrators.  *Id.* at 58 (Email dated March 10, 2022 from Jeffrey Zaino to Jordan Leu and Thomas Moore).  After considering the Parties' arguments in relation to the locale, the Tribunal determined in Procedural Order No. 2, dated May 27, 2022, that both New York and Dallas were appropriate locales for the arbitration and set Dallas, Texas as the locale for the arbitration, without limitation of the Tribunal's authority to conduct special hearings at other locations, or from deliberating, holding meetings, or communicating with the Parties at other locations or by videoconference if considered appropriate for the orderly conduct of the arbitration in the discretion of the Tribunal. [3]

## IV.   Procedural History

8.   The Claimant commenced this arbitration by filing its Demand for Arbitration and Statement of Claim on October 26, 2021.

9.   Respondents filed their initial Answering Statement on January 17, 2022.

10.  The Tribunal conducted an initial Preliminary Hearing Conference on May 17, 2022.  The Tribunal had distributed an agenda, form of procedural timetable, and a draft Procedural Order No. 1 in advance of the conference and instructed the Parties to consult and attempt to reach agreement on as many topics raised in those documents as possible.

11.  The Parties' disagreement on significant elements of the pre-hearing process, as well as the procedural timetable, reflected their fundamental disagreement on the nature of the claims in the arbitration that continued for its duration.  Claimant contended throughout the proceedings that the arbitration was a straightforward action to collect on debts that could not be subject to any reasonable dispute and, accordingly, an expedited and simplified schedule would be appropriate.  *See e.g.,* Claimant's Pre-Hearing Memorandum ¶1. Respondents' position, as first stated in their initial Answering Statement, was that the facts relevant to the arbitration were "exceedingly complex."  On that basis, they sought a process

---

[3] Procedural Order No. 1, dated May 12, 2022, denied Respondents' request for a two-month adjournment of the preliminary hearing conference.

that included extensive and far reaching party and non-party document disclosure, party
and non-party depositions, and expert reports.  Claimants opposed each of those requests
and sought a hearing some four months earlier than the date Respondents proposed.

12. The Parties' disagreement as to the nature of the matter resulted in numerous disputes
regarding document disclosure, witness summonses, and the scope of relevant testimony.
The Tribunal was required to issue seventeen procedural orders to resolve disputes as they
arose.  The Tribunal does not consider it necessary to this Award to describe each
individual procedural order.  We describe here only the procedural orders that represented
major milestones in the arbitration or that provided significant procedural rulings related
to the presentation of claims and defenses in the arbitration.

13. On June 2, 2022, the Tribunal issued Procedural Order No. 3.  The order provided, among
other things, a Procedural timetable for the arbitration, a process for the resolution of
document disclosure disputes, and the scheduling of an in-person hearing commencing on
January 5, 2023.  Further, the order provided (in the annexed Procedural Timetable) for
Respondents to submit a supplemental responsive pleading to the Arbitration Demand and
Statement of Claim setting out their position in further detail than their initial Answering
Statement.  The Tribunal had noted during the initial preliminary hearing that Respondents'
initial Answering Statement primarily addressed their position in respect to the arbitration
locale and addressed the merits only to the extent of stating that Respondents intended to
show that enforcement of the Loan Agreements would be "inequitable, unjust, and unfair."

14. In their supplemental Response to Arbitration Demand and Statement of Claim, dated June
15, 2022 (the "Supplemental Response"), Respondents specified their defenses as i) the
Loans Claimant sought to collect were not loans, but, rather, "seed money for a
partnership"; ii) Respondents were guarantors, not principals on the Loans and Claimant
had forfeited any rights to enforce the guaranty by mishandling of collateral and other
misconduct; iii) Claimant's performance of its "partnership obligations" was "the condition
precedent to delivery of notes", which "failed"; iv) "Goldman Sachs'" "failed effort" to sell the
Panda Power Plants resulted in a "strict foreclosure" under Article 9 of the UCC, barring any
efforts to enforce the notes or collect a deficiency; v) the "failed efforts" to sell the power
plants caused the once valuable collateral to become worthless such that Claimant lost its

right to collect the Loans or, alternatively, the loss in value of the collateral should offset any amounts due under the Loans; vi) Claimant breached fiduciary duties it owed to Respondents; and vi) the Loans were usurious under Texas law, which Respondents contended should apply notwithstanding the New York choice of law provision in the Loan Agreements.

15. In Procedural Order No. 5, dated August 31, 2022, the Tribunal found that taking into account their defenses, Respondents' disclosure requests addressed to Claimant and third parties still significantly exceeded the scope of appropriate disclosure under Commercial Arbitration Rule R-22. While sustaining Claimant's objections to Respondents' then-pending Request for Production of Documents and denying Respondents' requests for the issuance of third-party summonses and for depositions, the Tribunal afforded Respondents an opportunity to reformulate their disclosure requests. Thereafter, Respondents served reformulated disclosure requests on Claimant and the Parties submitted a Joint Discovery Report dated September 9, 2022 setting out their remaining areas of disagreement.

16. In Procedural Order No. 6, dated September 18, 2022, the Tribunal addressed the remaining disagreements, ruling that the Respondents would be entitled to the production of documents over a specified period i) reflecting communications between the Claimant and its affiliate the Investment Bank regarding Respondents, the Loans, and the Panda Power plants at issue in this arbitration; and ii) sufficient to show *x)* the policies of Claimant and/or the Investment Bank on communications between the affiliates regarding their common customers and whether such policies were observed in relation to Respondents; and *y)* Claimant's efforts to determine the creditworthiness of Respondents. After carefully considering Respondents' requests, the Tribunal declined to order production of Claimant's "underwriting file", documents relating to the Investment Bank's efforts to sell the Panda Power Plants, or otherwise relating to the engagement of Respondents or their affiliates and the Investment Bank, except to the extent the Parties had agreed on the scope of document production during their consulting process. The Tribunal found that its disposition of the disclosure disputes as reflected in the Procedural Order would provide Respondents a fair opportunity to establish the defenses they had asserted in the arbitration.

17. Procedural Order No. 9, dated December 10, 2022, addressed various pre-hearing issues, including Respondents' objection to Claimant's redaction of certain hearing exhibits. The Tribunal overruled Respondents' objection to the redaction of information concerning borrowers other than Respondents, except that it required Claimant to produce unredacted documents reflecting its communications with PPF's former Chief Financial Officer Bob Simmons or any action of Claimant in respect to loans it extended to Mr. Simmons, including efforts to collect such loans or to extend forbearance to him.[4] The Tribunal also ordered Claimant to report whether it or any of its affiliates was party to an agreement with Mr. Jeffrey Pollard, a former Managing Director in the Goldman Sachs Investment Bank who had led the effort to sell the power plants owned by Panda Power Fund II, pursuant to which they might require or facilitate his appearance as a witness in the arbitration. Further, the Procedural Order required Respondents to provide a marked copy of Claimant's Demand for Arbitration and Statement of Claim, indicating whether Respondents admitted or denied each paragraph thereof.

18. Respondents' hearing witness list, submitted on November 18, 2022, included Mr. Pollard as a witness for cross-examination. Claimant confirmed that it was party to a "generic cooperation clause" with Mr. Pollard, but objected to the inclusion of Mr. Pollard as a witness on the basis that the deadline for Respondents to submit requests for the issuance of third-party summonses had expired more than three months previously and that Mr. Pollard's testimony would be irrelevant and immaterial as it would relate "only to matters on other transactions beyond the scope of the enforcement of the integrated loan documents sought to be enforced on their terms" in the arbitration. Letter of Jordan Leu to the Tribunal, dated December 12, 2022. The Tribunal permitted Respondents to call Mr. Pollard as a witness and he thereafter agreed to appear by videoconference.

---

[4] Subsequently, Claimant contended that Tex. Fin. Code §59.006 would require notice to Mr. Simmons of the request to produce his banking information and a request that he consent to such disclosure. Letter of Jordan W. Leu to the Tribunal, dated December 13, 2022. Procedural Order No. 13, dated February 21, 2023, and entered on consent of all Parties, noted that such notice had been served on Mr. Simmons and he did not subsequently communicate any objection to the production of unredacted documents. Without reaching the question of whether the Texas Financial Code provision was applicable, the Tribunal ordered Claimant to produce the unredacted banking records to Respondent. For purposes of consistency, we refer to Mr. Simmons as Chief Financial Officer. He is referred to in some documents as the Treasurer or Finance Director of PPF. The Tribunal does not consider his title as it may have varied from time to time to be material to any issue in this arbitration.

19. On December 18, 2022, Respondents submitted their Statement of Facts Not in Dispute, a marked copy of the Demand for Arbitration and Statement of Claim, that they  characterized as their "voluntary effort to reduce the time and expense of the Hearing by accepting for such purposes (only) the bulk of the factual allegations of the Demand for Arbitration." [5] Claimant contended that Respondents' submission failed to comply with the Tribunal's directive in Procedural Order No. 9 and sought an order requiring Respondents to comply or, in the alternative, deeming all the allegations in the Statement of Claim admitted.  Letter of Jordan W. Leu to the Tribunal, dated December 19, 2022.  By Procedural Order No. 10, dated December 20, 2022, the Tribunal declined to require any further response to Procedural Order No. 9 or to make any additional order in respect to Respondents' Statement of Facts Not in Dispute.

20. Procedural Order No. 12, dated January 3, 2023, addressed Respondents' application for an adjournment of the hearing scheduled to begin on January 5, 2023, based on the unavailability of Respondent Todd Carter due to a serious medical condition.  The Tribunal noted that Todd. Carter's medical condition was serious and chronic and concluded that it was not reasonably foreseeable that Todd Carter would be able to attend a live hearing setting, provide live testimony, or otherwise participate at an adjourned hearing.  The Tribunal found that alternative arrangements and accommodations were necessary to ensure that the matter would be heard, and each Party would have an opportunity to participate to the extent feasible.  The alternative arrangements and accommodations included i) providing a live videoconference feed of the proceedings to Todd Carter; ii) permitting but not requiring him to participate in the hearing by a videoconference connection; iii) provision for Todd Carter to consult with his counsel during the hearing; iv) recording the hearing and making the recording available to Todd Carter; v) holding the hearing and evidentiary record open until at least March 6, 2023 to enable Todd Carter to testify and otherwise participate in the defense, including by providing him an opportunity to submit written testimony with provision for Claimant to cross-examine.

---

[5] In an email accompanying the submission, Respondents' counsel stated in regard to the Statement of Facts Not in Dispute that he had "unilaterally offered it as a potential time saving device."  Email of Thomas C. Moore to the Tribunal, dated December 20, 2022.

21. The Parties made simultaneous submissions of their Pre-Hearing Memoranda on November 21, 2022 and of their Pre-Hearing Reply Memoranda on December 9, 2023.

22. Respondents submitted witness statements from Dan Hudson, founder and owner of a company that provides support in the financial restructuring of power and energy related businesses, and Edmund D. Daniels, former General Counsel of Panda Power Funds.  By letter dated December 20, 2022, Claimant advised the Tribunal that it did not intend to cross-examine Mr. Hudson or Mr. Daniels on the testimony provided in their witness statements.  Claimant objected to portions of the testimony of both witnesses on the grounds of lack of personal knowledge and speculation and requested that the designated portions of the witness statements be stricken.  The Tribunal accepted the witnesses' testimony into the record.

23. The evidentiary hearing took place in person on January 5 and 6, 2023 in Dallas, Texas.  The following witnesses testified:
    - Craig Boyd, a Loan Asset Manager, Asset Management Division of Goldman Sachs (Claimant's witness - direct, cross, and redirect)
    - Bradley Baker, Vice President, Regional Lending Manager, Goldman Sachs Bank USA (Respondents' witness, produced by Claimant at Respondents' request – direct by Respondents, cross by Claimant)
    - Jeffrey Pollard, former Managing Director of the Investment Bank (Respondents' witness – direct by Respondents, cross by Claimant, and redirect; by videoconference)
    - Robert Carter (Respondents' witness – direct, cross, and redirect)

24.  At the conclusion of the hearing proceedings on January 6, 2023, the Tribunal noted its prior ruling that the hearing would be held open until at least March 6, 2023 to enable Todd Carter to testify or otherwise participate.

25. Todd Carter submitted written testimony dated March 1, 2023.  By email dated March 10, 2023, Claimant advised the Tribunal that it had elected not to cross-examine Todd Carter. Claimant filed objections to Todd Carter's testimony on March 17, 2023, including that the testimony included hearsay, was vague and confusing, irrelevant, conflated Claimant with other Goldman Sachs entities, was incomplete, speculative, and lacked foundation.

26. On March 28, 2023, Respondents submitted a Statement Pursuant to Rule 39(a) of the AAA Commercial Rules, responding to Claimant's objections to the testimony of Todd Carter. Respondents also sought leave to submit a witness statement of Russ Bell, Controller of Panda Power Funds, providing "back of the envelope" calculations of default interest payments the Carter paid after May 2017 and the amount "Goldman Sachs, as a whole" received in payments and fees "associated with its various roles in the power projects related to the Carters' loans" at issue in the arbitration.

27. By Procedural Order No. 14, dated March 31, 2023, the Tribunal found that it was capable of discerning the extent to which Todd Carter's testimony was relevant and competent, and it overruled Claimant's objections. The Tribunal also admitted the written testimony of Mr. Bell and allowed Claimant an opportunity to provide notice that it would cross-examine the witness or to submit any objections or documentary evidence to rebut his testimony. The Tribunal denied Respondents' request to respond to any rebuttal evidence Claimant might submit in response to Mr. Bell's testimony. Claimant responded to Mr. Bell's witness statement in its Post-Hearing Memorandum.

28. On May 1, 2023, the Parties made simultaneous submissions of their post-hearing memoranda.

29. By email dated May 3, 2023, Claimant objected to inclusion of a statute of limitations argument in Respondents' Post-Hearing Submission. Claimant requested that the Tribunal disregard the new argument or, in the alternative, provide Claimant an opportunity to respond only to the new arguments.

30. By Procedural Order No. 15, dated May 3, 2023, the Tribunal granted Claimant's alternative request to file an opposition brief to Respondents' statute of limitations arguments and ruled that it would not accept a Reply submission on such arguments.

31. On May 10, 2023, Claimant submitted its Response Brief Regarding Statute of Limitations.

32. By Procedural Order No. 16, dated May 3, 2023, the Tribunal set a procedure and schedule for fee and costs applications in the arbitration.

33. On May 25, 2023, Claimant submitted its Application for Recovery of Attorneys' Fees and Costs.  Respondents submitted their Statement Regarding Attorneys" Fees and Costs on June 1, 2023.

34. Each Party having confirmed that they have no further proofs to offer or witnesses to be heard, the Tribunal now declares the hearing closed and issues this Final Award. Email of Mark C. Morril to counsel, dated March 21, 2023 (confirming acceptance of Claimant's email of March 17, 2023 as representation pursuant to Commercial Arbitration Rule R-39 (a) that Claimant had no further proofs to offer or witnesses to be heard and granting Respondents until March 28, 2023 to confirm their position);  Respondents' Rule 39A Statement dated March 28, 2023.

## V.  Facts of the Case

35.  This section summarizes the facts the Tribunal considers relevant to the determination of the issues in this Arbitration.  Except where disputed facts are discussed below, the facts recited in this section are substantially undisputed.  To the extent that there is any disagreement as to the facts recited here that are not specifically identified as disputed, they constitute findings of fact by the Tribunal.  The Tribunal's recitation of the facts, as well as its evaluation of the respective claims and defenses of the Parties, has been impacted by credibility assessments as to the witnesses who testified.

### A.  Background to the loans at issue in this arbitration

36. Respondent Robert Carter began working in the business of building power plants in or about 1980, initially in the ERCOT power region, where Respondents are located, and later also in the PJM region. [6] TR-160.[7] Mr. Carter testified that he had over 60 years of business experience, primarily in oil and gas businesses that he founded and controlled.  TR-184. Those businesses included Carter Oil & Gas, which developed oil and gas prospects, and

---

[6] ERCOT, or Electric Reliability Council of Texas, is the operator of the Texas electrical grid.  PJM refers to an independent operator in the Pennsylvania/New Jersey/Maryland energy market. JX-34 at 8-9.

[7] "TR-#" refers to the stenographic record of the merits hearing.

Panda Energy International, Inc. ("PEII"), a company Mr. Carter formed in 1982 that raised approximately $5.9 billion in total capital to develop eleven power plants.

37. The PEII power plants were cogeneration facilities that generated both steam and electricity through a combined cycle process.[8] TR-161.  Two of the plants were among the largest combined cycle gas-fueled plants in the United States at the time.  TR 160-63; TR-185; JX-34 at GSBANK 25268.[9]  PEII operated as an independent power producer that sold power to utilities, including independent system operators, taking advantage of favorable sale conditions that had been created by the Public Utility Regulatory Policies Act during the Carter administration. The company was able to enter long-term (20-25 year) power purchase agreements with utilities and use that commitment to obtain financing to build power plants, which it then operated and ultimately sold. TR-161-63.

38. Robert Carter was the largest shareholder of PEII, which provided a 22 times earnings return on capital for its approximately 1100 investors.  TR 160-62, 185.  He agreed that it was a "very successful" business, which provided a "good living" that enabled him, among other things, to purchase a ranch. TR-162,185.  See also JX-34 at 4.

39. Todd Carter joined his father at PEII, focusing on helping to develop new projects and raise capital from private equity funds. Todd Carter traveled extensively to raise approximately $400 million from teachers' retirement funds, other pension funds, and other investors for the first PEII private equity fund.  TR-165-66, 204.

40. In or about 2010, Bill Norlund, who earlier had been the General Counsel of PEII and had left to work in the private equity business, suggested to Respondents that they might consider organizing private equity funds to raise capital. TR-189.  Robert Carter was interested in the private equity business model because it would enable his business to fund multiple projects instead of the "one-off deals" that PEII had been creating, and to finance power plants from the inception, without having to "take the project all the way through

---

[8] A combined cycle power plant is a collection of heat engines or turbines that work together. The turbines/engines create mechanical energy which is used to power generators which in turn produce electricity and steam from the same heat source. TR-161.
[9] "JX-#" refers to the Parties' joint exhibits. "TX-#" refers to hearing exhibits marked during the merits hearing.

and sell it." TR-163.  In April 2010, most of the management of PEII left that company, which by then was operating only one power plant (having sold the others it had constructed), to join Panda Power Funds ("PPF"), which would organize private equity funds to support the construction, operation and sale of cogeneration power facilities. JX-34 at 4.

41.  Respondent Robert Carter became Chairman of PPF and Todd Carter became President and CEO.  Mr. Norlund joined Respondents at PPF.

42.  Panda Power Fund I was the initial private equity fund the Carters and their associates organized to raise capital to construct power plants.  The Carters borrowed from Comerica Bank to fund required capital contribution to the limited partnership that was the Fund's general partner. By late 2014, that fund had closed investments on five power generation projects at a cost of approximately $3.1 billion. JX-34 at 4.

43.  Panda Power Fund II was the fund for which Respondents took out the Loans at issue in this arbitration from Claimant to fund their required capital contributions to the general partner.  Panda Power II GP, L.P. (the "General Partner") was the General Partner of Panda Power Fund II.  Robert Carter held a 60.2% and Todd Carter an 18.1% interest in the General Partner.  The remaining interests were held by the Carters' business associates William Norlund, Ralph Killian, and Robert Simmons, each of whom also borrowed money from the Claimant to fund their required capital contributions to the General Partner.  Panda Power Generation Infrastructure Fund, LLC was an entity majority-owned by the Carters that provided advisory services to Fund I and Fund II in exchange for fees.[10] Claimant's Post-Hearing Memorandum fn 3, citing to JX-34 at '25280.

44.  The Carters had worked with the Investment Bank on some projects prior to the formation of PPF Fund II.  Supplemental Response at 2. In 2013, PPF worked with the Investment

---

[10] The "Funds" comprising PPF Fund II were defined in the Loan Agreement dated November 13, 2014 between Claimant and Respondent Robert Carter as "each of (a) Panda Fund II A, (b) Panda Fund II B, (c) Panda Power Generation Infrastructure Fund A, L.P., (d) Panda Power Generation Infrastructure Fund B, L.P.,(e) Panda Power Generation Infrastructure Fund B (AIV), L.P. and (f) any other private investment fund or collective investment vehicle, or similar fund or entity, including any parallel fund thereof, that is sponsored or managed directly or indirectly by the Advisor or its Affiliates or with respect to which the General Partner acts as the general partner."  See JX-1 (Robert Carter loan agreement).

Bank on the private placement of a $585 million loan to fund the Panda Patriot Project.  RX-65 at 17.  PPF also engaged the Investment Bank to lead the refinance of Panda Power Fund I's Temple I and Sherman projects. JX-34 at 4.  In 2014, Respondents were working with the Investment Bank on a possible $150 million capital call facility for Panda Power Fund II that would enable PPF to bridge capital calls and for other purposes.  *Id.*  In each instance, Respondents were attracted to the Investment Bank because of its experience and capabilities in the sale and marketing of gas fired power plants, including through one of its managing directors, Jeff Pollard.  Respondents regarded the Investment Bank as the "gold standard" in the power generation business.  Daniels Witness Statement ¶8.

## B.  The Loans

45.  PPF Fund I and PPF Fund II both were structured to require the general partner to contribute 3% of the total capital to give limited partners the comfort that the general partner had "skin in the game" and both sets of partners would be aligned in interest.  Todd Carter Witness Statement ¶14.  In exchange for that 3% investment, the general partner entity ultimately would be entitled to 20% of the net sale proceeds upon sale of the power plants. The Carters' expectation was that they might earn as much as $175 million from their 20% share of the net sale proceeds from the power plants that would be built with the proceeds raised through the Panda Power Funds.  TR.175, 207-08; TX-3 at GSBANK 14485-87.

46. Goldman Sachs investment bankers in New York introduced PPF to the Claimant Goldman Sachs Bank in Dallas, who pitched PPF's then Chief Financial Officer Bob Simmons on the possibility of providing capital to PPF general partners to fund their required 3% capital contributions to PPF Fund II and to pay off loans Respondents had taken out from Comerica Bank to fund their general partner capital contributions to PPF Fund I.  JX-34 at 4; TR-165-68; Todd Carter Witness Statement ¶14.  Respondents contended here that the Investment Bank required them to substitute Claimant as their lender on PPF Fund I as a condition of providing the investment banking services PPF was seeking to engage for PPF Fund II.  Todd Carter Witness Statement ¶18; TR 167-68.

47. Respondents executed the Loan Agreements and accompanying promissory notes with Claimant on November 13, 204.  Claimant lent Robert Carter an initial amount not to exceed

$13,250,000 and Todd Carter an initial amount not to exceed $3,900,000.  JX-1 (Robert Carter Loan Agreement), JX-2 (Todd Carter Loan Agreement).  The Loan Agreements were amended numerous times to increase the amount borrowed, ultimately to $17,203,289 for Robert Carter and $5,160,827 for Todd Carter. *See* Amendments annexed to Claimant's Demand for Arbitration and Statement of Claim.

48. Robert Carter testified that he did not read the Loan Agreements but did not dispute that he signed them.  He understood that absent a showing of fraud, based on his roughly 60-years of experience in the business world, when a person signs a contract, they are bound by its terms and when a person takes out a loan, they are required to pay it back according to the agreed-upon terms.  He agreed that he signed the Loan Agreement as borrower and that Todd Carter also borrowed money from the Claimant. TR-189, 193, 215.

49. Mr. Carter's regular business practice was to rely on "advisors and legal people" who would read contracts and advise him to sign or not sign.  TR-190.  Mr. Carter testified that Panda Power's in-house counsel Eddy Daniels and Steve Campbell, as well as the Latham & Watkins law firm advised PPF in connection with the PPF Funds I and II.  Robert Carter initially testified that he did not understand the Panda Power lawyers to be representing him individually on the loan transaction, but on cross examination he later testified that he used PPF's in-house counsel to represent him on the loans.  TR-171-72; 227; JX-29 at GSBANK 3680 (Robert Carter personal financial statement states "Use In-House Counsel" as lawyer contact info).  Todd Carter described Mr. Daniels as a "competent and loyal" corporate counsel. Todd Carter Witness Statement ¶16.  After reviewing the evidence as a whole, the Tribunal found Mr. Daniel's statement that the Carters "did not have any legal representation in connection with the loans" unpersuasive.  Daniels Witness Statement ¶5.

50. Robert Carter and Todd Carter both contended that Claimant was lending against the strength of the projects and not against their personal assets. TR-170, Todd Carter Witness Statement ¶32. They did not dispute, however, that they each provided a personal financial statement at the time of the loan and thereafter on an annual basis. TR-221-22; JX-29 (compilation of Robert Carter personal financial statements); Todd Carter Witness Statement ¶32.  The Personal Financial Statement Robert Carter provided in June 2014 showed a net worth greater than $90 million, including a large fishing boat valued at $5

million, a ranch valued at $9 million, and a vacation home in Mexico valued at $4.5 million. Todd Carter's personal financial statement showed a net worth of $16.6 million.  The Tribunal considers Claimant's internal credit approval memo, prepared during the time it was considering the Loans, to be strong contemporaneous documentary evidence that Claimant obtained and relied upon Respondents' net worth and cash flows, including salary, bonuses, dividend, and interest income, as well as expenses, in their consideration of the Loans.  JX34 at 12.

### C.  Performance of Panda Fund II

51.  The projects funded by PPF Fund II were not successful.  The Investment Bank did not sell any of the power plants.  Respondents contended that the Investment Bank "fumbled the ball", particularly after Jeffrey Pollard, a Managing Director experienced in the sector, left the Investment Bank.  TR-239.  Respondents also stated they learned for the first time during the hearing that Goldman was not engaged in sales efforts at the time they signed the forbearance agreements, although they also testified that the Fund had engaged Evercore to sell the plants and they ultimately were sold at a deep discount.  *Id.*; Todd Carter Witness Statement ¶¶10-11, 27-28.  Although he did not recall the specifics of the decision to pause efforts to sell the PPF Fund II assets, Mr. Pollard testified that the decision to pause or terminate a sales process typically would be a client decision reached in consultation with the client's advisors at the Investment Bank.  TR 81-86.

52. It was undisputed that in 2017, the market valuation of gas fired power plants in the PJM region was negatively impacted by changes in purchasing patterns by independent systems operators.  Respondents' witness Dan Hudson testified that:

> In late 2017, around October, there was a problem with the capacity market overseen by PJM, another independent system operator like ERCOT.  A capacity market requires load serving entities to commit to purchasing future power when other types forms [sic] of energy like wind or solar are not readily available.  This capacity market helps ensure revenue to power generators need to cover the enormous cost of constructing gas fired power plants.  This problem adversely impacted values in the PJM region.

Dan Hudson Witness Statement ¶7.  Notably, the PPF Fund II plants were in the PJM region.  Todd Carter Witness Statement ¶8.

53.  An independent appraisal PPF and the General Partner obtained in 2017 to assess its compliance with the Maintenance Value requirement of the Loans also noted negative market conditions in the power generation sector.[11]   TX-66 at GSBANK0005774 ("For projects in the ERCOT region, market conditions are concluded to be negative in the short term but expected to improve in the medium to longer term.")

54.  Respondents' Pre-Hearing Memorandum noted that in "2017, several stressors affected the value of the Panda Power assets, including having lenders take over the Temple I project and events affecting the market for power production generally."  Respondents' Pre-Hearing Memorandum at 7.

55. Robert Carter testified that at some point he "saw what was happening in the power sector", including increasing competition from renewable energy sources. TR-178.  He determined to "find the next big thing" and founded Panda Biotech, a new company that would be in the business of processing hemp for textiles.  TR-179.  He invested substantially all of his capital in that company, including the proceeds from selling the ranch listed on the personal financial statement he had provided to Claimant in connection with the Loan.  *Id.*

### D.  Respondents' performance on the loan obligations

56.  By email dated April 13, 2017, Russ Bell, Vice President & Controller of PPF, provided Claimant the year-end 2016 financial statements for PPF Fund I and Fund II, a general partner account reconciliation, and a valuation report prepared by an independent appraiser. TX-66.  The financial statement showed a "Maintenance Value, as defined" in the Loan Agreement of 79.8%, as compared to the "Maximum Maintenance Value allowed per Sec. 5.16 of GP loan agreements" of 25%.  *Id.* at GSBANK000 5761.

57. Section 5.16 of the Loan Agreement provided that in the event the Maintenance Value was greater than 30%, the Borrower was required either to (a) post cash collateral or (b) prepay the Loans, in each case, in an amount sufficient to reduce the Maintenance Value to 25% or less.  JX-1 at 28.  On April 28, 2017, Claimant provided notice pursuant to the Loan Agreements that the occurrence of a "Trigger Event" required Robert Carter to post cash

---

[11] "Maintenance Value" (sometimes referred to as the "loan to value ratio") was defined in the Loan Agreements as "the ratio of the aggregate outstanding principal amount of the Obligations as of such date to the Appraised Value of the GP's Limited Partnership Interest owned by the Borrower."  JX-1 at 7.

collateral or prepay the Loans in an amount at least equal to $10,482,160 so as to reduce the Maintenance Value to 25% or less and demanded that Respondents make corrective payments by May 8, 2017.  *See* April 17 letter, as described in JX-13.

58. Respondents made principal and interest payments on the Loans through the application of their partnership distributions under the "waterfall" payment structure provided in the Private Placement Memorandum.  From and after May 31, 2017, when Claimant declared the Loans in default, Respondents made no further principal payments.  Further distributions to Respondents from Fund II were applied to reduce the interest balances on the Loans. JX-24 at ¶4. From and after July 2021, Respondents ceased making any payments. JX-28 (loan payment history); Claimant's Prehearing Memorandum Exhibit 10 (email from Robert Carter to Craig Boyd dated July 13, 2021).

59. Respondents did not make the corrective payments Claimant demanded.  On May 31, 2017, Claimant declared Robert Carter's loan in default and demanded immediate payment in full of the outstanding principal balance of $15,255,533, plus accrued and unpaid interest, fees, expenses, obligations, and other charges described in the Loan Agreement.  Claimant demanded $3,141,096 from Todd Carter on his Loan. The demands noted that pursuant to Section 2.3 (c) of the Loan Agreement, the principal balance would bear interest at a default rate that was 4% in excess of the interest rate that otherwise would apply.  JX-13.

**E.  The Parties' Dealings Subsequent to Default Notice**

60. Following the default notice, the Parties entered into five separate Forbearance Agreements.  JX14-23.  In each of these agreements, Respondents acknowledged their personal responsibility for the loans, including interest.  The Fifth Forbearance Agreement, dated March 18, 2019, was the latest and by its terms superseded the earlier Forbearance Agreements.  In that agreement, Respondents acknowledged i) the continuing existence of a Payment Default and a Trigger Event, as those terms were defined in the Loan Agreement; ii) that "the Lender has all rights, powers and remedies, whether arising under any of the Loan Documents and/or applicable law, available to it...."; and iii) that the Lender reserved all of its "rights, powers and remedies" under the Loan Agreement.  Paragraph 2 (ii) of the Fifth Forbearance Agreement provided that on and after January 1, 2019, interest would accrue on each Loan at an annual rate:

a) equal to the sum of (x) LIBOR for the then-current LIBOR Reset Period plus (y) 10% per annum, plus
b) interest at a rate per annum equal to 5%, capitalized and deemed to be part of the Loan

JX-22 at '11169-71.   Robert Carter testified that he signed the Forbearance Agreements, which he understood to be necessary to "keep the deal going". TR-176.

61. The Forbearance Agreements did not provide for the preservation of any defenses Respondents might have to enforcement of the Loan Agreements.  Rather, Respondents provided a comprehensive release of claims and defenses relating to the Loan Agreements:

> [T]he Borrower and each Guarantor hereby release, discharge and acquit forever the Lender, and any of its officers, trustees, agents, employees and counsel (in each case, past, present or future) from any and all liabilities, claims, defenses, demands, actions, causes of action, judgments, deficiencies, interest, liens, costs, or expenses (including count costs, penalties, attorneys' fees and disbursements and amounts paid in settlement) of any kind and character whatsoever, including, without limitation, claims for usury, breach of contract, breach of commitment, negligent misrepresentation or failure to act in good faith, in each case whether now known or unknown, suspected or unsuspected, asserted or unasserted or primary or contingent, arising out of written documents, underwritten undertakings, course of conduct, tort, violations of laws or regulations or otherwise, with respect to the Loan Agreement, the Loan Documents, any note, or any other agreement and the transactions arising or contemplated thereunder, existing as of or arising on or prior to the effective date of this letter agreement. Notwithstanding any provision of this letter agreement, this release shall remain in full force and effect and shall survive the termination of this letter agreement.  *Id.*

62. On January 6, 2020, the Parties also entered into Pre-Negotiation Agreements prior to entering discussions regarding the Loans.  JX-24 (Robert Carter); JX-23 (Todd Carter).  In these Agreements, the Parties agreed that i) the "Loan Parties", including Robert Carter as Borrower, "remain[ed] fully indebted to the Lender for obligations due and owing in the amount of $15,303,513, consisting of outstanding principal of $15,052,345, plus accrued and unpaid interest, fees, expenses, obligations and other charges….; and ii) the Lender had "all rights, powers, and remedies whether arising under any of the Loan Documents and/or applicable law, available to it…."[12]

---

[12] Todd Carter's indebtedness was stated to be $4,591,052, consisting of (i) outstanding principal of $4,515,702 and (ii) accrued and unpaid interest.  JX-25.

63. The Pre-Negotiation Agreements also provided for the preservation of "the Lender's rights and remedies under the Loan Documents or arising as a matter of law".   The rights of the Borrower and each Guarantor were not preserved, but, again, these parties provided a broad release of any claims arising out of the Loan Agreement and the Loan Documents. JX-24 at GSBANK735905185.

**F.   Facts Relevant to Respondents' Equitable Defenses**

64. Respondents have urged that the Tribunal consider serious health issues both Respondents suffer from.  The Tribunal will not describe the issues in any further detail in this Award, other than to note that it credits the testimony of both Respondents regarding the serious and continuing health issues they both suffer, which were described in their testimony and Respondents' legal submissions.  TR-164, Todd Carter Witness Statement ¶4.

65. Both Respondents also contend that their financial circumstances are significantly reduced. Respondent Robert Carter testified that he has virtually no liquid assets having sold his ranch and invested the proceeds and other assets in a new venture to convert hemp to textiles.  See TR-179:22-189:3.  It is undisputed that Todd Carter is unable to work due to his health condition.

66. On cross-examination, Robert Carter testified that after selling the 8,000 square foot home he had valued at $3 million in his 2014 financial statement submitted to Claimant in connection with his loan application, in or about 2018, he built a 14,000 square foot home, appraised by the local tax appraisal district at approximately $10 million in 2018. J-29; TR-229; 234-35.  Mr. Carter acknowledged that the new home is immune from creditors under the Texas homestead exemption. TR-234.  Further, Mr. Carter testified also that he continues to own the home in Puerto Vallarta, Mexico valued at approximately $4.5 million and the "fishing boat" valued at $5 million in his 2014 Personal Financial Statement.  J-29; TR-227-35.

1. **Discussion**
    A.   **Issues to be Determined**

67. Notably, the only substantive defense Respondents argued in their Post-Hearing Memorandum was that "justice, equity, and public policy require that the bank should be

denied any further recovery." Respondents' Post-Hearing Memorandum at 4. The Tribunal has considered, in addition to Respondents' appeal to equity, several other defenses they raised in their pre-hearing memoranda. Based on the foregoing, and noting our discussion below regarding Respondents' usury and UCC collateral defenses, we find that the following are the issues to be determined in this arbitration:

    a.  Did Respondents breach contract obligations owed to Claimant?

    b.  Were the Parties in a partnership or other fiduciary relationship?

    c.  Did the Parties' agreement or the terms of their relationship provide that the Loans were to be repaid solely from PPF partnership distributions and the proceeds of power plant sales?

    d.  Should the Tribunal exercise equitable powers to deny Claimant recovery in this arbitration?

    e.  Are Claimant's claims time-barred?

    f.  Is Claimant entitled to an award of fees and costs in the arbitration?

### B. Introduction to Respondents' Factual and Equitable Defenses

68. Claimant has consistently characterized this matter as a "straightforward collection case about two unpaid loans. *See, e.g.,* Claimant's Post-Hearing Memorandum at 1. Respondents do not dispute that they took out the Loans and that they did not pay the full amounts owed as calculated on the face of the Loan Agreements. They have interposed factual defenses going to the intent of the Parties, including in respect to whether the Loans ever were intended to be personal obligations of the Respondents, to be paid out of sources other than the proceeds of PPF partnership distributions, as well as a series of legal defenses, some of which Respondents did not significantly pursue, and an appeal to equity.

69. In analyzing Respondents' claims that i) the nature of the Parties' relationship was something other than the contract relationship reflected on the face of the Loan Agreements; ii) Respondents' obligations in respect to repayment of the loans were other than as stated on the face of the Loan Agreements; and iii) Respondents' equitable defenses, the Tribunal notes that from the time of the submission of their Answering Statement and continuing through each of their written submissions and arguments to the Tribunal, Respondents made expansive and very fact-specific allegations. The Tribunal liberally

construed Commercial Arbitration Rule R-32(a) to extend to Respondents substantial latitude to obtain the documents and witnesses they contended were necessary to establish their case, to be heard, and to present their case.

70.  We find, however, that Respondents made little attempt actually to prove their expansive defenses through documentary evidence or persuasive testimony.  Indeed, in its Post-Hearing Memorandum, although it repeated its factual allegations, Respondent characterized its "core position" as the arbitrators are not required to "enforce rigidly" the Loan Agreements, but instead "are empowered to do substantial justice, based on all the facts, and are not required to veil [their] eyes from a myriad of equitable considerations...." Respondents' Post-Hearing Memorandum at 4.  Respondents urged the Tribunal to find that "any further recovery by Goldman would be inequitable" and, based on a "back of the envelope" calculation by the PPF's Controller, that Claimant "is not out of pocket" and "has been made more than whole".  *Id.* at 25.

71.  Further, to the extent Respondents attempted to prove the factual allegations they contend support their equitable arguments, the Tribunal finds that Respondents' proof fell considerably short.[13]  As to many allegations, there was a near absence of proof.  In other instances, the Tribunal considers that the inferences Respondents would draw from acts taken, or not taken, by Claimant to be unwarranted and uncorroborated by any competent testimony.  Frequently, Respondents offer little other than the argument in their submissions, speculation, and, in a few cases, their own conclusory testimony.

72.  Respondents' core factual allegations, which the Tribunal considers to be unproven, discussed in further detail below, include the following:
- "Goldman Investment Banking drove this entire deal."  Respondents' Post-Hearing Memorandum 5.
- PPF's Finance Director Robert Simmons turned out to have been the Investment Bank's "agent inside Panda Power" who "seduced the Carters with promises of great wealth." Respondents' Post-Hearing Memorandum 6.

---

[13] The Tribunal does not refer here to proof of the Respondents' current medical conditions, which it finds were credibly established through their testimony and documentary evidence.

- The Carters were required to take out their general partnership loans from Claimant and to transfer existing non-recourse loans from Comerica Bank to Claimant in order to obtain the services of the Goldman Investment Bank. *Id.* at 6, 8.

- "Goldman" convinced Respondents that the projects would be hugely successful and induced them not only to take out new loans, but also to replace existing Comerica loans with loans from Claimant, "with blandishments that Goldman would be so successful, they would need private wealth advisors."   Respondents took out the loans at issue "only because of Goldman's rosy projections...." *Id. at 8.*

- Claimant was uninterested in Respondents' financial resources because the central rationale for the loans was the prospects for Panda Power. *Id.*

- No rational businesspeople would replace the "quotidian Comerica loan" with a loan that could be called simply because the "paper valuation" of Panda Power declined, unless Investment Banking had led them to believe that such a trigger event would never occur." *Id.*  at 9.

- "Everyone" understood all along that the only way the loans would be paid off was from Panda Power revenue streams".  *Id.*  at 12.

- Goldman has provided no real explanation as to why Investment Banking failed to sell even a single plant.

- Goldman did not comply with banking laws requiring segregation of its banking and investment banking businesses.  *Id.* at 11.

73.  We note that Respondents did not pursue to any significant degree some of the defenses that they asserted in their supplemental Response to Arbitration Demand and Statement of Claim dated June 15, 2022 ("Supplemental Response").  These include that:

- The Loans were usurious under Texas law, which Respondents contended would apply notwithstanding the New York choice of law provision in the loan documents. Supplemental Response at ¶7.  In the final paragraph of their Pre-Hearing Memorandum, Respondents urged that "it would be appropriate" to regard fees the Investment Bank charged in connection with syndication of the financing of PPF's plants as "essentially additional interest" on the Loans.  The Tribunal finds no basis for such a conclusion, to the extent Respondents intended it as a factual assertion. Respondents did not address a usury defense at the hearing and or in their Post-Hearing Memorandum.  Further, we find that New York Law, as chosen in the Loan

Agreements, would govern a usury defense.  New York law exempts loans of $2.5 million or more from its usury laws and, hence, the defense would be unavailable to Respondents even if they intended to preserve it.  N.Y. Gen Oblig. §5-501(6)(b).

- Respondents made various arguments regarding Claimant's alleged conduct in relation to the "collateral", *i.e.*, the power plants, including that the failed effort by Claimant's affiliate to sell the power plants resulted in a strict foreclosure under UCC Article 9.[14] Supplemental Response at paras 4, 6.  In their Pre-Hearing Reply Memorandum, Respondents contended that a secured creditor in possession or control of collateral after default must act in a commercially reasonable manner toward the collateral, that "GS and the bank concealed the true state of affairs regarding their ability to sell the plants" and that "far from prudently managing the collateral it controlled, Goldman Sachs squandered it." Respondents Pre-Hearing Reply Memorandum at 15-16.

74. As discussed further below, Respondents presented no testimony, documentary, or expert proof at the hearing regarding the Investment Bank's efforts to sell the PPF power plants. Respondents provided no proof from which the Tribunal might infer that the Investment Bank possessed or controlled the power plants, much less that it mismanaged or damaged their value.

75. Respondents in their testimony and arguments at the hearing made no reference to the usury or UCC arguments they had advanced in their Supplemental Response and their Pre-hearing Memoranda, nor did they address such arguments in their Post-Hearing Memorandum. Likewise, apart from their fiduciary and partnership defenses, Respondents did not develop independent defenses that the Loans were "seed money" rather than loans or that Respondents were "guarantors" rather than borrowers.  The Tribunal considers each of the foregoing defenses abandoned by Respondents and, to the extent not abandoned, unproven and unmeritorious.

---

[14] Respondents submitted no proof that Claimant actually invoked the strict foreclosure remedy under UCC Article 9, that it made any attempt to fulfill the procedural requirements for such a remedy, or that Claimant ever agreed to accept the proceeds of the sale of the power plants in full or partial satisfaction of Respondents' obligations under the Loan Agreements.

76. Further, the Tribunal finds it significant that Respondents raised no defenses to the loan obligations during the period Claimant entered into five separate forbearance agreements deferring Respondents' then past due large payment obligations.  Instead, Respondent expressly waived any defenses to the loan obligations in consideration of the forbearances. The Tribunal finds that i) these waivers were given knowingly, in exchange for value, i.e., Claimant's forbearance from pursuing collection of the outstanding loans; ii) Claimant justifiably relied on such waivers; and iii) the waivers were valid and legally enforceable. *See* TR 21 ("[i]f there is an issue with the loan documents, or the borrower has a defense, we want to hear it at that point. We don't want to hear it later.") (Boyd); *Keesville Nat. Bank v Gulati,* 194 A.D.2d 970, 971 (3d Dep't 1993) (explicit waiver of all defenses, rights of set-off and rights to interpose counterclaims by a literate and intelligent professional precludes defense that the borrower did not understand the character of the documents or did not read them); *Bank of Suffolk Cnty. v. Kite*, 49 N.Y.2d 827 (1980) (enforcing explicit waiver of defenses); *Schron v Grunstein*, 105 A.D.3d 430(1st Dep't 2013).

### C.   Issue 1: Did Respondents breach contract obligations owed to Claimant?

77. Claimant's breach of contract claim based on the set of loan documents Respondents signed requires little discussion or analysis here.  Respondents admit the basic elements of a breach of the contract.  We focus here on Respondents' performance as against the obligations provided on the face of the contract.  We reserve for discussion elsewhere Respondents' contentions that the arrangement between the Parties was something other than a contract relationship, as well as Respondents' equitable defenses to enforcement of the facial obligations of the Loan Agreements.

78. Under New York law, a party asserting a breach of contract claim must establish i) the existence of a contract; ii) its own performance under the contract; iii) the other party's breach of the contract; and iv) resulting damages. *JP Morgan Chase v. J.H. Elec. Co. of N.Y.,* 69 A.D.3d 802, 803 (1st Dep't 2010).

79.  As to the first element, although Respondents resist enforcement of the contract embodied in the loan documents based on a series of equitable defenses analyzed in other parts of this award, they acknowledge that they have "never disputed that they signed those

documents". Respondents' Post-Hearing Memorandum 5.  We find that the Loan documents, individually and collectively, plainly constitute a contract.

80. Respondents likewise have not disputed that Claimant disbursed loan funds in accordance with the terms of the Loan Agreements upon Respondents' submissions of borrowing requests.  We conclude based on these facts that Claimant has established its performance of the obligations provided on the face of the contract.

81. Respondents acknowledge that "The loans have not been paid….".  Respondents' Statement of Facts Not in Dispute at ¶4.  They assert, and Claimant does not dispute, that they paid the principal amounts owed under the Loan Agreements until May 2017, when Claimant declared the Loans in default, and that their PPF Fund II distributions were applied to interest obligations until July 2021, whereupon they ceased making any payments under the Loans.  In short, while resisting enforcement of the contract against them personally based on their interpretation of the contract and the equitable defenses that they contend require the contract to be "evaluated and enforced in accordance with the true intent of the parties", Respondents do not seriously dispute that they did not meet the facial obligations of the Loan Agreements.

82.  Further, and again focusing on the facial contract requirements and Respondents' performance in respect to the Loans, the Tribunal has little trouble concluding that Claimant incurred damages as the result of Respondents' breach.  Understanding that Claimant calculated its damages based on application of the default interest rate the Loan Agreements provided upon breach of the loan to value covenant, Claimant's internal records submitted as evidence here show that as of June 3, 2022, Respondent Robert Carter's account showed a balance of $14,791,452, comprised of $12,807,093 in unpaid principal and $1,984,452 in accrued interest.  JX-36.  Respondent Todd Carter's account as of the same date showed a total of $4,437,566 owed, comprised of $3,842,240 in unpaid principal and $595,325 in accrued interest. JX-37.

83. Based on the foregoing, the Tribunal concludes that Claimant has proven each of the four elements of a breach of contract claim under New York law.  We find that Claimant has established that Respondents breached the contract embodied in the Loan Agreements.

**D.  Issue 2:  Were the Parties in a partnership or other fiduciary relationship?**

84. Respondents' allegations regarding the existence of a partnership or other fiduciary relationship are conclusory and vague in the extreme.  *See e.g.*, Supplemental Response at 3 ("Goldman Sachs effectively became a silent general partner, providing seed capital, construction financing and investment banking expertise, while Panda Power Funds was the service partner."); Respondents' Pre-Hearing Memorandum 2-3 ("Here, Goldman Sachs, an investment bank and commercial bank holding company, formed a *de facto* partnership with the Carters to finance, build, and sell power plants.  Goldman Sachs arranged the Loan through the Bank to facilitate the joint venture.")

85. Respondents did not establish that that the Parties were in a partnership, actual or *de facto*, a joint venture, or other fiduciary relationship.  Respondents did not prove any conversations between the Parties regarding any such relationship, nor did they provide any documentary evidence to support a partnership, joint venture, or fiduciary relationship by inference.

86. We accept for purposes of analysis Respondents' contention that under New York law a fiduciary relationship may arise from the facts, regardless of contractual language, where one party is under a duty to act for or give advice for the benefit of another on matters within the scope of the relation.[15]  Respondents' Pre-Hearing Memorandum at 16.  We find, however, based on our careful review of the facts, no reason to conclude that Claimant was under any duty in the relationship at hand to act for Respondents or to give them advice on matters relating to the loan, or even more broadly to the PPF business.  We specifically reject Respondents' contention that the record here supports that Claimant owed a fiduciary duty to Respondents because they were "less sophisticated", or "unsophisticated in the sale of power plants."  Respondents' Post-Hearing Memorandum at 16.

---

[15] The Tribunal does not accept Respondents' contention that Texas law should apply because their breach of fiduciary defense is "not a claim based on the Loan…" Respondents Pre-Hearing Memorandum at 17. Respondents have raised their fiduciary allegations as a defense in this arbitration in which Claimant seeks to recover under the Loan Agreements.  As such, New York law as chosen by the Parties in the Loan Agreement applies.  JX-1 at ¶9(n).

87. Rather, as discussed above, at the time they entered the Loan Agreements at issue here, Respondents had years, or decades, of experience in the power generation business, including the financing of power plant construction through limited partnership structures, the sale of power plants, and generally in the high-risk, high-reward energy sector. As Respondents acknowledged, they had achieved substantial success in those complex businesses. *See* Respondents' Pre-Hearing Reply Memorandum at 5 *("*The Carters have a long and successful career of building and managing world-class power plants."). They had managed the financing, construction, operation, and sale of more than ten combined cycle co-generation power plants, including two of the largest such plants ever built in the United States, raising billions of dollars in capital to do so. J-34 at 4.

88. We likewise do not accept that Respondents were "vulnerable" to Claimant (or its affiliates), that they "empowered" Claimant to their detriment, that Claimant solicited or accepted "empowerment" as against Respondents (other than to the extent provided in their arm's length commercial loan agreements), or that Respondents were unable to effectively protect themselves. Respondents' Post-Hearing Memorandum *at* 24, citing *Atlantic Info Tech., GmbH v. CA, Inc.*, 485 F.Supp.2d 224 (E.D.N.Y. 2007) (granting motion to dismiss on the pleadings a breach of fiduciary duty claim where plaintiff alleged that it had trust and confidence in the defendant and that defendant had superior knowledge, finding no basis to conclude that the parties had "more than a conventional business relationship.")

89. Respondents contend that the Carters relied on "Goldman Sachs' unique ability to market and sell the project" in deciding to take out the loans and that Claimant "seduced" them with "blandishments" that the power plants would be "hugely successful". Respondents' Pre-Hearing Memorandum at 5, Respondents' Post-Hearing Memorandum at 8. The Tribunal does not accept that Respondents took out the Loans "solely because of Goldman's rosy projections." Respondents' Post-Hearing Memorandum 8. We find, rather, the Respondents took out the loans with full knowledge that they were involved in a high risk, high reward venture.

90. The record reflects, moreover, that Respondents themselves provided substantial information to Claimant and to the Investment Bank regarding opportunities in the power generation sector at the time Claimant was considering the loans, that Claimant was aware

of Respondents' deep experience and expertise in the energy sector, and in determining to extend the Loans, Claimant relied substantially on Respondents' assessment of the market, which was consistent with Claimant's own research.  *See* JX-34 at 6.[16]  Respondents themselves noted their history in evaluating investment opportunities in the energy sector. *See* Respondents' Post-Hearing Memorandum at 8 ("Comerica... left it to Panda Power to assess the prospects for success.")

91. We find that Respondents have failed to establish that they relied solely, or even substantially, on Claimant's analysis, advice, or any enticements, when they determined to organize PPF Fund II in 2014 and to borrow the money necessary to fund their required general partner capital contributions.  We credit JX-34, Claimant's internal Credit Memo, as the more specific and contemporaneous evidence of Respondents' knowledge and the basis for their investments as against Respondents' testimony that "Goldman" convinced Respondents and their investors to take on new projects in the PJM grid. *Cf.* Todd Carter Witness Statement at ¶ 8.

92. We find that the relationship of Claimant and Respondents was that of creditor and debtor, formed in the context of a conventional, arm's length commercial transaction.  We conclude, based on the complete absence of evidence to support Respondents' allegations, as well as substantial evidence in the record that dispels any such inference, that there was no partnership or joint venture between Claimant and Respondents.  We find no basis to conclude that this ordinary course commercial dealing rose to the level of a fiduciary relationship.  We find that Claimant was a commercial lender and nothing more.

93. We find also that Respondents' clear and unambiguous disclaimer of a fiduciary relationship in the loan documents precludes any fiduciary claim.  *Dorset Indus., Inc. v. Unified Grocers, Inc.*, 893 F.Supp. 2d 395, 415 (E.D.N.Y. 2012).  We need not reach the question of whether the Investment Bank, a non-party to this arbitration, owed a fiduciary duty to Respondents. We note, however, evidence in the record that Respondents' engagement letter with the

---

[16] "The Advisor believes that the expected substantial need for new natural gas-fueled power generation with limited competition puts PPF in an advantageous position....  Panda believes that attractive investment opportunities in the electric power energy sector should include asset development in addition to asset acquisition.   ...Panda believes that the electric power industry will provide a number of attractive investment opportunities for the Fund...."

Investment Bank also clearly and unambiguously disclaimed the existence of a fiduciary relationship.  *See* Attachment 3 to Respondents' Pre-Hearing Memorandum at 5-6 (Goldman Sachs Investment Bank engagement letter).

94.  Our finding that the transaction between Claimant and Respondent was no more than a commercial loan, extended under the terms and conditions expressly set out in the loan documents is dispositive also of Respondents' stated defenses that i) "Respondents were at best guarantors"; and ii) "Delivery of the notes was conditioned on Goldman Sachs fully performing its partnership obligations…. [because] Goldman Sachs failed to perform its obligation (including but not limited to its failure to sell any of the power plants)… the condition precedent for delivery of the notes failed."[17]  Supplemental Response at 8, ¶¶ 2, 3.

### E.  Issue 3: Did the Parties' agreement or the terms of their relationship provide that the Loans were to be paid solely from PPF partnership distributions and the proceeds of power plant sales?

95. We find no basis in the record to support Respondents' contention that notwithstanding the payment provisions that appear on the face of the documents, the "true intent" of the parties was that the loans were to be paid solely from PPF partnership distributions to Respondents and the proceeds of the sale of the PPF plant assets.

96. On the face of the Loan Agreement, including on the separate cover page and in the Preamble, each Respondent was stated to be the "Borrower", with other parties to the loan designated as "Guarantor".  Each Respondent represented and warranted that he was "competent to enter into this Agreement and the other Loan Documents to which it is a party and to perform its obligations hereunder and thereunder…." JX-1 at 18. The Loan Agreement further provided that any amendment or waiver to the obligations stated in the document was required to be in writing and signed by the Lender and the Loan Parties.  JX-1 at ¶6.3.  Further, the document contained a standard integration clause, confirming that the Loan Documents embodied "the entire agreement and understanding between the Borrower and the Lender and supersede[d] all prior agreements and understandings…."  JX-1 at ¶7.3.  Attached to each loan agreement was a promissory note stating, " the

---

[17] Our finding is reinforced by the fact that the Loan Agreements provided a number of express conditions precedent.  JX-1 at ¶3.1.  There was no condition precedent that related in any way to the performance of the Investment Bank or in any way to the sale of the power plants.

undersigned Borrower (the 'Borrower') promises to pay on demand to Goldman Sachs Bank USA (the 'Lender')...."  *See, e.g.*, JX 8.

97. We first find that any claim that the payment provisions differ from those set out in the Loan Agreement is barred by the integration clause in that document, as well as the requirement that any amendment to the Loan Agreement be in writing.  JX-1 at ¶¶7.3, 7(n). Consistent with our finding above that the Parties' relationship was that of commercial lender and borrowers, on the terms and conditions set out in the Loan Agreements, we first address the stated terms relevant to payment.

98. The Loans were on a demand basis and stated that no provision of the Loan Agreement or any other agreement would "affect Lender's unrestricted right to demand payment in full of the Loans at any time." JX-1 ¶2.1 (b), ¶2.5(b); see also JX-1 41 (notation above signature line: "THE BORROWER ACKNOWLEDGES THAT THE LOANS MADE PURSUANT TO THIS AGREEMENT ARE PAYABLE IN FULL UPON DEMAND BY THE LENDER.") (emphasis in original).  The Loan Agreement also provided for payments based on the Borrowers' share of Advisory Fee distributions and the proceeds of any Disposition Sale, as defined in the Fund's organizing documents.  *Id.* at 2.5 (c), (d; JX-34 at 2-3).  Partnership distributions payable to the Borrower were to be paid to the Lender.[18]  *Id.*  at ¶5.9.  We decline to draw an inference from the provisions requiring the application of Respondents' fund distributions to their outstanding Loans that such distributions were to be the exclusive way in which the Loans would be paid.

99. The Tribunal accepts that both Parties had a commercial expectation, or at least an aspiration, at the inception of the relationship that the Panda Power Fund II projects would be successful, and the power plants would generate cash distributions to the Panda Power general partners sufficient to meet their loan obligations. Respondents' Pre-Hearing Memorandum 4; Respondents' Post-Hearing Memorandum 12.  Those distributions included an annual management fee payable in substantial part to Respondents that would

---

[18] The Fund distribution "waterfall" was provided in the Panda Power Fund II Amended and Restated Private Placement Memorandum dated December 2013. TX-3 at GSBANK14439.

be applied directly as loan repayments.  TR-51, 106[19]  That expectation, however, does not support the existence of the limitation Respondents would have us find on their personal payment obligations, which would be in direct conflict with the obligations that are stated clearly on the face of the Loan Agreements.

100. Even assuming, for purposes of analysis, that Respondents could enforce an agreement or understanding at odds with the Loan Agreement notwithstanding the integration clause and the requirement that any amendments to the Loan Agreement be in writing, we find that Respondents have failed to establish that Claimant agreed to any different payment arrangement.  We find, rather, that Respondents have provided no evidence to support upending the express payment terms provided in the commercial Loan Agreement they entered with Claimant in favor of a set of implied terms.

101.  The agreement or understanding Respondents allege would negate those express obligations appears in no document offered into the record in this arbitration, including i) any formal agreement; ii) any email or other communication between the Parties; or iii) any document, including any communication, internal to either of the Parties, suggesting any variation in the payment terms or Respondents ultimate liability for the Loans.  Notably, Respondents themselves testified only to their "understanding" and not to any conversation with Claimant in which their personal liability was varied or negated.  See e.g., Todd Carter Witness Statement ¶ 16 ("In our minds, this... was limited to our Panda Power holdings."); TR-170 ("It was considered... the strength of the projects was what they were lending against.") (Robert Carter).

102.  We credit Mr. Baker's testimony that the Loans were "underwritten", *i.e.*, extended to the Respondents individually, based on Claimant's analysis of their financial capabilities.  TR 52, 60-61, 107 ("But when we're loaning money, we always have personal recourse on our deals.  ...That recourse is the full balance sheet and ability of that client to address the debt and get us repaid.")  Claimant's underwriting process included obtaining detailed personal

---

[19] Q: But the expectation of the bank at the time the loan was made is it would not be necessary to have recourse to those other assets, that it would be paid out of the income generated... by Panda Power, correct? A: We don't have expectations.  ... We have hopes that [our clients'] plans are going to work through, but there's a reason it was structured... where we have personal recourse on our loans... so that if things don't go as planned for them, they – we're underwriting their full balance sheet and their full cash flow."

financial statements from each Respondent, described above, and updated statements on a regular basis.  Claimant's internal analysis before it extended the Loans reflects that it considered and relied upon Respondents' personal financial capability.  JX-34 at 19 ("Approval is recommended based on the strength of the cash flow stream of the Guarantor (Advisor) and the structure of the loan covenants (LTV < 30%) and annual cash flow sweep, **as well as the ability of the individual borrowers to support their debt**.") (emphasis added); *Id.* at 1 (loan facilities structured as five separate facilities due to each borrower's interests in funds "held on their own respective balance sheets."); *Id.* at 11 (source document for financial analysis included personal financial statements – balance sheet and cash flow).

103.   The Tribunal also considers that Respondents' furnishing of personal financial statements at the time Claimant was considering the Loans and on an annual basis thereafter, at least one of which was sent by Robert Carter personally to Claimant, as substantial evidence of their own awareness that Claimant was relying at least in part on their personal financial wherewithal. (JX-29 at GSBANK 3679 - email of Robert Carter to Bradley Baker:  "Per Bob Simmon's instructions I am forwarding the same package I sent to Comerica.")

### F.   Issue 4: Should the Tribunal exercise equitable powers to deny Claimant recovery in this arbitration?

104.   Respondents describe their "core position" in this arbitration as the arbitrators are "empowered to do substantial justice" irrespective of the strict application of the law.  Respondents urge the Tribunal to exercise such assumed powers based on "a myriad of equitable considerations" they contend arise from "all the facts" and rule that Respondents should be relieved of any further obligation to Claimant.  Respondents' Post-Hearing Memorandum 4, 25.

105.   We assume for purposes of analysis that some such equitable power exists, although we think it doubtful as applied to sophisticated commercial parties with decades of experience in multiple billions of dollars of investments in complex, high-risk, high reward, inherently speculative projects.  As discussed above, the record here leaves no room for doubt that both Respondents are highly sophisticated and experienced businesspeople, who are well-

versed in complex commercial transactions.  Both have extensive experience in high-risk transactions and inherently volatile commodity markets in the energy sector, including the large investments required and related financial structures.  The record also makes clear that Respondents enjoyed great success in their business careers and reaped substantial financial benefits from their activities in the power generation sector.

106.  Against the foregoing background, and based on our careful consideration of the record, we have little trouble concluding that Respondents took out the personal loans from Claimant at issue here to support the Panda Fund II venture with full knowledge of the obligations they were undertaking and the results that would follow from the success or failure of the power plant venture the Fund was financing.  It follows, based on our careful review of the record, including the testimony of both Respondents, that the Tribunal declines the invitation to exercise equitable powers to relieve Respondents of what we find to be clear legal obligations they undertook knowingly in a manifestly high-risk venture in a sector in which they had decades of experience.

107.  We find also that Respondents have failed to meet their burden to establish the factual predicates on which they premise their request for equitable relief.  Respondents made sweeping allegations of conspiracy and misconduct throughout this arbitration.  The Tribunal accorded them substantial procedural latitude, including as to document disclosure and the summoning of witnesses.  We consider that Respondents made no serious attempt to prove many of their allegations through evidence or persuasive testimony.  As to those allegations Respondents attempted to prove, their proof fell well short of that required to establish the propositions they asserted.  The testimony of Respondents and their witnesses was unsupported by documentary evidence and unpersuasive.[20]

---

[20] *See e.g.*, Todd Carter Witness Statement ¶19 ("I wonder whether Goldman had another motive for adding so much to the amount of the loan.")  The Tribunal considers this and similar testimony, as well as numerous allegations in Respondents pleadings and their pre-hearing and post-hearing memoranda regarding Claimant's "motive" to be completely speculative.

108.  We consider each of the principal factual predicates Respondents advance in turn and conclude that they are largely unproven and unpersuasive in the context of a business transaction undertaken by sophisticated, experienced parties.

109.  *Contention: The loans were to be repaid solely from Panda Power partnership distributions or proceeds of the sale of the Panda Power plants.*

    a.  For the reasons discussed above, we have concluded that Respondents failed to prove that the Loan Agreement should be interpreted to limit repayment obligations to the proceeds of the power plants funded by Panda Power Fund II.

    b.  We reject the argument as well to the extent Respondents predicate it on an appeal to equity.  Respondents urge that the Tribunal upend the written contract obligations based on their argument that "no rational person" would have agreed to such obligations unless they were "absolutely sure" (based on assurances they received from Claimant or its affiliates) that such obligations would never be triggered.  Both Respondents testified to their alleged understanding that they never would be expected to pay off the loans from their "personal wealth".  Todd Carter Witness Statement ¶ 32.

    c.  The Tribunal considers it unlikely on the record before it that Respondents did not understand that they had taken out personal loans from Claimant or that their assets would be at risk if they failed to perform their loan obligations. [21]  Likewise, the Tribunal does not credit Respondents' position that they understood the requirement that they furnish personal financial statements in connection with the loans to be "an irrelevant, 'check the box' kind of thing…."  Todd Carter Witness Statement ¶32.

---

[21] Robert Carter agreed on cross-examination that Panda Power's in-house counsel Edmund Daniels represented him on the loan transaction and the Forbearance Agreements. TR-219, 227 Although Respondents contended that they did not understand the loan obligations they were undertaking because they did not have "individual" counsel, they identified no conflict between their personal interests and those of Panda Power that would have precluded in-house counsel from representing them on the loans. Respondents' Pre-Hearing Memorandum at 7.  We do not accept that Respondents' choice to represented by in-house counsel rather than individual external counsel in a commercial, non-consumer loan transaction provides any basis to alter or negate their Loan obligations.

d.  Further, we need not determine Respondents' actual understanding of their obligations under the loan documents that each signed as Borrower.  As discussed above, the Tribunal does not credit the argument that there was any actual unwritten agreement or understanding that Respondents' personal obligations as stated on the face of the contract documents would not be enforced.  We find that at most, Respondents may have had a unilateral understanding that they would not be required to use their personal assets to pay the loans.

e.  We find such a unilateral understanding insufficient to bind Claimants or to negate their right to enforce the obligations stated in the loan documents.  Whether Respondents' purported understanding was based on optimism about the market potential for the PPF projects at the time of the transaction, or statements by Claimant or its investment banking affiliate, we decline to find that Claimant's right to enforce Respondents' personal payment obligations were negated or in any way limited beyond the stated provisions of the loan documents.  Further, we find no equitable basis to relieve Respondents of their positions, clearly stated and knowingly undertaken, as the "Borrowers" and principal obligors on the Loans.

110.  Contention: *Claimant or its affiliate acted improperly*
We find that Respondents have failed to establish through competent proof that Claimant (or its affiliate the Investment Bank) acted wrongfully in any way, including by i) wrongfully "inducing" Respondents to refinance with Claimant their existing loans from Comerica as a condition of obtaining services from the Investment Bank; ii) the loans were "predatory and deceitful" and intended only to benefit Claimant's affiliate the Investment Bank; or iii) in Claimants' relationship with a Panda Power employee.  Respondents have submitted no documentary evidence, persuasive testimony, or expert proof to support these sweeping and speculative allegations.

111.  Respondents have provided no documentary or other evidence to support an inference that Claimant engaged in any conspiracy or other wrongdoing with other units of The Goldman Sachs Group, Inc., that Claimant's loans were primarily for the benefit of the Goldman Sachs Investment Bank, or that Claimant or any of its affiliates in any way wrongfully "induced" Respondents to take out the Loans.  Further, although Respondents

contended that the Investment Bank "fumbled the ball" in its sale of the Panda Power co-generation plants, they provided no evidence regarding the actual sales process, any specific aspect of the Investment Bank's performance, any expert testimony, or other evidence to suggest that the plants failed to sell for any reason other than a market downturn, which was amply proven.[22]

112.  We also find that Respondents have not established through competent proof in this arbitration that "Goldman" (whether Claimant,  its Investment Bank affiliate, other affiliates, or the Goldman Sachs enterprise) i) exercised "dominion and control" over Claimant's collateral in Panda Power distributions because Respondents engaged the Investment Bank on an exclusive basis to market the power plants; ii) "damaged" the collateral Claimant was holding for the Loans when efforts to sell the power plants were unsuccessful; or iii)  acted wrongfully in making the loans or their efforts to sell the power plants.  *Supplemental Response* at 8 ¶ 5.  As to each of these allegations, we find that Respondents have failed to provide any significant documentary evidence or meaningful testimony.

113.  Contention: *Improper Contacts between Claimant and the Investment Bank*

    a.  Respondents make much of an email from Brad Baker, Claimant's Vice President, Regional Lending Manager, who was processing the Loans, to the Panda Power Finance Director Bob Simmons, asking for permission, as part of his due diligence on the Loans, to reach out to a contact in the Investment Bank for an update on efforts to sell the power plants.  TX-C63 OC1. Notably, PPF's Finance Director responded promptly, "Of course I am fine with that." *Id*.  The Tribunal is unpersuaded that a contact of this nature between Claimant and its investment banking affiliate was improper or sufficient to establish pervasive wrongdoing or deception.  Rather, Respondents rely primarily on conclusory allegations in their legal memoranda and their own testimony.

---

[22] The Tribunal does not accept that Mr. Pollard's resignation from the Investment Bank was a cause of its inability to sell the plants.  We credit testimony from Mr. Pollard, as well as other evidence in the record, that sales efforts already had been unsuccessful at the time of his departure, because all of the bids or indications of interest the Investment Bank had received had come in well below prices at which PPF would be willing to transact.  See, e.g., TR. 81.

b.  We find such arguments and proof manifestly insufficient to establish any wrongdoing, wrongful inducement, predatory or deceitful practice.[23]  We credit the contemporaneous description of the contact between Claimant and the Investment Bank summarized in the Credit Memo, JX-34 at 8 (GS Bank contacted two individuals at the Investment Bank "to gain a better understanding of IBD's relationship with the Panda Power Funds.")

c.  Respondents cite to RX-24A, The Goldman Sachs Group, Inc. Policies Regarding the Safeguarding of Confidential Information, the Chinese Wall and Other Information Barriers.  They do not, however, identify the limitations, if any, that those Policies would impose on communications between Claimant and colleagues at the Investment Bank, or any aspect of the Policies that was breached by Mr. Bradley's conduct.  Attachment 6 to Respondents' Pre-Hearing Memorandum.  Indeed, having identified no improper conduct, Respondents simply speculate that "Evidently, these 'colleagues' were careful not to put anything in writing about their discussion of the prospects for a sale of any of the. Panda Power plants." Respondents' Pre-Hearing Memorandum at 6.  Further, the Tribunal is unpersuaded that Claimant and the Investment Bank had "conflicting interests" or that Claimant's "norm" was to hide discussions with the Investment Bank from the Carters.

114.  Contention:  *Alleged disloyalty of Robert Simmons*

We find that Respondents have not established that the former PPF Chief Financial Officer Robert Simmons acted improperly in cooperation with Claimant or the Investment Bank, worked to advance the interests of those entities over the interests of PPF or Respondents, or that Mr. Simmons was in any respect the Investment Bank's "agent within Panda Power". From the record, it appeared that Respondents themselves designated Mr. Simmons to represent them with Claimant in respect to the Loans.  TR-173 (Robert Carter) (Bob Simmons, in-house counsel, and Latham & Watkins negotiated the loan documents.); TR-190 (depended on "legal people" and Bob Simmons to read contracts and advise him

---

[23] Likewise, we find that Respondents failed to offer any proof to support their allegation that "The whole purpose of the Loans was to benefit the Bank's affiliate, Investment Banking, by helping it convince investors that Bob and Todd had personal stake in the outcome.  But accurate answers to the questions on the [internal Credit Approval Memo] would have put the bank sideways with Section 619 of the Dodd Frank Act, commonly referred to as the Volker Rule." Respondents' Post-Hearing Memorandum at 10-11.

whether to sign or not sign).  The Tribunal does not consider an email in which one of Mr. Simmons' colleagues alerted Mr. Baker and employees of the Investment Bank that Bob Carter had entered the room to provide any significant evidence of wrongdoing.[24]  Further, Mr. Pollard, Respondents' principal contact in the Investment Bank during the time the plants were being sold, testified that he dealt primarily with Todd Carter and only secondarily with Mr. Simmons in his capacity as PPF's Chief Financial Officer.  TR 78.

115.   Contention: *Respondents took out the loans only because of Goldman's blandishments and inducements*

We find that Respondents have offered no proof of any specific representation that Claimant (or the Investment Bank) made at the time of the loan transaction, let alone any representation that was knowingly false or otherwise improper.  Further, as discussed in detail above, the Tribunal considers that Respondents' own very extensive and sophisticated experience in the power generation business belies any inference that Respondents took out the Loans only because of "Goldman's rosy projections" or other "blandishments" such as suggesting that Respondents might benefit from the services of Claimant's wealth management affiliate.

116.   Contention: *Claimant Improperly Required Respondent to Refinance their Comerica Loans*

Respondents provided no documentary proof or credible testimony to support their allegation that Claimant or the Investment Bank required them to refinance their existing Comerica loans with Claimant in order to obtain the services of the Investment Bank in the sale of the PPF power plants.  We consider such proof of that baseline fact as was offered to be speculative and vague. Robert Carter testified that he "guessed" that Claimant talked with Bob Simmons and "I guess, convinced him that was the best way to do it, to move forward...." TR 168. *See also* Todd Carter Witness Statement ¶17 ("We were told that Goldman wanted to take out Comerica.)

---

[24] Similarly, we find Respondents' testimony that they "learned... that Mr. Simmons was having secret conversations with Panda's limited partners" to be of no relevance to the issues in this arbitration.  Todd Carter Witness Statement ¶¶22-25.  We likewise give no weight to Mr. Daniel's testimony that he "would not be surprised" if Mr. Simmons had "secret, unauthorized communications" with his contacts at "Goldman". Daniels Witness Statement ¶10; Todd Carter Witness Statement ¶22.

117. Further, Respondents provided no basis from which this Tribunal might conclude that a requirement that Respondents consolidate all of their general partner capital contribution borrowing with Claimant would have been improper even if it had been imposed.

118. Contention: *Respondents are entitled to equitable relief because of the Investment Bank's "failure" to sell the Panda Power plants*
Respondents offered no evidence regarding the sales process or the sufficiency of the Investment Bank's efforts to sell the Fund II plants or expert testimony from which the Tribunal could concluded that the Investment Bank acted in any way that was improper, even assuming for purposes of argument that the Investment Bank's sale performance could be attributed to Claimant or constitute a defense to Respondents' obligations under the Loan Agreements.

119. We find that Respondents failed to advance any evidence that the efforts of Claimant's affiliates to market the power plants for sale were inadequate.  The only evidence regarding the market for power plants was that there was a significant decline in the market for power plants in the regions and during the timeframe in which the Investment Bank was trying to sell them on behalf of PPF. Much of the proof in the record regarding the reason that the plants were not sold came from Respondents themselves and their witnesses who confirmed the adverse market conditions.

120. Respondents' witness Dan Hudson testified that in later 2017, "there was a problem with the capacity market overseen by PJM….  This problem adversely impacted values in the PJM region."  Hudson Witness Statement ¶ 7.  The independent appraisal report of PPF's holdings as of December 31, 2016 included in JX-66 stated that "market conditions for gas-fired facilities in the ERCOT region are concluded to be negative in the short term…".  TX-66 at GSBANK 5807-08.  Mr. Pollard testified that the Panda Power Plants failed to attract bids at the valuations Respondents had hoped to achieve.  TR 89- 90 (bids received were not adequate for Panda to transact); 95-98 (investor interest waned in the power sector). We credit Mr. Pollard's testimony.

121.  We find that Respondents have identified no shortcoming in the sales efforts by Claimant's affiliate, the Investment Bank. [25] We conclude that Respondents' allegations that the Investment Bank failed to make adequate efforts to sell the plants amount to be no more than speculation, unsupported by any evidence in the record.

122.  Contention: *Claimant has earned enough and has been made "more than whole"*
We first find that Respondents have provided no proof to support their allegation that Claimant has made "profits more than sufficient to cover any paper losses on the loans…" Respondents' sole proof of this allegation is the witness statements of Russ Bell. Bell provides what he describes as "back of the envelope" calculations of the amount Respondents paid from the time the loan to value covenant was breached and the total amount he contends "Goldman Sachs, as a whole, has received… related to the Carters' loans at issue in this arbitration."  See also Todd Carter Witness Statement ¶31.

123.  Respondents alleged in their Supplemental Response that if the Loans were in fact Loans and not "seed money", they had been paid in full.  At the same time, however, Respondents conceded that they did not pay the default interest provided in the Loan Agreements after they reported a "Trigger Event" in April 2017.  We disagree that the failure to pay a default interest rate, common in commercial loans, should be regarded as a "technical default." Respondents' Post-Hearing Memorandum at 2.

124.  We decline, in the context of a straightforward commercial loan, entered in the context of a complex energy plant financing transaction by sophisticated and experienced Borrowers, to apply a retrospective judgment that the non-breaching Lender has "earned enough" and should not be entitled to collect the Loans pursuant to the terms of the Loan Agreements.

125.  Contention: *Respondents should be relieved of further responsibility on the Loans because of their current personal circumstances*

---

[25] Although Respondents testified that they learned for the first time at the hearing that the Investment Bank had paused efforts to sell the power plants at the time Respondents entered into forbearance agreements, the Tribunal credits Mr. Pollard's testimony as noted above that, although he had no specific recollection regarding the PPF plants,  under the Investment Bank's regular processes, a decision to pause or terminate sales would be a client decision, typically made in collaboration with the Investment Bank. TR-86.

The Tribunal is, of course, sympathetic to the current difficult personal circumstances of both Respondents. We do not, however, consider such circumstances to provide a basis to relieve the Respondents of legal obligations they knowingly undertook in connection with the financing of the Fund II project in 2014. As discussed, Respondents were sophisticated businesspeople, experienced in power plant investments, with an impressive record of success in such ventures at the time they took out personal loans from Claimant to finance their Fund II general partner capital contribution. We have found that all of the Parties had high hopes for the project the Fund was supporting. We have concluded that Respondents have failed to establish that the projects were unsuccessful because of any action taken, or not taken, by Claimant or its investment banking affiliate, or for any reason other than a change in market conditions that affected the sector in which Panda Power was operating. We conclude that Respondents' unfortunate personal circumstances do not provide a basis to relieve them of the legal obligations they undertook on their Fund II loans.

### G.   Issue 4: Are Claimant's claims time-barred?

126.  Respondents raised a statute of limitations argument for the first time in their Post-Hearing Memorandum. First contending that Texas law would apply, notwithstanding the New York choice of law provision in the Loan Agreements, Respondents then urged that the statute of limitations ran on the original notes in 2018 and the amended and restated notes in 2020 because both were demand notes and under Texas law, an action on a demand note accrues at the time of making of the note. Respondents' Post-Hearing Memorandum at 15. Further, Respondents alleged that none of the Forbearance Agreements Respondents signed, including the Fifth Forbearance Agreement dated March 18, 2019, and the Pre-Negotiation Agreement dated January 6, 2020 contained a written acknowledgement of the outstanding debts sufficient to defeat the statute of limitations. Respondents' Post-Hearing Memorandum at 16.

127.  Claimant urges first that Respondents waived any statute of limitations defense by not raising it as an affirmative defense in their initial responsive pleading. Claimant also i) disputed the applicability of Texas law and argued for the application of New York law, the law chosen in the Loan documents; ii) noted that statutes of limitations when worded as a time within which to bring "suits" have been held by courts in some jurisdiction not to apply in arbitration; and iii) argued that even if the Texas statute of limitations were to apply, the

defense would fail based on Respondents' clear and unequivocal acknowledgement of their debts in the five Forbearance Agreements and the Pre-Negotiation Agreements.  Claimant's Statute of Limitations Memorandum at 1-2.

128.  We approach the statute of limitations issue by again indulging the assumption for purposes of discussion that the law most favorable to Respondents applies.[26]  We consider then the Texas 4-year statute of limitations.  Also analyzing the issue in the light most favorable to Respondents, we assume that at the time this arbitration was filed the Texas statute of limitations applied in arbitration and not just in judicial proceedings.

129.  As a threshold matter, we find that Respondents have waived any statute of limitations defense.  Respondents did not assert the defense in their initial Answering Statement filed in January 2022 or in their Supplemental Response to Demand for Arbitration filed in June 202, but, rather, asserted it only for the first time in their Post-Hearing Memorandum filed in May 2023 after the evidentiary hearing that took place in January 2023.

130.  We do not apply here the Texas pleading rules, which specify that statute of limitations is an affirmative defense that must be pleaded in response to a preceding pleading.  Tex.R.Civ.P 94.  We conclude, however, as a matter of process in this arbitration, that Respondents waived a statute of limitations defense by failing to plead it in either their original Answering Statement or their Supplemental Response.  We find that Claimant would be prejudiced if the Tribunal were to allow Respondents to assert a statute of

---

[26] There would be a substantial basis to find that the New York 6-year statute of limitations applies to the claims in this arbitration.  Contrary to the statement at Respondents' Post-Hearing Memorandum 14, the Tribunal notes that it did not rule in Procedural Order No. 2 that the arbitration was filed "improperly" in New York.  Rather, the Tribunal found that both New York and Dallas were appropriate locales for the dispute and determined in its discretion to set Dallas as the locale, taking into account, *inter alia,* Respondents' assertions that they could not travel to New York for the hearing because of their current health conditions.  The Tribunal considers Respondents' arguments regarding minimum contacts and *forum non conveniens* to be inapposite where parties have agreed by contract to arbitrate and to apply the rules of the administering institution.  In determining to set the arbitration locale in Dallas pursuant to AAA Commercial Arbitration Rule R-11, the Tribunal did not disturb the governing law provided by the Loan Agreements, which was New York law.  New York law provides that its statute of limitations applies in instances where a cause of action accrues in favor a resident of the state.  N.Y. C.P.L.R. §202.  Further, N.Y.C.P.L.R. 7502(b) provides that arbitrators "may, in their sole discretion, apply or not apply" statutes of limitation.

limitations defense after the evidentiary hearing was completed and the record was being held open for the limited purpose of receiving the testimony of Todd Carter.

131.  Further, we find that Respondents' statute of limitations defense fares no better on the merits under Texas law.  The Texas Supreme Court has held that a cause of action to recover a debt that is otherwise time-barred may be renewed where the party sought to be charged acknowledges the original debt in a signed writing and expresses a willingness to honor the obligation. *DeRoeck v. DHM Ventures, LLC*, 556 S.W.3d 831 (Tex. 2018).  The effect of the acknowledgement is to create a new promise to pay the old debt.  A new claim may be based on the acknowledgement, provided that it gives fair notice that the claim is based on the new promise to pay embraced in the acknowledgement of the previous debt.  The acknowledgement can come before or after suit on the original debt is barred by limitations. *Id.*

132.  We find that the repeated forbearance agreements, including the most recent Fifth Forbearance Agreement dated March 18, 2019, fall squarely within the requirements set out by the Texas Supreme Court.  They are in writing and signed by the Respondent debtor who "acknowledge[d] (i) that the Loan Parties have failed to repay all such obligations…." The signing Respondent undertook to "in any event, repay all obligations in full" by no later than the earlier to occur of a specified date or the date on which the debtor received certain defined proceeds.  See JX-22 at 1, 3.

133.  In light of the strict compliance of the Forbearance Agreements with the requirements of Texas law, and their manifest intent to refresh Respondents' loan obligations, we decline to create new requirements beyond those stated by the Texas Supreme Court, such as Respondents' suggestion that the release in the Forbearance Agreement should have referred specifically to the statute of limitations.  We do not consider that Respondents' extended parsing of the Forbearance Agreements changes the required elements, which we find to have been met, or provides useful analysis.  We find that the Texas statute of limitations, if applied in this arbitration, would not bar the claims.

### H.   Issue 6: Is Claimant Entitled to an Award of Fees and Costs in the Arbitration?

134.  Having determined for the reasons stated above to enforce the Loan Agreements, the Tribunal considers that it is appropriate to enforce ¶7.5 of the Loan Agreement, which provided that "the Borrower/Guarantors shall pay to the Lender on demand all expenses reasonably incurred in connection with the collection and enforcement of all Obligations under the Loan Documents… including, without limitation, all reasonable attorneys' fees and expenses." JX-1 at 31-32.  We find that Claimant is entitled to enforce this substantive provision of the Loan Agreements as written.  Claimant's Application for Recovery of Attorneys' Fees and Costs sets out fees and costs related to advising and assisting Claimant with loan workout efforts and those incurred in connection with this arbitration.  The Tribunal finds that both categories of fees and costs qualify as "expenses reasonably incurred in connection with the collection and enforcement" of obligations under the Loan Agreements and are recoverable in the arbitration.

135.  Further, to the extent the Tribunal might have discretion as to the award of fees and costs or as to the amount of fees to be assessed, we find no substantial basis to exercise any such discretion to reduce the amount of fees and costs Claimant has proven here.[27]  Respondents were on notice based on the plain language of the Loan Agreements that they would be liable for collection expenses, including attorneys' fees.  As discussed above, we have found that Respondents were experienced businesspeople with substantial experience in sophisticated and complex transactions, who also were well-aware that they were entering high risk, high reward ventures.

136.  Further, we find that the fees Claimant incurred were reasonable.  The relatively large fees generated in the matter were driven substantially by the proliferation of defenses Respondents asserted.  The issues in this arbitration were of obvious business significance to both Parties.  Claimant had a strong interest in collecting the substantial amounts outstanding on the Loans, as well as a more general business interest in enforcing defaults on its business loan portfolio.  Respondents resisted enforcement with a series of defenses, that shifted over the course of the arbitration, all of which the Tribunal rejected.

---

[27] As a matter of discretion, and in the interests of finality, the Tribunal will not award any fees or costs Claimants incurred after those documented in their Application for Recovery of Attorneys' Fees and Costs.

137.  While some of the defenses Respondents asserted appeared spurious, some Respondents did not pursue, and the Tribunal ultimately rejected all of the defenses, we find that it was reasonable for Claimant to conclude that it was required to investigate and address each defense.  The substantial number of hours Claimants were required to devote to the prosecution of this arbitration resulted largely from Respondents' aggressive defense.

138.  The Tribunal finds the hourly rates were consistent with the prevailing market for large firms in the national marketplace.   Further, we find that the staffing by Claimant's counsel was appropriate, taking into account the complexity of the fact and legal issues and the multiplicity of defenses Respondents asserted.

139.  Respondents did not assert a fee claim in the post-hearing process the Tribunal established to hear the Parties' fee and costs applications.[28]  Rather, Respondents submitted a statement urging that if Claimant were to prevail the Tribunal should exercise its discretion to deny the fee request because i) Respondents have no liquid assets "to speak of"; and ii) the proceedings were not extensive; iii) Claimant's counsel had too many attorneys staffing the matter.  For the reasons stated, the Tribunal disagrees with each of Respondents positions regarding Claimant's fee and costs requests

## 2.  Final Award

For the reasons stated above, the Arbitrators make the following Award:

1.  Claimant is awarded $14,791,452.50 against Respondent Robert Carter for principal and interest owed through June 3, 2023.

2.  Claimant is awarded $4,437,566.05 against Respondent Todd Carter for principal and interest owed through June 3, 2023.

3.  Interest shall continue to accrue as provided in ¶2 (ii) of the Fifth Forbearance Agreements, dated March 18, 2019, between Claimant and Respondent Robert Carter and between Claimant and Respondent Todd

---

[28] At ¶7 of their *Supplemental Response,* Respondents asserted that because the Loans were usurious under Texas law, "Goldman Sachs" owed punitive damages "plus attorneys' fees."  As discussed above, the Tribunal found that Respondents' abandoned their usury defense and, to the extent not abandoned, it lacked merit.

Carter, from June 4, 2023 through the date of payment.  If at any time the LIBOR rate provided in the Fifth Forbearance Agreements is no longer published, the Secure Overnight Funding Rate published by the Federal Reserve Bank of New York shall be substituted thereafter for LIBOR in the aforementioned paragraph of the Fifth Forbearance Agreement.

4.  Claimant is awarded legal fees in the amount of $1,059,667.56, court reporter costs of $9,811.77 and additional expenses of $1,032.02 as itemized in Claimant's Application for Recovery of Attorneys' Fees and Costs.

5.  The administration fees and expenses of the AAA totaling $25,479.14, the compensation and expenses of the arbitrators, totaling $183,776.58 shall be paid by Respondents.

6.  This Final Award resolves all claims presented to the Tribunal.  Any claim not specifically addressed in this Final Award is dismissed.

This Final Award may be executed in counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument and may be transmitted in electronic counterparts.

Dated: August 29, 2023

Mark C. Morril
Chair

48 **284**

Steven Skulnik
Co-Arbitrator

Edna R. Sussman
Co-Arbitrator

I, Mark C. Morril, do hereby affirm upon my oath as Arbitrator, that I am the individual described in and who executed this instrument which is my Final Award.

Dated: August 29, 2023

Mark C. Morril

I, Steven Skulnik, do hereby affirm upon my oath as Arbitrator, that I am the individual described in and who executed this instrument which is my Final Award.

Dated: August 29, 2023

Steven Skulnik

I, Edna R. Sussman, do hereby affirm upon my oath as Arbitrator, that I am the individual described in and who executed this instrument which is my Final Award.

Dated: August 29, 2023

Edna R. Sussman